**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

---

SIERRA CLUB

*Petitioner,*

v.

U.S. ENVIRONMENTAL PROTECTION AGENCY, and MICHAEL REGAN, Administrator, U.S. Environmental Protection Agency,

*Respondents.*

---

Case No. ______________________

# PETITION FOR REVIEW

Pursuant to Federal Rule of Appellate Procedure 15 and section 307(b) of the Clean Air Act, 42 U.S.C. § 7607(b), the Sierra Club ("Petitioner"), petitions this Court to review the Environmental Protection Agency's final agency action entitled "Air Plan Approval; Michigan; Clean Data Determination for the Detroit Area for the 2015 Ozone Standard," published at 88 Fed. Reg. 32,584 (May 19, 2023). A copy of the final agency action is attached hereto as Attachment A. The agency docket number for the rule is EPA-R05-OAR-2023-0058.

This case is related to a second petition for review filed today in this Court challenging another EPA action regarding the Detroit, MI area, which was finalized on the same date and involves the same parties and many of the same facts.

Dated: July 17, 2023

Respectfully Submitted,

/s/ Nicholas Leonard
Nicholas Leonard (MI Bar P79283)
Great Lakes Environmental Law Center
4444 Second Avenue, Detroit, MI 48201
313-782-3372
nicholas.leonard@glelc.org
Attorney for Petitioner

/s/ Elena Saxonhouse
Elena Saxonhouse (CA Bar 235139)
Sierra Club Environmental Law Program
2101 Webster St., Suite 1300
Oakland, CA 94612
415-977-5765
elena.saxonhouse@sierraclub.org
Attorney for Petitioner

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Petition for Review and Rule 26.1 Disclosure Statement of Petitioner is being served via First Class Mail to each of the following addresses on this 17th day of July, 2023:

Michael Regan
EPA Headquarters 1101A
United States Environmental Protection Agency
William Jefferson Clinton Federal Building
1200 Pennsylvania Ave., NW
Washington, DC 20460

Merrick Garland
Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

Jeffrey M. Prieto, General Counsel
Office of General Counsel (MC 2310A)
United States Environmental Protection Agency
1200 Pennsylvania Ave, NW
Washington, DC 20460

Todd Kim, Assistant Attorney General
Environment and Natural Resources Division
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

Additionally, I hereby certify that a single copy of the foregoing Petition for Review and Rule 26.1 Disclosure Statement of Petitioner will be sent via certified mail, return receipt requested, to the following address once I obtain a copy time-stamped by the Clerk of the Court:

Correspondence Control Unit
Office of General Counsel (2311)
United States Environmental Protection Agency
William Jefferson Clinton Federal Building
1200 Pennsylvania Avenue, NW
Washington, DC 20460

/s/ Nicholas Leonard
Nicholas Leonard

# Attachment A

**ENVIRONMENTAL PROTECTION AGENCY**

**40 CFR Part 52**

**[EPA–R05–OAR–2023–0058; FRL–10634–02–R5]**

## Air Plan Approval; Michigan; Clean Data Determination for the Detroit Area for the 2015 Ozone Standard

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Final rule.

**SUMMARY:** The Environmental Protection Agency (EPA) is determining under the Clean Air Act (CAA) that the Detroit, Michigan nonattainment area (hereafter also referred to, respectively, as the ''Detroit area'' or ''area'') has attained the 2015 ozone National Ambient Air Quality Standards (NAAQS or standard). This determination is based upon complete, quality-assured, and certified ambient air monitoring data for the 2020–2022 design period showing that the area achieved attainment of the 2015 ozone NAAQS, based on the exclusion of certain exceedances of the 2015 ozone NAAQS that were due to exceptional events. EPA is taking final agency action on an exceptional events request submitted by the Michigan Department of Environment, Great Lakes, and Energy (EGLE) on January 26, 2023. As a result of the clean data determination, based on exclusion of event-influenced data, EPA is suspending the requirements for the area to submit attainment demonstrations and associated Reasonably Available Control Measures (RACM), Reasonable Further Progress (RFP) plans, contingency measures for failure to attain or make reasonable progress, and other planning SIPs related to attainment of the 2015 ozone NAAQS, for as long as the area continues to attain the 2015 ozone NAAQS. This action does not constitute a redesignation of the area to attainment of the 2015 ozone NAAQS.

**DATES:** This final rule is effective on May 19, 2023.

**ADDRESSES:** EPA has established a docket for this action under Docket ID No. EPA–R05–OAR–2023–0058. All documents in the docket are listed on the *www.regulations.gov* website. Although listed in the index, some information is not publicly available, *i.e.,* Confidential Business Information (CBI) or other information whose disclosure is restricted by statute. Certain other material, such as copyrighted material, is not placed on the internet and will be publicly available only in hard copy form. Publicly available docket materials are available either through *www.regulations.gov* or at the Environmental Protection Agency, Region 5, Air and Radiation Division, 77 West Jackson Boulevard, Chicago, Illinois 60604. This facility is open from 8:30 a.m. to 4:30 p.m., Monday through Friday, excluding Federal holidays and facility closures due to COVID–19. We recommend that you telephone Eric Svingen, Environmental Engineer, at (312) 353–4489 before visiting the Region 5 office.

**FOR FURTHER INFORMATION CONTACT:** Eric Svingen, Attainment Planning and Maintenance Section, Air Programs Branch (AR–18J), Environmental Protection Agency, Region 5, 77 West Jackson Boulevard, Chicago, Illinois 60604, (312) 353–4489, *Svingen.eric@epa.gov.*

**SUPPLEMENTARY INFORMATION:** Throughout this document whenever ''we,'' ''us,'' or ''our'' is used, we mean EPA.

## I. Background

EPA has determined that ground-level ozone is detrimental to human health. On October 1, 2015, EPA promulgated a revised 8-hour ozone NAAQS of 0.070 parts per million (ppm). See 80 FR 65292 (October 26, 2015). Under EPA's regulations at 40 CFR part 50, the 2015 ozone NAAQS is attained in an area when the 3-year average of the annual fourth highest daily maximum 8-hour average concentration is equal to or less than 0.070 ppm, when truncated after the thousandth decimal place, at all of the ozone monitoring sites in the area. See 40 CFR 50.19 and appendix U to 40 CFR part 50.

Upon promulgation of a new or revised NAAQS, section 107(d)(1)(B) of the CAA requires EPA to designate as nonattainment any areas that are violating the NAAQS, based on the most recent three years of quality assured ozone monitoring data. On August 3, 2018, EPA designated the Detroit area, consisting of Livingston, Macomb, Monroe, Oakland, St. Clair, Washtenaw, and Wayne Counties, as a Marginal nonattainment area for the 2015 ozone NAAQS (83 FR 25776). On February 1, 2023, EPA determined based on 2018–2020 monitoring data that the Detroit area had failed to attain by its Marginal attainment date of August 3, 2021, and reclassified the area to Moderate (88 FR 6633).[1]

On February 3, 2023, EPA proposed to determine that the Detroit area attained the 2015 ozone NAAQS, based upon complete, quality-assured, and certified ambient air monitoring data for the 2020–2022 design period (88 FR 7382). Such a determination, based upon EPA's Clean Data Policy, is known informally as a clean data determination.

EPA's proposed clean data determination relied upon EPA's concurrence on an exceptional events demonstration submitted by EGLE on January 26, 2023, which requested exclusion of ozone concentrations recorded at the Wayne County monitor at East 7 Mile with Site ID 26–163–0019 on June 24 and 25, 2022. EGLE posted the demonstration for public comment on December 19, 2022, after substantial engagement with EPA staff who provided guidance on analytical methods and data that is used to support exceptional events demonstrations under EPA's exceptional events rule. EGLE's January 26, 2023, submittal was substantially similar to the version posted for State public comment on December 19, 2022, allowing EPA to expeditiously review the comments EGLE received on the demonstration, and to concur on EGLE's demonstration on January 30, 2023.

In the February 3, 2023, proposed clean data determination, EPA proposed to take final agency action on the exceptional events concurrence, which removed the event-influenced data from the design value, and opened an opportunity for public comment on EPA's concurrence.

## II. Response to Comments

Upon publication of the February 3, 2023, proposed clean data determination, EPA opened a 31-day comment period, ending March 6, 2023. During the comment period EPA received 32 comments. One comment recommended that EPA finalize the proposed actions, and the remaining comments were adverse or raised issues that are not relevant to EPA's proposed actions. The most detailed set of adverse comments was submitted by the Great Lakes Environmental Law Center (GLELC) together with Sierra Club, and several other comments referenced the GLELC comment or raise similar issues. Summaries of the adverse comments

[1] EPA previously proposed to approve a January 3, 2022, request by EGLE to redesignate the Detroit area to attainment of the 2015 ozone NAAQS based on 2019–2021 monitoring data showing attainment of the 2015 ozone NAAQS (87 FR 14210). EPA's proposed approval was published on March 14, 2022, and the comment period closed on April 27, 2022. In this final action, EPA is not taking further action to finalize the proposed redesignation. EPA is responding to comments received during the comment period for the proposed redesignation on EPA's separate final action on EGLE's January 3, 2022, request.

and EPA's responses are provided below.

*A. Environmental Justice Considerations*

*Comment:* Several commenters raised concerns regarding asthma disparities in Detroit and other respiratory diseases affecting residents of the area. In these comments, commenters referenced asthma rates in Detroit that are higher than the State average, as well as relatively high asthma hospitalization rates in specific Wayne County zip codes, which are near the East 7 Mile monitor. GLELC referenced statistics indicating that asthma rates for Detroit adults increased over the time period from 2016 to 2021. In her comment letter, U.S. Representative Rashida Tlaib referenced a report identifying several disparities in asthma rates, including statistics that Black residents in Detroit were more than three times more likely to be hospitalized than white Detroit residents. Several commenters also referenced longstanding environmental justice concerns affecting the Detroit area, especially regarding poverty rates and vulnerable populations. Several commenters noted that EPA's mission is to protect human health and the environment, and questioned whether EPA's action is contrary to that mission.

*Response:* EPA is committed to the meaningful involvement and fair treatment of vulnerable populations disproportionately affected by pollution.

Without agreeing or disagreeing with commenters' impact analysis, EPA acknowledges that communities in Detroit face environmental conditions that have adverse human health or environmental effects on people of color, and/or low-income populations. This action, however, is not likely to change existing disproportionate and adverse effects on people of color, low-income populations and/or Indigenous peoples because it reflects air quality measurements for ground level ozone that have improved significantly over time due to the implementation of pollution reduction programs in the area and nationally to levels that now meet health-based air quality standards.

Additionally, the Agency expects ozone values to improve further in the future as recently promulgated pollution reduction requirements are implemented.

In order to identify environmental burdens and susceptible populations in communities in the Detroit area, EPA performed a screening-level analysis using the latest version of EPA's EJ screening and mapping tool (''EJSCREEN'').[2] EPA utilized the EJSCREEN tool to evaluate environmental and demographic indicators at the county level for each county within the Detroit nonattainment area (Livingston, Macomb, Monroe, Oakland, St. Clair, Washtenaw, and Wayne Counties).

EJSCREEN provides environmental indicators for 12 pollutants or sources, which include fine particulate matter ($PM_{2.5}$), ozone, air toxics cancer risk, traffic proximity, lead paint, Superfund site proximity, underground storage tanks, and wastewater discharge. Of the seven counties in the Detroit area, all but St. Clair County scored at or above the 80th percentile nationally for at least one indicator: Livingston County for Superfund site proximity and wastewater; Macomb County for $PM_{2.5}$, traffic proximity, Superfund site proximity, and underground storage tanks; Monroe County for ozone; Oakland County for traffic proximity, underground storage tanks, and wastewater; Washtenaw County for underground storage tanks; and Wayne County for $PM_{2.5}$, air toxics cancer risk, traffic proximity, lead paint, underground storage tanks, and wastewater discharge.

EPA's screening-level analysis indicates that, of the seven counties in the Detroit area, only Wayne County scored above the national average for the EJSCREEN ''Demographic Index,'' which is the average of an area's percent minority and percent low-income populations. As discussed in EPA's EJ technical guidance, people of color and low-income populations often experience greater exposure and disease burdens than the general population, which can increase their susceptibility to adverse health effects from environmental stressors.[3] As a function in part due to its relatively high demographic index, Wayne County is the only county in the Detroit area scoring at or above the 80th percentile in at least one EJ Index, which is derived by combining a single environmental factor with the demographic indicator. Specifically, Wayne County has EJ Indexes above the 80th percentile in $PM_{2.5}$, ozone, traffic proximity, lead paint, and underground storage tanks. EPA has provided that if any of the EJ indexes for the areas under consideration are at or above the 80th percentile nationally, then further review may be appropriate.[4]

EPA is aware of and sensitive to commenters' concerns about elevated asthma rates and other respiratory diseases in the Detroit area. GLELC references statistics showing that asthma rates for adults in Detroit increased from 15.5% in 2016 to 16.2% in 2021. Asthma can be a debilitating illness made worse by poor air quality, including high ozone concentrations, among other stressors.

As an initial matter, EPA notes that the October 26, 2015, rulemaking strengthening the ozone NAAQS to the level of 0.070 ppm provided a detailed rationale for the Administrator's determination that the 2015 ozone NAAQS would be protective of public health (80 FR 65292). This rationale included explicit consideration of protection for people, including children, with asthma. As we explain in the October 26, 2015, rulemaking, asthma is a multi-etiologic disease, and air pollutants, including ozone, represent only one potential factor that may trigger an asthma exacerbation. The design value for ozone in the Detroit area has decreased from 0.073 ppm, when the area was initially designated nonattainment for the 2015 ozone NAAQS (83 FR 25776) to the current 0.070 ppm (87 FR 14210).

EPA reviewed current and upcoming emission reduction measures that are anticipated to further mitigate pollution issues in the Detroit area. Existing Federal mobile source and point source emission reduction programs will result in ongoing $NO_X$ and VOC emissions reductions in the Detroit area. For example, $NO_X$ cap and trade programs such as the Cross-State Air Pollution Rule continue to achieve emissions reductions that are protective of human health regardless of whether EPA makes a clean data determination or redesignates downwind areas for any NAAQS. In addition, the Federal Good Neighbor Plan for the 2015 ozone NAAQS, as promulgated, is projected to achieve emissions reductions that will provide health benefits to populations living in proximity to covered facilities beginning in the 2023 ozone season.[5]

*Comment:* A comment by GLELC noted that EPA has discretion to delay action on a concurrence of an exceptional events demonstration and clean data determination, or to not act at all. The commenter stated, ''[a]t a

[2] *See* documentation on EPA's Environmental Justice Screening and Mapping Tool at *https://www.epa.gov/ejscreen*.

[3] EPA, ''Technical Guidance for Assessing Environmental Justice in Regulatory Analysis,'' section 4 (June 2016).

[4] EPA, ''EJSCREEN Technical Documentation,'' appendix H (September 2019).

[5] See Regulatory Impact Analysis available at *https://www.epa.gov/csapr/good-neighbor-plan-2015-ozone-naaqs*.

minimum, EPA has the discretion to wait for this summer's ozone season to see if the area will continue to attain the standards.'' The commenter raised Executive Order 12898, and noted specifically its direction that Federal agencies address environmental justice ''to the greatest extent practicable and permitted by law.'' The commenter also suggested that, in areas where EPA has discretion, EPA should consider environmental justice concerns to the greatest extent practicable when exercising that discretion.

*Response:* EPA recognizes that it has discretion in issuing a clean data determination. We have considered the information raised by the commenters and information submitted by the State, as well as air quality trends in the area and control measures that would address ozone pollution. We acknowledge the environmental justice considerations for this area (see discussion above). We note that there are many Federal measures, both for point sources and mobile sources, that will continue to require reductions in ozone precursor pollutants. All monitors in the nonattainment area must have a design value *i.e.,* 3-year average of the 4th high maximum daily 8-hour average, at or below the NAAQS to show attainment. We have also assessed critical concentration values for the Detroit area that the Detroit area would need to record in the 2023 ozone season in order for the area to have a violating design value for the 2021–2023 period. The critical value for Allen Park is 0.073 ppm, and all other monitoring sites have critical values of 0.075 ppm or higher. By comparison, three monitors in the Detroit area had critical values of 0.071 ppm for the 2022 ozone season for the 2020–2022 period. We therefore exercise our discretion to issue the clean data determination.

*Comment:* Several commenters raised concerns with the Stellantis Mack Avenue Auto Assembly Plant located in Wayne County. GLELC referenced a complaint filed under title VI of the Civil Rights Act regarding permits issued by EGLE for this facility.

*Response:* This determination is based upon complete, quality-assured, and certified ambient air monitoring data for the 2020–2022 design period showing that the area achieved attainment of the 2015 ozone NAAQS, based on the exclusion of certain exceedances of the 2015 ozone NAAQS that were due to exceptional events. EPA acknowledges comments regarding a pending title VI complaint and notes that the title VI complaint process is a separate legal process from this clean data determination.

Commenters have raised concerns regarding VOC emissions from the Stellantis facility. EPA's concern in this action is whether ambient ozone data support a determination that the Detroit area has attained the 2015 ozone NAAQS. This determination does not take emissions allowed under any individual permit, like that of the Stellantis-Mack Ave. Assembly Plant, into consideration, but instead evaluates aggregate area-level ozone concentrations. Pursuant to that evaluation, the area continues to attain the 2015 ozone NAAQs.

As noted by commenters, EPA is actively engaged in negotiations toward resolution of a claim of discrimination regarding the Stellantis facility, which was filed by GLELC under title VI of the Civil Rights Act. EPA believes it would be inappropriate to discuss the confidential matters in the case investigation here.

### *B. Exceptional Events Demonstration*

*Comment:* The commentors stated, ''Regarding the Ozone Exceptional Event Demonstration, the Commenters believe that EGLE has not met its high evidentiary burden by failing to adequately demonstrate that wildfire smoke from Northern Canada traveled to the East 7 Mile monitor on June 24 and 25, 2022 . . .''

*Response:* EPA's technical support document for the review of EGLE's exceptional events demonstration describes EPA's finding that EGLE adequately demonstrated that wildfire smoke from Northern Canada traveled to the East 7-Mile monitor on June 24 and 25, 2022. Further responses to comments provide additional detail about how the ozone exceedances at East 7-Mile were due to wildfire smoke, as indicated by measurements of Brown Carbon (BrC), which is a by-product of incomplete combustion and thus an indicator of wildfire smoke. Smoke from wildfires in Saskatchewan and Manitoba Provinces, Canada was transported into the Detroit area throughout the week of June 20, 2022. By June 23, 2022, smoke from these fires had reached southern Ontario at the Michigan border. Northerly winds on June 23, 2022 transported the smoke to Detroit, and a cold front moved through the Detroit area on June 23, 2022, bringing air and wildfire emissions from Canada behind it. The air behind the cold front subsided, which allowed the air containing wildfire emissions aloft to sink to the surface. The presence of smoke from the Canadian wildfire behind this cold front resulted in atypical air quality for such a frontal passage. Although meteorological conditions were stagnant on June 24–25, 2022, under a surface high pressure, the Canadian wildfire emissions had already been transported to the area prior and contributed to elevated ozone concentrations.

After the passage of the cold front on June 23, 2022, a spike in BrC, which is a by-product of incomplete combustion and thus an indicator of wildfire smoke, was measured at the Dearborn monitoring site. The spikes in the BrC data leading up to and including June 24 and June 25, 2022, show there were elevated levels of woodsmoke in the air mass in the Detroit area. HYSPLIT forward trajectory analyses from the Saskatchewan and Manitoba fires depict smoke from these fires reaching southern Ontario at the Michigan border on June 23, 2022. HYSPLIT back trajectory analyses from the East 7-mile monitor depict smoke-filled air from this region reaching the Great Lakes region and impacting the surface in southern Michigan and Detroit at the time of the exceedances. The timing of the HYSPLIT trajectory endpoints, both the forward and backward trajectories, align with the timing of the smoke movement in the National Oceanic and Atmospheric Administration (NOAA) Hazard Mapping System (HMS) maps and with the meteorological features in the National Weather Service surface and 850 mb maps, to depict movement and retention of smoke from the Canadian fires to the East 7-Mile monitor on the exceedance days. The EGLE demonstration, prepared with early engagement and feedback from EPA as it was being developed, includes technical analysis generated by the State of Michigan which EPA considered, using a weight of evidence approach, in evaluating whether to reach a decision to concur with the demonstration. As discussed in more detail in EPA's response to comment about the matching day analysis, the meteorological conditions on the exceedance days examined in conjunction with local and background emissions do not present the conditions conducive to producing elevated ozone concentrations. EPA ultimately concluded that the exceedances at issue were due to wildfire smoke, rather than local pollution. Further comments will discuss our analysis in more detail.

*Comment:* The commentors stated, ''(EGLE) has failed to establish a clear causal relationship between the wildfire smoke from Northern Canada and the exceedance of the ozone NAAQS at the East 7-Mile monitor on the days in question.''

*Response:* EPA has carefully analyzed the information submitted by EGLE to

establish a clear causal relationship between the wildfire smoke from Northern Canada and the exceedance of the ozone NAAQS at the East 7-Mile monitor on the days in question. Using a weight of evidence approach supported by the previously discussed back trajectory analyses, along with local and regional meteorological evidence, a matching day analysis, and the presence of surface level BrC concentrations, EPA has concluded that a clear causal relationship exists between the event and monitored exceedances.

This conclusion is supported by local and regional meteorological evidence, and by a matching day analysis.

Ozone formation and transport are highly dependent upon meteorology. Therefore, a comparison between ozone on similar meteorological days with and without fire impacts could support a clear causal relationship between the wildfire event and the monitored concentration. Significant differences in ozone concentrations among days with similar meteorology may indicate influences from non-typical sources such as a wildfire. ''EPA Guidance on the Preparation of Exceptional Events Demonstrations for Wildfire Events that May Influence Ozone Concentrations,'' identifies a matching day analysis as an acceptable method to support the demonstration of a clear causal relationship between the wildfire event's emissions and the monitored ground-level ozone concentrations.

EGLE submitted a matching day analysis, and, after careful consideration, EPA concluded that it was an appropriate factor to consider in the weight-of-evidence approach.

In ''EPA Guidance on the Preparation of Exceptional Events Demonstrations for Wildfire Events that May Influence Ozone Concentrations,'' we explained that meteorological variables to include in a matching day analysis should be based on the parameters that are known to strongly affect ozone concentrations in the vicinity of the monitor location. EPA's guidance states that these variables may include: daily high temperature, hourly temperature, surface wind speed and direction, upper air temperature and pressure, relative or absolute humidity, atmospheric stability, cloud cover, solar irradiance, and others as appropriate. A matching day analysis of this type, when combined with a comparison of the qualitative description of the synoptic scale weather pattern (*e.g.,* cold front location, high pressure system location), can show that the fire contributed to elevated ozone concentrations.

EPA evaluated EGLE's approach to identify meteorologically similar days and concluded their analysis was consistent with EPA guidance. Furthermore, EPA agreed with ELGE's conclusion, based on meteorologically similar days, that there would not have been an ozone exceedance under similar meteorological conditions without the presence of wildfire smoke.

EPA determined that EGLE correctly applied the approach outlined in EPA's guidance, by identifying similar days through assessment of synoptic and local meteorological conditions. EGLE appropriately identified daily meteorological parameters such as maximum temperature, average temperature, average relative humidity, average wind speed and direction, average mean sea level pressure, 850 mb temperature, 850 mb wind speed and direction, 500 mb wind speed and direction, mixing level ratio (MLR), lifted condensation level (LCL), convective available potential energy (CAPE), 1,000 to 500 mb thickness, and total daily global horizontal irradiance (GHI). Further, EGLE appropriately determined thresholds for maximum temperature, average temperature, average relative humidity, average wind speed, and average wind direction. EGLE removed from its analysis days that fell outside of the set thresholds because the meteorology was not considered similar. Once the remaining matching days were left, EGLE analyzed upper air meteorology conditions, smoke influence, HYSPLIT, and precipitation to establish the final days for the matching day analysis.

EPA agrees with EGLE's finding that meteorological parameters that strongly affect ozone concentrations in southeast Michigan consist of maximum temperature, average temperature, surface wind speed, surface wind direction, upper-level (850 mb) temperature, and upper-level wind flow (850 mb and 500 mb), and EPA therefore determined that EGLE's selection of these parameters for the matching day analysis was appropriate.

Typical meteorological conditions for high ozone days in the Detroit area consist of southerly winds at the surface and aloft, along with a multiday buildup of pollutants. Table 6 in EGLE's demonstration depicts the exceptional event days and matching days meteorological parameters, as well as the MDA8 ozone concentrations on those days, which were 61 ppb or less on the days with matching meteorological conditions.

EGLE's matching day analysis establishes that, absent some atypical circumstances, local ozone formation in southeast Michigan is not likely to occur under the meteorological conditions present, as it was on June 24 and June 25, 2022. Although conditions that day were stagnant and temperatures were warm (conditions often conducive for local ozone production), these factors were offset by a northerly component to the wind at 850 mb. Typically, winds from this direction would prevent the southerly air flow that can lead to increased ozone concentrations, and would provide clean air to southeast Michigan resulting in lower ozone concentrations than values observed on June 24, 2022, and June 25, 2022. Nevertheless, on June 24, 2022, the first ozone exceedance day of this episode occurred under these atypical meteorological conditions for high ozone days such as the 850 mb northerly wind.

EGLE's matching day analysis identified several matching days with northerly flow at 850 mb. All the matching days had MDA8 ozone concentrations below 70 ppb, with one of the days having a MDA8 of just 41 ppb. The similar weather patterns and supplementary meteorological parameters between the exceptional event days and matching days depict that, on similar meteorological days, ozone concentrations would be well below the standard, providing additional evidence that a non-typical source aided in ozone concentrations exceeding the standard. This data strongly suggests that the exceedances occurring on June 24, 2022, and June 25, 2022, were caused by an exceptional event, in this case wildfire smoke from Canada.

EPA's conclusion is further supported by the presence of BrC.

Local ground-based measurements of BrC, a by-product of incomplete combustion, is an indicator of wildfire smoke. The clear causal relationship between the wildfire smoke from Northern Canada and the exceedance of the ozone NAAQS at the East 7-Mile monitor on the days is further established by the presence of BrC in the Detroit area on the days leading up to and including June 24, 2022, and June 25, 2022. Typically with the passage of a cold front, pollutant concentrations are expected to decrease, but after the passage of the cold front on June 23, 2022, a spike in BrC was measured at the Dearborn monitoring site at the ground level. The cold front brought air and wildfire emissions from Canada behind it and blocked transport from the fires south of Michigan that were previously impacting southeast Michigan. The spikes in the BrC data leading up to and including June 24,

2022, and June 25, 2022, show there were elevated levels of woodsmoke in the air mass in the Detroit area and are an indicator of surface level smoke. Although smoke from fires south of Michigan likely affected the area from June 20 to June 21, 2022, the source of smoke for June 23 to June 25, 2022 are the Canadian wildfires according to the HYSPLIT back trajectories and the placement of the cold front that advanced through the area. Ozone concentrations violated the standard after the winds shifted from a southerly flow to a northerly component at 850 mb after the passage of the cold front providing further evidence of Canadian wildfire smoke impacts on southeast Michigan.

*Comment:* The commenters stated that EPA's approach for states to submit a demonstration and for EPA to evaluate the submittal using a weight of evidence approach, is biased. The commenters noted, ''The state or local air agency that submits a demonstration is a proponent of the demonstration, and therefore has incentive to either ignore or downplay evidence that is unfavorable to the demonstration. [internal footnote deleted] EPA's limitation of other evidence to that 'otherwise known to the agency' abdicates EPA's duty to environmental justice communities. Such communities may not have the technical expertise to make relevant, unfavorable evidence 'known to the agency.' Thus, EPA's approach is inherently biased in favor of granting exceptional event exclusions.''

*Response:* EPA's requirements for exceptional events submittals require the State to provide notice and opportunity for public comment at the State level prior to submitting an exceptional event demonstration to EPA. As part of this process, additional supportive or non-supportive evidence can be provided. In the 2016 Revisions to the Exceptional Events Rule: Update to Frequently Asked Questions, EPA recommends air agencies consult with their EPA regional office to identify which types of analyses may be most useful in supporting the weight of evidence for a clear causal relationship, and to rule out analyses that may be unnecessary. The EGLE public comment period began on December 19, 2022, and concluded on January 18, 2023. EPA's evaluation of the exceptional event, using the weight of evidence approach, considers the demonstration submitted by the State as well as the comments received during the State's public comment period.

EPA's responsibility is to use its technical expertise to evaluate the State demonstration and public comments to inform a decision regarding concurrence or nonconcurrence of the exceptional event. We can also defer an exceptional event decision if we determine that the demonstration does not have regulatory significance. With regard to the commenters' concern about the ability of communities with environmental justice (EJ) concerns to effectively make relevant, unfavorable evidence known to the agency, EPA is committed to the meaningful involvement and fair treatment of communities with EJ concerns in the context of the regulatory action. If EPA's independent technical analysis of a State's exceptional event demonstration leads us to conclude that the demonstration is deficient in its evidence or analysis and EPA requires additional information, EPA will request that the State provide the information, if available. If such information cannot be provided and EPA is unable to access such information independently, that may lead to a nonconcurrence decision. In the event that EPA has evidence that supports a decision on an exceptional event demonstration contrary to what a State has attempted to establish, EPA will consider such evidence.

*Comment:* The commenters stated, ''EPA's rush to carry out a clean data determination is particularly problematic here, because EPA dragged its heels in designating the area nonattainment in the first place and later reclassifying the area to Moderate, and only did so in each instance as the result of a citizens' suit. By itself, this is arbitrary and capricious behavior. At a minimum, EPA has the discretion to wait for this summer's ozone season to see if the area will continue to attain the standards.''

*Response:* As described in the preamble to EPA's October 3, 2016, Final Exceptional Events Rule (81 FR 68216, 68267–68268), EPA is committed to work collaboratively with air agencies as they prepare exceptional event demonstrations. This collaboration, communication, and engagement between EPA and the State is expected to occur throughout the duration of the exceptional events process beginning with the initial notification of the potential exceptional event, and continue through the State's public comment period and formal submittal of the demonstration to EPA. It also describes how EPA will generally give priority to exceptional events determinations that may affect near-term regulatory decisions, such as EPA's action on SIP submittals, NAAQS designations and clean data determinations, and states EPA's intent to make decisions regarding event status expeditiously following submittal of a complete demonstration if required by a near-term regulatory action.

For the Southeast Michigan exceptional event demonstration submitted to EPA on January 26, 2023, EPA had provided EGLE feedback prior to its public comment period, which began on December 19, 2022. Due to the pending final action on EGLE's redesignation request for the Detroit area, proposed in April 2022 but not finalized pending the evaluation of the area 2022 ozone season data, EPA recognized the high priority of evaluating EGLE's demonstration. EGLE's public comment period on its exceptional events demonstration concluded on January 18, 2023, and EGLE submitted the demonstration and response to comments to EPA on January 26, 2023. EPA began reviewing and drafting its concurrence TSD while EGLE's demonstration was open for public comment and during the period that EGLE prepared its response to public comments. Because EGLE's demonstration submittal to EPA on January 26, 2023, was substantially similar to the version of the demonstration that had been available during the State public comment period, EPA was able to expeditiously review the comments EGLE received on the demonstration and concur on EGLE's demonstration on January 30, 2023.

*Comment:* The commenters stated, ''In simple terms, EGLE only relies on data from the handful of days with the worst ozone pollution to determine whether or not an area is attaining the ozone NAAQS. By their very nature, most if not all of the MDA8 ozone concentrations that EGLE may want to exclude from their design value will be among the worst at that given monitor in any given year.''

*Response:* The exceptional events rule was written to apply to any criteria pollutant NAAQS per 40 CR 50.14(a)(1)(ii). Under 40 CFR part 50 appendix U(4)(a), the 2015 ozone NAAQS are met at an ambient air quality monitoring site when the 3-year average of the annual fourth-highest Maximum Daily 8-Hour Average (MDA8) ozone concentration (*i.e.,* the form of the standard) is less than or equal to 0.070 ppm. Due to the form of the 2015 ozone NAAQS, for the data to be regulatory significant, the data will likely be in a high percentile of the 5-year distribution or one of the four highest within one year.

An exceptional event demonstration must have regulatory significance, which means that it would affect a regulatory determination by the Administrator, as specified in 40 CFR

50.14(a)(1)(i). The determination of whether the demonstration has regulatory significance is a separate evaluation from whether the demonstration has established a clear causal relationship between the event and the monitored exceedance or violation.

*Comment:* The commenters stated, ''EGLE also suggests that an increase in the MDA8 of 30 parts per billion from June 23 to June 24, 2022, is exceptional. However, EGLE also provides that this increase is far from unprecedented as it has happened at least three other times in the past five years. [internal footnote deleted]''

*Response:* The East 7-Mile monitoring station has seen an increase of 30 ppb or more from one day to the next on five occasions in the last five years. Only three out of the five occasions led to concentrations above 70 ppb, with one of these instances being June 24, 2022, the exceptional event day. Michigan's ozone season begins March 1 and ends October 31 each year, 246 days per year. This suggests that this 30 ppb increase from one day to the next, occurring just 3 out of 1,231 monitoring days, is a rare circumstance. However, whether such an increase is termed ''exceptional'', ''unprecedented'', or not, other information included in EGLE's demonstration—the evidence supporting the clear causal relationship between the wildfires and the exceedances, the evidence of the uniqueness of the concentrations compared to those for the past five years, and the conclusions of the matching day analysis of similar meteorological days, support EPA's concurrence without consideration of the significance of the 30 ppb increase.

*Comment:* The commenters stated, ''During none of the previous five years has EGLE sought to exclude ozone data from the East 7-Mile monitor because it was impacted by wildfire smoke. Additionally, there have been eight instances in recent years when ozone concentrations at the East 7-Mile monitor have increased between 25 and 29 ppb from one day to the next. [internal footnote deleted] This illustrates that significant increases in the MDA8 up to 30 ppb is not a rare occurrence and has happened numerous times in the absence of any exceptional event.''

*Response:* EGLE's decision to seek or not seek to exclude other ozone data from consideration by EPA is irrelevant to EPA's exceptional event decision here. Wildfire smoke can impact air quality or ozone concentrations on days that do not have regulatory significance. As stated in a previous response, whether an increase greater than 25 ppb is termed ''exceptional'', ''unprecedented'', or not, other information included in EGLE's demonstration is sufficient for EPA to determine concurrence without consideration of the significance of the increase.

*Comment:* The commenters stated, ''It is well established that $PM_{2.5}$ is a more relevant pollutant to utilize for the multi-pollutant corroboration analysis than $PM_{10}$. [internal footnotes deleted] This is noted by the EPA in its recently updated Frequently Asked Questions regarding the Exceptional Events Rule which states 'elevated $PM_{2.5}$ . . . may be an indicator of smoke, and therefore may provide supporting evidence that elevated ozone in the same area was at least partially attributable to a wildfire event.' [internal footnotes deleted] The EPA also cautions against relying on $PM_{10}$ concentrations as an indicator of smoke because '$PM_{10}$ generally tends to 'fall' to ground level relatively quickly in the vicinity of the event and, in our experience, is not usually subject to long range transport.' [internal footnotes deleted] Despite this clear EPA guidance stating that Michigan should rely on $PM_{2.5}$ data rather than $PM_{10}$ data to support exceptional event demonstrations related to wildfires, the Ozone Exceptional Event Demonstration relies primarily on $PM_{10}$.''

*Response:* According to EPA's ''Guidance on the Preparation of Exceptional Events Demonstrations for Wildfire Events that May Influence Ozone Concentrations,'' air agencies can use example evidence such as concentrations of supporting ground level measurements including particulate matter (mass or speciation) to demonstrate that wildfire emissions were present at the altitude of the monitor. The Guidance also suggests including ''Plots of co-located or nearby CO, $PM_{2.5}$, $PM_{10}$, or $O_3$ and $PM_{2.5}$ precursor concentrations . . .'' EGLE evaluated their $PM_{10}$ concentrations but did not rely solely on $PM_{10}$ concentrations for their multi-pollutant corroboration. To expand commenter's quote from the recently updated Frequently Asked Questions document regarding $PM_{10}$ and smoke: ''$PM_{10}$ generally tends to ''fall'' to ground level relatively quickly in the vicinity of the event and, in our experience, is not usually subject to long-range transport. However, all demonstrations are evaluated case-by-case based on the weight of evidence''. EPA's evaluation of EGLE's demonstration considered the BrC data measured for determining surface-level smoke in the days leading up to the event, as well as the event days. EPA recognizes that long-range transport of wildfire smoke would not typically have an impact on nearby $PM_{10}$.

*Comment:* The commenters stated, ''EGLE's LADCO [Lake Michigan Air Directors Consortium] screening analysis does not support a finding that wildfire smoke was present in the Detroit area during on June 24 or 25, 2022.''

*Response:* EPA evaluated and considered all the information provided in EGLE's demonstration and EPA's Technical Support Document (TSD) describes which analyses EGLE provided that EPA found to be persuasive. EPA did not rely on all evidence provided in EGLE's demonstration. EPA reviews exceptional events demonstrations on a case-by-case basis using a weight of evidence approach considering the specifics of the individual event. EGLE's LADCO screening analysis is one piece of evidence to identify the potential for smoke influences on surface air quality conditions using the variability of ozone and $PM_{2.5}$ data with input from smoke maps. $PM_{2.5}$ concentrations can be comprised of many components, including sulfates, nitrates, metals, organic and elemental carbon, as well as many other species. The LADCO analysis does not show a high peak (representing high 24-hr $PM_{2.5}$ concentrations) for $PM_{2.5}$ during this time period, however, EGLE's demonstration includes analysis of hourly BrC data from their air monitoring network for this period of time. BrC particles are released by the combustion of organic matter and are an indicator of the presence of wildfire smoke. The HMS maps, HYSPLIT back trajectories, upper-level and surface weather maps, and BrC data provide evidence that wildfire smoke was present in the Detroit area, as well as at the ground level where measurements are made.

*Comment:* The commenters stated, ''First, EGLE has unjustifiably limited its matching day analysis to identifying days with similar meteorological conditions in the past four years (2022–2019) rather than the past five years (2022–2018).''

*Response:* According to EPA's ''Guidance on the Preparation of Exceptional Events Demonstrations for Wildfire Events that May Influence Ozone Concentrations,'' since high ozone days may be relatively rare, air agencies should examine several years of data for similar meteorology versus restricting the analysis to high ozone days only. EGLE searched for similar meteorological days over a 3-year

period, consistent with the most recent design value period. During EGLE's search for similar meteorological days, EGLE initially analyzed years 2020–2022 but due to unusual circumstances of matching days and smoke influence, EGLE expanded its analysis to include 2019. Adding the additional year provided enough similar meteorological days for a matching day analysis.

*Comment:* The commenters stated, ''Second, EGLE states that even within the unjustifiably limited 4 year period it used for its matching day analysis, it utilized HYSPLIT trajectories and smoke maps to determine whether 'smoke existed over the region' on certain days and excluded those days from its matching day analysis. [internal footnote deleted] EGLE has not submitted any other exceptional event demonstration in the past 5 years to justify excluding any other ozone data collected by the East 7-Mile monitor from regulatory use.''

*Response:* EPA's ''Guidance on the Preparation of Exceptional Events Demonstrations for Wildfire Events that May Influence Ozone Concentrations'' notes a comparison between ozone on meteorologically similar days with and without fire impacts could support a clear causal relationship between the fire and the monitored concentration. Supporting documentation used in a matching day analysis to demonstrate a day has potential smoke influence is not subject to the same level of rigor and evaluation as described in the exceptional event rule for exceptional events. Furthermore, wildfire smoke can impact air quality or ozone concentrations on days that do not have regulatory significance, and days without regulatory significance would not qualify for consideration under the exceptional events rule, so not all days with smoke are identified or pursued for evaluation according to the exceptional events rule. To identify and omit matching days from the matching day analysis that may have had smoke influence, EGLE evaluated smoke maps and HYSPLIT back trajectories. If their evaluation depicted any potential smoke influence on the matching day concentrations, the day was excluded from the matching day analysis.

*Comment:* ''The Commenters disagree with EGLE's assertion that it is not required to assess local emissions sources and their impacts on ozone pollution at the East 7-Mile monitor on June 24 and 25, 2022. [internal footnote deleted]'' The commenters also stated, ''However, many monitors throughout the Detroit area showed increases in $NO_X$ concentrations from June 23rd to the 24th. [internal footnote deleted]''

*Response:* Air pollution concentrations can increase due to increased emissions, or decreased dispersion of local emissions. EPA recognizes meteorological conditions were stagnant on June 24–25, 2022, which could be an explanation for increases in $NO_X$ concentrations. However, wildfire emissions had residual $NO_X$ which had already been transported to the area and contributed to the ozone precursor emissions that resulted in increased ozone production. Some typical meteorological conditions for high ozone days in Detroit were present on the matching day analysis and the exceptional event days but the northerly wind component aloft is atypical for such days. The northerly wind aloft usually brings in cleaner air to Detroit but for this exceptional event, that was not the case. EPA's review of the demonstration concluded that wildfire smoke affected air quality at the monitoring site; however, it did not suggest that local sources of pollution were not also contributing precursor emissions that potentially contributed to the higher ozone concentrations observed at the East 7-Mile monitoring site on June 24–25, 2022.

*Comment:* The commenters stated, ''Given the limitations of EGLE's exceptional event demonstration regarding the matching day analysis and multi-pollutant corroboration analysis and the complicating factors discussed in the paragraph above, it is necessary for EGLE to conduct both a statistical regression modeling analysis and a photochemical modeling analysis.''

*Response:* Neither the exceptional event rule nor the guidance requires all analyses identified in the guidance, such as a statistical regression modeling analysis and a photochemical modeling analysis, as necessary for a successful demonstration to illustrate the clear causal connection between the wildfire and the monitored concentration. EPA's ''Guidance on the Preparation of Exceptional Events Demonstrations for Wildfire Events that May Influence Ozone Concentration'' states ''The EPA does not expect an air agency to prepare all identified analyses but only those that add to their weight of evidence supporting the clear causal relationship. As with all exceptional events demonstrations, the submitting air agency and the EPA Regional office should discuss the appropriate level of evidence during the Initial Notification process.'' In this instance, EGLE provided the appropriate level of evidence, and EPA's analysis believes the evidence put forth by EGLE is sufficient to demonstrate a clear causal relationship between the fire and the monitored ozone exceedances June 24–25, 2022.

*Comment:* The commenters stated, ''EGLE has failed to comply with public notification requirements for the exceptional event.''

*Response:* EGLE's demonstration met the public notification requirement for this event. EGLE's air quality forecasts and real-time continuous data provided the public notice of Unhealthy for Sensitive Groups (USG) Air Quality Index (AQI) ozone concentrations on June 24 and June 25, 2022, after ambient concentrations of ozone rose quickly due to the distant Canadian fires. Data from the air monitors are provided, in near-real time, to EPA's AIRNOW website as well as Michigan EGLE's website (*http://www.deqmiair.org/*). Furthermore, a Clean Air Action Day was issued for southeast Michigan for June 25, 2022. Such days are publicly announced the day before ozone concentrations are forecasted to reach the USG AQI category.

*Comment:* The commenters stated, ''Additionally, EGLE claims it's not required to submit a mitigation plan but also claims that the East 7-Mile monitor has been impacted by wildfire smoke several times over the past four years. [internal footnotes deleted] EGLE cannot have it both ways—it cannot exclude data from its matching day analysis by claiming it was impacted by wildfire smoke without submitting an exceptional event demonstration while also claiming it's not required to submit a mitigation plan to the EPA because it hasn't had recurring issues regarding wildfire smoke at the East 7-Mile monitor.''

*Response:* See response above regarding exceptional event demonstrations and regulatory significance. Per 40 CFR part 51(b)(1)(i), generally areas subject to the mitigation requirements have experienced three events or three seasons of events of the same type and pollutant in a 3-year period and have submitted a demonstration or an initial notification of a potential exceptional event. Per EPA's Mitigation Plan action on May 12, 2022 (87 FR 29045), EPA did not identify Michigan as an area subject to mitigation plan requirements.

*C. Clean Data Policy*

*Comment:* The commenters asserted that EPA's original Clean Data Policy, as set forth in the May 10, 1995, memorandum from John Seitz, stated that EPA would annually review monitoring data and revoke the clean data determination if the area

subsequently violated the standard.[6] The commenters also noted that under the memorandum states were required to continue to operate an ambient air quality monitoring network in accordance with EPA rules for such networks. The commenters contend that EPA's rules do not create any regulatory requirement for EPA to annually review monitoring data to verify that it still qualifies for suspension of planning requirements and, consequently, EPA fails to create a mandatory deadline for such review. The commenters further contended that this lack of a mandatory deadline is inconsistent with other provisions in the CAA which establish mandatory deadlines for EPA to determine whether an area is attaining the NAAQS, specifically, the designation of nonattainment areas (two years from promulgation of a standard), determination of attainment by the attainment date (six months from the attainment date), and action on maintenance plans and redesignation requests (18 months from submittal). Finally, the commenters asserted that EPA has not codified the requirement for continued operation of the monitoring network.

*Response:* As the commenters note, EPA initially issued the Clean Data Policy in a 1995 memorandum from John Seitz. The approach set forth in the memorandum was subsequently codified for the 1997, 2008, and 2015 ozone NAAQS.[7] EPA's longstanding Clean Data Policy has been upheld by the D.C. Circuit and all other courts that have considered it.[8]

In this rule, EPA is determining that the Detroit area has attained the 2015 ozone NAAQS and is suspending the requirements for the area to submit attainment demonstrations and associated Reasonably Available Control Measures (RACM), Reasonable Further Progress (RFP) plans, contingency measures for failure to attain or make reasonable progress, and other planning State Implementation Plans (SIPs) related to attainment of the 2015 ozone NAAQS, for as long as the area continues to attain the 2015 ozone NAAQS, in accordance with provisions set forth at 40 CFR 51.1318. The commenters raise structural and statutory objections to the Clean Data Policy provisions of 40 CFR 51.1318. These comments are not relevant to EPA's determination of attainment with respect to the Detroit area and should more properly have been raised in the context of the 2015 Ozone NAAQS Implementation Rule,[9] which contained that provision.

The 2015 Ozone NAAQS Implementation Rule was promulgated through notice and comment rulemaking and subject to the judicial review provisions of section 307(b) of the CAA. CAA section 307(b)(1) allows petitioners to challenge any of EPA's final actions in the appropriate U.S. Court of Appeals, and states that ''[a]ny petition for review under this subsection shall be filed within sixty days from the date notice of such promulgation, approval, or action appears in the **Federal Register**.'' Further, any such judicial review is limited to only those objections that were raised with reasonable specificity in timely comments.[10] In the case of the Implementation Rule for the 2015 ozone NAAQS, petitions for judicial review were required to be filed in the United States Court of Appeals for the District of Columbia Circuit by February 4, 2019. There is an exception to the 60-day time limit, but it only applies ''if such petition is based solely on grounds arising after such sixtieth day,'' and ''then any petition for review under this subsection shall be filed within sixty days after such grounds arise.''

The commenters did not submit comments regarding the provisions of 40 CFR 51.1318 during the comment period for the 2015 Ozone NAAQS Implementation Rule. The deadline for filing a petition for review on the 2015 Ozone NAAQS Implementation Rule has passed. Further, the comments raised by the commenters cannot be characterized as ''grounds arising after'' the deadline for filing a petition, as they relate to structural concerns with EPA's administration of the Clean Data Policy and existed at the time EPA promulgated the Implementation Rule.

While the comments fall outside the scope of this rulemaking, EPA would like to note that the Seitz memorandum does not specifically set forth an annual deadline for review of monitoring data and revocation of the suspension if the area is violating the standard, but rather explains that the clean data determination and suspension of the obligation to submit certain attainment-related planning requirements, ''would be contingent on the existence of monitoring data for the areas that continue to demonstrate attainment'' and goes on to state that ''If EPA subsequently determines that an area has violated the standard, the basis for the determination that the area need not make the pertinent SIP revisions would no longer exist.'' Similarly, the clean data provisions codified at 40 CFR 51.1318 for the 2015 ozone NAAQS state that the planning SIPs related to attainment of the ozone NAAQS for which the determination has been made shall be suspended until such time as, ''the EPA determines that the area has violated that NAAQS, at which time the area is again required to submit such plans.'' States must continue to operate approved air quality monitoring networks and report air quality monitoring data to EPA in accordance with 40 CFR part 58. Per 40 CFR 58.15, states, or where appropriate local, agencies shall submit to EPA an annual monitoring data certification letter to certify data collected by FRM, FEM, and ARM monitors at SLAMS and SPM sites meet criteria in appendix A to this part from January 1 to December 31 of the previous year. The annual data certification letter is due by May 1 of each year. The certified data can be used to determine whether areas continue to attain the NAAQS.

### *D. Other Issues in the Area*

*Comment:* The commenters stated, ''EPA has not codified the process for annual review of the qualification of an area's status and revocation of the suspension if the area is violating the standards. Nor has EPA codified the requirements for continued operation of the monitoring network. Thus, EPA's rulemakings have left these details unaddressed.''

*Response:* With regard to the comment regarding EPA's codification of the process for annual review of the area's status and revocation of the suspension if the area is violating the standards, please see EPA's Response to Comments regarding the Clean Data Policy. With regard to the comment regarding requirements for continued operation of the monitoring network, as described below, the State's monitoring network must operate according to the design criteria in 40 CFR appendix D, and modification of the air monitoring

---

[6] May 10, 1995, memorandum from John S. Seitz, Director, Office of Air Quality Planning and Standards, ''Reasonable Further Progress, Attainment Demonstration, and Related Requirements for Ozone Nonattainment Areas Meeting the Ozone National Ambient Air Quality Standard.''

[7] *See* 40 CFR 51.918, 40 CFR 51.1118, and 40 CFR 51.1318, respectively.

[8] The Court of Appeals for the District of Columbia Circuit (D.C. Circuit) upheld EPA's rule embodying the Clean Data Policy for the 1997 8-hour ozone standard. *NRDC* v. *EPA,* 571 F.3d 1245 (D.C. Cir. 2009). Other courts have reviewed and considered rulemakings applying EPA's Clean Data Policy and have consistently upheld them. *Sierra Club* v. *EPA,* 99 F.3d 1551 (10th Cir. 1996); *Sierra Club* v. *EPA,* 375 F. 3d 537 (7th Cir. 2004); *Our Children's Earth Foundation* v. *EPA,* No. 04–73032 (9th Cir. June 28, 2005 (Memorandum Opinion)), *Latino Issues Forum* v. *EPA,* Nos. 06–75831 and 08–71238 (9th Cir. March 2, 2009 (Memorandum Opinion)).

[9] 83 FR 62998, December 6, 2018.

[10] CAA section 307(d)(7)(B).

network must meet criteria in 40 CFR 58.14 (c)(1). Design values are computed and published annually by EPA's Office of Air Quality Planning and Standards (OAQPS) and reviewed in conjunction with the EPA Regional Offices.

*Comment:* The commenters stated, ''Finally, EPA has left unaddressed the problem that a State might not maintain its ambient air quality monitoring network sufficiently for EPA to make its annual determination. If this occurs, EPA must revoke the suspension, and EPA must commit to this process by rule.''

*Response:* EPA has specific design criteria for ozone monitoring networks described in 40 CFR part 58 appendix D. The minimum number of ozone monitors required to operate in a Metropolitan Statistical Area (MSA) is determined by the population size and the most recent 3-year design values per table D–2 of appendix D to part 58 in 40 CFR. Applying the minimum network design criteria to the Detroit metropolitan statistical area, EGLE operates three more ozone monitoring sites than the minimum required number. No ozone monitors are eligible for shutdown unless the monitor has shown attainment during the previous five years of monitoring and has a less than 10 percent likelihood of exceeding 80 percent of any NAAQS over the next three years per 40 CFR 58.14(c)(1). Thus, monitors which are registering concentrations close to the NAAQS, including those showing attainment, are not eligible to be discontinued. Also under 40 CFR 58.14 (c)(1), in a nonattainment or maintenance area, if the most recent attainment plan or maintenance plan adopted by the State and approved by EPA contains a contingency measure to be triggered by an air quality concentration and the monitor to be discontinued is the only State or Local Air Monitoring Stations (SLAMS) monitor operating in the nonattainment or maintenance area, the monitor may not be discontinued. The ozone monitoring network in the Detroit Nonattainment Area has historically monitored ozone at more than the minimum required number of monitoring sites, and according to EGLE's Annual Ambient Air Monitoring Network Review Plan for 2023, there are no changes expected to the ozone monitoring network in Detroit.

*Comment:* GLELC referenced EPA's March 14, 2022, proposal to redesignate the Detroit area to attainment, based in part on air quality data from 2019–2021 showing attainment of the 2015 ozone NAAQS. The commenter claims that to redesignate the Detroit area in 2023, EPA ''must use the three-year period 2021–2023 for the ozone design value.'' The commenter also asserts that, to redesignate an ozone nonattainment area with Moderate classification, provisions for RACT must be approved into the Michigan SIP.

*Response:* As noted in EPA's February 3, 2023, proposal to determine that the Detroit area attained the 2015 ozone NAAQS, this final action is limited to a clean data determination. EPA is addressing final action on EGLE's January 3, 2022, redesignation request in a separate action, and EPA is responding to comments relevant to the redesignation, including issues raised by GLELC regarding recent monitoring data and the area's Moderate classification, in that separate action.

*Comment:* Several commenters questioned EPA's method of data collection, or suggested that EPA review additional sources of information, including data showing local emission levels. One comment recommended that EPA consider impacts from the COVID–19 pandemic, as well as a chip shortage affecting auto manufacturing. Another comment suggested that Wayne County should have an additional monitoring site.

*Response:* In the February 3, 2023, proposed rulemaking, EPA explained that under the Clean Data Policy, EPA may make a clean data determination if a nonattainment area meets the 2015 ozone NAAQS based on three complete, consecutive calendar years of quality-assured air quality data for all monitoring sites in the area. Data regarding local emission levels, or temporary drops in emission levels due to temporarily adverse economic conditions, may be relevant to other rulemakings including redesignations to attainment under CAA section 107(d)(3)(E). However, these factors are beyond the scope of a clean data determination, which is an assessment of whether an area is factually attaining the NAAQS. As discussed above, the existing monitors in the Detroit area meet all requirements for an ozone monitoring network. Further, to the extent that local emissions information may be relevant to EGLE's exceptional events demonstration, the discussion above explains EPA's concurrence on EGLE's analysis establishing a clear causal relationship between wildfire smoke and high ozone levels at the East 7-Mile monitor.

*Comment:* Several commenters raised concerns about local, State, or Federal Government. Some commenters criticized past actions by government agencies or government officials and noted distrust between Detroit residents and government bodies. Some commenters raised concerns regarding climate change.

*Response:* These concerns are also beyond the scope of this action.

## III. Final Actions

EPA is making a determination that the Detroit area is attaining the 2015 ozone NAAQS, based upon complete, quality-assured, and certified ambient air monitoring data for the 2020–2022 design value period, after concurring on the exclusion of certain exceedances due to exceptional events. EPA is also taking final agency action on an exceptional events request submitted by EGLE on January 26, 2023, and concurred on by EPA on January 30, 2023, based on EPA's evaluation of the weight of evidence provided in EGLE's exceptional event demonstration. As a result of the clean data determination, EPA is suspending the requirements for the area to submit attainment demonstrations and associated RACM, RFP plans, contingency measures for failure to attain or make reasonable progress, and other planning SIPs related to attainment of the 2015 ozone NAAQS, for as long as the area continues to attain the 2015 ozone NAAQS.

In accordance with 5 U.S.C. 553(d) of the Administrative Procedure Act (APA), EPA finds there is good cause for this action to become effective immediately upon publication. The immediate effective date for this action is authorized under 5 U.S.C. 553(d)(1).

Section 553(d)(1) of the APA provides that final rules shall not become effective until 30 days after publication in the **Federal Register** ''except . . . a substantive rule which grants or recognizes an exemption or relieves a restriction.'' The purpose of this provision is to ''give affected parties a reasonable time to adjust their behavior before the final rule takes effect.'' *Omnipoint Corp.* v. *Fed. Commc'n Comm'n,* 78 F.3d 620, 630 (D.C. Cir. 1996); see also *United States* v. *Gavrilovic,* 551 F.2d 1099, 1104 (8th Cir. 1977) (quoting legislative history). However, when the agency grants or recognizes an exemption or relieves a restriction, affected parties do not need a reasonable time to adjust because the effect is not adverse. EPA has determined that this rule relieves a restriction because this rule suspends the requirements for the area to submit attainment demonstrations and associated RACM, RFP plans, contingency measures for failure to attain or make reasonable progress, and other planning SIPs related to attainment of the 2015 ozone NAAQS, for as long as the area continues to

attain the 2015 ozone NAAQS. For this reason, EPA finds good cause under 5 U.S.C. 553(d)(1) for this action to become effective on the date of publication of this action.

## IV. Statutory and Executive Order Reviews

This action makes a clean data determination for the Detroit area for the 2015 ozone NAAQS based on air quality data resulting in the suspension of certain Federal requirements and does not impose any additional requirements.

### *A. Executive Order 12866: Regulatory Planning and Review, Executive Order 13563: Improving Regulation and Regulatory Review 13563, and Executive Order 14094: Modernizing Regulatory Review*

This action is not a ''significant regulatory action'' under the terms of Executive Order 12866 (58 FR 51735, October 4, 1993) and is therefore not subject to review under Executive Orders 12866, 13563 (76 FR 3821, January 21, 2011), and 14094 (88 FR 21879, April 11, 2023).

### *B. Paperwork Reduction Act*

This rule does not impose an information collection burden under the provisions of the Paperwork Reduction Act of 1995 (44 U.S.C. 3501 *et seq.*).

### *C. Regulatory Flexibility Act*

This action merely approves State law as meeting Federal requirements and imposes no additional requirements beyond those imposed by State law. Accordingly, the Administrator certifies that this rule will not have a significant economic impact on a substantial number of small entities under the Regulatory Flexibility Act (5 U.S.C. 601 *et seq.*).

### *D. Unfunded Mandates Reform Act (UMRA)*

This action does not contain any unfunded mandate as described in UMRA, 2 U.S.C. 1531–1538, and does not significantly or uniquely affect small governments. This action does not impose additional requirements beyond those imposed by State law. Accordingly, no additional costs to State, local, or Tribal governments, or to the private sector, will result from this action.

### *E. Executive Order 13132: Federalism*

This action does not have federalism implications. It will not have substantial direct effects on the states, on the relationship between the national government and the states, or on the distribution of power and responsibilities among the various levels of government.

### *F. Executive Order 13175: Consultation and Coordination With Indian Tribal Governments*

Executive Order 13175 (65 FR 67249, November 9, 2000), requires EPA to develop an accountable process to ensure ''meaningful and timely input by Tribal officials in the development of regulatory policies that have Tribal implications.'' This rule does not have Tribal implications, as specified in Executive Order 13175. It will not have substantial direct effects on Tribal governments. Thus, Executive Order 13175 does not apply to this rule.

### *G. Executive Order 13045: Protection of Children From Environmental Health and Safety Risks*

EPA interprets Executive Order 13045 as applying only to those regulatory actions that concern environmental health or safety risks that EPA has reason to believe may disproportionately affect children, per the definition of ''covered regulatory action'' in section 2–202 of the Executive Order. Therefore, this action is not subject to Executive Order 13045 because it approves a State action implementing a Federal standard.

### *H. Executive Order 13211: Actions That Significantly Affect Energy Supply, Distribution, or Use*

This action is not subject to Executive Order 13211 (66 FR 28355 (May 22, 2001)), because it is not a significant regulatory action under Executive Order 12866.

### *I. National Technology Transfer Advancement Act*

This rulemaking does not involve technical standards. Therefore, EPA is not considering the use of any voluntary consensus standards.

### *J. Executive Order 12898: Federal Actions To Address Environmental Justice in Minority Populations and Low-Income Populations*

Executive Order 12898 (59 FR 7629, February 16, 1994) directs Federal agencies, to the greatest extent practicable and permitted by law, to make environmental justice part of their mission by identifying and addressing, as appropriate, disproportionately high and adverse human health or environmental effects of their programs, policies, and activities on minority populations (people of color and/or Indigenous peoples) and low-income populations.

EPA believes that the human health or environmental conditions that exist prior to this action result in or have the potential to result in disproportionate and adverse human health or environmental effects on people of color, low-income populations and/or Indigenous peoples. Demographic data identifies that the Detroit area includes communities that are pollution-burdened and underserved. Further, EPA performed a screening-level analysis using EPA's EJSCREEN to identify environmental burdens and susceptible populations in communities in the Detroit area.

EPA believes that this action is not likely to change existing disproportionate and adverse effects on people of color, low-income populations and/or Indigenous peoples. While EPA recognizes the importance of assessing impacts of our actions on potentially overburdened communities, this clean data determination for the 2015 ozone NAAQS would not exacerbate existing pollution exposure or burdens for populations in the Detroit area.

As discussed in the Response to Comments section of this preamble, there is no information to support a conclusion that EGLE's implementation of its 2015 ozone SIP would result in a disparate impact on minority populations (people of color and/or Indigenous peoples) and low-income populations.

### *K. Congressional Review Act*

This action is subject to the Congressional Review Act, and EPA will submit a rule report to each House of the Congress and to the Comptroller General of the United States. This action is not a ''major rule'' as defined by 5 U.S.C. 804(2).

### *L. Judicial Review*

Under section 307(b)(1) of the CAA, petitions for judicial review of this action must be filed in the United States Court of Appeals for the appropriate circuit by July 18, 2023. Filing a petition for reconsideration by the Administrator of this final rule does not affect the finality of this rule for the purposes of judicial review nor does it extend the time within which a petition for judicial review may be filed, and shall not postpone the effectiveness of such rule or action. This action may not be challenged later in proceedings to enforce its requirements. See section 307(b)(2).

## List of Subjects in 40 CFR Part 52

Environmental protection, Air pollution control, Incorporation by reference, Intergovernmental relations,

Nitrogen dioxide, Ozone, Reporting and recordkeeping requirements, Volatile organic compounds.

Dated: May 12, 2023.

**Debra Shore,**

*Regional Administrator, Region 5.*

For the reasons stated in the preamble, title 40 CFR part 52 is amended as follows:

## PART 52—APPROVAL AND PROMULGATION OF IMPLEMENTATION PLANS

■ 1. The authority citation for part 52 continues to read as follows:

**Authority:** 42 U.S.C. 7401 *et seq.*

■ 2. In § 52.1170, the table in paragraph (e) is amended by adding an entry for ''2015 Ozone Clean Data Determination'' immediately after the entry for ''Determination of failure to attain the 2010 $SO_2$ standard'' to read as follows:

**§ 52.1170 Identification of plan.**

* * * * *

(e) * * *

EPA—APPROVED MICHIGAN NONREGULATORY AND QUASI-REGULATORY PROVISIONS

| Name of nonregulatory SIP provision | Applicable geographic or nonattainment area | State submittal date | EPA Approval date | Comments |
|---|---|---|---|---|
| * | * | * | * | * * * |
| 2015 Ozone Clean Data Determination. | Detroit area (Livingston, Macomb, Monroe, Oakland, St. Clair, Washtenaw, and Wayne Counties). | ........................ | 5/19/2023, [INSERT **FEDERAL REGISTER** CITATION]. | EPA's final determination suspends the requirements for EGLE to submit an attainment demonstration and other associated nonattainment planning requirements for the Detroit nonattainment area for as long as the area continues to attain the 2015 ozone NAAQS. |
| * | * | * | * | * * * |

* * * * *

[FR Doc. 2023–10562 Filed 5–18–23; 8:45 am]

**BILLING CODE 6560–50–P**

---

## ENVIRONMENTAL PROTECTION AGENCY

### 40 CFR Parts 52 and 81

**[EPA–R05–OAR–2022–0004; FRL–9629–04–R5]**

### Air Plan Approval; Michigan; Redesignation of the Detroit, MI Area to Attainment of the 2015 Ozone Standards

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Final rule.

**SUMMARY:** The Environmental Protection Agency (EPA) is finalizing its redesignation of the Detroit, Michigan area to attainment for the 2015 ozone National Ambient Air Quality Standards (NAAQS) in accordance with a request from the Michigan Department of Environment, Great Lakes, and Energy (EGLE). EGLE submitted this request on January 3, 2022. EPA is approving, as a revision to the Michigan State Implementation Plan (SIP), the State's plan for maintaining the 2015 ozone NAAQS through 2035 in the Detroit area. EPA is also finding adequate and approving Michigan's 2025 and 2035 volatile organic compound (VOC) and oxides of nitrogen ($NO_X$) motor vehicle emissions budgets (budgets) for the Detroit area. The Detroit area includes Livingston, Macomb, Monroe, Oakland, St. Clair, Washtenaw, and Wayne Counties.

**DATES:** This final rule is effective on May 19, 2023.

**ADDRESSES:** EPA has established a docket for this action under Docket ID No. EPA–R05–OAR–2022–0004. All documents in the docket are listed on the *www.regulations.gov* website. Although listed in the index, some information is not publicly available, *i.e.,* Confidential Business Information (CBI) or other information whose disclosure is restricted by statute. Certain other material, such as copyrighted material, is not placed on the internet and will be publicly available only in hard copy form. Publicly available docket materials are available either through *www.regulations.gov* or at the Environmental Protection Agency, Region 5, Air and Radiation Division, 77 West Jackson Boulevard, Chicago, Illinois 60604. This facility is open from 8:30 a.m. to 4:30 p.m., Monday through Friday, excluding Federal holidays and facility closures due to COVID–19. We recommend that you telephone Eric Svingen, Environmental Engineer, at (312) 353–4489 before visiting the Region 5 office.

**FOR FURTHER INFORMATION CONTACT:** Eric Svingen, Environmental Engineer, Attainment Planning and Maintenance Section, Air Programs Branch (AR–18J), Environmental Protection Agency, Region 5, 77 West Jackson Boulevard, Chicago, Illinois 60604, (312) 353–4489, *svingen.eric@epa.gov.*

**SUPPLEMENTARY INFORMATION:** Throughout this document whenever ''we,'' ''us,'' or ''our'' is used, we mean EPA.

**I. Background**

EPA is redesignating the Detroit area to attainment of the 2015 ozone standard, in accordance with EGLE's January 3, 2022, submission. The background for this action is discussed in detail in EPA's proposal, dated March 14, 2022 (87 FR 14210). In that proposal, we noted that, under EPA's regulations at 40 CFR part 50, the 2015 ozone NAAQS is attained in an area when the 3-year average of the annual fourth highest daily maximum 8-hour average concentration (*i.e.,* the design value) is equal to or less than 0.070 parts per million (ppm), when truncated after the thousandth decimal place, at all of the ozone monitoring sites in the area. (*See* 40 CFR 50.19 and appendix U to 40 CFR part 50.) Under the Clean Air Act (CAA), EPA may redesignate nonattainment areas to attainment if complete, quality-assured data show that the area has attained the standard and the area meets the other CAA redesignation requirements in section 107(d)(3)(E). The proposed rule provides a detailed discussion of how Michigan has met these CAA requirements and EPA's rationale for approving the redesignation request.

As discussed in the proposed rule, quality-assured and certified monitoring data for 2019–2021 show that the area has attained the 2015 ozone standard, and EPA has determined that the