Nos. 23-3581, 23-3583

_____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

SIERRA CLUB,

*Petitioner,*

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY and
MICHAEL REGAN, Administrator, U.S. Environmental Protection Agency,

*Respondents.*

Petition for Review of the U.S. Environmental Protection Agency's
Final Rulemakings at 88 Fed. Reg. 32,584 (May 19, 2023) and
88 Fed. Reg. 32,594 (May 19, 2023)

## PETITIONER'S BRIEF

Elena Saxonhouse
Sanjay Narayan
SIERRA CLUB
2101 Webster Street, Suite 1300
Oakland, CA 94612
(415) 977-5765
elena.saxonhouse@sierraclub.org
sanjay.narayan@sierraclub.org

Nicholas Leonard
GREAT LAKES ENVIRONMENTAL
LAW CENTER
4444 Second Avenue
Detroit, MI 48201
(313) 782-3372
nicholas.leonard@glelc.org

*Counsel for Sierra Club*

Dated: January 8, 2024

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Sixth Circuit

Rule 26.1, Sierra Club certifies that it is not a subsidiary or affiliate of a publicly

owned corporation. Sierra Club further certifies that it is not aligned with a

publicly owned corporation, or affiliate of such corporation, that has a

substantial financial interest in the outcome of the litigation.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ......................................................... i

TABLE OF AUTHORITIES ................................................................................. v

GLOSSARY OF TERMS .................................................................................... xii

STATEMENT REQUESTING ORAL ARGUMENT .............................................1

JURISDICTIONAL STATEMENT .......................................................................1

STATEMENT OF ISSUES ...................................................................................3

STATEMENT OF THE CASE...............................................................................5

LEGAL FRAMEWORK AND FACTUAL BACKGROUND...............................10

   I.   Ozone Pollution and Public Health ..............................................................10

   II.  The Clean Air Act and the Ozone National Ambient Air Quality Standard......................................................................................................12

   III. Nonattainment Designations and the 1990 Amendments to the Act ..........14

   IV. The Detroit Area Nonattainment Designation and Bump-Up ....................15

   V.  Requirements for Converting an Area from "Nonattainment" to "Attainment," and Clean Data Determinations.............................................17

   VI. Michigan's Redesignation Request in Spring 2022 ....................................19

   VII. Michigan's Exceptional Event Request to Exclude Data from the 2022 Ozone Design Value to Support Its Previously Submitted Redesignation Request. .....................................................................................................20

   VIII. Regulatory and Public Health Impacts of EPA's Actions ..........................23

STANDARD OF REVIEW ..................................................................................28

SUMMARY OF ARGUMENT .............................................................................29

   I.   EPA's Exceptional Event Approval, a Predicate for Each of the Other Challenged Actions, Is Contradicted by the Record....................................30

   II.  EPA Failed to Satisfy the Statutory Requirements for Redesignation. .......33

     A.  EPA Cannot Show the Area "Has Attained" the Standard. .......................33

     B.  The State Has Not Met "All Requirements Applicable to the Area.".........33

     C.  EPA Cannot Show that the Air Quality Improvement Was the Result of "Permanent and Enforceable" Emissions Reductions.................................35

ARGUMENT .......................................................................................................36

   I.   Sierra Club Has Standing to Challenge EPA's Actions...............................36

II.   EPA's Approval of Michigan's Exceptional Event Request Was Arbitrary and Capricious Because It Lacked a Rational Basis to Conclude that High Ozone Pollution on June 24 and 25, 2022 Was Due to Wildfire Smoke.....41

  A.  EPA's Determination that Fire Emissions Affected the East 7 Mile Monitor Based on Michigan's Pollutant Corroboration Analysis Was Arbitrary and Capricious ...................................................................................................43

    1. EPA Ignored Evidence That Wildfire Smoke Did Not Meaningfully Affect Ozone Concentrations the East 7 Mile Monitor............................44

    2. Local PM10 and Brown Carbon Data Does Not Support EPA's Conclusion that Wildfire Smoke was Present at the East 7 Mile Monitor Throughout the Exceptional Event..........................................................48

  B.  EPA's Determination that Fire Emissions Caused the Ozone Exceedances at the East 7 Mile Monitor was Arbitrary and Capricious Because It Failed to Assess Whether EGLE Properly Omitted Several Days From its Matching Day Analysis ...............................................................................52

  C.  EPA's Determination that Wildfire Emissions Caused the Ozone Exceedance at the East 7 Mile Monitor is Unlawful Because It Did Not Analyze Local Conditions' Contribution to High Ozone Levels on the Exceptional Event Days.................................................................................56

III.  EPA's Redesignation to Attainment Was Unlawful Because EPA Lacked a Rational Basis to Conclude that the Area Was Attaining the Air Quality Standard in Light of 2022 Data....................................................................58

IV.  EPA's Redesignation Was Unlawful Because the State Has Not Met Its Obligation to Adopt RACT Measures to Reduce Ozone Precursor Emissions in the Detroit Nonattainment Area, a "Requirement Applicable to the Area" That is a Prerequisite for Redesignation..................................60

  A.  The Act's Plain Text Forecloses EPA's Interpretation of "Applicable to the Area"...............................................................................................62

    1. "Applicable" Is Not Ambiguous as to Timing .........................................62

    2. Sixth Circuit Precedent Instructs that "Applicable" Must Be Read in the Context of the RACT Provision Itself, Which Leaves No Room for Exceptions ...............................................................................................67

    3. EPA is Wrong that This and Other Courts' Precedent Supports Its Approach. ...............................................................................................71

4. Allowing Exceptions to the RACT Requirement by Countenancing EPA's Interpretation of "Applicable," Would Undermine the Act's Strict Deadlines for Complying with Moderate Area Requirements.................74

B. EPA's Concerns About the Practical Effects of Rejecting Its Timing-Based Interpretation of "Applicable" Are Overblown and Fail to Overcome the Term's Plain Meaning ...............................................................................76

1. EPA is Wrong that Applying the Plain Language Would Make the Statute Unworkable ...............................................................................76

2. EPA's Interpretation Invites States to Game the Redesignation Process .81

V. EPA's Redesignation Was Unlawful Because EPA Lacked a Rational Basis to Conclude that the Air Quality Improvement Was "Due to Permanent and Enforceable Reductions in Emissions" ......................................................82

A. Commenters Presented Evidence That the Economic Downturn Associated With the COVID-19 Pandemic Temporarily Lowered Ozone Concentrations ..............................................................................84

B. EPA's Responses Fail to Show That Attainment Was Due to Permanent Emissions Reductions..............................................................86

CONCLUSION .................................................................................91

CERTIFICATE OF COMPLIANCE..................................................93

CERTIFICATE OF SERVICE ...........................................................94

LEGAL ADDENDUM

STANDING ADDENDUM (separately paginated)

1. Declaration of Dolores Leonard ......................................... 1

2. Declaration of Robert Shobe ............................................. 20

3. Declaration of Martin Habalewsky ................................... 24

4. Declaration of Andrew Sarpolis ........................................ 29

iv

# TABLE OF AUTHORITIES

## Cases

*All. of Nurses v. Regan*, 22-cv-01606-CJN (D.D.C. Feb. 14, 2023) ......................16

*Am. Trucking Ass'ns, Inc. v. EPA,* 283 F.3d 355 (D.C. Cir. 2002).........................37

*Bahr v. Regan,* 6 F.4th 1059 (9th Cir. 2021) .................................................... 51, 55

*Bangura v. Hansen,* 434 F.3d 487 (6th Cir. 2006) ..................................... 47, 55, 58

*Bd. of Cnty. Comm'rs of Weld Cnty. v. EPA,* 72 F.4th 284 (D.C. Cir. 2023)..........20

*Big Rivers Elec. Corp. v. EPA,* 523 F.2d 16 (6th Cir. 1975)...................................12

*Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156 (1962)......................47

*Butte Cty. v. Hogen,* 613 F.3d 190 (D.C. Cir. 2010) ..............................................47

*Carr v. U.S.*, 560 U.S. 438 (2010) .................................................................... 64, 65

*Chevron v. Nat. Res. Def. Council*, 467 U.S. 837 (1984).......................... 29, 62, 73

*Clean Wisconsin v. EPA*, 964 F.3d 1145 (D.C. Cir. 2020)........................ 37, 38, 86

*Commonwealth of Ky. v. EPA*, 165 F.3d 26 (6th Cir. 1998) (unpublished), 1998
   WL 661138 ......................................................................................... 59, 63

*Commonwealth of Pa., Dep't of Env't Res. v. EPA*, 932 F.2d 269 (3d Cir. 1991)...12

*Davis v. Mich. Dep't of Treasury*, 489 U.S. 803 (1989)........................................63

*Engine Mfrs. v. EPA,* 88 F.3d 1075 (D.C. Cir. 1996)............................................71

*Envt'l Def., Inc. v. EPA*, 509 F.3d 553 (D.C. Cir. 2007) ........................................28

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.(TOC) Inc.*, 528 U.S. 167 (2000)

...............................................................................................36

*Greenbaum v. EPA*, 370 F.3d 527 (6th Cir. 2004) ....................................63

*Hosseini v. Nielsen,* 911 F.3d 366 (6th Cir. 2018)............................. 47, 52

*Int'l Union, United Mine Workers v. Mine Safety & Health Admin.,* 626 F.3d 84

(D.C. Cir. 2010). ............................................................. 47, 58

*Keeley v. Whitaker*, 910 F.3d 878 (6th Cir. 2018) ........................... 29, 73

*Kisor v. Wilkie*, 588 U.S. __, 139 S.Ct. 2400 (2019)................................29

*Knott v. McDonald's Corp.*, 147 F.3d 1065 (9th Cir. 1998) ...................................64

*Louisville Gas & Elec. Co. v. Fed. Energy Regul. Comm'n*, 988 F.3d 841 (6th Cir.

2021).......................................................................................28

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29 (1983)

.................................................................. 28, 47, 55, 90

*Nat. Res. Def. Council (NRDC) v. EPA.*, 571 F.3d 1245 (D.C. Cir. 2009) .............18

*Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644 (2007) ........90

*NRDC v. Browner*, 57 F.3d 1122 (D.C. Cir. 1995) ...................................81

*NRDC v. EPA*, 22 F.3d 1125 (D.C. Cir. 1994) .......................................76

*NRDC v. EPA*, 706 F.3d 428 (D.C. Cir. 2013) .......................................82

*NRDC v. EPA*, 777 F.3d 456 (D.C. Cir. 2014) ................................. 15, 74

*NRDC v. EPA*, 824 F.2d 1146 (D.C. Cir. 1987) .....................................61

*Occidental Eng'g Co. v. Immigr. & Naturalization Serv.,* 753 F.2d 766 (9th Cir. 1985) ................................................................................................55

*S. Coast Air Quality Mgmt. Dist. v. EPA*, 472 F.3d 882 (D.C. Cir. 2006) . 14, 35, 61

*Sierra Club v. EPA*, 21 F.4th 815 (D.C. Cir. 2021) ...................................63

*Sierra Club v. EPA*, 294 F.3d 155 (D.C. Cir. 2002) ......................... 70, 76

*Sierra Club v. EPA*, 311 F.3d 853 (7th Cir. 2002) .......................... 75, 76

*Sierra Club v. EPA*, 375 F.3d 537 (7th Cir. 2004)...................... 71, 72, 73

*Sierra Club v. EPA*, 60 F.4th 1008 (6th Cir. 2023). ................... 36, 40, 80

*Sierra Club v. EPA*, 774 F.3d 383 (7th Cir. 2014) ...................................85

*Sierra Club v. EPA*, 793 F.3d 656 (6th Cir. 2015) ......................... *passim*

*State of Ohio v. EPA*, 784 F.2d 224 (6th Cir. 1986) .................................90

*State of Ohio v. Ruckelshaus*, 776 F.2d 1333 (6th Cir. 1985) .................29

*Sw. Airlines Co. v. Saxon*, 596 U.S. 450 (2022) .....................................62

*Sw. Pa. Growth All. v. Browner*, 121 F.3d 106 (3d Cir. 1997) ................. 33, 59, 64

*Sw. Pa. Growth All. v. Browner*, 144 F.3d 984 (6th Cir.1998) ..............28

*U.S. v. Jackson*, 480 F.3d 1014 (9th Cir. 2007)......................................63

*Util. Air Regul. Grp. v. EPA*, 573 U.S. 302 (2014) ................................64

*Wall v. EPA*, 265 F.3d 426 (6th Cir. 2001)....... 10, 35, 62, 36, 38, 39, 70, 71, 72, 83

**Statutes**

42 U.S.C. § 7401(b)(1).................................................................................80

42 U.S.C. § 7401(c) ...................................................................................80

42 U.S.C. § 7407(d) ...................................................................................5

42 U.S.C. § 7407(d)(1)(A) .........................................................................14

42 U.S.C. § 7407(d)(3)(A) .........................................................................26

42 U.S.C. § 7407(d)(3)(E) ......................................................... 1, 7, 17, 30, 33

42 U.S.C. § 7407(d)(3)(E)(i)........................................ 4, 7, 18, 22, 32, 33, 39, 58, 59

42 U.S.C. § 7407(d)(3)(E)(iii) ........................................... 5, 18, 35, 83, 90

42 U.S.C. § 7407(d)(3)(E)(iv)...................................................................65

42 U.S.C. § 7407(d)(3)(E)(v)............................... 5, 8, 18, 33, 34, 60, 64, 67, 71, 82

42 U.S.C. § 7409(b)(1)...............................................................................12

42 U.S.C. § 7410(a)(1)...............................................................................12

42 U.S.C. § 7410(a)(2)(B) .........................................................................12

42 U.S.C. § 7410(k)(2)...............................................................................78

42 U.S.C. § 7410(k)(3)...............................................................................78

42 U.S.C. § 7501 .......................................................................................5

42 U.S.C. § 7501(1) ...................................................................................39

42 U.S.C. § 7502(a)(2)(A)..........................................................................40

42 U.S.C. § 7502(c)(2)...............................................................................39

42 U.S.C. § 7505a ........................................................................... 65, 66

42 U.S.C. § 7505a(c) ............................................................... 34, 65, 66

42 U.S.C. § 7505a(d) ............................................................... 24, 61, 69

42 U.S.C. § 7506(c)(1)(A) ....................................................................72

42 U.S.C. § 7511(a)(1) .............................................................. 16, 74, 78

42 U.S.C. § 7511(a)(5) ........................................................................79

42 U.S.C. § 7511(b)(2) ........................................................ 15, 16, 74, 81

42 U.S.C. § 7511a ...............................................................................15

42 U.S.C. § 7511a(b) .................................................................... 17, 25

42 U.S.C. § 7511a(b)(2) ............................... 4, 17, 34, 60, 61, 67, 68, 70, 71, 74, 82

42 U.S.C. § 7511a(f) ....................................................... 4, 17, 60, 71, 82

42 U.S.C. § 7511a(i) ...........................................................................75

42 U.S.C. § 7602(q) ...........................................................................74

42 U.S.C. § 7607(b) ..........................................................................1, 2

42 U.S.C. § 7619(b) .................................................................. 8, 20, 29

42 U.S.C. § 7619(b)(3)(A)(i) ..............................................................21

42 U.S.C. § 7619(b)(3)(B)(ii) ........................................ 3, 21, 30, 41, 57

42 U.S.C. §§ 7501–7515 ....................................................................13

5 U.S.C. § 706(2)(C) ..........................................................................28

**Regulations**

40 C.F.R. § 50.14 ..................................................................................20

40 C.F.R. § 50.14(A)(1)(i)(A) .................................................................1

40 C.F.R. § 50.14(b)(4)......................................................................8, 32

40 C.F.R. § 50.19 ....................................................................................7

40 C.F.R. § 51.1312(a)(1) ......................................................................60

40 C.F.R. § 51.1312(c)...........................................................................60

40 C.F.R. § 51.1313 ...............................................................................60

40 C.F.R. § 51.1318 ......................................................... 1, 18, 39, 60, 79

40 C.F.R. § 81.305 .................................................................................79

40 C.F.R. Part 50 Appendix U ...............................................................13

40 C.F.R. Part 51 Appendix V § 2.3.1 ...................................................78

40 C.F.R. Part 58...................................................................................12

Mich. Admin. Code R. 336.1601-336.1662, Part 6 (2019) ....................38

Mich. Admin. Code R. 336.2901-336.2908 (2019)................................40

**Other**

1990 Clean Air Act Amendments, Pub. L. No. 101-549, 104 Stat. 2399 (1990)....14

61 Fed. Reg. 50,718 (Sept. 27, 1996) ....................................................59

62 Fed. Reg. 38,856 (July 18, 1997).......................................................37

80 Fed. Reg. 65,292 (Oct. 26, 2015)................................................ 13, 15

83 Fed. Reg. 25,776 (June 4, 2018) ...........................................................15

87 Fed. Reg. 14,210 (Mar. 14, 2022)......................................................7, 19

87 Fed. Reg. 21,842 (Apr. 13, 2022) ................................................... 16, 81

88 Fed. Reg. 32,584 (May 19, 2023) ................................................ *passim*

88 Fed. Reg. 32,594 (May 19, 2023) ................................................ *passim*

88 Fed. Reg. 37,766 (June 9, 2023) ................................................... 38, 40

88 Fed. Reg. 6,633 (Feb. 1, 2023) ..................................................... 16, 60

88 Fed. Reg. 7,382 (Feb. 3, 2023) ..................................................... 22, 77

Senate Rep No. 101-228, 1990 U.S.C.C.A.N. 3385 (1989) ............................ 14, 66

# GLOSSARY OF TERMS

| | |
|---|---|
| CDD | Clean Data Determination |
| EE | Exceptional Event |
| EGLE | Michigan Department of Environment, Great Lakes, and Energy |
| EPA | United States Environmental Protection Agency |
| NAAQS | National Ambient Air Quality Standard |
| NOx | Nitrogen Oxides |
| $PM_{2.5}$ | Fine Particulate Matter |
| RACM | Reasonably Available Control Measures |
| RACT | Reasonably Available Control Technology |
| SIP | State Implementation Plan |
| VOCs | Volatile Organic Compounds |

## STATEMENT REQUESTING ORAL ARGUMENT

Sierra Club requests oral argument in this case. As this consolidated case involves three separate, but related, agency actions and two administrative records, oral argument will assist the Court in understanding the relationship between the various actions and records, as well as provisions of the Clean Air Act and its implementing regulations that may not be familiar to the reviewing panel.

## JURISDICTIONAL STATEMENT

### I.    Agency's Jurisdiction

The United States Environmental Protection Agency ("EPA") issued two rulemakings challenged in this direct appeal, one making a Clean Data Determination for the Detroit area pursuant to 40 C.F.R. § 51.1318 ("Clean Data Determination"), and excluding certain air monitoring data in doing so pursuant to 40 C.F.R. § 50.14(A)(1)(i)(A) ("Exceptional Event Approval"); and another redesignating the Detroit Ozone Nonattainment Area to "attainment" pursuant to 42 U.S.C. § 7407(d)(3)(E) ("Redesignation").

### II.    Court of Appeal's Jurisdiction

This Court has jurisdiction over these direct appeals of Clean Air Act final agency actions of EPA pursuant to 42 U.S.C. § 7607(b).

### III.    Filing Date Establishing the Timeliness of the Petition for Review

Notice of EPA's final actions issuing the Clean Data Determination and Exceptional Event Approval appeared in the Federal Register on May 19, 2023. Clean Data Determination for the Detroit Area for the 2015 Ozone Standard, 88 Fed. Reg. 32,584 (May 19, 2023). Notice of EPA's final action redesignating the Detroit Ozone Nonattainment Area to attainment appeared in the Federal Register on the same day. Redesignation of the Detroit, MI Area to Attainment of the 2015 Ozone Standards, 88 Fed. Reg. 32,594 (May 19, 2023). The petition for review for each action was due 60 days after the Federal Register notice, that is by July 18, 2023. 42 U.S.C. § 7607(b)(1). Sierra Club filed both its petition for review of the Clean Data Determination and Exceptional Event Approval (Case No. 23-3581) and its petition for review of the redesignation (Case No. 23-3583) on July 17, 2023. Thus, both petitions for review were timely filed.

### IV.    Final Agency Action

EPA characterizes each of the actions as a "final action" of the EPA Administrator. *See* 88 Fed. Reg. at 32,584 (Clean Data Determination and Exceptional Event Approval) and 88 Fed. Reg. at 32,594 (Redesignation).

## STATEMENT OF ISSUES

### *Clean Data Determination & Exceptional Event Approval*

1.      EPA must determine a "clear causal relationship" exists between the measured exceedances of a national ambient air quality standard and wildfire smoke before excluding such exceedances from the data set used to evaluate compliance with the air quality standard. 42 U.S.C. § 7619(b)(3)(B)(ii). Did EPA's Exceptional Event Approval excluding two days of high ozone readings in Detroit on the basis of wildfire smoke violate this requirement where the administrative record failed to include the requisite supporting evidence, and was the resulting Clean Data Determination finding that Detroit was attaining the standard therefore also unlawful? More specifically:

  a.      Was EPA's determination that the exceptional event affected pollution levels at Detroit's East 7 Mile monitor irrational considering that EPA failed to explain why pollutants EPA has identified as associated with wildfires did not have elevated levels during the exceptional event and that the evidence EPA did rely on does not support its conclusion that wildfire affected pollution levels during the exceptional event?

  b.      Was EPA's determination that wildfire emissions caused the ozone exceedances at the East 7 Mile monitor irrational because EPA failed to

3

assess and the record does not contain evidence to show whether Michigan properly omitted several days from its matching day analysis?

c.      Was EPA's determination that wildfire emissions caused the ozone exceedance at the East 7 Mile monitor irrational given that EPA acknowledged local conditions may have contributed to high ozone concentrations during the exceptional event, but failed to explain why it determined it was unnecessary to analyze the contribution of local conditions to high ozone levels during the exceptional event.

### *Redesignation*

2.      EPA relied on its Exceptional Events Approval to ignore two days of high ozone pollution in 2022 when it redesignated the Detroit Nonattainment Area to attainment, thereby lifting certain pollution protections. Where EPA's Exceptional Events Approval failed to provide a reasoned basis for EPA's finding that the Detroit area attained the ozone standard in 2022, did EPA violate 42 U.S.C. § 7407(d)(3)(E)(i), which requires EPA to find that an area "has attained" the air quality standard before redesignating a nonattainment area to attainment?

3.      EPA approved Michigan's request to redesignate the Detroit Nonattainment Area to attainment even though Michigan had not revised its state implementation plan to include the reasonably available control technology ("RACT") requirements mandated by the statute (42 U.S.C. § 7511a(b)(2), (f)) for Moderate

ozone nonattainment areas. Did EPA therefore violate the requirement of 42

U.S.C. § 7407(d)(3)(E)(v) to only redesignate areas to attainment if the state "has

met all requirements applicable to the area . . ."?

4.    Did EPA violate the requirement of 42 U.S.C. § 7407(d)(3)(E)(iii) by

redesignating the Detroit Nonattainment Area to attainment based on air quality

data from 2019-2021, when it could not reasonably conclude from the record that

the air quality improvement in those years was from "permanent and enforceable

emissions reductions," because the temporary pandemic-related recession

depressed ozone pollution and would have contributed to attainment during that

time?

## STATEMENT OF THE CASE

The Clean Air Act charges EPA with deciding which areas of a state have

air that is unsafe to breathe. 42 U.S.C. § 7407(d). EPA does so by comparing air

monitoring data with the air quality standards the agency has set to protect public

health. EPA's designation of an area as being in "nonattainment" with a standard

triggers specific actions the state must take to reduce pollution in that area. *Id.* §

7501 *et seq*. When EPA changes the area's designation to "attainment," many of

those obligations disappear. A nonattainment designation therefore matters

enormously. It matters for the health of people breathing unsafe air and it matters

for industries that will be more tightly regulated because their pollution contributes to the problem.

In this case, Sierra Club challenges EPA's decision to lift the nonattainment designation for ozone—a lung irritant that causes asthma and other harms—for a seven-county area in Southeast Michigan. The decision carries particular import for Detroit and neighboring cities in Wayne County, where homes may be down the street from auto-manufacturing plants and oil refineries, and where cases of asthma have been rising so disproportionately compared to the state as a whole that Michigan's community health agency has dubbed it the "epicenter of the asthma burden." ARC-31 (Great Lakes Environmental Law Center and Sierra Club Comments on Proposed Clean Data Determination), Ex. 4 at 7 n.23 [App. __].[1]

To ensure that EPA hews to the Clean Air Act's priority of protecting public health, even in the face of pressure from industry, Congress has tightly prescribed

---

[1] Before these cases were consolidated, EPA filed a separate record index in each case. To distinguish between these records, this brief uses different prefixes: "ARC" refers to the Administrative Record index for the Clean Data Determination and Exceptional Event Approval filed in Case No. 23-3581 (Doc. 9). "ARR" refers to the Administrative Record index for the Redesignation filed in Case No. 23-3583 (Doc. 10). The digits following ARC and ARR refer to the last two digits of the Document ID listed in the Certified Record Indices for the respective cases. Certain of the documents appear in both records: ARC-02 (Michigan 2022 Exceptional Event Demonstration), ARC-03 (EPA concurrence on EGLE Exceptional Event Request), ARC-04 (EPA Technical Support Document for Exceptional Event Approval), ARC-31 (Great Lakes Environmental Law Center and Sierra Club Comments on Proposed Clean Data Determination), and ARC-45 (Detroit Design Value Report 2020-22). This brief refers to these

the conditions EPA and states must meet before EPA can lift a designation of

nonattainment. 42 U.S.C. § 7407(d)(3)(E). The most fundamental of these

conditions is that the concentration of pollution in the ambient air must be at or

below the relevant air quality standard. *Id.* § 7407(d)(3)(E)(i). The three agency

actions challenged here encompass EPA's flawed determination that Detroit-area

ozone is at or below the standard of 70 parts per billion (ppb), in spite of

contradictory information before it.

     To determine compliance with the standard, EPA must consider three years

of air quality data. 40 C.F.R. § 50.19. In its redesignation proposal, EPA relied on

data from 2019-21, a highly anomalous period spanning the pandemic years, when

many of the largest contributors to ozone pollution (e.g., power plants burning

fossil fuels) were operating less. ARR-01 (Proposed Redesignation of the Detroit,

MI Area to Attainment of the 2015 Ozone Standards, 87 Fed. Reg. 14,210 (Mar.

14, 2022)) at 14,211 [App.__]. Then, when pollution levels predictably rose as the

pandemic waned in 2022, EPA decided to throw out two days where a Detroit-

based monitor measured ozone levels that EPA would normally consider to violate

the standard. ARC-43 (Final Clean Data Determination for the Detroit Area for the

2015 Ozone Standard, 88 Fed. Reg. 32,584 (May 19, 2023)) [App. __]. EPA

---

documents by their ARC number only and only a single copy is reproduced in the
joint appendix.

blamed these June 2022 violations on wildfires 1,430 miles away and, in a separate rulemaking, approved Michigan's request to excluded these data points as having been influenced by an "exceptional event." *Id.* Excluding this monitoring data let EPA find that the Detroit area was meeting EPA's ozone standard as of 2022 and finalize its redesignation of the area from nonattainment to attainment. 88 Fed. Reg. at 32,594 [App. __]. EPA simultaneously issued a Clean Data Determination, which is a finding that air quality in a nonattainment area has in fact attained the standard and, under EPA's regulations, suspends a set of the state's air pollution control requirements for the area even without a redesignation to attainment. 88 Fed. Reg. at 32,584 [App. __]. But EPA lacked the evidence to meet the high bar the Act sets for attributing high ozone levels to such a far-off source of pollution, as opposed to the many high-polluting facilities closer to the violating monitor. 42 U.S.C. § 7619(b); 40 C.F.R. § 50.14(b)(4). This core failure undermines each of the three challenged actions.

Even if EPA had evidence to support its factual finding of attainment, it made a key legal error as well. One of EPA's core duties prior to lifting a nonattainment designation, beyond evaluating current air quality, is to ensure that the state has met the Act's "applicable" requirements for the nonattainment area. 42 U.S.C. § 7407(d)(3)(E)(v). This prerequisite ensures that a state is not excused from the Act's other mandates intended to reduce air pollution, and that state rules

resulting from those mandates are built into the state's plan to keep the area in compliance with health standards for the long-term after EPA removes the nonattainment label. But here, EPA moved forward with lifting the nonattainment designation even where the state had not met the Act's requirement to issue rules to limit pollution from specific sources in the nonattainment area. EPA excused the state from this obligation because the requirement to adopt those rules came due after the state had submitted its redesignation request to EPA, but before EPA approved the request. In EPA's view, the omitted pollution-control rules were not "applicable" requirements, even though it agreed that the state's deadline to adopt them had since passed. 88 Fed. Reg. at 32,611-12 [App. __]. As shown below, the plain language of multiple provisions of the Clean Air Act, as well as this Court's precedent, all forbid EPA from excusing the Act's mandatory requirements in this way.

By flubbing these essential steps for redesignation, EPA has failed to protect the health of a particularly vulnerable community amidst a worsening public health crisis. While EPA claims to be "sensitive to" concerns about "elevated asthma rates and other respiratory diseases in the Detroit area," and committed to "fair treatment of vulnerable populations disproportionately affected by pollution," the agency's actions say otherwise. 88 Fed. Reg. at 32,585 [App. __]. In making a weighty decision to eliminate measures that would protect the Detroit area's

vulnerable populations, EPA abandoned its responsibility to ensure that pollution concentrations were actually meeting the standard and to require Michigan's compliance with the Clean Air Act's mandatory pollution control requirements for the area. EPA's response to concerns about how its flawed decision-making will impact Detroit communities is to assure the public that air quality has improved "to levels that now meet health-based air quality standards." *Id.* This circular reasoning that the air is already safe has no basis in evidence and, as a result, is no assurance at all.

## LEGAL FRAMEWORK AND FACTUAL BACKGROUND

### I. Ozone Pollution and Public Health

Ozone exposure causes serious health problems, including chest pain, coughing, throat irritation, and increased susceptibility to respiratory infections. *See, e.g.*, *Wall v. EPA*, 265 F.3d 426, 428 (6th Cir. 2001). Ozone is particularly dangerous for those who already suffer from respiratory illnesses as it can worsen diseases like asthma, emphysema, and chronic bronchitis. Sensitive populations such as children and the elderly are also especially susceptible to the negative health effects of ozone and are far more likely to be hospitalized for asthma. ARR-

10 (Sierra Club et. al Comments on the Proposed Approval of the Detroit, Michigan 2015 Ozone Redesignation) at 5 [App. ___].

While Detroiters have long had disproportionately high rates of asthma when compared to the rest of Michigan's population, the problem has grown worse in the past five years. During this period, the asthma rate among Detroit adults has increased while Michigan's rate has remained the same. ARC-31 at 7 [App. ___]. Similarly, the disproportionate rate of asthma hospitalizations in Detroit compared to the Michigan average has also worsened in recent years. *Id.* at Ex. 5, 6 [App. __, __]. There is also significant evidence that the asthma burden in Southeast Michigan is disproportionately high among Black children compared to White children, particularly in Wayne County where Detroit is located. According to a 2019 report, 31.9 per 10,000 Black children were hospitalized between the years 2010 to 2014 due to asthma attacks compared to 5.8 of 10,000 White children. *Id.*

Ozone forms when nitrogen oxide ("NOx") and volatile organic compounds ("VOCs"), known as "ozone precursors," react in the presence of sunlight. In the Detroit area, there are a multitude of sources of those ozone-producing pollutants. Numerous power plants, including the Monroe coal-fired power plant, and mobile sources such as cars and trucks are just a few of the significant sources of NOx pollution in the Detroit Nonattainment Area. ARR-10 at 8-9 [App. ___]. Additionally, an oil refinery in Detroit and numerous automotive assembly plants

11

throughout the Southeast Michigan region – including the Mack Avenue Assembly

Plant and Jefferson North Assembly Plant in Detroit – are significant sources of

VOC pollution. *Id.*; ARC-31 at 8 [App. __]. These pollutants contribute to peak

ozone formation during hot, dry, stagnant summertime conditions. In Michigan,

weather is conducive to the formation of ozone from the spring through the fall and

thus the ozone season starts on March 1 and ends on October 31. ARR-10 at 4

[App. ___].

## II.  The Clean Air Act and the Ozone National Ambient Air Quality Standard

The Clean Air Act ("Act") represents a "national policy … to reduce air

pollution." *Big Rivers Elec. Corp. v. EPA,* 523 F.2d 16, 22 (6th Cir. 1975). The

cornerstone of this policy is the Act's requirement for EPA to establish air quality

standards at a level "requisite to protect the public health" with "an adequate

margin of safety." 42 U.S.C. § 7409(b)(1). In turn, states are required to establish

an air monitoring network to assess conformity with each standard and develop

regulatory programs capable of ensuring continual compliance with each standard.

42 U.S.C. § 7410(a)(1), (a)(2)(B); 40 C.F.R. Part 58; *Commonwealth of Pa., Dep't*

*of Env't Res. v. EPA*, 932 F.2d 269, 272 (3d Cir. 1991) (citing *Train v. Nat. Res.*

*Def. Council, Inc.* ("*NRDC*")*,* 421 U.S. 60, 99 (1975)) ("The need to maintain the

Clean Air Act standards once they are reached is well-recognized by the Courts.").

If EPA determines that an area fails to meet the standards, the Act requires the

12

state to develop and implement specific and enforceable air pollution control programs capable of lowering air pollution to meet the standard by statutory deadlines. *See* 42 U.S.C. §§ 7501–7515.

In 2015, EPA revised the ozone standard to 70 parts per billion (ppb). Final National Ambient Air Quality Standards ("NAAQS") for Ozone, 80 Fed. Reg. 65,292 (Oct. 26, 2015). EPA determines compliance with that standard by calculating the "design value." The design value for the ozone standard is the fourth-highest daily maximum 8-hour average ozone concentration averaged over three years. 40 C.F.R. Part 50, Appendix U. In more detail: First, ozone monitors measure ozone concentrations each hour; second, for each day, EPA compiles the hourly ozone concentrations to determine the maximum daily 8-hour average for the day; third, at the end of each year, EPA identifies the fourth highest of those maximum daily 8-hour averages; finally, EPA averages the fourth highest daily 8-hour average for each of the past three years. The resulting three-year average is the design value; if it is higher than 70 ppb, air pollution exceeds the ozone standard. Functionally, this means that whether an area meets the standard can hinge on one or two days with elevated levels of ozone pollution in any given three-year period.

### III.   Nonattainment Designations and the 1990 Amendments to the Act

Based on the above-described design values, EPA designates each area of a state as either in "attainment" or "nonattainment" with the air quality standard. 42 U.S.C. § 7407(d)(1)(A).[2] If the design value is at or below the standard, EPA considers an area to be in attainment. On the other hand, if the area is above the standard, it is designated "nonattainment."

Congress added new sections governing nonattainment areas to the Act in 1990 in response to EPA's pervasive failure under the prior scheme to bring areas suffering from unhealthy air quality into attainment. 1990 Clean Air Act Amendments, Pub. L. No. 101-549, 104 Stat. 2399 (1990); Senate Rep No. 101-228, 1990 U.S.C.C.A.N. 3385 at *3400 (1989). Under the previous version of the Act, first enacted in 1970, states had wide freedom to select pollution control measures to attain the standards. *See generally Train*, 421 U.S. at 79. In enacting the 1990 Amendments, Congress intended to correct the "discretion-filled approach of two decades prior." *S. Coast Air Quality Mgmt. Dist. v. EPA*, 472 F.3d 882, 886-87 (D.C. Cir. 2006). "No longer willing to rely upon EPA's exercise of discretion, Congress adopted a graduated classification scheme that prescribed mandatory controls that each state must incorporate into its [State Implementation

---

[2] Additionally, an area may be designated as "unclassifiable" if, on the basis of available information, it cannot be classified as meeting or not meeting the standard. 42 U.S.C. § 7407(d)(1)(A)(iii).

Plan]." *Id.* at 887; *see also NRDC v. EPA*, 777 F.3d 456, 459-61 (D.C. Cir. 2014) (describing "history of Congress's and EPA's efforts to establish air quality standards for ozone").

For ozone, this graduated classification scheme ranks nonattainment areas from Marginal to Extreme based on the severity and duration of ozone pollution, and establishes deadlines for submitting the mandatory controls and bringing the area into attainment. *See generally* 42 U.S.C. § 7511a. An area that fails to attain the standards by the deadline must be reclassified by EPA within six months to a higher rank. *Id.* § 7511(b)(2). Such reclassifications are known informally as "bump-ups."

## IV.  The Detroit Area Nonattainment Designation and Bump-Up

Whenever EPA revises an air quality standard, the Act requires it to designate the areas failing to meet the standard as nonattainment areas within two years; for the 2015 ozone standard, that deadline was October 2017. 42 U.S.C. § 7407(d)(1)(B); 80 Fed. Reg. 65,292 (Oct. 26, 2015). Nearly 10 months after that deadline, and facing litigation challenging its delay, EPA designated a seven-county area in Southeast Michigan as a nonattainment area for the ozone standard ("Detroit Nonattainment Area") in 2018. *See* Additional Air Quality Designations for the 2015 Ozone NAAQS, 83 Fed. Reg. 25,776, 25,779, 25,813 (June 4, 2018). Initially, EPA designated the Detroit Nonattainment Area as a Marginal

nonattainment area. *Id*. Michigan was required to lower ozone pollution in the Detroit Nonattainment Area and attain the standard by August 3, 2021. 42 U.S.C. § 7511(a)(1); Proposed Reclassification of Areas Classified as Marginal for the 2015 Ozone NAAQS, 87 Fed. Reg. 21,842, 21,844 (Apr. 13, 2022). Michigan failed to meet that deadline; that failure required EPA to reclassify (or bump up) the Detroit Nonattainment Area from Marginal to Moderate nonattainment no later than February 3, 2022. *See,* 42 U.S.C. § 7511(b)(2). EPA belatedly undertook that reclassification on February 1, 2023, again in response to litigation. Final Finding of Failure to Attain and Reclassification of the Detroit Area as Moderate for the 2015 Ozone NAAQS, 88 Fed. Reg. 6,633 (Feb. 1, 2023) (making reclassification effective March 1, 2023); *see All. of Nurses v. Regan*, 22-cv-01606-CJN, Mot. to Dismiss Pl. Claim Regarding the Detroit, MI Area as Moot (Doc. 29) (D.D.C. Feb. 14, 2023).

The reclassification of the Detroit Nonattainment Area from Marginal to Moderate nonattainment required Michigan to revise its State Implementation Plan to more effectively limit the emission of ozone precursor pollutants from both stationary and mobile sources. For stationary sources, Michigan was required to submit revisions of its State Implementation Plan to require certain types of sources of VOCs to achieve emissions limits achievable through the use of reasonably available control technology ("RACT") and to similarly limit NOx

from all existing major sources located in the nonattainment area unless the state could demonstrate that NOx emission reductions lacked benefits. 42 U.S.C. § 7511a(b)(2), (f).[3] For mobile sources, Michigan was required to implement a motor vehicle inspection and maintenance program aimed at ensuring cars in the nonattainment area are complying with emission limits. *See generally* 42 U.S.C. § 7511a(b). Michigan issued VOC RACT rules in April 2023 limiting emissions from sources like the automobile industry's vehicle coating operations, but suspended enforcement of those rules for the Detroit Nonattainment Area once EPA redesignated the area in the action challenged here. Habalewsky Decl., Ex. 1 (Variance, Suspension of Enforcement of Part 6 Reasonably Available Control Technology Rules for the Southeast Michigan 2015 Ozone Maintenance Area).

## V. Requirements for Converting an Area from "Nonattainment" to "Attainment," and Clean Data Determinations

Once all of the air monitors in a nonattainment area have an ozone design value that is at or below 70 ppb, a state can request that EPA redesignate the area from nonattainment to attainment. To grant that request, EPA must determine that the area satisfies five criteria listed in 42 U.S.C. § 7407(d)(3)(E). The first, third, and fifth of those criteria are at issue in this case. These require that the area has

---

[3] For Moderate areas, major sources are those that emit more than 100 tons of NOx annually. 42 U.S.C. § 7511a(f)(1), 7602(j) (definition of "major stationary source").

attained the standard, *id.* § 7407(d)(3)(E)(i), that the improvement in air quality is due to permanent and enforceable reductions in pollution resulting from federal and state requirements, *id.* § 7407(d)(3)(E)(iii), and that the State "has met all requirements applicable to the area" under section 7410 and part D of Clean Air Act Subchapter I, *id.* § 7407(d)(3)(E)(v). Part D includes, for instance, requirements for a Moderate ozone nonattainment area.

EPA's regulations add a mechanism called a "Clean Data Determination" to relieve a state from some obligations for nonattainment areas when air quality in an area is meeting the standard, but where EPA would not be able to redesignate the area because it cannot satisfy the other statutory criteria. A Clean Data Determination suspends the state's requirements to "submit attainment demonstrations and associated RACM [reasonably available control measures], RFP [reasonable further progress] plans, contingency measures for failure to attain or make reasonable progress, and other planning SIPs related to attainment" of the standard until the area either is redesignated to attainment or EPA determines the area has again violated the standard. 40 C.F.R. § 51.1318. The Clean Air Act does not explicitly authorize Clean Data Determinations nor does it specify any standard of approval; EPA has made clear that a Clean Data Determination is independent of the statute's redesignation provisions. *See, e.g.*, *NRDC v. EPA*, 571 F.3d 1245, 1260 (D.C. Cir. 2009) ("The Clean Data Policy does not effect a redesignation; an

area must still comply with the statutory requirements before it can be redesignated to attainment.").

## VI. Michigan's Redesignation Request in Spring 2022

By the end of the 2021 ozone season, the ozone design values at numerous monitors were teetering on the edge of the 70 ppb standard, with several monitors in the Detroit Nonattainment Area recording a design value precisely at 70 ppb. ARR-10 at 7 [App. ___]. On January 3, 2022, just prior to EPA's February 3, 2022 deadline to bump-up the area to Moderate nonattainment, Michigan submitted a request that EPA redesignate the Detroit Nonattainment Area to attainment. ARR-02 (Michigan Department of Environment, Great Lakes, and Energy ("EGLE") Redesignation Request and Maintenance Plan) [App. ___]. Just a little over two months later, EPA proposed to approve Michigan's request to redesignate the Detroit area from nonattainment to attainment. 87 Fed. Reg. at 14,210 [App. ___]. Issuing the proposal just as the 2022 ozone season was beginning, EPA based its proposed approval on the area monitors' ozone design values for the years 2019 to 2021. *Id.*

Sierra Club and nineteen other public interest organizations submitted comments noting the possibility that even a relatively mild ozone season that year could push the area back above the ozone standard, and opposing the redesignation. ARR-10 at 6-7 [App. ___]. Validating these concerns, several days

of high levels of ozone pollution in May, June, and July pushed the 2022 design

value to 71 ppb—so that the area was no longer attaining the standard. ARC-45

(Detroit Design Value Report 2020-22) at 7 [App. __].

## VII. Michigan's Exceptional Event Request to Exclude Data from the 2022 Ozone Design Value to Support Its Previously Submitted Redesignation Request

Rather than take steps to address those increased ozone levels, Michigan

invoked an exception that would allow it to ignore them. The Act allows for EPA

to exclude valid air quality data from the calculation of a design value if the EPA

finds that the exceedance of an air quality standard was clearly caused by an

"exceptional event," such as wildfires, volcanos, and other events that are, *inter*

*alia,* "not reasonably controllable or preventable" and "unlikely to recur at a

particular location." 42 U.S.C. § 7619(b); 40 C.F.R. § 50.14.  When caused by

such events, EPA may ignore poor air quality for the purpose of determining

whether or not an area is meeting an air quality standard. *See Bd. of Cnty. Comm'rs*

*of Weld Cnty. v. EPA,* 72 F.4th 284, 290 (D.C. Cir. 2023) ("EPA may disregard

data that arises from an 'exceptional event'.").

Exceptional event determinations carry significant consequences for

communities living with levels of ozone pollution above the standard. Disregarding

air quality data untethers the ozone design value – which in this case was the value

used to determine whether the Detroit Nonattainment Area was to remain subject

to heightened requirements to lower ozone pollution – from the actual level of pollution measured by air monitors. Put another way, by disregarding data pursuant to an exceptional event determination, EPA is authorizing states to pretend air pollution in a community is lower than it actually is for the purposes of assessing compliance with the standard and thus avoid the Act's requirements for nonattainment areas. Given the significant consequences of exceptional event determinations, Congress mandated that EPA make the protection of public health the "highest priority" when establishing its regulations governing the issuance of exceptional event determinations. 42 U.S.C. § 7619(b)(3)(A)(i). Congress has also established a high evidentiary bar for states seeking to disregard air quality data through an exceptional event request. States must demonstrate that an "exceptional event caused a specific air pollution concentration at a particular air quality monitoring location" and that "a clear causal relationship" exists between the measured exceedances of the standard and the exceptional event. 42 U.S.C. § 7619(b)(3)(B)(ii).

In January 2023, Michigan submitted an exceptional event request to EPA seeking to disregard the high concentrations of ozone pollution detected on June 24 and 25, 2022 when calculating the ozone design value. Michigan claimed that smoke from wildfires 1,430 miles away had traveled to the Detroit area and caused those high ozone levels. The stakes riding on this request were high; without

approving the exceptional event request, EPA could not determine that the Detroit Nonattainment Area was currently attaining the ozone standard and could not redesignate the area to attainment. *See* 42 U.S.C. § 7407(d)(3)(E)(i).

Absent the exclusion of ozone data pursuant to an exceptional event demonstration, the ozone design value at the East 7 Mile monitor for 2020-22 was 71 ppb. ARC-45 at 7 [App. ___]. Excluding ozone data from June 24 and 25, 2022 would bring the ozone design value down to 69 ppb – barely below the standard of 70 ppb. ARC-01 (Proposed Clean Data Determination for the Detroit Area for the 2015 Ozone Standard, 88 Fed. Reg. 7,382 (Feb. 3, 2023)) at 7,383, Table 1 [App. ___] (Monitor 26-163-0019 refers to the East 7 Mile monitor). This in turn would allow EPA to both issue its Clean Data Determination and finalize its proposed redesignation.[4] EPA ultimately relied on the on the Exceptional Event Approval to conclude that the Detroit Nonattainment Area was currently attaining the ozone standard. *See* 88 Fed. Reg. at 32,613 [App. ___].[5]

---

[4] EPA only provided for public comment on the exceptional events in EPA's proposed Clean Data Determination, without informing the public that the exceptional events were also relevant to the redesignation. EPA instead stated: "In this proposed action, EPA is not taking further action to finalize the proposed redesignation." ARC-01, 88 Fed. Reg. at 7,382 n.1 [App. ___]. In spite of EPA's statement, Sierra Club commented on flaws in EPA's Exceptional Event Approval in both the Redesignation and Clean Data Determination/Exceptional Event Approval dockets, and EPA responded to both sets of comments. 88 Fed. Reg. at 32,584-92, 32,610-13 [App. ___, ___]. *See also infra* n. 12.

[5] The technical basis for EPA's Exceptional Event Approval and Clean Data Determination, and Sierra Club's critique of it, appear in the administrative records

EPA appears to have recognized the necessity for the approval of Michigan's exceptional event request in order to approve its redesignation request and to have worked with the state to establish a schedule to ensure the necessary approvals occurred before the 2023 ozone season. In an email from the EPA's Air and Radiation Division Director for Region 5 (the regional office covering Michigan), to EGLE's Air Division Director, EPA provided a detailed schedule regarding EGLE's exceptional event request that described when the EPA would issue its initial concurrence determination, when the EPA would hold its public comment period, and when the EPA Region 5 Administrator would sign the final rule approving not only the exceptional event request, but also Michigan's redesignation request. ARC-31, Ex. 29 [App. ___].

## VIII.  Regulatory and Public Health Impacts of EPA's Actions

EPA's decision to issue its Exceptional Event Approval, Clean Data Determination, and Redesignation will have significant consequences for residents living in the Detroit Nonattainment Area well into the future. As discussed in more detail above, the Act provides a graduated classification scheme for ozone nonattainment that requires states to reduce ozone pollution to below the standard

---

prepared for the Redesignation rulemaking as well as the Clean Data Determination rulemaking. *See* Case No. 23-3583, List of Documents Comprising the Administrative Record [Doc.10] (including Doc. ID Nos. EPA-R05-OAR-2023-0058-0002, -03, -04, and -31, all related to the Clean Data Determination and Exceptional Event Approval).

by specific deadlines, or the Act requires EPA to "bump-up" the nonattainment classification, which in turn requires states to implement more aggressive pollution control measures. *Supra* at 14-17. Conversely, when EPA redesignates an area from nonattainment to attainment, states are required to develop maintenance plans with contingency provisions that describe the actions the state will take to correct any violation of the standard that occurs after the redesignation. 42 U.S.C. § 7505a(d).

If ozone pollution does increase to levels that once again threaten the standard, there are two primary differences in the air quality protection provided by the maintenance plan as opposed to the Act's nonattainment provisions: first, Michigan has more discretion to select which pollution control measures to implement under its maintenance plan compared to the Act's nonattainment requirements, and; second, the timeline for attaining the standard and the consequences for a prolonged violation are less certain under Michigan's maintenance plan compared to the Act's bump ups for ozone nonattainment.

Under its maintenance plan, Michigan is required to take additional action if levels of ozone pollution exceed either the "warning level" or "action level". ARR-02 (Redesignation Request) at 28 [App. ___].[6] If levels of ozone pollution are

---

[6] The warning level is defined as an annual, fourth highest daily maximum 8-hour average of 74 ppb or greater at any monitor in the Detroit Nonattainment Area. The action level is defined as either a violation of the standard or a fourth highest daily

present in the Detroit Nonattainment Area above the warning level, then Michigan must conduct a study to determine if ozone pollution is trending higher. *Id.* If Michigan, at its sole discretion, determines its study shows ozone pollution is trending higher, then it must identify which of the over one dozen contingency measures described in the maintenance plan to implement. *Id.* If levels of pollution are present above the action level then Michigan is free to pick from the over one dozen contingency measures or adopt any "additional measures" as it sees fit. *Id.* at 28-30 [App. ___]. Not only do the contingency measures vary widely – ranging from the adoption of pollution control technology at industrial sources of ozone precursors in the area to programs to encourage reduced automotive idling – but Michigan also has complete discretion in deciding which measures to implement. *Id.* at 29-30 [App. ___]. Under the Act's nonattainment provisions, the Act specifies exactly what measures Michigan must take and requires EPA to review Michigan's proposals. *See* 42 U.S.C. § 7511a(b).

Further, while the Act's graduated classification scheme for ozone nonattainment designations establishes clear deadlines for states to achieve attainment and requires more aggressive pollution control measures if states fail to meet those deadlines, Michigan's maintenance plan merely requires the

---

maximum 8-hour average monitored averaged over two years of 71 ppb or greater at any monitor in the Detroit Nonattainment Area. *Id.*

25

implementation of some type of contingency measure within 18 months after the end of ozone season. There is no clear direction or requirement regarding when Michigan must attain the standard or what Michigan must do if its contingency measures fail to lower ozone pollution levels to below the standard in a timely fashion. For example, whereas RACT emission limits on certain pollution sources would be mandated in a Moderate nonattainment area, they are only optional contingency measures in Michigan's maintenance plan. 88 Fed. Reg. at 32,600 n.14 [App. __].

Furthermore, unlike the two-year deadline after EPA revises a standard, there is no requirement for EPA to periodically re-assess which areas are failing to meet standards and issue new nonattainment area designations when a state's maintenance plan is failing to ensure attainment with the standard. Instead, this is completely at EPA's discretion. *See* § 7407(d)(3)(A) (EPA "*may* at any time notify the Governor of any State that available information indicates that the designation of any area or portion of an area within the State or interstate area should be revised.") (emphasis added).

In short, the Act ensures the protection of the public health by requiring states to take specific actions to reduce ozone pollution by enumerated deadlines, thus minimizing discretion for both EPA and states. Under Michigan's maintenance plan, Michigan has almost unfettered discretion to determine what

26

measures it will implement to reduce ozone pollution and when it will achieve attainment by. Thus, by taking the series of actions at issue in this case, EPA has eroded many of the Clean Air Act's key requirements that exist to ensure that all residents have safe air to breathe. They have done so, as the EPA notes, in an area that most needs the protections of the Act.

As EPA has acknowledged, communities in Detroit already face "environmental conditions that have adverse human health or environmental effects on people of color, and/or low-income populations," including disproportionately high levels of ozone pollution when compared to national averages. 88 Fed. Reg. at 32,585 [App. ___]. EPA also acknowledged that it is "sensitive to" concerns about "elevated asthma rates and other respiratory diseases in the Detroit area." *Id.*

While EPA claims its decision to ignore high levels of ozone pollution in the Detroit area will not worsen these existing, disparate impacts because ozone levels "now meet health-based air quality standards," the ozone data measured at the East 7 Mile monitor demonstrates that pollution remains above the standard and thus poses a serious threat to public health—even while EPA relieves Michigan of its obligation to address that threat. *Id.*; ARC-45 at 7 [App. ___].

27

## STANDARD OF REVIEW

The Administrative Procedures Act ("APA") supplies the standard of review for all four issues listed above.[7] Under APA review, courts will overturn an EPA action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A); *see also Sw. Pa. Growth All. v. Browner*, 144 F.3d 984, 988 (6th Cir.1998). Courts must also set aside any agency action that is "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(C).

To demonstrate non-arbitrary decision-making, the agency must examine the relevant data and articulate a satisfactory explanation for its action, including a rational connection between the facts found and the choices made. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983); *Louisville Gas & Elec. Co. v. Fed. Energy Regul. Comm'n*, 988 F.3d 841, 846 (6th Cir. 2021).

The standard for reviewing an agency's interpretation of a statute (relevant to issue 3 above) is different from a review of whether the agency's action is

---

[7] For certain EPA actions issued under the Clean Air Act, 42 U.S.C. § 7607(d) supersedes the APA. However, by its own terms, this Clean Air Act provision does not apply to EPA's redesignation of a nonattainment area or a Clean Data Determination unless EPA determines that it does so. EPA must make such a determination explicit at the time of the rulemaking. *Envt'l Def., Inc. v. EPA*, 509 F.3d 553, 561 (D.C. Cir. 2007). EPA has not done so here.

arbitrary. With respect to statutory interpretation, deference is only permissible if despite "exhaust[ing] all the 'traditional tools' of construction"—including text, context, and structure—a court cannot determine the statute's meaning. *Chevron v. NRDC*, 467 U.S. 837, 843 n.9 (1984); *Keeley v. Whitaker*, 910 F.3d 878, 885-86 (6th Cir. 2018) (where "the statute, read in context[,]" is unambiguous, *Chevron* deference does not apply). *See Kisor v. Wilkie*, 588 U.S. __, 139 S.Ct. 2400, 2448 (2019) ("If a reviewing court employs all of the traditional tools of construction, the court will almost always reach a conclusion about the best interpretation of the regulation at issue" and "will have no need to adopt or defer to an agency's contrary interpretation") (Kavanaugh, J., concurring). *See State of Ohio v. Ruckelshaus*, 776 F.2d 1333, 1339 (6th Cir. 1985) ("The principle of deference does not permit the court to become a rubber stamp, automatically approving every agency interpretation of a statute.").

## SUMMARY OF ARGUMENT

All three of the actions challenged here are unlawful because they depend on EPA's wholly unsupported conclusion that Detroit ozone readings above the health-based air quality standard on two days in the summer of 2022 were clearly caused by the "exceptional event" of smoke from a wildfire 1,430 miles away, leading EPA to exclude those high readings from the data it used to evaluate whether the area was attaining the standard. 42 U.S.C. § 7619(b). The unlawful

Exceptional Events Approval rendered both the Clean Data Determination and the Redesignation unlawful because both those actions were explicitly predicated on EPA's finding that the area met the ozone standard in 2022. *See* 88 Fed. Reg. at 32,601-02 [App. ___]; 88 Fed. Reg. at 32,584 [App. ___].

Even if the Court accepts EPA's Exceptional Event Approval and resulting Clean Data Determination, it must vacate the Redesignation because EPA failed to satisfy two other requirements for redesignation set forth in the statute. 42 U.S.C. § 7407(d)(3)(E).

## I.  EPA's Exceptional Event Approval, a Predicate for Each of the Other Challenged Actions, Is Contradicted by the Record

For EPA to exclude air quality data based on the influence of wildfire smoke, "a clear causal relationship must exist between the measured exceedances . . . and the exceptional event [in this case, the wildfire,] to demonstrate that the exceptional event caused a specific air pollution concentration at a particular air quality monitoring location." 42 U.S.C. § 7619(b)(3)(B)(ii). EPA's conclusion that there was a "clear causal relationship" between wildfire smoke and two exceedances of the ozone standard in June 2022 was arbitrary because EPA lacked record support for its conclusion and even ignored information that state regulatory staff acknowledged was contradictory. First, while EPA guidance points to an unusually high presence of fine particulate matter ($PM_{2.5}$) and carbon monoxide in the air as the best evidence of wildfire smoke, EPA ignored Michigan regulators'

own finding that these pollutants were *not* particularly high at the violating monitor on the two days in question. ARC-62 (Exceptional Events Guidance) at 22 [App. __]; ARC-02 (Michigan 2022 Exceptional Event Demonstration) at 51-52 [App. __]. Even when looking to a different pollutant associated with wildfire smoke, brown carbon, the administrative record failed to support EPA's conclusion that elevated levels of brown carbon pollution were present throughout the exceptional event. ARC-02 at 40-41 [App. __]. Second, even if EPA had demonstrated the presence of wildfire smoke in the area that day, it lacked evidence to demonstrate that the wildfire smoke *caused* the ozone exceedance at the violating monitor. Michigan provided a "matching day analysis" where it compared ozone levels on previous days with similar meteorological conditions to those that existed during the claimed exceptional event; if ozone levels on the exceptional event days are significantly higher when compared to ozone concentrations on days with similar meteorological conditions, that can be evidence of a non-typical source influencing ozone pollution. ARC-02 at 53 [App. __]. But Michigan omitted an unspecified number of meteorologically similar days with no evidence that they were properly discarded from the analysis. *See id*. EPA's blind acceptance of Michigan's conclusions on this incomplete record was not reasoned decision-making. The record lacks any further analysis beyond the matching day analysis to differentiate between the impact of local sources and the 1,430-mile away wildfire. Given the

31

particularly dense concentration of sources of ozone precursors in the Detroit area, EPA's decision not to require more before concluding there was a "clear causal relationship" was arbitrary. 40 C.F.R. § 50.14(b)(4); ARC-62 at 3 [App. __] (noting that the analyses needed to demonstrate a clear causal connection between a wildfire and air quality exceedances will vary based on numerous factors, including "the complexity of the airshed").[8]

Because the Exceptional Event Approval was unlawful, and a necessary basis for EPA's Clean Data Determination, the Clean Data determination is unlawful, too. 88 Fed. Reg. at 32,584 [App. __] (noting the determination was based on a showing of attainment "based on the exclusion of certain exceedances . . . due to exceptional events."). Likewise, without the exceptional event approval, EPA had no basis for finding that the Detroit Nonattainment Area "has attained" the standard, as required by 42 U.S.C. § 7407(d)(3)(E)(i) prior to a redesignation. *See* 88 Fed. Reg. at 32,613 [App. __] (noting in Redesignation that EPA's determination under this section relied on EPA's concurrence with the state's exceptional events demonstration).

---

[8] *See also, e.g.*, Declaration of Dolores Leonard ("Leonard Decl.") ¶¶5, 9 (Standing Addendum ["SA"] at 1-2) (her home in Detroit is "surrounded by industrial facilities," and there are "dozens of pollution sources" in her zipcode and neighboring areas).

## II.   EPA Failed to Satisfy the Statutory Requirements for Redesignation.

Section 7407(d)(3)(E) of the Act imposes five requirements (or "prongs") that must be satisfied at the time EPA redesignates an area. EPA failed to meet three of them.

### A.   EPA Cannot Show the Area "Has Attained" the Standard

As noted above, EPA's redesignation did not satisfy § 7407(d)(3)(E)(i), requiring EPA to determine "the area has attained the national ambient air quality standard" because EPA relied upon its unlawful Exceptional Event Approval in making this determination. 88 Fed. Reg. at 32,613 [App. __]; *Sw. Pa. Growth All. v. Browner*, 121 F.3d 106, 113 (3d Cir. 1997). While the Court's inquiry could end there, there are two additional statutory requirements EPA failed to satisfy, taken below in turn.

### B.   The State Has Not Met "All Requirements Applicable to the Area."

EPA's finding that the state has met all of the Act's "requirements applicable to the area" per § 7407(d)(3)(E)(v) required an interpretation of this phrase that is contradicted by the text, structure, and context of the statute: that "applicable" requirements means only those requirements that were applicable on the date the state submitted its redesignation request. 88 Fed. Reg at 32,611-12 [App. __] (citing 42 U.S.C. § 7407(d)(3)(E)(v)). Based on this interpretation, EPA

proceeded with redesignation even though Michigan had not met the RACT requirement that was then effective for the Detroit Nonattainment Area. *Id.*

Three provisions of the Act plainly contradict this approach. First, prong (v) requires that the state "has met" all applicable requirements. 42 U.S.C. § 7407(d)(3)(E)(v). The use of the present perfect tense indicates a continuing obligation that persists at the time of redesignation, in parallel with EPA's interpretation of the same use of this tense in the other prongs required for redesignation. Second, the maintenance plan provision in § 7505a(c) specifically addresses the timing of lifting the requirements applicable to a nonattainment area: "Until [the maintenance plan] is approved and an area is redesignated as attainment for any area designated as a nonattainment area, the requirements of this part [i.e., part D, which includes the Moderate nonattainment area requirements] shall continue in force and effect with respect to such area." *Id.* § 7505a(c). Third, the provision requiring RACT for Moderate ozone nonattainment areas is mandatory, not permissive. *Id.* § 7511a(b)(2) (the state's plan "shall provide for the implementation of" RACT measures).

Those expressly mandatory terms reflect Congress's desire, in the 1990 Amendments to the Act (which include each section of the Act cited above), to limit EPA's discretion to avoid or delay improving air quality in nonattainment areas. "The specificity in the 1990 Amendments reflects the concern that, without

34

detailed directives, industry intervention might frustrate efforts to put pollution control steps in place." Hon. Henry A. Waxman, *An Overview of the Clean Air Act Amendments of 1990*, 21 Envtl. L. 1721, 1743–44 (1991); *see also S. Coast Air Quality Mgmt. Dist.*, 472 F.3d at 886-87. Indeed, this Court has twice rejected a similar attempt by EPA to allow a state to avoid completing the RACT requirement prior to redesignation. *Sierra Club v. EPA*, 793 F.3d 656, 669-70 (6th Cir. 2015); *Wall*, 265 F.3d at 440.

### C.    EPA Cannot Show that the Air Quality Improvement Was the Result of "Permanent and Enforceable" Emissions Reductions

EPA's Redesignation is also unlawful because it did not adequately respond to evidence in the record showing that area monitors met the standard as a result of the COVID-19 pandemic's impact on economic activity rather than "permanent and enforceable" emission reductions. 42 U.S.C. § 7407(d)(3)(E)(iii). The major economic downturn and lockdowns in 2020 significantly depressed emissions of pollution that contributes to ozone. Even under those conditions, the area's monitors just barely attained the standard during the 2019-2021 period relied upon by EPA. The record provides an insufficient basis to reasonably support EPA's conclusion that "permanent and enforceable" measures, rather than a combination of permanent reductions and temporary conditions, produced attainment.

For each of those independent reasons, the Redesignation should be vacated. 5 U.S.C. § 706(2)(A).

# ARGUMENT

## I.  Sierra Club Has Standing to Challenge EPA's Actions

Sierra Club has associational standing to challenge EPA's actions on behalf of its members. Associational standing requires that at least one member has standing to sue in her own right, that the interests at stake are germane to the organization's purpose, and that neither the claim asserted nor the relief requested requires participation of individual members in the lawsuit. *Sierra Club*, 793 F.3d at 661 (citing *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.(TOC) Inc.*, 528 U.S. 167, 181 (2000)). An individual has standing to sue when she has suffered an injury that is concrete and particularized, actual or imminent, fairly traceable to the defendant's actions, and likely to be redressed by a favorable decision. *Sierra Club v. EPA*, 60 F.4th 1008, 1017 (6th Cir. 2023).

Sierra Club and its members meet these requirements for all three EPA actions challenged here. Sierra Club's organizational purposes include protecting public health and the environment from air pollution. *See* Declaration of Andrew Sarpolis ("Sarpolis Decl.") ¶¶ 2-5 (SA at 29-30). Sierra Club's members live, breathe, and recreate outdoors in the area that EPA redesignated from nonattainment to attainment and for which it granted a Clean Data Determination based on its Exceptional Events Approval. *See id.* ¶ 7 (SA at 30) (noting more than 7,000 members living in the seven-county area); Decl. of Martin Habalewsky (SA

at 24-26); Leonard Decl. (SA at 1-4); Declaration of Robert Shobe (SA at 20-23).

Sierra Club members also live near the East 7 Mile monitor in Detroit, which has

measured some of the area's highest ozone concentrations, including those days

ignored by EPA in granting Michigan's request to consider them exceptional

events. *See, e.g.*, Shobe Decl. ¶4 (SA at 20). Individual members have health

problems exacerbated by high levels of ozone, including asthma, and face other

harms resulting from high ozone levels, and from ozone precursor pollution. *See*

Leonard Decl. ¶¶11-14 (SA at 2-3); Habalewsky Decl. ¶¶6-7, 9-12 (SA at 24-25,

25-26); Shobe Decl. ¶¶13-16 (SA at 22). High ozone levels cause members to

curtail outdoor activities and members enjoy those activities less when concerned

about health harms from air pollution. These harms caused by a risk of higher

ozone levels are concrete and imminent. *Clean Wisconsin v. EPA*, 964 F.3d 1145,

1156-57 (D.C. Cir. 2020). "More ozone is more ozone, and there is no 'threshold

concentration below which' ground-level ozone is 'known to be harmless." *Id.* at

1158 (citing *Am. Trucking Ass'ns, Inc. v. EPA,* 283 F.3d 355, 360 (D.C. Cir. 2002);

NAAQS for Ozone, 62 Fed. Reg. 38,856, 38,863 (July 18, 1997)).

    Sierra Club members' injuries are traceable to the EPA actions because each

action here pauses or eliminates steps that the state would otherwise need to take to

reduce levels of VOC and NOx pollution, leading in turn to higher concentrations

of ozone in the air these members breathe and related harms. *See supra* at 18, 23-

26. For example, Michigan recently issued RACT rules to reduce VOC pollution from petroleum refineries, vehicle coating operations, asphalt mixers, gasoline loading systems, and other existing sources of VOCs in the state's ozone nonattainment areas.[9] Sierra Club members live near these types of sources and would benefit from the pollution reductions resulting from these regulations. *E.g.*, Leonard Decl. ¶¶5-9 (SA at 1-2); Shobe Decl. ¶6 (SA at 20); Habalewsky Decl. ¶9 (SA at 25). Because EPA redesignated the southeast Michigan area to attainment, however, Michigan issued a "variance" to prevent enforcement of these requirements in those seven counties. Habalewsky Decl., Ex. 1 (SA at 27). As another example, whereas new major sources of VOCs or NOx proposed for a nonattainment area must meet particularly rigorous permitting requirements, such as offsetting the new proposed emissions with decreases at other facilities in the area, such requirements do not apply in an attainment area. *See* Michigan Nonattainment New Source Review Certification for the 2015 Ozone NAAQS, 88 Fed. Reg. 37,766, 37,767 (June 9, 2023) (applying to sources "in nonattainment areas"). "Put simply, an attainment designation amounts to a relaxation of regulatory requirements." *Clean Wisconsin*, 964 F.3d at 1157 (holding that EPA's designation of areas as attainment, rather than nonattainment, "increase[s] the

---

[9] Mich. Admin. Code R. 336.1601-336.1662, Part 6. Emission Limitations and Prohibitions – Existing Sources of Volatile Organic Compound Emissions (effective April 18, 2023).

likelihood that Environmental Petitioners' members will experience ozone-related injuries."). *Sierra Club*, 793 F.3d at 663 ("[M]any courts have apparently found it so obvious that redesignation would lead to higher emissions that they did not even need to discuss the standing of environmental litigants.").

The injuries stemming from the Redesignation are also traceable to the Exceptional Event Approval and resulting Clean Data Determination, because the Act forbade redesignation without a finding of *continuing* attainment as of 2022 – a finding that would not be possible without those two actions. *See* 42 U.S.C. §7407(d)(3)(E)(i); 88 Fed. Reg. at 32,602 [App. __] (relying on finding in Clean Data Determination and Exceptional Event Approval rulemaking that the area "continued to attain the standard for the 2020-22 period," although the state's redesignation request was based on the 2019-21 period); *see also infra* at 58-59. And the Clean Data Determination itself injures Sierra Club members by suspending the state's obligation to adopt various measures required of nonattainment areas and intended to help bring ozone levels down to safer levels. 40 C.F.R. § 51.1318. For example, a Clean Data Determination suspends reasonable further progress plans detailing how specified emission reductions will be achieved. *Id.*; 42 U.S.C. §§ 7501(1), 7502(c)(2). EPA's accompanying Redesignation eliminated those requirements (and others); but, the Clean Data Determination is a distinct source of injury to Sierra Club members because it

suspends those requirements even if Sierra Club is successful in obtaining vacatur of the Redesignation.

For similar reasons, vacatur of any of EPA's three actions is likely to redress Sierra Club members' injuries. *See Sierra Club*, 60 F.4th at 1017. ("These two requirements of standing [(traceability and redressibility)] often run together and we analyze them in tandem.") (internal quotation omitted). Vacating the Redesignation would redress harms because the state would need to bring ozone levels down with more stringent pollution control measures, and would need to do so by a specified deadline. 42 U.S.C. § 7502(a)(2)(A). Sierra Club members would benefit from the state having to adopt (or return to enforcing) emissions limits representing RACT. *See supra* at 38; Habalewsky Decl., Ex. 1 (SA at 27-28). The stricter requirements on new proposed sources in nonattainment areas would again apply to the Detroit area. *See* 88 Fed. Reg. at 37,767; Mich. Admin. Code R. 336.2901-336.2908 (2019) ("New Source Review for Major Sources Impacting Nonattainment Areas").

Vacating the Clean Data Determination or the Exceptional Event Approval would require vacatur of the Redesignation; as discussed above, the Redesignation has no factual or legal basis without them. Vacating the Clean Data Determination or the Exceptional Event Approval it relies on would also bring Sierra Club members relief by reinstating the full suite of regulatory requirements intended to

reduce ozone levels. As Sierra Club's members satisfy the requirements for individual standing, Sierra Club has associational standing on their behalf. *Sierra Club*, 793 F.3d at 661.

## II. EPA's Approval of Michigan's Exceptional Event Request Was Arbitrary and Capricious Because It Lacked a Rational Basis to Conclude that High Ozone Pollution on June 24 and 25, 2022 Was Due to Wildfire Smoke

The Clean Air Act required EPA to determine that Michigan's exceptional event demonstration established a clear causal relationship between wildfire emissions and an exceedance of the ozone standard at the East 7 Mile ozone monitor. 42 U.S.C. § 7619(b)(3)(B)(ii). While EPA has noted that evidentiary support required to meet the clear causal relationship criterion will vary on a case-by-case basis, it has also provided guidance that establishes a three-tier system in order to instruct states about the general types of evidence necessary to meet the criterion based on the intensity of the wildfire and its capability of producing pollution, as well as the distance between the wildfire and the impacted monitor. ARC-62 at 3-4 [App. __]. Tier 1 analyses, which require the least amount of evidentiary support, are appropriate for fires located in close proximity to the impacted monitor. *Id.* at 4 [App. __]. Tier 3 analyses are required when the relationship between the wildfire and the impacted monitor is at the most tenuous and thus requires the highest degree of evidentiary support to satisfy the clear causal relationship criterion. *Id.* at 12 [App. __].

41

Since the wildfire that supposedly caused the exceedances at the East 7 Mile monitor on June 24 and 25, 2022 was approximately 1,430 miles away, EPA guidance instructed Michigan to submit a Tier 3 analysis. A Tier 3 analysis is generally required to include: evidence that wildfire emissions were transported to the monitor(s); evidence that fire emissions affected the monitor, and; evidence that fire emissions caused the ozone exceedance. *Id.* at 26 [App. __]. At the direction of this guidance, Michigan submitted smoke maps and smoke trajectory models as evidence that wildfire emissions were transported to the area of the monitor, a pollutant corroboration analysis based on coarse particulate matter ($PM_{10}$), fine particulate matter ($PM_{2.5}$), carbon monoxide, and brown carbon air quality data as evidence that fire emissions affected the monitor, and a matching day analysis as evidence that wildfire emissions caused the ozone exceedance. *See generally* ARC-02 [App. __]. At issue in this case are the pollutant corroboration analysis and the matching day analysis. *Id.* at 39-41, 51-52, 53-59 [App. __, __, __].

As discussed below, EPA's Exceptional Event Approval relied on arbitrary and capricious determinations. Since each of the following categories of evidence is considered necessary by EPA guidance to establish a "clear causal relationship" between the wildfire smoke and the ozone exceedances at the East 7 Mile monitor on both June 24 and 25 2022, a finding that EPA's determination based on *any* of

42

the categories of evidence for the high ozone levels on *either* June 24 or 25 was arbitrary and capricious is sufficient to render the Exceptional Event Approval arbitrary and capricious as a whole, and, consequently, the Clean Data Determination and the Redesignation as well.

### A. EPA's Determination that Fire Emissions Affected the East 7 Mile Monitor Based on Michigan's Pollutant Corroboration Analysis Was Arbitrary and Capricious

When wildfire smoke is present in an area, it typically causes elevated concentrations of a number of air pollutants, notably soot (also known as "fine particulate matter" or "$PM_{2.5}$") from the wildfire ash and carbon monoxide ("CO") from combustion. *See* ARC-62 at 22 [App. ___]. As such, EPA guidance instructs exceptional event demonstrations to include a pollutant corroboration analysis, which consists of identifying whether air quality monitors in the area measured elevated levels of the pollutants that are typically associated with wildfire smoke. *Id.* at 14-15 [App. ___]. Since this analysis relies on actual, on-the-ground monitoring data it helps to alleviate some of the uncertainty inherent in other pieces of evidence, such as satellite imagery and meteorological modelling that are generally used to demonstrate wildfire emissions were transported to the monitor. As explained by EPA, "[b]ecause plume elevation is not directly available from simple satellite imagery, plume imagery alone does not conclusively show that wildfire emissions transported aloft reached a ground-level monitor. If plume

43

arrival at a given location coincides with elevation of wildfire plume components (such as PM$_{2.5}$, CO or organic and elemental carbon), those two pieces of evidence combined can show that smoke was transported from the event location to the monitor with elevated [ozone] concentrations." *Id.* at 14-15 [App. __]. In this case, EPA not only arbitrarily determined that Michigan's evidence demonstrated that wildfire emissions impacted the East 7 Mile monitor, it ignored evidence to the contrary.

### 1. EPA Ignored Evidence That Wildfire Smoke Did Not Meaningfully Affect Ozone Concentrations the East 7 Mile Monitor

Michigan utilized a screening analysis developed by the Lake Michigan Air Directors Consortium ("LADCO") to find evidence from local monitoring data that smoke affected the East 7 Mile Monitor. *See* ARC-02 at 51-52 [App. __]. This analysis looks at associations between ozone, PM$_{2.5}$, and carbon monoxide during the exceptional event period to measure the standard deviation of each pollutant above expected levels based on historical data. *Id.* If there are two or more pollutants with a standard deviation above one, it may indicate that concentrations for at least two pollutants commonly associated with wildfire smoke were higher than normal which is evidence that wildfire smoke was present in the area. *Id.* As illustrated by Figure 1 below, the standard deviation for both PM$_{2.5}$ (the blue line) and carbon monoxide (the green line) during the exceptional event period (denoted

by the circle) was below one, indicating that concentrations of these pollutants did

not significantly deviate from historical concentrations on the exceptional event

days in question. *Id.* at 52 [App. ___].

<u>Figure 1</u>



The lack of any significant deviations of PM$_{2.5}$ and CO pollution during the

exceptional event days in question is evidence that wildfire smoke *did not* affect

the East 7 Mile monitor. In fact, later in its exceptional event demonstration,

Michigan relied on another LADCO analysis for other days as evidence that

wildfire smoke *did not* affect the East 7 Mile monitor as a part of its matching day

analysis. *Id.* at 58-59 [App. ___]; *infra* at 54. Put another way, Michigan and EPA

ignored the LADCO analysis for the exceptional event days when it did not

support their conclusion that wildfire smoke affected the East 7 Mile monitor

during the exceptional event days but later relied on LADCO analyses as evidence

that wildfire smoke did not affect the East 7 Mile monitor during the days included in the matching day analysis.

The fact that the LADCO analysis for the exceptional event days did not support a conclusion that wildfire smoke affected the East 7 Mile monitor was not lost on Michigan. In an email, a meteorologist with EGLE who worked on the exceptional event demonstration noted that the LADCO analysis flagged two days at the East 7 Mile monitor for a potential exceptional event demonstration based on high levels of $PM_{2.5}$ and carbon monoxide but that those days "'don't align with the high [ozone] days at East 7 Mile' including June 24 and 25, 2022." ARC-31, Ex. 20 [App. ___].

Rather than address this the evidence that $PM_{2.5}$ and carbon monoxide were not unusually high on the days Michigan claimed wildfire smoke was in the area, EPA ignored it, noting that it was "one piece of evidence to identify the potential for smoke influences on surface air quality conditions…" and that it instead relied on brown carbon air quality as evidence that wildfire smoke affected the East 7 Mile monitor. 88 Fed. Reg. at 32,589 [App. ___]. As discussed below, EPA's consideration of brown carbon data was also arbitrary and capricious. *Infra* at 48-51. Additionally, the LADCO analysis for the exceptional event days was not just one piece of evidence, it's the exact type of evidence that EPA *directs* states to collect to investigate the presence of wildfire smoke, and it *contradicts* EPA's

conclusion. ARC-62 at 14 [App. __]. Under the arbitrary and capricious standard, the agency cannot ignore evidence contradicting its position. It must examine the relevant data and articulate a satisfactory explanation for its action, including a rational connection between the facts and the choices made. *Motor Vehicle Mfrs. Ass'n,* 463 U.S. at 43 (citing *Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 168 (1962)); *Butte Cty. v. Hogen,* 613 F.3d 190, 194 (D.C. Cir. 2010). When an agency "fails to examine relevant evidence or articulate a satisfactory explanation for a decision," then its decision is arbitrary and capricious. *Bangura v. Hansen,* 434 F.3d 487, 502 (6th Cir. 2006). A conclusory explanation for matters involving a central factual dispute where there is considerable evidence in conflict does not suffice to meet the deferential standards of review. *Int'l Union, United Mine Workers v. Mine Safety & Health Admin.,* 626 F.3d 84, 94 (D.C. Cir. 2010). In this instance, since there was factual evidence that contradicted EPA's determination that wildfire smoke affected the East 7 Mile monitor during the exceptional event days, it must at the very least articulate "a rational connection between the facts found and the choice made." *Hosseini v. Nielsen,* 911 F.3d 366, 371 (6th Cir. 2018). Here, EPA never explained why pollutants its guidance identifies as common indicators of wildfire smoke – $PM_{2.5}$ and carbon monoxide – were not elevated above normal concentrations at any point during the exceptional event.

### 2. Local PM10 and Brown Carbon Data Does Not Support EPA's Conclusion that Wildfire Smoke was Present at the East 7 Mile Monitor Throughout the Exceptional Event

In addition to the LADCO analysis, Michigan referred to the presence of two other pollutants as evidence that wildfire smoke affected the East 7 Mile monitor – $PM_{10}$ and brown carbon. "$PM_{10}$" refers to coarse particulate matter that is less than 10 microns in diameter, a larger cutoff than for $PM_{2.5}$, and so includes not only soot but also larger particles such as road and construction dust. In its exceptional event demonstration, EGLE claimed elevated concentrations of $PM_{10}$ pollution were evidence of wildfire smoke being present in the area. However, EPA has cautioned against relying on $PM_{10}$ concentrations as an indicator of smoke because "$PM_{10}$ generally tends to 'fall' to ground level relatively quickly in the vicinity of the event and, in our experience, is not usually subject to long range transport." ARC-31, Ex. 16 at 20 [App. __]. In its final rule, EPA acknowledged that wildfire smoke "would not typically have an impact" on local $PM_{10}$ levels when smoke travels long distances and seemingly disregarded this information in issuing its exceptional event determination. 88 Fed. Reg. at 32,589 [App. __].

EPA instead cited brown carbon concentrations measured by an air quality monitor in Dearborn, Michigan. Brown carbon sources include the combustion of biomass, biofuels, and fossil fuels. According to EGLE and EPA, brown carbon pollution peaked on June 23, 2023 – a day *before* the two-day exceptional event.

ARC-02 at 9 [App. ___]; 88 Fed. Reg. at 32,586 [App. ___]. While the administrative record does not include a detailed accounting of brown carbon data collected by the Dearborn monitor, it does include an imprecise graph – provided below as Figure 2 – that appears to show the hourly average of brown carbon pollution spiking on June 23 and then dropping sharply either on or before June 24 to normal levels with another small, short-term spike and corresponding drop on what appears to be June 25. ARC-02 at 41 [App. ___]. Notably, none of these spikes during the supposed exceptional event period appear to be out of the ordinary – higher spikes in brown carbon concentration are apparent in the few days before the exceptional event days.

Figure 2



EPA states that spikes in brown carbon data "leading up to and including June 24 and 25[,] 2022, show there were elevated levels of woodsmoke in the air mass in the Detroit area." 88 Fed. Reg. at 32,586 [App. ___]. There are two

problems with this assertion. First, the graph of data included in the record (while imprecise) contradicts that assertion; it appears to illustrate a short-term spike in the 1-hour average brown carbon concentration on June 23, no short-term spike in brown carbon concentrations on June 24, and a relatively small, short-term spike in the 1-hour average brown carbon concentrations on June 25. This does not reasonably support the assertion that brown carbon pollution was elevated throughout the exceptional event period – which EPA claimed to have occurred and which EPA was required to find in order to support its exceptional event determination for both days. Second, EPA has not explained how small, short-term spikes that occurred sporadically before the exceptional event and during one of the two exceptional event days in question are evidence that woodsmoke was present in the area and affected the East 7 Mile monitor during all of June 24 and 25. For instance, EPA never places the brown carbon data during the exceptional event in its historical context to demonstrate that brown carbon concentrations during the exceptional event were abnormally high and thus evidence of wildfire smoke being present in the Detroit area, which EPA guidance notes is necessary. *See* ARC-62 at 22 [App. ___] (noting that pollutant corroboration analyses should identify pollutants "that have increases or differences in typical behavior" to demonstrate wildfire emissions affected a monitor). EPA also never explains how Figure 2 – which illustrates brown carbon data being at rather low levels for most

of the exceptional event period – is evidence that wildfire smoke affected the East

7 Mile monitor. In fact, later in its exceptional event demonstration, Michigan

relied on similar brown carbon data – which showed brown carbon concentrations

generally being below 1 ug/m3 with short-term spikes - as evidence that wildfire

smoke *did not* impact the East 7 Mile monitor on other days utilized in its

matching day analysis. *See* ARC-02 at 57-58 [App. __]. If brown carbon is an

indicator of wildfire smoke, elevated concentrations should have been present

during the entirety of the exceptional event period.

In short, none of the air quality data gathered at the East 7 Mile monitor or at

the Dearborn, Michigan monitor demonstrate that there were elevated levels of

pollutants commonly associated with wildfire smoke during the entirety of the

exceptional event period and thus the data fails to show the wildfire emissions

affected the East 7 Mile monitor. Michigan and the EPA relied on this analysis to

corroborate less reliable evidence, such as the smoke trajectory maps commonly

associated with a Tier 1 analysis, and to provide evidence to establish that wildfire

smoke affected the East 7 Mile monitor. *See Bahr v. Regan,* 6 F.4th 1059, 1078

(9th Cir. 2021) (upholding exceptional events determination only where

monitoring data showed "unnatural increases in both ozone and its precursor

compounds" for the duration of the exceptional event period). Both EGLE and

EPA first examined the pollutants commonly associated with wildfire smoke –

PM$_{2.5}$ and carbon monoxide. Neither supported a finding that wildfire smoke was present in the area during the exceptional event period. EPA instead rested its decision on brown carbon data; but this evidence showed brown carbon pollution peaking *before* the exceptional event and remaining at low levels for the majority of the exceptional event. EPA has not established a clear, causal relationship between wildfire smoke and the high ozone events at the East 7 Mile monitor that it excluded as exceptional events. EPA was required provide some documentary support and to articulate a rational connection between the facts found and its decision to conclude that wildfire smoke affected the East 7 Mile monitor. *Hosseini v. Nielsen,* 911 F.3d 366, 371 (6th Cir. 2018). In this instance, EPA pointed to a pollutant corroboration analysis as support for its determination that wildfire smoke affected the East 7 Mile monitor. However, that analysis does not support that decision nor did EPA articulate a rational connection between the facts and its ultimate decision.

**B.    EPA's Determination that Fire Emissions Caused the Ozone Exceedances at the East 7 Mile Monitor was Arbitrary and Capricious Because It Failed to Assess Whether EGLE Properly Omitted Several Days From its Matching Day Analysis**

Even if EPA could show that wildfire smoke affected the East 7 Mile monitor, its decision would still be arbitrary because the record lacks any evidence connecting that smoke to the ozone exceedance. *See* ARC-62 at 26 [App. ___]. To show that wildfire emissions caused the ozone exceedance, Michigan's exceptional

event demonstration provided a matching day analysis which analyzed ozone concentrations on previous days with similar meteorological conditions to those that existed during the exceptional event. ARC-02 at 53-59 [App. __]. Since ozone formation is dependent on meteorology, a matching day analysis seeks to utilize meteorological variables that are associated with ozone formation to identify whether there are significant differences in ozone concentrations among days with similar weather conditions. ARC-62 at 27 [App. __]. If ozone concentrations are high on days with meteorological conditions that have not typically been associated with elevated ozone in the past, it may be evidence that non-typical sources, such as wildfire smoke, influenced ozone pollution. *Id.* EPA notes that since high ozone days "may be relatively rare, air agencies should examine several years of data from similar meteorology…." *Id.* Given that high ozone days are rare, excluding data from a matching day analysis can significantly skew the results.

That is exactly what Michigan did with its exceptional event demonstration. Michigan noted that it omitted "several days" that had similar meteorological conditions to June 24 and 25 2022 from its matching day analysis but that also experienced "potential smoke influence." ARC-02 at 53 [App. __]. The state's description suggests that these were days that had similar meteorological conditions to those that existed on June 24 and 25 as well as high levels of ozone pollution. *See id.* If those days had been included in the matching day analysis, the

53

analysis might have suggested that ozone levels were higher on June 24 and 25 simply due to local meteorological conditions and the many local sources of pollution, not because of wildfire smoke. Ultimately, Michigan only included four days with similar meteorological conditions to June 24 and 25 in its matching day analysis. *Id.* at 56 [App. __]. It also provided local brown carbon data and a LADCO analysis for each of the four days to demonstrate that ozone concentrations on the matching days were not influenced by wildfire smoke. *Id.* at 57-59 [App. __]. At no point in its exceptional event demonstration did Michigan specify which days it had excluded due to potential smoke impacts. When the Sierra Club noted this in its comments, rather than provide its analysis so that the petitioners could provide detailed comments, Michigan responded that its analysis "could be duplicated" by the petitioners. *Id.* at 87 (Response to Comments) [App. __].

Rather than assess whether Michigan properly excluded these days from its matching day analysis, EPA blindly accepted Michigan's conclusion that the exclusion of these days was proper due to "potential smoke influence." *Id.* at 53 [App. __]. When the petitioners noted Michigan had not previously submitted an exceptional event demonstration to support EGLE's determination that wildfire smoke had impacted the East 7 Mile monitor on "several days," EPA responded by stating Michigan analyzed "smoke influence" by utilizing smoke maps and

54

HYSPLIT back trajectories. 88 Fed. Reg. at 32,590 [App. ___]. However, none of this evidence was provided in the administrative record. Instead, all that Michigan provided was brown carbon data, LADCO analyses, weather maps, and HYSPLIT back trajectories to support its conclusion that smoke did not affect the East 7 Mile monitor on the four matching days, but provided no evidence to support the decision to omit several days from the matching day analysis due to potential smoke influence. ARC-02, Appendix A at 57-59 [App. ___]

A court reviewing an agency decision under the APA must determine "whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Occidental Eng'g Co. v. Immigr. & Naturalization Serv.,* 753 F.2d 766, 769 (9th Cir. 1985). Any agency decision is arbitrary and capricious if the agency fails to examine relevant evidence. *Bangura,* 434 F.3d at 502 (citing *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 23-43). Here, there is simply no evidence in the administrative record supporting EPA's decision to omit "several days" from the matching day analysis due to potential smoke impacts. While the Ninth Circuit has found that a proper matching day analysis can be probative evidence that supports the finding of a clear causal relationship between wildfire smoke and exceedances at the East 7 Mile monitor, such an analysis must be properly supported by information in the administrative record. *See Bahr,* 6 F.4th at 1079-80. EPA's analysis is not.

**C.     EPA's Determination that Wildfire Emissions Caused the Ozone Exceedance at the East 7 Mile Monitor is Unlawful Because It Did Not Analyze Local Conditions' Contribution to High Ozone Levels on the Exceptional Event Days**

In its final rule, EPA acknowledged that local weather conditions and pollution sources could be responsible for the high ozone concentrations at the East 7 Mile monitor. 88 Fed. Reg. at 32,590 [App. __]. Sierra Club noted in its comments that significant sources of ozone precursor pollutants recently began operating near the East 7 Mile monitor that could have influenced ozone concentrations. ARC-31 at 31 [App. __]. The comments also noted that many states that had previously submitted exceptional event requests claiming wildfire smoke had affected air quality in urban areas had included some type of analysis to differentiate the contributions of local pollution sources to high ozone concentrations from wildfire smoke. *Id.* at 29-30 [App. __].

EPA guidance instructs states submitting a Tier 3 analysis to include evidence that wildfire smoke caused the ozone exceedances during the exceptional event. ARC-62 at 25-30 [App. __]. It also provides three generally acceptable types of analysis capable of making this demonstration, including a matching day analysis. *Id.* While Michigan chose to provide a matching day analysis to demonstrate that fire emissions caused the ozone exceedance during the exceptional event, as discussed above, that analysis lacked sufficient evidentiary support. *See supra* at 52-55. However, even if it was adequately supported, EPA

56

guidance clearly notes that the evidentiary support required for an exceptional event demonstration will vary on a case-by-case basis and will be dependent in part on the number of local pollution sources that are present in the area that also affected ozone pollution at an air quality monitor. ARC-62 at 3 [App. __]. EPA guidance also provides that photochemical models can "differentiate the contributions from specific sources on model predicted [ozone]…concentrations" and that this evidence can be used to demonstrate a clear causal relationship between wildfire smoke and ozone exceedances. *Id.* at 29 [App. __].

Rather than attempt to disentangle and differentiate the impact of local weather conditions and pollution sources from wildfire smoke and their respective impacts on ozone pollution at the East 7 Mile monitor, EPA simply noted that neither the exceptional event rule nor EPA guidance requires states to perform a photochemical analysis or any other type of analysis capable of differentiating the impact of local weather condition and pollution sources from wildfire smoke on ozone pollution. While it is true this type of analysis is not mandated by law or guidance, the Act still requires EPA to find a "clear causal relationship…between the measured exceedances of a national ambient air quality standard and the exceptional event to demonstrate that the exceptional event caused a specific air pollution concentration at a particular air quality monitoring location." 42 U.S.C. § 7619(b)(3)(B)(ii). In situations such as this, where EPA has acknowledged local

weather and pollution conditions potentially contributed to high ozone concentrations during the exceptional event, such an analysis is required to satisfy the Act's requirement. At the very least, EPA was obligated to provide a satisfactory explanation for its decision to not analyze local conditions and their contribution to the high ozone levels during the exceptional event, particularly since many states have done so as a part of past exceptional event demonstrations. *Bangura,* 434 F.3d at 502. A conclusory explanation that such an analysis is not always required by statute or guidance is not enough to satisfy even the deferential arbitrary and capricious standard. *Int'l Union, United Mine Workers,* 626 F.3d at 94.

For all of the above reasons, the Court must vacate the Exceptional Event Approval and the Clean Data Determination that relied upon that approval to find that the area had attained the standard. *See* 88 Fed. Reg. at 32,584 [App. __].

### III. EPA's Redesignation to Attainment Was Unlawful Because EPA Lacked a Rational Basis to Conclude that the Area Was Attaining the Air Quality Standard in Light of 2022 Data

EPA's unlawful decision to grant Michigan's exceptional events request renders its decision to redesignate the Detroit area to attainment unlawful as well. This is because § 7407(d)(3)(E)(i) requires EPA to determine that an area "has attained" the standard before it can redesignate the area, a requirement that both EPA and this Court have taken to mean that "the attainment *must continue until the*

*date of redesignation*." *Commonwealth of Ky. v. EPA*, 165 F.3d 26 (6th Cir. 1998) (unpublished), 1998 WL 661138, at *3 (emphasis added); *accord Sw. Pa. Growth All.*, 121 F.3d at 113 (holding that EPA may not redesignate nonattainment area to attainment status if EPA knows that area is not meeting the NAAQS).[10] In issuing the final Redesignation in May 2023, EPA found that "the area has continued to attain the standard" subsequent to the 2019-21 period, and relied upon 2022 data in making that determination. 88 Fed. Reg. at 32,613 [App. __]. As monitoring data showed enough exceedances to push the area out of attainment in 2022, however, EPA could *only* make a finding of continued attainment by relying on the Exceptional Events Approval that allowed the agency to toss out two days measuring exceedances. As a result, if the Court agrees that the Exceptional Events Approval was irrational, then the Court must also find that EPA had no basis for finding the area "has attained" the standard, and need not evaluate the remainder of the flaws in EPA's Redesignation. 42 U.S.C. § 7407(d)(3)(E)(i).

---

[10] *See also, e.g.*, Final Disapproval of the Request to Redesignate the Kentucky Portion of the Cincinnati-Northern Kentucky Moderate Ozone Nonattainment Area to Attainment and the Associated Maintenance Plan, 61 Fed. Reg. 50,718, 50,718-19 (Sept. 27, 1996).

## IV. EPA's Redesignation Was Unlawful Because the State Has Not Met Its Obligation to Adopt RACT Measures to Reduce Ozone Precursor Emissions in the Detroit Nonattainment Area, a "Requirement Applicable to the Area" That is a Prerequisite for Redesignation

Even if the Court finds that EPA reasonably determined that the area met the ozone standard in 2022, EPA failed to satisfy a different prerequisite for redesignation. EPA "may not promulgate a redesignation of a nonattainment area . . . to attainment unless. . . the State containing such area *has met all requirements applicable to the area* under section 7410 of [Title I of the Act] and part D." *Id.* § 7407(d)(3)(E)(v) (emphasis added). When EPA issued the Redesignation in May 2023, the "requirements applicable to the area" included those for a Moderate ozone nonattainment area. 88 Fed. Reg. at 6,634 (making Moderate area requirements effective Mar. 1, 2023). For Moderate areas, the ozone provisions in subpart 2 of part D require that the state "shall submit a revision to the applicable implementation plan to include provisions to require the implementation of [RACT]" for certain sources of VOC pollution and for major sources of NOx. 42 U.S.C. § 7511a(b)(2); 40 C.F.R. § 51.1312(a)(1).[11] As discussed above, Congress

---

[11] In addition, under § 7502(c)(1), Michigan was required to implement all reasonably available control measures ("RACM") for these pollutants. *See also* 40 C.F.R. § 51.1313; 42 U.S.C. § 7511a(f). For ozone plans, RACM consists of control measures on sources of ozone precursors, either inside or outside the nonattainment area, as necessary to demonstrate attainment. *See* 40 C.F.R. § 51.1312(c). A valid Clean Data Determination pauses the RACM requirement, but not the RACT requirement. 40 C.F.R. § 51.1318.

added RACT requirements to the Act as part of a new regime to constrain EPA discretion, whereby increasingly strict tiers of regulation are triggered by a state's failure to meet its attainment deadline. *S. Coast Air Quality Mgmt. Dist.*, 472 F.3d at 886-87. The RACT requirements ensure that states take concrete measures to secure emission reductions from culprit polluters– reductions that will not only achieve attainment but ensure that such air quality improvements endure. 42 U.S.C. § 7511a(b)(2); *id.* § 7505a(d) (maintenance plan provisions must include measures already in the state plan, among other requirements).

Sierra Club commented, and EPA did not dispute, that Michigan has *not* satisfied the RACT requirements for a Moderate ozone nonattainment area.[12] EPA acknowledged that the "RACT . . . plan[] became due March 1, 2023." 88 Fed. Reg. at 32,611 [App. ___]; *see also id.* at 32,598. EPA approved the redesignation nonetheless, claiming it could exempt the state from this prerequisite because the RACT plan came due after the state originally submitted its request for redesignation. *Id.* at 32,611-12.  EPA thus seeks to redefine "all requirements applicable to the area" as *only* those requirements that *were* applicable when the

---

[12] Sierra Club raised this issue during the administrative proceeding and EPA addressed it. *See* Sierra Club Supplemental Comments, ARR-48 at 3-4; 88 Fed. Reg. at 32,610-12. *See NRDC, Inc. v. EPA*, 824 F.2d 1146, 1150–51 (D.C. Cir. 1987) (exhaustion will not bar a claim under the Administrative Procedures Act when "the agency had the opportunity to consider the very argument pressed by the petitioner on judicial review" (internal quotations omitted)).

state submitted its request. The plain language, context, and structure of the Act all foreclose that interpretation. *See Chevron*, 467 U.S. at 834 n.9 (courts may not defer to an agency's statutory interpretation unless "exhaust[ing] all the 'traditional tools of construction" a court cannot determine the statute's meaning); *see also Sw. Airlines Co. v. Saxon*, 596 U.S. 450, 455 (2022) (reviewing context of statutory terms to confirm plain meaning). This Court has previously halted similar attempts by EPA to redesignate nonattainment areas without checking all the statutory boxes based on supposed ambiguity in the word "applicable," and the Court should do so again here. *Wall*, 265 F.3d at 440; *Sierra Club*, 793 F.3d at 669-70.

### A.    The Act's Plain Text Forecloses EPA's Interpretation of "Applicable to the Area"

#### 1.   "Applicable" Is Not Ambiguous as to Timing

EPA asserts that the supposed ambiguity of the term "applicable" in the phrase "all requirements applicable to the area" allows for EPA's "longstanding," "30-year interpretation" that the state's undisputed obligation to submit RACT provisions for the Detroit area was not "applicable" because Michigan had submitted its request for redesignation before the RACT provisions came due. 88 Fed. Reg. at 32,611-12 [App. ___] (citing *inter alia* ARR-17 [Mem. from J. Calcagni, Procedures for Processing Requests to Redesignate Areas to Attainment] at 4-5 [App.___]). The age of EPA's submittal-date interpretation carries no weight, however, as the Court must still jettison it if it departs from the plain meaning of

the statute. *See, e.g.*, *Sierra Club v. EPA*, 21 F.4th 815, 819-23, 827-28 (D.C. Cir. 2021) (invalidating two of EPA's longstanding interpretations related to ozone plans, regarding "interprecursor trading" and contingency measures.).

That is the case here. The plain meaning of the statute, evident when the term "all requirements applicable" is read in context, refers to requirements applicable at the time of EPA's action, not a subset of requirements that "were applicable" at some prior date. *See, e.g.*, *Greenbaum v. EPA*, 370 F.3d 527, 535-36 (6th Cir. 2004) (in determining whether statutory text is ambiguous, the "words of a statute must be read in their context and with a view to their place in the overall statutory scheme") (quoting *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989)). As discussed below, in studying not only the provision at issue, but interlocking and adjacent provisions of the Act, along with this Court's precedent evaluating some of the very same provisions, there can be no question as to the statute's meaning.

First, by using the present perfect tense to describe requirements the state "has met," the provision "denotes past action with an abiding effect or continuing relevance," as opposed to "noncontinuing compliance." *Commonwealth of Ky.*, No. 96-4274, 1998 WL 661138, at *3; *see also, e.g., U.S. v. Jackson*, 480 F.3d 1014, 1018-19 (9th Cir. 2007) ("[O]ne would not refer in the present tense to something that had already happened"). In addition, the word "all" requires an expansive

63

reading. *See, e.g.*, *Knott v. McDonald's Corp.*, 147 F.3d 1065, 1067 (9th Cir. 1998) ("all" is not ambiguous, and "means all").

Congress's use of the present tense in each of the four requirements adjacent to § 7407(d)(3)(E)(v) is further evidence that Congress meant for EPA to evaluate a state's compliance with requirements applicable to the area at time of redesignation, not at the time of the request. *See, e.g.*, *Carr v. U.S.*, 560 U.S. 438, 449 (2010) (a "statute's undeviating use of the present tense" is a "striking indicator of its prospective orientation") (internal quotation and alteration omitted). For example, as discussed above, courts and EPA interpret the precondition that an area "has attained" the standard in prong (i), to require that the area *is* attaining based on the latest data on air quality at the time of redesignation. *Sw. Pa. Growth All.*, 121 F.3d at 113. Likewise, EPA reads the requirement that it "has fully approved" the "applicable implementation plan" in prong (ii) to mean that the plan *is* fully approved at the time of redesignation. ARR-17 at 3 ("The SIP for the area must be fully approved. … An area cannot be redesignated if" conditions other than full approval exist.). Yet in prong (v), EPA seeks to interpret "has met all requirements applicable. . ." as *not* requiring that the state *is* meeting requirements effective at the time of redesignation. While "the presumption of consistent usage" may "yield to context," *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 320 (2014), there are no differences in context here that might permit EPA to impart different

meanings to these adjacent subparts. Had Congress meant for past conduct to satisfy some requirements, but not others, it "presumably would have varied the verb tenses to convey this meaning." *Carr*, 560 U.S. at 450. Moreover, each requirement here is part of the same section that Congress specifically added to the Act to ensure that EPA would rigorously evaluate states' requests for redesignation.

The statute's insistence on continuing compliance with the relevant nonattainment area requirements up through the date of redesignation is confirmed by 42 U.S.C. § 7505a. This section addresses the requirements for the maintenance plan a state must submit to accompany a redesignation request to EPA. As described above, maintenance plans are essential to the Act's public health protections because they assure that redesignated areas not only meet air quality standards at the time of redesignation, but will do so long-term. Submission of a maintenance plan is part and parcel with a redesignation request, and approval of the plan is one of the five requirements for redesignation. *See* 42 U.S.C. § 7407(d)(3)(E)(iv); ARR-02 (Redesignation Request) at 25-30 [App. __]. Section 7505a(c) is entitled "Nonattainment requirements applicable pending plan approval," and specifically addresses how the submission of a maintenance plan to EPA affects a state's compliance obligations: in short, it does not. Rather, "*until* [the maintenance plan] is approved and *an area is redesignated as attainment* for

65

any area designated as a nonattainment area, *the requirements of this part* [i.e., part D, which includes the Moderate nonattainment area requirements] *shall continue in force and effect* with respect to such area." 42 U.S.C. § 7505a(c) (emphasis added). In other words, the Moderate nonattainment area requirements – including the obligation to adopt RACT rules to limit ozone precursors– must "continue in force and effect" until an area is redesignated. *Id.*[13] EPA's interpretation directly bypasses this text by instead stopping the clock on the state's nonattainment obligations at the time the state submits its maintenance plan. In doing so, EPA eliminates the RACT requirement and with it the "force and effect" of the Act's Moderate area requirements and bump-up scheme. *Id.*

Well-established rules of statutory construction, confirmed by the plain language of § 7505a, thus demand that the Court read prong (v) as a continuing obligation evaluated at the time of redesignation.

---

[13] The Senate Report accompanying the bill containing the 1990 Amendments provides further evidence on this point, as it specifically clarifies that "the *pendency* of a State request for a redesignation to attainment" would have "*no effect* on the [State Implementation Plan] requirements for the area for which the redesignation is requested." Sen. Rep. No. 101-228,1990 U.S.C.C.A.N. 3385, at 3401 (1989) (emphasis added).

2.  **Sixth Circuit Precedent Instructs that "Applicable" Must Be Read in the Context of the RACT Provision Itself, Which Leaves No Room for Exceptions**

By focusing on the term "applicable" alone to claim there is ambiguity as to whether the state must comply with requirements effective at the time of redesignation, EPA ignores Sixth Circuit precedent. This Court has twice held that EPA must not interpret the term "all requirements applicable to the area" in a vacuum. *Wall*, 265 F.3d at 440; *Sierra Club*, 793 F.3d at 669-70. Instead, EPA must consult the statutory text describing the requirement EPA is attempting find inapplicable. *Sierra Club*, 793 F.3d at 670 ("Instead [of considering only the language of 7407(d)..], … [the court] look[s] to *Wall*'s teachings on the type of language that does occur in the provisions directly under review.") In *Wall* and *Sierra Club*, the Court rejected two other EPA attempts to exclude RACT from "all requirements applicable to the area" in § 7407(d)(3)(E)(v). The Court found in each case that EPA's various excuses for providing states with leeway as to the RACT requirement could not overcome the unambiguous language of the RACT provision, which requires that a state's implementation plan under the Act "shall provide for the implementation of RACT measures. *Wall*, 265 F.3d at 440-42 (citing 7511a(b)(2)); *Sierra Club*, 793 F.3d at 669-70.

In *Wall*, EPA redesignated the Cincinnati ozone nonattainment area based on its acceptance of the state's "commitment to implement . . . RACT rules as

contingency measures in the maintenance plan" (*i.e.*, rules that may or may not come into play depending on the results of future air monitoring), instead of requiring RACT rules to be in place as a prerequisite to redesignation. 265 F.3d at 433. EPA had also claimed it need not enforce the RACT requirement because emission reductions from additional pollution control measures were not needed for attainment. *Id.* at 441. The Court rejected EPA's approach, holding that EPA could not exempt the state from the RACT requirement in § 7511a(b)(2) – the same requirement at play here – given the clear and mandatory nature of that subsection's language. *Id.* at 440. "Congress clearly intended that actual provisions to require implementation of RACT measures must be contained in SIPs submitted with respect to redesignation requests." *Id.* at 442; *see Sierra Club*, 793 F.3d at 669. However persuasive EPA's practical arguments, they did "not allow the EPA to take a position that conflicts with the clear intention of Congress." *Wall*, 265 F.3d at 441.

*Wall* noted, too, that EPA's failure to enforce the RACT requirement as a prerequisite to redesignation has consequences for how the state must address post-redesignation relapses in pollution that are inconsistent with the Act's provisions for quickly remedying those relapses. Maintenance plans must contain contingency measures "to assure that the State will promptly correct any violation of the standard . . . which occurs after the redesignation of the area as an attainment,"

including "a requirement that the State will implement" all relevant measures that "*were contained* in the [SIP] … before redesignation." *Id.* at 442 (quoting 42 U.S.C. § 7505a(d)) (emphasis in original). If EPA does not require a state to incorporate RACT measures into its SIP before redesignation, those measures also remain absent from the mandatory contingency measures for the area, making it less likely that future violations of the standard will be "promptly" corrected. 42 U.S.C. § 7505a(d).[14]

In *Sierra Club*, petitioners challenged EPA's redesignation of the Cincinnati-Hamilton metropolitan area from nonattainment to attainment for particulate pollution. 793 F.3d at 660-61. EPA again sought to interpret "applicable" requirements to exclude RACT measures based on EPA's practical concern that the emission reductions that would result from RACT were not necessary to achieve attainment. *Id.* at 668. The Court explicitly rejected EPA's argument that it must defer to the agency's interpretation of what requirements are "applicable." *Id.* at 670. Rather, the Court found the plain language of RACT/RACM requirements—that a State seeking redesignation "shall provide for

---

[14] While Michigan's maintenance plan includes RACT controls as "potential" contingency measures that "may" be implemented to address new NAAQS violations, these are not mandatory and, even if selected, need only be implemented 18 months after the measured violation or other triggering event. *See* 88 Fed. Reg. at 32,606 [App. __].

69

the implementation" of those measures—to be controlling, and to contradict EPA's interpretation. *Id.* at 669-70.

Wall and *Sierra Club* together instruct that EPA does not have discretion to interpret the word "applicable" in a manner that exempts the state from requirements that the Act makes mandatory. Here, the "provision[] directly under review," *Sierra Club,* 793 F.3d at 670, is again the RACT requirement for Moderate areas: "The State shall submit a revision to the applicable implementation plan to include provisions to require the implementation of" RACT for a set of specified sources. 42 U.S.C. § 7511a(b)(2).  As in *Wall* and *Sierra Club,* the term "shall" is mandatory; as in those cases, the plain language contains no exception for early redesignation request submittals.

EPA's reason for seeking to excuse the state from the RACT requirement here may be different than in *Wall* and *Sierra Club*; but here, as in those cases, EPA's purported rationale would bypass requirements the statute makes mandatory. EPA's timing-based interpretation has no grounding in the text of the statute, and thus should be no more compelling a reason to depart from the unambiguous language requiring RACT than EPA's non-textual rationales were in those cases. "[T]here must be evidence that Congress meant something other than what it literally said before a court can depart from plain meaning." *Sierra Club v. EPA*, 294 F.3d 155, 161 (D.C. Cir. 2002) (quoting *Engine Mfrs. v. EPA,* 88 F.3d

70

1075, 1088 (D.C. Cir. 1996)). EPA lacks any evidence that it can properly define the term "requirements applicable to the area" in § 7407(d)(3)(E)(v) as "requirements that were applicable at the time of the state's request for redesignation" and thereby eliminate the requirement found in § 7511a(b)(2) and (f) that states must implement RACT for Moderate areas. Consistent with its precedent, this Court must therefore reject EPA's interpretation.

### 3. EPA is Wrong that This and Other Courts' Precedent Supports Its Approach.

EPA's final rule relies on *Wall* and *Sierra Club v. EPA*, 375 F.3d 537 (7th Cir. 2004), as supporting an interpretation of "applicable" that exempts Michigan from the RACT requirement. Neither case supports the agency's position. *Wall* did allow EPA to redesignate Cincinnati without the state having completed the Part D requirement to issue "transportation-conformity" requirements (rules to ensure transportation-related projects do not contribute to air quality violations). 265 F.3d at 431, 438-40. But the Court did not give EPA free-wheeling authority to define "applicable" without regard to statutory text and context; rather, *Wall* held that the language of the transportation-conformity requirements themselves and the overall structure of the Act supported EPA's conclusion that they were not applicable for purposes of redesignation, *Id.* at 438-39. There is a key distinction in those provisions that is not present in the RACT provision relevant here: EPA could be assured that the state would abide by the transportation-conformity requirements

71

after redesignation. This is because states need to comply with transportation-conformity requirements whether or not the area is in nonattainment. *Id*. (citing 42 U.S.C. § 7506(c)(1)(A)). Likewise, areas "must implement conformity under Federal rules if state rules are not yet approved." *Id.* at 433. Neither is true of the RACT requirement. RACT *only* applies while the area is in nonattainment, and there is no duplicate federal requirement. As such, EPA's failure to enforce the *prerequisite* nature of the state's RACT rules for redesignation is equivalent to exempting the state from a mandatory Clean Air Act requirement. Once redesignated, the RACT requirement evaporates. 88 Fed. Reg at 32,598 [App. __] ("[U]pon the effective date of this redesignation to attainment, nonattainment requirements, including Moderate area requirements, will no longer apply to the Detroit area."). In short, even though the *Wall* Court countenanced a limited exception to "applicable," there is no textual basis for extending this holding to the exception EPA seeks here, based merely on the timing of the state's submission of its redesignation request. *See also Sierra Club,* 793 F.3d at 670.

Nor does the Seventh Circuit case relied upon by EPA in its response to comments apply here. *See* 88 Fed. Reg. at 32,612 [App. __]. Applying the broadest view of *Chevron* deference, that court held that it was reasonable for EPA to interpret "applicable" requirements as only those measures necessary to achieve attainment. *Sierra Club*, 375 F.3d at 540-42. Where it was undisputed that the area

was already attaining, the Court found RACT was not required as a condition of redesignation. *Id.* at 541 ("As the reason to take additional steps was to achieve an adequate reduction in ozone, it would be odd to require them even when they turned out to be unnecessary."). EPA's description of the opinion as upholding the redesignation "based on the timing of submittal" is incorrect. 88 Fed. Reg. at 32,612 [App. __]. While the opinion does mention in dicta that the submittal came prior to the deadline for RACT requirements, 375 F.3d at 541, the court's holding is based upon EPA's rationale that additional controls would not help the area meet the standard. *See, e.g.*, *id.* at 540 (describing the crux of the issue as whether "applicable requirements" were "limited to those measures that have proved to be necessary to achieve compliance"). Here, EPA purports to provide an exception due to the timing of submittal, not attainment status and, in any event, the attainment status is very much in dispute. *See supra* at 41-58 and *infra* at 82-91.

There is no reason to expand the Seventh Circuit's approach to encompass the separate claims at issue here, especially where any effort to "exhaust" the "traditional tools of statutory construction" contradicts EPA's interpretation. *Chevron,* 467 U.S. at 834 n.9; *see Keeley*, 910 F.3d at 885-86. The Seventh Circuit's cursory declaration that the term "applicable" was ambiguous enough to permit EPA to limit it to the measures necessary to achieve attainment, *Sierra Club*, 375 F.3d at 541, does not demand that this Court read that term as

73

encompassing only those requirements applicable at the time of the redesignation request, especially where the text and context of the statute contradict that reading.[15]

### 4. Allowing Exceptions to the RACT Requirement by Countenancing EPA's Interpretation of "Applicable," Would Undermine the Act's Strict Deadlines for Complying with Moderate Area Requirements.

Beyond being incompatible with the text of the maintenance plan and RACT provisions, EPA's interpretation effectively nullifies the Act's attainment deadlines and the bump-up scheme that follows. The ozone provisions give a mandatory schedule for attainment deadlines and EPA's related determinations. 42 U.S.C. § 7511(a)(1) tbl. 1, (b)(2). "Those 'attainment deadlines' … are central to the regulatory scheme." *NRDC*, 777 F.3d at 466-67 (citation omitted). And the Act sets a strict schedule for the mandatory controls that are required for reclassified areas. *E.g.* 42 U.S.C. § 7511a(b)(2) (2 years for RACT submittal after reclassification to Moderate). Although the Detroit area's RACT plan was due in March 2023 as a result of its failure to attain by its 2021 deadline, EPA excused

---

[15] Furthermore, the Seventh Circuit's finding of ambiguity in the word "applicable" from the phrase "applicable implementation plan" ignores the statutory definition of the phrase. The Act defines the whole phrase "applicable implementation plan" as, in relevant part: "the portion (or portions) of the implementation plan, or most recent revision thereof, which has been approved under section 7410 of this title" 42 U.S.C. § 7602(q). In other words, that phrase must be read as a whole, and it refers to the state's currently approved implementation plan.

74

Michigan from that deadline. 88 Fed. Reg. at 32,611 [App. __]. Such an extension of the effective date of a bump-up and its accompanying requirements is unauthorized by any statutory language, and similar attempts have been rejected by other courts.[16]

Courts have rejected EPA's attempts to implicitly extend the Act's deadlines when not explicitly permitted by the statutory text, including in the context of ozone area bump-ups. For example, in *Sierra Club v. EPA*, 311 F.3d 853 (7th Cir. 2002), the Court held that EPA could not delay the St. Louis ozone nonattainment area's bump-up to Serious despite EPA's belief that it would be unfair to impose more stringent requirements where out-of-state pollution was contributing to the city's nonattainment problem. The Court found that the "reading of the statute the EPA has adopted, and that it defends here, 'would subvert the plain meaning of the statute, making its mandatory language merely permissive.'" *Id.* at 858-59 ("[A] literal interpretation of deadlines and time limits is the only proper reading of those words.") (internal citation omitted). "Congress addressed in great detail the circumstances under and extent to which the EPA could grant exceptions to the nonattainment schedule," leaving EPA and courts without discretion to disturb that

---

[16] If EPA intended to rely upon § 7511a(i), which permits "adjustment" of applicable deadlines to "assure consistency among the required [state implementation plan] submissions," it did not state as much in its decision, nor would this be an appropriate adjustment.

scheme. *Id.* at 862. *See also, e.g.*, *Sierra Club*, 294 F.3d at 161 (rejecting another EPA attempt to extend a state's attainment deadline due to pollution from upwind areas).[17] Regarding the Detroit nonattainment area, EPA has already missed two statutory deadlines: the deadline for nonattainment designations and the deadline for reclassifying the Detroit Nonattainment Area from Marginal to Moderate nonattainment. *See supra* at 15-16. This Court must also reject EPA's backdoor attempt to extend the state's deadline to meet moderate nonattainment area requirements.

### B.    EPA's Concerns About the Practical Effects of Rejecting Its Timing-Based Interpretation of "Applicable" Are Overblown and Fail to Overcome the Term's Plain Meaning

#### 1.    EPA is Wrong that Applying the Plain Language Would Make the Statute Unworkable

EPA has but one rationale for its position that it is not a "reasonable reading of the CAA to require states to make additional SIP submissions" due to a bump-up following the redesignation request: that "such an interpretation would almost necessarily delay action on the redesignation request beyond the 18-month time frame" permitted for EPA to approve or deny the request. 88 Fed. Reg. at 32,612 [App. __]. EPA's fears that "the State might never be able to have the area

---

[17] While courts have in rare circumstances allowed EPA to extend the Act's deadlines, the conditions present in such cases - like EPA's failure to timely complete necessary guidance for states to meet their deadlines – are not present here. *E.g., NRDC v. EPA*, 22 F.3d 1125, 1135 (D.C. Cir. 1994).

redesignated" should it interpret the statute without its submittal-timing exception are overblown. *Id.* This is not a situation where the state cannot ever catch up with ever-accumulating requirements that post-date its request for redesignation. Moreover, the agency's concern with its deadline to potentially relieve the state from having to impose pollution controls, while ignoring the deadlines intended to protect public health, gets the purpose of the Act exactly backwards.

First, a reminder of the local context. Michigan took a gambit in submitting a request for redesignation request in early 2022 even though it should have been obvious that there was a high risk of ozone exceedances that summer. When the East 7 Mile monitor did in fact exceed the standard during the 2022 ozone season, a long delay followed as the state sought to preserve a finding of attainment by seeking permission to ignore these exceedances. Michigan submitted an exceptional event demonstration in January 2023. ARC-02 [App. __]. EPA concurred with the demonstration within the week, 88 Fed. Reg. at 32,592, and proposed to approve it and find the area was attaining less than two months later, in February 2023. 88 Fed. Reg. 7,382 [App.__]. That was just prior to the effective date of March 1, 2023 for the bump-up to Moderate. Then, just three months after the proposed exceptional event approval, EPA finalized that approval, the Redesignation, and the Clean Data Determination. This timeline shows both that EPA can act quickly (and on multiple submissions) when it wants to, and that the

Moderate area designation came due in this case for the entirely legitimate reason that monitors continued to observe high ozone levels. Had air quality remained within the standard, EPA would have been able to finalize its redesignation before the Moderate area bump-up occurred and would not need a contorted interpretation of "applicable" to protect the state from meeting requirements that came due after the state originally submitted its request.

More generally, reading "applicable" in the present tense does not render the redesignation process unworkable.  If at the time of submittal, the area meets the requirements for redesignation, but EPA is aware a bump-up is imminent, EPA can simply approve the redesignation request before the deadlines for new requirements. While there is an outermost 18-month limit on EPA action, EPA can act more expeditiously. 42 U.S.C. § 7410(k)(2), (3). EPA has even created a device to assist in doing so: "parallel processing" of a SIP submission, under which EPA can propose approval of a SIP even before the state has fully adopted it. 40 C.F.R. Part 51, App'x V § 2.3.1.

EPA's concern that states "might never be able to have the area redesignated" is misplaced for another reason as well. 88 Fed. Reg. at 32,612 [App. __]. Following a bump-up, the Act gives increasing time periods for states to impose the additional requirements and to bring the area into attainment before the next date of the statutory determination. 42 U.S.C § 7511(a)(1) tbl. 1 (9 years for

78

Serious areas, 15 years for Severe, and 20 years for Extreme). This gives more than enough time for the state to meet requirements for redesignation before new requirements come due. For example, even if EPA waited to redesignate the Detroit area until after RACT measures are adopted by the state and approved by EPA, the redesignation would occur well before a further bump-up to Serious. Furthermore, the Act allows EPA to grant up to two one-year extensions of the attainment deadline if the area has good air quality in the year immediately preceding the attainment deadline. 42 U.S.C. § 7511(a)(5). Thus, a state with an area on the verge of attaining the standards can get even more time.

Also, for an area legitimately attaining the standard, EPA has the option of issuing a Clean Data Determination so that the state can work towards completing requirements such as RACT for a full redesignation while being relieved of its obligation to carry out most of the requirements associated with nonattainment. Clean Data Determinations, unlike redesignations, require nothing more than a finding of attainment, such that EPA would not have to wait to approve the state implementation plan revisions required for redesignation. *See* 40 C.F.R. § 51.1318.

Finally, EPA forgets that the state is not entitled to have its redesignation request approved in the absence of meeting the statutory requirements. *See, e.g.*, 40 C.F.R. § 81.305 (California areas for 1-hour ozone standard that have been classified Extreme since 1990). Nothing in the Act requires EPA to *approve*

79

redesignations within 18 months. EPA could meet its 18-month deadline by denying the redesignation request; the consequence would be only (as the Act requires) that the State adopt a RACT revision into its state plan and resubmit its request for redesignation with that additional safeguard against pollution relapses in place.

With these many pathways available to EPA and states, the statute is workable as Congress intended without rewriting plain language.  Indeed, these approaches would be far more consistent with congressional intent to ensure public health protections are in place before EPA lifts the more stringent requirements applicable to nonattainment areas. The purpose of the Act is not to smooth a path to minimal requirements for states and industry, but to reduce dangerous pollution. *See, e.g.*, 42 U.S.C. § 7401(b)(1); *Sierra Club*, 60 F.4th at 1012 ("One of the Act's 'primary goal[s]' is to 'encourage or otherwise promote reasonable . . . State[] and local governmental actions . . . for pollution prevention'") (citing 42 U.S.C. § 7401(c)). Holding EPA accountable to this priority is particularly important where EPA has recognized that the impacted community suffers far greater environmental risk than average. *See, e.g.*, 88 Fed. Reg. at 32,596 [App. __] (finding that Wayne County ranks in the 80th percentile nationally for a range of environmental burdens scored by EPA's environmental justice screening and mapping tool).

### 2. EPA's Interpretation Invites States to Game the Redesignation Process

It is EPA's interpretation that in fact creates practical problems, as it would encourage states to submit premature redesignation requests in advance of expected bump-ups. Michigan's submission just weeks before a bump-up was due itself smacks of this possibility.[18] While EPA responds that "there is no incentive for states to submit a redesignation request before an area qualifies for redesignation" because such an application would not "have been considered complete," 88 Fed Reg. at 32,612 [App. __], that response is nonsensical. Because a determination of completeness does not constitute a determination on the merits of a submission,[19] a state could submit a technically complete but substantively faulty application simply to avoid having to meet the requirements associated with

---

[18] Michigan submitted its redesignation request in January 2022, just weeks before the moderate area bump-up would have been final had EPA acted in accordance with statutory deadlines to reclassify the area following its failure to attain. 87 Fed. Reg. at 21,844 (noting attainment date of August 3, 2021); 42 U.S.C. § 7511(b)(2) (requiring EPA to determine within six months after attainment date – that is, by February 3, 2022 – whether there was a failure to attain); 87 Fed. Reg. 21,842-01, at 21845-46 (Apr. 13, 2022) (proposing a finding of failure to attain for Detroit and noting that once final, that finding would effectuate the moderate area classification by operational of law); ARR-02 (Michigan redesignation request dated January 3, 2022) [App. __].

[19] The completeness determination is "essentially ministerial," "taking at most six months." *NRDC v. Browner*, 57 F.3d 1122, 1126 (D.C. Cir. 1995). In contrast, "the plan approval process may take up to twelve months due to the more extensive technical analyses necessary to ensure that the SIP meets the Act's substantive requirements." *Id.*

a bump-up. Avoiding meeting those requirements is strong incentive for states under pressure from industries that would like to avoid stricter controls, and there is no adverse consequence for this type of premature submittal to deter states from making one.

EPA's response thus fails to provide assurance that states would not seek to self-extend a bump-up deadline by submitting a premature redesignation request before the deadline arises. Under EPA's submittal-date interpretation, a state could submit a maintenance plan and redesignation request before the RACT requirement is due with an inadequate showing that the area is attaining, in the hopes that the next year's data will better support the attainment status.  This is the type of "administrative gamesmanship" that Congress "sought to end" through the 1990 Amendments. *NRDC v. EPA*, 706 F.3d 428, 375 n.7 (D.C. Cir. 2013). Again, all available evidence points to the necessity of reading "requirements applicable to the area," and the related mandate to implement RACT for Moderate areas, as they were written.  42 U.S.C. § 7407(d)(3)(E)(v); *id.* § 7511a(b)(2), (f).

## V.   EPA's Redesignation Was Unlawful Because EPA Lacked a Rational Basis to Conclude that the Air Quality Improvement Was "Due to Permanent and Enforceable Reductions in Emissions"

To satisfy another of the Act's prerequisites for redesignating an area as attainment, EPA had to determine that the improvement in air quality evident from the 2019-2021 design value was "due to permanent and enforceable reductions in

emissions." 42 U.S.C. § 7407(d)(3)(E)(iii). EPA lacked a rational basis to conclude as much. The three-year period in question saw lockdowns and a major economic downturn resulting from the COVID-19 pandemic, exactly the type of unusual circumstances that EPA's own guidance advises can prevent EPA from "reasonably attribut[ing]" air quality improvements to permanent reductions. ARR-17 at 4 [App. __]. The guidance instructs that "Attainment resulting from temporary reductions in emission rates (e.g., reduced production or shut down *due to temporary adverse economic conditions*) . . . would not qualify as an air quality improvement due to permanent and enforceable emission reductions." *Id.* (emphasis added).

As the air quality improvement was just barely enough to achieve the standard, EPA's conclusion that it was due to enforceable measures like state and federal rules, and not these other factors, is especially vulnerable. That conclusion is based on an implicit finding by EPA that the highest ozone concentrations would not be *even 1 ppb* higher at the area's highest reading monitors in any of the relevant years absent the pandemic. Examining the air quality data helps illustrate this point. Had the St. Clair County monitor's fourth highest measured ozone concentration been 1 ppb higher in any one of the three years, that monitor would

have violated the NAAQS.[20] 88 Fed. Reg. at 32,596 [App. __] (three-year average at Port Huron was at the standard of 70 ppb). The same is true of the E. 7 Mile monitor in Detroit. *Id.* These razor-thin margin mean that any readings higher than 70 ppb would have flipped the area into nonattainment. In other words, under these circumstances, an anomaly like a major pandemic could easily be the reason that design values were *at* 70 ppb instead of just above, even if the anomaly's impact was small. As shown below, EPA failed to "clearly show that the air quality improvements are the result of implemented controls," ARR-17 at 4 [App. __], and not this anomaly.

A.    **Commenters Presented Evidence That the Economic Downturn Associated With the COVID-19 Pandemic Temporarily Lowered Ozone Concentrations**

Commenters presented evidence that ozone precursor emissions from Midwest power plants, as well as overall vehicular traffic, were both significantly lower than usual in 2020 and 2021, corresponding with COVID lockdowns and the economic downturn. ARR-10 at 16-17 [App. __]. Coal power plant emissions reached an all-time low during 2020, and only gradually increased through 2021. *Id.* at 16 n.62 [App. __ n.62]. Coal consumption for electric power in Michigan and the upwind states of Indiana and Illinois declined dramatically between 2019 and

---

[20] *See generally Wall*, 265 F.3d at 429 ("[A]n area will attain the NAAQS only if, over the three-year period, each of its monitoring sites record three or fewer times during which the ozone concentration has exceeded the NAAQS.").

2020 and was still down relative to 2019 in 2021. *Id.* at n.63 [App. __ n.63].

Automobile travel similarly declined during 2020 and did not return to pre-

pandemic levels until June 2021. ARR-10, Ex. 9 [App. __]. As would be expected,

NOx and VOC emissions correspondingly dropped dramatically during this time.

For example, point source VOC emissions in the seven nonattainment counties

dropped from near 10,000 tons in 2019 to below 8,000 tons in 2020, while point

source NOx emissions from the nonattainment area dropped from more than

30,000 tons in 2019 to under 25,000 tons in 2020. ARR-02 (Redesignation

Request), Charts 5, 6 at 18-19 [App. __].

The evidence in the record drawing a direct link between temporary

economic conditions and reductions of precursor pollution, along with the

substantial temporary decline in specific industries and activities that create

precursor pollution distinguishes this case from others where a court has deferred

to EPA's finding that reductions were permanent and enforceable. *See Sierra Club*

*v. EPA*, 774 F.3d 383, 393 (7th Cir. 2014) (upholding EPA's attribution of air

quality improvement to permanent and enforceable reductions where, unlike here,

there was "no information in the record to support a conclusion that … the[]

reductions were temporary or that any temporary reductions contributed to the

attainment of the NAAQS").

### B.   EPA's Responses Fail to Show That Attainment Was Due to Permanent Emissions Reductions

EPA cannot "reasonably attribute[]" the emissions reductions to permanent and enforceable measures in the context of these significant, temporary influences. ARR-17 at 4 [App. ___].  EPA responded to the comments on economic influences with new analysis of the emissions impact of the economic downturn in the final rule, but EPA's response is incomplete and relies on emissions rebounding by June 2020 or later, after the ozone season had already started. EPA acknowledges a "pronounced effect on electricity production" at "Detroit[-]area" power plants in April 2020, but argues that "emissions activity from these sources increased in subsequent months following the same monthly patterns that were observed in 2018 and 2019." 88 Fed. Reg. at 32,603 [App. ___].

There are several problems with EPA's response. First, while power plant emissions across the Midwest contribute to ozone pollution in Michigan, sometimes even more significantly than local sources, EPA analyzed only the emissions patterns of local plants to determine the impact of the pandemic. *See generally Clean Wisconsin*, 964 F.3d at 1165 (noting EPA's position that ozone "violations in western Michigan were caused primarily by Chicago-area emissions"). Second, EPA's own heat input data (with heat input being a measure of the amount of fossil fuel burned in a boiler) show power plant operation in both Southeast Michigan and statewide to be dramatically lower in May 2020 than in

86

May of other years, and still lagging in June. ARR-12 (Redesignation Technical

Support Document), Appendix B at 25-26 [App. ___] (charts reproduced below); 88

Fed. Reg. at 32,603-04 [App. ___].





EPA fails to account for the real possibility that, absent the downturn, ozone

exceedances *prior* to the rebound – e.g., in May 2020 – would have pushed the

2019-2021 design value above 70 ppm. As ozone exceedances are often measured

87

in May, this is a fatal gap in EAP's analysis. *See* ARR-12, Appendix E at 43-44 [App. ___] (showing many past exceedances occurring in the month of May).

Moreover, other evidence presented by commenters confirms that the emissions-influencing depression in economic activity in fact continued through 2021. For example, analysis from the International Energy Association found that demand for oil, coal, and gas in the United States were all down in 2021 relative to 2019. *See* ARR-10, Ex. 10 [App. ___]; *see also id.*, Ex. 8 at 2 (Congressional Research Service report stating that "many economic indicators show that economic activity ha[d] still not fully recovered [as of May 2021]."). While EPA points to certain types of manufacturing, like production of personal protective equipment, ramping *up* during the pandemic, EPA does not link these operations to increased emissions of NOx and VOCs that would counteract the decline in fossil fuel burning during the relevant time period, and therefore fails to refute Sierra Club's main point. 88 Fed. Reg. at 32,604 [App. ___]. (Nor is it likely that this type of manufacturing would come anywhere close to the levels of NOx and VOCs typically produced by fossil-fuel burning power plants.)

EPA's response to the decline in vehicular traffic pointed out by commenters is similarly flawed. EPA points to data showing that, "*beginning in June 2020*," vehicle-miles-traveled levels were comparable to those before the start of the pandemic. 88 Fed. Reg. at 32,603 [App. ___] (emphasis added). EPA states, "This is

significant because EPA has found that in the upper Midwest, the majority of ozone exceedances occur in late May though late July." *Id.* But again, this only proves petitioners point: EPA is arbitrarily disregarding the good possibility that "late May" exceedances in 2020 would have pushed the area into nonattainment for the 2019-21 period. Moreover, even if the "majority" of ozone exceedances begin in late May, *any* earlier exceedances would be significant. As noted above, even one or two high ozone days can significantly impact the ozone design value for a three-year period. *See supra* at 13, 22.

Tellingly, EPA acknowledges the pandemic's impact on ozone concentrations elsewhere in the record, stating that "[t]he decreases [in ozone concentrations] seen in 2020 may have been partially due to reductions in precursor emissions caused by stay-at-home orders during the COVID-19 pandemic, with increases in 2021 as normal economic activity resumed." ARR-43 (Trends in Ozone Adjusted for Weather Conditions) at 2 [App. ___].

Because the fourth highest ozone readings for six out of seven of the area's monitors were already at or above 70 ppb in 2020, it is very likely that non-pandemic levels of precursor emissions would have pushed the 2019-2021 design values to nonattainment. *See* ARR-10, Ex. 3 at 2; *see* 88 Fed. Reg. at 32,596 [App. ___] (list of relevant monitors). The COVID recession is simply too important of a temporary influence for EPA to be able to "reasonably attribute" the improved air

quality to *permanent* emission reductions, especially where just one additional violation could have pushed the area into nonattainment. By relying on a faulty and incomplete analysis on this central issue, EPA "entirely failed to consider an important aspect of the problem" before it, and failed to satisfy § 7407(d)(3)(E)(iii). *Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 658 (2007) (quoting *Motor Vehicle Mfrs. Ass'n.,* 463 U.S. at 43). As would be expected if the 2019-21 design value were the result not of permanent and enforceable pollution reductions, but of unusual conditions, ozone levels rose again in 2022, as discussed *supra* and in Sierra Club's comments on the Clean Data Determination.[21] This evidence further weakens EPA's conclusion that lower concentrations in 2019-2021 were due to permanent emissions reductions rather than temporary conditions. Yet, instead of accepting the most obvious conclusion from the 2022 data that the pandemic temporarily had depressed ozone concentrations, EPA proceeded to finalize the Redesignation, removing still-needed protections for the Detroit area. Doing so was arbitrary. *See, e.g.*, *id*; *State of Ohio v. EPA*, 784 F.2d 224, 230-31 (6th Cir. 1986) (finding EPA action arbitrary where unsupported by adequate evidence).

---

[21] These comments were before EPA when it made its decision on redesignation and are part of the administrative record for the Redesignation, as was the technical analysis underlying EPA's Clean Data Determination and Exceptional Event Approval. *See supra* nn. 1, 4, 12.

90

EPA's core failure in declaring the Detroit area's ozone problem solved where the record did not support– and even contradicted– that finding, undermines the Act's provisions to protect public health. By making this unsupported finding, EPA relegates the Detroit area to a far weaker regime of pollution protections (described *supra* at 16-17, 23-26, 38-39) and undermines the agency's own conclusion that it has sufficiently protected environmental justice communities in Wayne County. 88 Fed. Reg. at 32,600 [App. __]. Whereas EPA seeks to assure the asthma-burdened communities of Detroit that their air is safe to breathe, EPA is only able to reach that conclusion by relying on skewed data: either by throwing out two days of valid data, or by relying on years with unusually low ozone precursor pollution. Precisely because Congress feared this type of lax enforcement by EPA, it set out very specific statutory criteria for both nonattainment areas and redesignation, leaving as little as possible to EPA's discretion. By strictly enforcing these mandates and requiring reasoned agency decision-making under the APA, the Court will ensure the Act serves its core function to protect the public from illness and disease.

## CONCLUSION

For the foregoing reasons, the Court should vacate both of the rulemakings challenged here, encompassing EPA's redesignation of the Detroit Nonattainment

Area to attainment, its Clean Data Determination for the same area, and its

approval of Michigan's exceptional events request.

Respectfully submitted,


*/s/Elena Saxonhouse*\
Elena Saxonhouse\
Sanjay Narayan\
SIERRA CLUB\
2101 Webster Street, Suite 1300\
Oakland, CA 94612\
(415) 977-5765\
elena.saxonhouse@sierraclub.org\
sanjay.narayan@sierraclub.org

*Counsel for Sierra Club*

*/s/Nicholas Leonard*\
Nicholas Leonard\
GREAT LAKES ENVIRONMENTAL\
LAW CENTER\
4444 Second Avenue\
Detroit, MI 48201\
(313) 782-3372\
nicholas.leonard@glelc.org

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32 and 6 Cir. R. 32, I hereby certify that the foregoing Petitioner's Brief is 21,306 words, excluding exempted portions, according to the count of Microsoft Word, and thereby complies with the Order of the Clerk dated Nov. 6, 2023 [Doc. 10] setting the word limit for Petitioner's Brief at 22,000 words.

I further certify that the response complies with Fed. R. App. P. 32(a)(5) and (6) because it has been prepared in 14-point Times New Roman font.

Dated: January 9, 2024

*/s/Elena Saxonhouse*
Elena Saxonhouse

## CERTIFICATE OF SERVICE

I hereby certify that on January 9, 2024, I caused the foregoing Petitioner's Brief with corrected Certificate of Compliance to be electronically filed with the Clerk of the Court by using the Court's CM/ECF system. All registered counsel will be served by the Court's CM/ECF system.

*/s/Elena Saxonhouse*
Elena Saxonhouse

# Legal Addendum

# TABLE OF CONTENTS

**Unpublished Cases** ........................................................................ **1**

*Commonwealth of Ky. v. EPA*, No. 96-4274, 1998 WL 661138
(6th Cir. Sept. 2, 1998) ................................................................... 1


**Clean Air Act** ............................................................................... **5**

42 U.S.C. § 7407(d)(3)..................................................................... 5

42 U.S.C. § 7505a ........................................................................... 7

42 U.S.C. § 7511a(b) ...................................................................... 8

42 U.S.C. § 7511a(f) ...................................................................... 12

42 U.S.C. § 7619 ............................................................................ 14


**Federal Regulations** ................................................................. **17**

40 C.F.R. § 50.14 ........................................................................... 17

40 C.F.R. § 51.1312 ....................................................................... 29

40 C.F.R. § 51.1318 ....................................................................... 31

165 F.3d 26
Unpublished Disposition
NOTICE: THIS IS AN UNPUBLISHED OPINION.
(The Court's decision is referenced in a "Table of Decisions
Without Reported Opinions" appearing in the Federal
Reporter. Use FI CTA6 Rule 28 and FI CTA6 IOP 206
for rules regarding the citation of unpublished opinions.)
United States Court of Appeals, Sixth Circuit.

COMMONWEALTH OF KENTUCKY,
Natural Resources and Environmental
Protection Cabinet, Petitioner,
STATE of Ohio, Intervenor,
v.
UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY, Respondent.

No. 96-4274.
|
Sept. 2, 1998.

On Appeal from the United States Environmental Protection
Agency.

Before SUHRHEINRICH, DAUGHTREY, and GILMAN,
Circuit Judges.

**Opinion**

SUHRHEINRICH, Circuit Judge.

**\*1** Petitioner Commonwealth of Kentucky appeals a final
ruling of the Environmental Protection Agency ("EPA")
denying Petitioner's request to (1) redesignate the Kentucky
portion of the "Cincinnati-Northern Kentucky Moderate
Ozone Nonattainment Area" (the "Area") to "attainment"
status for the air quality standard for ozone and (2) approve
Kentucky's associated attainment maintenance plan.[1]

Petitioner argues that the EPA's final ruling was arbitrary
and capricious because even though the Area met the air
quality standard for ozone for the period specified in the
redesignation request, the EPA denied Petitioner's request
for redesignation based on a single violation which occurred
outside the period specified in the redesignation request. We
AFFIRM the ruling of the EPA.

I.

The Clean Air Act (the "CAA") established a comprehensive
program to improve the nation's air quality through state
and federal regulation. 42 U.S.C. §§ 7401-7671q (West
1995). Under the CAA, the EPA Administrator must identify
dangerous air pollutants and determine National Ambient
Air Quality Standards ("NAAQS") for the permissible
concentration of specified pollutants in the ambient air. See
id. §§ 7408– 7409. For each pollutant, a state must devise a
state implementation plan ("SIP") to attain and maintain the
NAAQS. See id. §§ 7407(a), 7410(a).

Ozone nonattainment areas are classified "marginal,"
"moderate," "serious," "severe," or "extreme." See id. §
7511a. The CAA specifies a deadline for each area to attain
the ozone NAAQS. See id. § 7511(a)(1). If an area does not
attain the NAAQS for ozone by the deadline, it is reclassified
"by operation of law" and "bumped up" to the next more
stringent classification. See id. § 7511(b)(2)(A).

The EPA has set the NAAQS for ozone at 0.12 parts per
million.[2] See id. § 50.9 (1997). To determine attainment,
the EPA records the average hourly concentration of ozone
at monitoring sites within each area. The EPA records
any "exceedances" of the NAAQS for ozone. An area
is designated attainment when there are three or fewer
exceedances in a three-year period. When there are more than
three exceedances, the area is designated nonattainment.

On November 11, 1994, Kentucky requested that the EPA
(1) redesignate the Area from "moderate" nonattainment to
attainment, and (2) approve Kentucky's ten-year attainment
maintenance plan for the Area. Later, Kentucky sought
to omit from its original maintenance plan certain air
quality control measures. The EPA informed Kentucky that
a revised maintenance plan would be approved if Kentucky
demonstrated that the measures it proposed to omit were not
necessary to maintain the ozone NAAQS. On July 10, 1995,
Kentucky submitted a revised request for final approval.

On July 14, 1995, the ozone level at a monitoring site in
Lebanon, Ohio, violated the NAAQS for the fourth time
in three years. After reviewing Kentucky's redesignation
request, air quality data, and all public comments, the EPA
issued a final ruling denying redesignation. 61 Fed.Reg. at
50,718 (1996).

II.

**\*2** Petitioner argues that the EPA's final rule was arbitrary and capricious because the Area met the air quality standard for ozone for the period specified in the redesignation request, i.e., 1992-1994. The EPA denied Kentucky's request based on a single violation in July 1995. Petitioner raises four issues on appeal: (1) whether the EPA's interpretation of the Clean Air Act requires an area to be in attainment pending a redesignation request is reasonable and entitled to deference; (2) whether the EPA's policy of considering violations outside the period specified in a redesignation request is a *de facto* revision of the three year regulatory standard and results in a "moving standard" in violation of the Administrative Procedures Act; (3) whether Petitioner should be permitted to address the 1995 violation by implementing contingency provisions in its proposed maintenance plan; and (4) whether the EPA has arbitrarily subjected the Area to a possible "serious" nonattainment classification.

A.

Courts review redesignation decisions of the EPA with deference and affirm them unless they are "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law." 5 U.S.C.A. § 706(2)(A) (West 1996). *See Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971); *Wayne State Univ. v. Cleland,* 590 F.2d 627, 632 (6th Cir.1978). Courts review an agency's interpretation of a statute it administers in two steps. *See Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc. .,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). If Congress has directly addressed the precise issue, a court must effectuate the "unambiguously expressed intent of Congress." *Id.* at 842-43. If Congress has been either silent or ambiguous on the precise issue, then a reviewing court must defer to the agency's statutory interpretation if it is reasonable. *See id.* The agency's interpretation need not be the only permissible construction or the one that the reviewing court would have held. *See id.* at 843 n. 11. However, a court must set aside administrative rules for which there is no rational basis. *PPG Indus., Inc. v. Costle,* 630 F.2d 462, 465 (6th Cir.1980).

B.

Petitioner claims that the CAA does not require an air quality control area to be in attainment pending a redesignation request. The CAA requires a nonattainment area to satisfy five criteria to qualify for redesignation:

(i) the Administrator determines that the area has attained the national ambient air quality standard;

(ii) the Administrator has fully approved the applicable implementation plan for the area under section 7410(k) of this title;

(iii) the Administrator determines that the improvement in air quality is due to permanent and enforceable reductions in emissions resulting from implementation of the applicable implementation plan and applicable Federal air pollutant control regulations and other permanent and enforceable reductions;

**\*3** (iv) the Administrator has fully approved a maintenance plan for the area as meeting the requirements of section 7505a of this title; and

(v) the State containing such area has met all requirements applicable to the area under section 7410 of this title and part D of this subchapter.

42 U.S.C. § 7407(d)(3)(E) (West 1995). Petitioner challenges the EPA's determination that Kentucky failed to meet criteria one and four.

Petitioner contends that the requirements of the phrase "has attained" in the first criterion are satisfied once an area meets the NAAQS and that the "has attained" status is not affected by a single subsequent violation of the NAAQS. The EPA responds that the phrase "has attained" means more than merely reaching attainment at a single point in time. In the EPA's view, it also means that the Area has remained in attainment until the EPA issues a final ruling on a request for redesignation.

The Third Circuit endorsed the view of the EPA in dicta. *Southwestern Pa. Growth Alliance v. Browner,* 121 F.3d 106, 113 (3d Cir.1997). In *Browner,* the court explained that

"use of the term 'has attained' instead of 'attained' may be interpreted as suggesting that the attainment must continue until the date of redesignation." *Id; see* Barrett v. United States, 423 U.S. 212, 216-17, 96 S.Ct. 498, 46 L.Ed.2d 450 (1976).

Petitioner argues that Congress could have been more clear if it had used the simple present tense ("attains") or the progressive present tense ("is attaining") to explicitly require continuing compliance. However, as the EPA responds, Congress also could have been more clear if it had used the simple past tense ("attained") to require a noncontinuing compliance. Congress declined both of these options and simply used the present perfect tense ("has attained"). According to standard usage, the present perfect tense denotes past action with an abiding effect or continuing relevance. Kenneth Graham Wilson, *The Columbia Guide to Standard American English* 342 (1993); Celia Milward, *Handbook for Writers* 17, 463 (1980). Thus, the phrase "has attained," as the Third Circuit concluded, requires "that the attainment must continue until the date of redesignation." Southwestern Pa. Growth Alliance, 121 F.3d at 113.

The statutory phrase "fully approved a maintenance plan" in criterion four further supports the view that an area must comply with the NAAQS pending a final EPA ruling on a request for redesignation. A redesignation request must be accompanied by a "maintenance plan" which must include any proposed revision to the existing SIP. The maintenance plan must "provide for the maintenance of the [NAAQS] for at least 10 years after the redesignation." *Id.* § 7505a(a). As the EPA argues, by using the word "maintenance" and specifying a ten year period, Congress intended that an area must be "in attainment" when the EPA issues a ruling on a redesignation request. The Area's violation of the NAAQS within the ten-year maintenance period would indicate, as a practical matter, that the "maintenance" plan was ineffective.

**\*4** Moreover, until the EPA approves a maintenance plan and grants a redesignation request, the nonattainment requirements "shall continue in force and effect" for that area. *See id.* § 7505a(c). The nonattainment requirements most reasonably refer to the unrevised SIP or existing maintenance plan. *See* id. § 7502(c). Accordingly, we find that the CAA requires an area to be in attainment pending a redesignation request.

Finally, under *Chevron,* where an agency administers a statute and the statute is either silent or ambiguous on an issue, a reviewing court must defer to the agency's statutory interpretation, if it is reasonable. Chevron, 467 U.S. at 842-43. Considering (1) the use of the present perfect tense in the phrase, "has attained," denoting past action with abiding effect, (2) the use of the term "maintenance," and (3) the explicit continuation of the nonattainment requirements until redesignation of the area, the EPA's position requiring continuing compliance is not an unreasonable interpretation of the CAA. Accordingly, we must defer to the EPA's interpretation of the statute.

## C.

Petitioner also argues that the EPA's policy of considering violations outside the period specified in a redesignation request is a *de facto* revision of the three year regulatory standard and results in a "moving standard" in violation of the Administrative Procedures Act. The EPA uses a three year period over which to average violations of the ozone standard for compliance with the NAAQS. *See* 40 C.F.R. § 50.9 app. H (1997). Petitioner contends that the EPA is required to consider only the air quality data from the three years identified in the state's redesignation request. The regulation, 40 C.F.R. § 50.9, provides only the methodology for determining attainment (averaging violations over a three year period) and does not specify which three year period the EPA must examine. Thus, the EPA is free to examine the most recent three year period for which air quality control data exists or the period identified in a state redesignation request. As the EPA interprets the CAA, the CAA requires the EPA to determine attainment based on all data available at the time the EPA issues its ruling. This has not resulted in a "moving" standard. The EPA uniformly considers the most recent three years of air quality control data when it considers a redesignation request.

## D.

Petitioner also contends that it should be allowed to address the July 1995 violation by the remedial contingency provisions included in the maintenance plan that it submitted with its redesignation request. In the 1990 amendments to the CAA, Congress permitted states to address violations of the NAAQS after redesignation to attainment status by

contingency plans which are required for redesignation and must include all pre-request SIP measures. *See* 42 U.S.C. § 7505a(d). Petitioner argues that use of the contingency provisions would be appropriate because the July 1995 violation occurred after the EPA had published its proposed final ruling that the Area was in attainment.

 **\*5** Under the plain language of the CAA, however, redesignation is a bright line rule. Until the EPA approves a request for redesignation, the existing requirements for nonattainment areas "continue in force and effect." *Id.* § 7505a(c). Further, the 1990 amendments were designed explicitly to "promptly correct any violation of the standard which occurs after the redesignation of the area as an attainment area." *Id.* § 7505a(d). Thus, the EPA's decision not to allow Petitioner to address the 1995 violation with its proposed contingency plan was proper.

E.

Finally, Petitioner claims that the Area has been arbitrarily subjected to a possible "serious" nonattainment classification. Petitioner argues that the EPA was arbitrary in not redesignating the Area to attainment status and that, if the Area again does not attain the ozone standard, it will automatically be bumped up from its "moderate" classification to a "serious" classification with the accompanying adverse regulatory and economic repercussions. We disagree. The threat of reclassification and its economic consequences simply are not relevant to the Area's attainment status.

III.

We find the EPA ruling on Petitioner's request for redesignation consistent with the EPA's authority under the CAA. Therefore, we AFFIRM its ruling.

**All Citations**

165 F.3d 26 (Table), 1998 WL 661138

## Footnotes

1    The State of Ohio intervenes in this action because the city of Cincinnati is part of the Area. Like Kentucky, Ohio has petitioned for redesignation. The EPA has not issued a final ruling on the Ohio petition. The Chambers of Commerce of Northern Kentucky and Greater Cincinnati filed a joint amicus brief of behalf of Kentucky.

2    The ozone standard was reduced to .08 parts per million on July 18, 1997.

**End of Document**                                        © 2024 Thomson Reuters. No claim to original U.S. Government Works.

**42 U.S.C.**

United States Code, 2013 Edition
Title 42 - THE PUBLIC HEALTH AND WELFARE
CHAPTER 85 - AIR POLLUTION PREVENTION AND CONTROL
SUBCHAPTER I - PROGRAMS AND ACTIVITIES
Part A - Air Quality and Emission Limitations
Sec. 7407 - Air quality control regions
From the U.S. Government Publishing Office, www.gpo.gov

## §7407. Air quality control regions

### (d) Designations

#### (3) Redesignation

(A) Subject to the requirements of subparagraph (E), and on the basis of air quality data, planning and control considerations, or any other air quality-related considerations the Administrator deems appropriate, the Administrator may at any time notify the Governor of any State that available information indicates that the designation of any area or portion of an area within the State or interstate area should be revised. In issuing such notification, which shall be public, to the Governor, the Administrator shall provide such information as the Administrator may have available explaining the basis for the notice.

(B) No later than 120 days after receiving a notification under subparagraph (A), the Governor shall submit to the Administrator such redesignation, if any, of the appropriate area (or areas) or portion thereof within the State or interstate area, as the Governor considers appropriate.

(C) No later than 120 days after the date described in subparagraph (B) (or paragraph (1)(B)(iii)), the Administrator shall promulgate the redesignation, if any, of the area or portion thereof, submitted by the Governor in accordance with subparagraph (B), making such modifications as the Administrator may deem necessary, in the same manner and under the same procedure as is applicable under clause (ii) of paragraph (1)(B), except that the phrase "60 days" shall be substituted for the phrase "120 days" in that clause. If the Governor does not submit, in accordance with subparagraph (B), a redesignation for an area (or portion thereof) identified by the Administrator under subparagraph (A), the Administrator shall promulgate such redesignation, if any, that the Administrator deems appropriate.

(D) The Governor of any State may, on the Governor's own motion, submit to the Administrator a revised designation of any area or portion thereof within the State. Within 18 months of receipt of a complete State redesignation submittal, the Administrator shall approve or deny such redesignation. The

**005**

submission of a redesignation by a Governor shall not affect the effectiveness or enforceability of the applicable implementation plan for the State.

(E) The Administrator may not promulgate a redesignation of a nonattainment area (or portion thereof) to attainment unless—

(i) the Administrator determines that the area has attained the national ambient air quality standard;

(ii) the Administrator has fully approved the applicable implementation plan for the area under section 7410(k) of this title;

(iii) the Administrator determines that the improvement in air quality is due to permanent and enforceable reductions in emissions resulting from implementation of the applicable implementation plan and applicable Federal air pollutant control regulations and other permanent and enforceable reductions;

(iv) the Administrator has fully approved a maintenance plan for the area as meeting the requirements of section 7505a of this title; and

(v) the State containing such area has met all requirements applicable to the area under section 7410 of this title and part D of this subchapter.

(F) The Administrator shall not promulgate any redesignation of any area (or portion thereof) from nonattainment to unclassifiable.

**42 U.S.C.**
United States Code, 2013 Edition
Title 42 - THE PUBLIC HEALTH AND WELFARE
CHAPTER 85 - AIR POLLUTION PREVENTION AND CONTROL
SUBCHAPTER I - PROGRAMS AND ACTIVITIES
Part D - Plan Requirements for Nonattainment Areas
subpart 1 - nonattainment areas in general
Sec. 7505a - Maintenance plans
From the U.S. Government Publishing Office, www.gpo.gov

# §7505a. Maintenance plans

**(a) Plan revision**

   Each State which submits a request under section 7407(d) of this title for redesignation of a nonattainment area for any air pollutant as an area which has attained the national primary ambient air quality standard for that air pollutant shall also submit a revision of the applicable State implementation plan to provide for the maintenance of the national primary ambient air quality standard for such air pollutant in the area concerned for at least 10 years after the redesignation. The plan shall contain such additional measures, if any, as may be necessary to ensure such maintenance.

**(b) Subsequent plan revisions**

   8 years after redesignation of any area as an attainment area under section 7407(d) of this title, the State shall submit to the Administrator an additional revision of the applicable State implementation plan for maintaining the national primary ambient air quality standard for 10 years after the expiration of the 10-year period referred to in subsection (a) of this section.

**(c) Nonattainment requirements applicable pending plan approval**

   Until such plan revision is approved and an area is redesignated as attainment for any area designated as a nonattainment area, the requirements of this part shall continue in force and effect with respect to such area.

**(d) Contingency provisions**

   Each plan revision submitted under this section shall contain such contingency provisions as the Administrator deems necessary to assure that the State will promptly correct any violation of the standard which occurs after the redesignation of the area as an attainment area. Such provisions shall include a requirement that the State will implement all measures with respect to the control of the air pollutant concerned which were contained in the State implementation plan for the area before redesignation of the area as an attainment area. The failure of any area redesignated as an attainment area to maintain the national ambient air quality standard concerned shall not result in a requirement that the State revise its State implementation plan unless the Administrator, in the Administrator's discretion, requires the State to submit a revised State implementation plan.

(July 14, 1955, ch. 360, title I, §175A, as added Pub. L. 101–549, title I, §102(e), Nov. 15, 1990, 104 Stat. 2418.)

**42 U.S.C.**
United States Code, 2013 Edition
Title 42 - THE PUBLIC HEALTH AND WELFARE
CHAPTER 85 - AIR POLLUTION PREVENTION AND CONTROL
SUBCHAPTER I - PROGRAMS AND ACTIVITIES
Part D - Plan Requirements for Nonattainment Areas
subpart 2 - additional provisions for ozone nonattainment areas
Sec. 7511a - Plan submissions and requirements
From the U.S. Government Publishing Office, www.gpo.gov

## §7511a. Plan submissions and requirements (d) Designations

### (b) Moderate Areas

Each State in which all or part of a Moderate Area is located shall, with respect to the Moderate Area, make the submissions described under subsection (a) of this section (relating to Marginal Areas), and shall also submit the revisions to the applicable implementation plan described under this subsection.

#### (1) Plan provisions for reasonable further progress

##### (A) General rule

(i) By no later than 3 years after November 15, 1990, the State shall submit a revision to the applicable implementation plan to provide for volatile organic compound emission reductions, within 6 years after November 15, 1990, of at least 15 percent from baseline emissions, accounting for any growth in emissions after 1990. Such plan shall provide for such specific annual reductions in emissions of volatile organic compounds and oxides of nitrogen as necessary to attain the national primary ambient air quality standard for ozone by the attainment date applicable under this chapter. This subparagraph shall not apply in the case of oxides of nitrogen for those areas for which the Administrator determines (when the Administrator approves the plan or plan revision) that additional reductions of oxides of nitrogen would not contribute to attainment.

(ii) A percentage less than 15 percent may be used for purposes of clause (i) in the case of any State which demonstrates to the satisfaction of the Administrator that—

(I) new source review provisions are applicable in the nonattainment areas in the same manner and to the same extent as required under subsection (e) of this section in the case of Extreme Areas (with the exception that, in applying such provisions, the terms "major source" and "major stationary source" shall include (in addition to the sources described in section 7602 of this title) any stationary source or group of sources located within a contiguous area and under common control that emits, or has the potential to emit, at least 5 tons per year of volatile organic compounds);

(II) reasonably available control technology is required for all existing major sources (as defined in subclause (I)); and

(III) the plan reflecting a lesser percentage than 15 percent includes all measures that can feasibly be implemented in the area, in light of technological achievability.

To qualify for a lesser percentage under this clause, a State must demonstrate to the satisfaction of the Administrator that the plan for the area includes the measures that are achieved in practice by sources in the same source category in nonattainment areas of the next higher category.

**(B) Baseline emissions**

For purposes of subparagraph (A), the term "baseline emissions" means the total amount of actual VOC or $NO_x$ emissions from all anthropogenic sources in the area during the calendar year 1990, excluding emissions that would be eliminated under the regulations described in clauses (i) and (ii) of subparagraph (D).

**(C) General rule for creditability of reductions**

Except as provided under subparagraph (D), emissions reductions are creditable toward the 15 percent required under subparagraph (A) to the extent they have actually occurred, as of 6 years after November 15, 1990, from the implementation of measures required under the applicable implementation plan, rules promulgated by the Administrator, or a permit under subchapter V of this chapter.

**(D) Limits on creditability of reductions**

Emission reductions from the following measures are not creditable toward the 15 percent reductions required under subparagraph (A):

(i) Any measure relating to motor vehicle exhaust or evaporative emissions promulgated by the Administrator by January 1, 1990.

(ii) Regulations concerning Reid Vapor Pressure promulgated by the Administrator by November 15, 1990, or required to be promulgated under section 7545(h) of this title.

(iii) Measures required under subsection (a)(2)(A) of this section (concerning corrections to implementation plans prescribed under guidance by the Administrator).

(iv) Measures required under subsection (a)(2)(B) of this section to be submitted immediately after November 15, 1990 (concerning corrections to motor vehicle inspection and maintenance programs).

**(2) Reasonably available control technology**

The State shall submit a revision to the applicable implementation plan to include provisions to require the implementation of reasonably available control technology under section 7502(c)(1) of this title with respect to each of the following:

(A) Each category of VOC sources in the area covered by a CTG document issued by the Administrator between November 15, 1990, and the date of attainment.

(B) All VOC sources in the area covered by any CTG issued before November 15, 1990.

(C) All other major stationary sources of VOCs that are located in the area.

Each revision described in subparagraph (A) shall be submitted within the period set forth by the Administrator in issuing the relevant CTG document. The revisions with respect to sources described in subparagraphs (B) and (C) shall be submitted by 2 years after November 15, 1990, and shall provide for the implementation of the required measures as expeditiously as practicable but no later than May 31, 1995.

**(3) Gasoline vapor recovery**

**(A) General rule**

Not later than 2 years after November 15, 1990, the State shall submit a revision to the applicable implementation plan to require all owners or operators of gasoline dispensing systems to install and operate, by the date prescribed under subparagraph (B), a system for gasoline vapor recovery of emissions from the fueling of motor vehicles. The Administrator shall issue guidance as appropriate as to the effectiveness of such system. This subparagraph shall apply only to facilities which sell more than 10,000 gallons of gasoline per month (50,000 gallons per month in the case of an independent small business marketer of gasoline as defined in section 7625–1 [2] of this title).

**(B) Effective date**

The date required under subparagraph (A) shall be—

(i) 6 months after the adoption date, in the case of gasoline dispensing facilities for which construction commenced after November 15, 1990;

(ii) one year after the adoption date, in the case of gasoline dispensing facilities which dispense at least 100,000 gallons of gasoline per month, based on average monthly sales for the 2-year period before the adoption date; or

(iii) 2 years after the adoption date, in the case of all other gasoline dispensing facilities.

Any gasoline dispensing facility described under both clause (i) and clause (ii) shall meet the requirements of clause (i).

### (C) Reference to terms

For purposes of this paragraph, any reference to the term "adoption date" shall be considered a reference to the date of adoption by the State of requirements for the installation and operation of a system for gasoline vapor recovery of emissions from the fueling of motor vehicles.

### (4) Motor vehicle inspection and maintenance

For all Moderate Areas, the State shall submit, immediately after November 15, 1990, a revision to the applicable implementation plan that includes provisions necessary to provide for a vehicle inspection and maintenance program as described in subsection (a)(2)(B) of this section (without regard to whether or not the area was required by section 7502(b)(11)(B) of this title (as in effect immediately before November 15, 1990) to have included a specific schedule for implementation of such a program).

### (5) General offset requirement

For purposes of satisfying the emission offset requirements of this part, the ratio of total emission reductions of volatile organic compounds to total increase [3] emissions of such air pollutant shall be at least 1.15 to 1.

**42 U.S.C.**
United States Code, 2013 Edition
Title 42 - THE PUBLIC HEALTH AND WELFARE
CHAPTER 85 - AIR POLLUTION PREVENTION AND CONTROL
SUBCHAPTER I - PROGRAMS AND ACTIVITIES
Part D - Plan Requirements for Nonattainment Areas
subpart 2 - additional provisions for ozone nonattainment areas
Sec. 7511a - Plan submissions and requirements
From the U.S. Government Publishing Office, www.gpo.gov

## §7511a. Plan submissions and requirements (d) Designations

### (f) NO$_x$ requirements

(1) The plan provisions required under this subpart for major stationary sources of volatile organic compounds shall also apply to major stationary sources (as defined in section 7602 of this title and subsections (c), (d), and (e) of this section) of oxides of nitrogen. This subsection shall not apply in the case of oxides of nitrogen for those sources for which the Administrator determines (when the Administrator approves a plan or plan revision) that net air quality benefits are greater in the absence of reductions of oxides of nitrogen from the sources concerned. This subsection shall also not apply in the case of oxides of nitrogen for—

(A) nonattainment areas not within an ozone transport region under section 7511c of this title, if the Administrator determines (when the Administrator approves a plan or plan revision) that additional reductions of oxides of nitrogen would not contribute to attainment of the national ambient air quality standard for ozone in the area, or

(B) nonattainment areas within such an ozone transport region if the Administrator determines (when the Administrator approves a plan or plan revision) that additional reductions of oxides of nitrogen would not produce net ozone air quality benefits in such region.

The Administrator shall, in the Administrator's determinations, consider the study required under section 7511f of this title.

(2)(A) If the Administrator determines that excess reductions in emissions of NO$_x$ would be achieved under paragraph (1), the Administrator may limit the application of paragraph (1) to the extent necessary to avoid achieving such excess reductions.

(B) For purposes of this paragraph, excess reductions in emissions of NO$_x$ are emission reductions for which the Administrator determines that net air quality benefits are greater in the absence of such reductions. Alternatively, for purposes of this paragraph, excess reductions in emissions of NO$_x$ are, for—

(i) nonattainment areas not within an ozone transport region under section 7511c of this title, emission reductions that the Administrator determines would

not contribute to attainment of the national ambient air quality standard for ozone in the area, or

 (ii) nonattainment areas within such ozone transport region, emission reductions that the Administrator determines would not produce net ozone air quality benefits in such region.

 (3) At any time after the final report under section 7511f of this title is submitted to Congress, a person may petition the Administrator for a determination under paragraph (1) or (2) with respect to any nonattainment area or any ozone transport region under section 7511c of this title. The Administrator shall grant or deny such petition within 6 months after its filing with the Administrator.

**42 U.S.C.**
United States Code, 2013 Edition
Title 42 - THE PUBLIC HEALTH AND WELFARE
CHAPTER 85 - AIR POLLUTION PREVENTION AND CONTROL
SUBCHAPTER III - GENERAL PROVISIONS
Sec. 7619 - Air quality monitoring
From the U.S. Government Publishing Office, www.gpo.gov

## §7619. Air quality monitoring

**(a) In general**

After notice and opportunity for public hearing, the Administrator shall promulgate regulations establishing an air quality monitoring system throughout the United States which—

(1) utilizes uniform air quality monitoring criteria and methodology and measures such air quality according to a uniform air quality index,

(2) provides for air quality monitoring stations in major urban areas and other appropriate areas throughout the United States to provide monitoring such as will supplement (but not duplicate) air quality monitoring carried out by the States required under any applicable implementation plan,

(3) provides for daily analysis and reporting of air quality based upon such uniform air quality index, and

(4) provides for recordkeeping with respect to such monitoring data and for periodic analysis and reporting to the general public by the Administrator with respect to air quality based upon such data.

The operation of such air quality monitoring system may be carried out by the Administrator or by such other departments, agencies, or entities of the Federal Government (including the National Weather Service) as the President may deem appropriate. Any air quality monitoring system required under any applicable implementation plan under section 7410 of this title shall, as soon as practicable following promulgation of regulations under this section, utilize the standard criteria and methodology, and measure air quality according to the standard index, established under such regulations.

**(b) Air quality monitoring data influenced by exceptional events**

**(1) Definition of exceptional event**

In this section:

**(A) In general**

The term "exceptional event" means an event that—

(i) affects air quality;

(ii) is not reasonably controllable or preventable;

(iii) is an event caused by human activity that is unlikely to recur at a particular location or a natural event; and

(iv) is determined by the Administrator through the process established in the regulations promulgated under paragraph (2) to be an exceptional event.

**(B) Exclusions**

In this subsection, the term "exceptional event" does not include—

(i) stagnation of air masses or meteorological inversions;

(ii) a meteorological event involving high temperatures or lack of precipitation; or

(iii) air pollution relating to source noncompliance.

**(2) Regulations**

**(A) Proposed regulations**

**014**

Not later than March 1, 2006, after consultation with Federal land managers and State air pollution control agencies, the Administrator shall publish in the Federal Register proposed regulations governing the review and handling of air quality monitoring data influenced by exceptional events.

**(B) Final regulations**

Not later than 1 year after the date on which the Administrator publishes proposed regulations under subparagraph (A), and after providing an opportunity for interested persons to make oral presentations of views, data, and arguments regarding the proposed regulations, the Administrator shall promulgate final regulations governing the review and handling or [1] air quality monitoring data influenced by an exceptional event that are consistent with paragraph (3).

### (3) Principles and requirements

**(A) Principles**

In promulgating regulations under this section, the Administrator shall follow—

(i) the principle that protection of public health is the highest priority;

(ii) the principle that timely information should be provided to the public in any case in which the air quality is unhealthy;

(iii) the principle that all ambient air quality data should be included in a timely manner,[2] an appropriate Federal air quality database that is accessible to the public;

(iv) the principle that each State must take necessary measures to safeguard public health regardless of the source of the air pollution; and

(v) the principle that air quality data should be carefully screened to ensure that events not likely to recur are represented accurately in all monitoring data and analyses.

**(B) Requirements**

Regulations promulgated under this section shall, at a minimum, provide that—

(i) the occurrence of an exceptional event must be demonstrated by reliable, accurate data that is promptly produced and provided by Federal, State, or local government agencies;

(ii) a clear causal relationship must exist between the measured exceedances of a national ambient air quality standard and the exceptional event to demonstrate that the exceptional event caused a specific air pollution concentration at a particular air quality monitoring location;

(iii) there is a public process for determining whether an event is exceptional; and

(iv) there are criteria and procedures for the Governor of a State to petition the Administrator to exclude air quality monitoring data that is directly due to exceptional events from use in determinations by the Administrator with respect to exceedances or violations of the national ambient air quality standards.

### (4) Interim provision

Until the effective date of a regulation promulgated under paragraph (2), the following guidance issued by the Administrator shall continue to apply:

(A) Guidance on the identification and use of air quality data affected by exceptional events (July 1986).

(B) Areas affected by PM–10 natural events, May 30, 1996.

(C) Appendices I, K, and N to part 50 of title 40, Code of Federal Regulations.

(July 14, 1955, ch. 360, title III, §319, as added Pub. L. 95–95, title III, §309, Aug. 7, 1977, 91 Stat. 781; amended Pub. L. 109–59, title VI, §6013(a), Aug. 10, 2005, 119 Stat. 1882.)

**AMENDMENTS**

**2005**—Pub. L. 109–59 designated existing provisions as subsec. (a), inserted heading, substituted "After notice and opportunity for public hearing" for "Not later than one year after August 7, 1977, and after notice and opportunity for public hearing", and added subsec. (b).

**EFFECTIVE DATE**

Section effective Aug. 7, 1977, except as otherwise expressly provided, see section 406(d) of Pub. L. 95–95, set out as an Effective Date of 1977 Amendment note under section 7401 of this title.

[1] *So in original. Probably should be "of".*

[2] *So in original. Probably should be followed by "in".*

> Code of Federal Regulations
>> Title 40. Protection of Environment
>>> Chapter I. Environmental Protection Agency (Refs & Annos)
>>> Subchapter C. Air Programs
>>> Part 50. National Primary and Secondary Ambient Air Quality Standards (Refs & Annos)

40 C.F.R. § 50.14

§ 50.14 Treatment of air quality monitoring data influenced by exceptional events.

Effective: October 3, 2016

Currentness

(a) Requirements—

(1) Scope.

(i) This section applies to the treatment of data showing exceedances or violations of any national ambient air quality standard for purposes of the following types of regulatory determinations by the Administrator:

(A) An action to designate an area, pursuant to Clean Air Act section 107(d)(1), or redesignate an area, pursuant to Clean Air Act section 107(d)(3), for a particular national ambient air quality standard;

(B) The assignment or re-assignment of a classification category to a nonattainment area where such classification is based on a comparison of pollutant design values, calculated according to the specific data handling procedures in 40 CFR part 50 for each national ambient air quality standard, to the level of the relevant national ambient air quality standard;

(C) A determination regarding whether a nonattainment area has attained the level of the appropriate national ambient air quality standard by its specified deadline;

(D) A determination that an area has data for the specific NAAQS, which qualify the area for an attainment date extension under the CAA provisions for the applicable pollutant;

(E) A determination under Clean Air Act section 110(k)(5), if based on an area violating a national ambient air quality standard, that the state implementation plan is inadequate under the requirements of Clean Air Act section 110; and

(F) Other actions on a case-by-case basis as determined by the Administrator.

(ii) A State, federal land manager or other federal agency may request the Administrator to exclude data showing exceedances or violations of any national ambient air quality standard that are directly due to an exceptional event from

use in determinations identified in paragraph (a)(1)(i) of this section by demonstrating to the Administrator's satisfaction that such event caused a specific air pollution concentration at a particular air quality monitoring location.

(A) For a federal land manager or other federal agency to be eligible to initiate such a request for data exclusion, the federal land manager or other federal agency must:

(1) Either operate a regulatory monitor that has been affected by an exceptional event or manage land on which an exceptional event occurred that influenced a monitored concentration at a regulatory monitor; and

(2) Initiate such a request only after the State in which the affected monitor is located concurs with the federal land manager's or other federal agency's submittal.

(B) With regard to such a request, all provisions in this section that are expressed as requirements applying to a State shall, except as noted, be requirements applying to the federal land manager or other federal agency.

(C) Provided all provisions in this section are met, the Administrator shall allow a State to submit demonstrations for any regulatory monitor within its jurisdictional bounds, including those operated by federal land managers, other federal agencies and delegated local agencies.

(D) Where multiple agencies within a state submit demonstrations for events that meet the requirements of the Exceptional Events Rule, a State submittal shall have primacy for any regulatory monitor within its jurisdictional bounds.

(2) A demonstration to justify data exclusion may include any reliable and accurate data, but must specifically address the elements in paragraphs (c)(3)(iv) and (v) of this section.

(b) Determinations by the Administrator—

(1) Generally. The Administrator shall exclude data from use in determinations of exceedances and violations identified in paragraph (a)(1)(i) of this section where a State demonstrates to the Administrator's satisfaction that an exceptional event caused a specific air pollution concentration at a particular air quality monitoring location and otherwise satisfies the requirements of this section.

(2) Fireworks displays. The Administrator shall exclude data from use in determinations of exceedances and violations where a State demonstrates to the Administrator's satisfaction that emissions from fireworks displays caused a specific air pollution concentration in excess of one or more national ambient air quality standards at a particular air quality monitoring location and otherwise satisfies the requirements of this section. Such data will be treated in the same manner as exceptional events under this rule, provided a State demonstrates that such use of fireworks is significantly integral to traditional national, ethnic, or other cultural events including, but not limited to, July Fourth celebrations that satisfy the requirements of this section.

(3) Prescribed fires.

(i) The Administrator shall exclude data from use in determinations of exceedances and violations, where a State demonstrates to the Administrator's satisfaction that emissions from prescribed fires caused a specific air pollution concentration in excess of one or more national ambient air quality standards at a particular air quality monitoring location and otherwise satisfies the requirements of this section.

(ii) In addressing the requirements set forth in paragraph (c)(3)(iv)(D) of this section regarding the not reasonably controllable or preventable criterion:

(A) With respect to the requirement that a prescribed fire be not reasonably controllable, the State must either certify to the Administrator that it has adopted and is implementing a smoke management program or the State must demonstrate that the burn manager employed appropriate basic smoke management practices identified in Table 1 to § 50.14. Where a burn manager employs appropriate basic smoke management practices, the State may rely on a statement or other documentation provided by the burn manager that he or she employed those practices. If an exceedance or violation of a NAAQS occurs when a prescribed fire is employing an appropriate basic smoke management practices approach, the State and the burn manager must undertake a review of the subject fire, including a review of the basic smoke management practices applied during the subject fire to ensure the protection of air quality and public health and progress towards restoring and/or maintaining a sustainable and resilient wildland ecosystem. If the prescribed fire becomes the subject of an exceptional events demonstration, documentation of the post-burn review must accompany the demonstration.

(B) If the State anticipates satisfying the requirements of paragraph (c)(3)(iv)(D) of this section by employing the appropriate basic smoke management practices identified in Table 1 to § 50.14, then:

(1) The State, federal land managers, and other entities as appropriate, must periodically collaborate with burn managers operating within the jurisdiction of the State to discuss and document the process by which air agencies and land managers will work together to protect public health and manage air quality impacts during the conduct of prescribed fires on wildland. Such discussions must include outreach and education regarding general expectations for the selection and application of appropriate basic smoke management practices and goals for advancing strategies and increasing adoption and communication of the benefits of appropriate basic smoke management practices;

(2) The State, federal land managers and burn managers shall have an initial implementation period, defined as being 2 years from September 30, 2016, to implement the collaboration and outreach effort identified in paragraph (b)(3)(ii)(B)(1) of this section; and

(3) Except as provided in paragraph (b)(3)(ii)(B)(2) of this section, the Administrator shall not place a concurrence flag in the appropriate field for the data record in the AQS database, as specified in paragraph (c)(2)(ii) of this section, if the data are associated with a prescribed fire on wildland unless the requirements of paragraph (b)(3)(ii)(B)(1) of this section have been met and associated documentation accompanies any applicable exceptional events demonstration. The Administrator may nonconcur or defer action on such a demonstration.

(C) With respect to the requirement that a prescribed fire be not reasonably preventable, the State may rely upon and reference a multi-year land or resource management plan for a wildland area with a stated objective to establish, restore and/or maintain a sustainable and resilient wildland ecosystem and/or to preserve endangered or threatened species through a program of prescribed fire provided that the Administrator determines that there is no compelling evidence to the contrary in the record and the use of prescribed fire in the area has not exceeded the frequency indicated in that plan.

(iii) Provided the Administrator determines that there is no compelling evidence to the contrary in the record, in addressing the requirements set forth in paragraph (c)(3)(iv)(E) of this section regarding the human activity unlikely to recur at a particular location criterion for demonstrations involving prescribed fires on wildland, the State must describe the actual frequency with which a burn was conducted, but may rely upon and reference an assessment of the natural fire return interval or the prescribed fire frequency needed to establish, restore and/or maintain a sustainable and resilient wildland ecosystem contained in a multi-year land or resource management plan with a stated objective to establish, restore and/or maintain a sustainable and resilient wildland ecosystem and/or to preserve endangered or threatened species through a program of prescribed fire.

**Table 1 to § 50.14—Summary of Basic Smoke Management**
**Practices, Benefit Achieved With the BSMP, and When it is Applied [a]**

| Basic Smoke Management Practice [b] | Benefit achieved with the BSMP | When the BSMP is applied—before/during/after the burn |
|---|---|---|
| Evaluate Smoke Dispersion Conditions.... | Minimize smoke impacts......................... | Before, During, After. |
| Monitor Effects on Air Quality................. | Be aware of where the smoke is going and degree it impacts air quality............... | Before, During, After. |
| Record-Keeping/Maintain a Burn/Smoke Journal...................................................... | Retain information about the weather, burn and smoke. If air quality problems occur, documentation helps analyze and address air regulatory issues..................... | Before, During, After. |
| Communication—Public Notification...... | Notify neighbors and those potentially impacted by smoke, especially sensitive receptors.................................................... | Before, During. |
| Consider Emission Reduction Techniques | Reducing emissions through mechanisms such as reducing fuel loading can reduce downwind impacts.................................... | Before, During, After. |
| Share the Airshed—Coordination of Area Burning................................................... | Coordinate multiple burns in the area to manage exposure of the public to smoke.. | Before, During, After. |

(4) Wildfires. The Administrator shall exclude data from use in determinations of exceedances and violations where a State demonstrates to the Administrator's satisfaction that emissions from wildfires caused a specific air pollution concentration in excess of one or more national ambient air quality standard at a particular air quality monitoring location and otherwise satisfies the requirements of this section. Provided the Administrator determines that there is no compelling evidence to the contrary in the record, the Administrator will determine every wildfire occurring predominantly on wildland to have

met the requirements identified in paragraph (c)(3)(iv)(D) of this section regarding the not reasonably controllable or preventable criterion.

(5) High wind dust events.

(i) The Administrator shall exclude data from use in determinations of exceedances and violations, where a State demonstrates to the Administrator's satisfaction that emissions from a high wind dust event caused a specific air pollution concentration in excess of one or more national ambient air quality standards at a particular air quality monitoring location and otherwise satisfies the requirements of this section provided that such emissions are from high wind dust events.

(ii) The Administrator will consider high wind dust events to be natural events in cases where windblown dust is entirely from natural undisturbed lands in the area or where all anthropogenic sources are reasonably controlled as determined in accordance with paragraph (b)(8) of this section.

(iii) The Administrator will accept a high wind threshold of a sustained wind of 25 mph for areas in the States of Arizona, California, Colorado, Kansas, Nebraska, Nevada, New Mexico, North Dakota, Oklahoma, South Dakota, Texas, Utah, and Wyoming provided this value is not contradicted by evidence in the record at the time the State submits a demonstration. In lieu of this threshold, States can identify and use an Administrator-approved alternate area-specific high wind threshold that is more representative of local or regional conditions, if appropriate.

(iv) In addressing the requirements set forth in paragraph (c)(3)(iv)(D) of this section regarding the not reasonably preventable criterion, the State shall not be required to provide a case-specific justification for a high wind dust event.

(v) With respect to the not reasonably controllable criterion of paragraph (c)(3)(iv)(D) of this section, dust controls on an anthropogenic source shall be considered reasonable in any case in which the controls render the anthropogenic source as resistant to high winds as natural undisturbed lands in the area affected by the high wind dust event. The Administrator may determine lesser controls reasonable on a case-by-case basis.

(vi) For large-scale and high-energy high wind dust events, the Administrator will generally consider a demonstration documenting the nature and extent of the event to be sufficient with respect to the not reasonably controllable criterion of paragraph (c)(3)(iv)(D) of this section provided the State provides evidence showing that the event satisfies the following:

(A) The event is associated with a dust storm and is the focus of a Dust Storm Warning.

(B) The event has sustained winds that are greater than or equal to 40 miles per hour.

(C) The event has reduced visibility equal to or less than 0.5 miles.

(6) Stratospheric Intrusions. Where a State demonstrates to the Administrator's satisfaction that emissions from stratospheric intrusions caused a specific air pollution concentration in excess of one or more national ambient air quality standard at a particular air quality monitoring location and otherwise satisfies the requirements of this section,

the Administrator will determine stratospheric intrusions to have met the requirements identified in paragraph (c)(3)(iv)(D) of this section regarding the not reasonably controllable or preventable criterion and shall exclude data from use in determinations of exceedances and violations.

(7) Determinations with respect to event aggregation, multiple national ambient air quality standards for the same pollutant, and exclusion of 24–hour values for particulate matter.

(i) Where a State demonstrates to the Administrator's satisfaction that for national ambient air quality standards with averaging or cumulative periods less than or equal to 24 hours the aggregate effect of events occurring on the same day has caused an exceedance or violation, the Administrator shall determine such collective data to satisfy the requirements in paragraph (c)(3)(iv)(B) of this section regarding the clear causal relationship criterion. Where a State demonstrates to the Administrator's satisfaction that for national ambient air quality standards with averaging or cumulative periods longer than 24 hours the aggregate effect of events occurring on different days has caused an exceedance or violation, the Administrator shall determine such collective data to satisfy the requirements in paragraph (c)(3)(iv)(B) of this section regarding the clear causal relationship criterion.

(ii) The Administrator shall accept as part of a demonstration for the clear causal relationship in paragraph (c)(3)(iv)(B) of this section with respect to a 24–hour NAAQS, a State's comparison of a 24–hour concentration of any national ambient air quality standard pollutant to the level of a national ambient air quality standard for the same pollutant with a longer averaging period. The Administrator shall also accept as part of a demonstration for the clear causal relationship in paragraph (c)(3)(iv)(B) of this section with respect to a NAAQS with a longer averaging period, a State's comparison of a 24–hour concentration of any national ambient air quality standard pollutant to the level of the national ambient air quality standard for the same pollutant with a longer averaging period, without the State having to demonstrate that the event caused the annual average concentration of the pollutant to exceed the level of the NAAQS with the longer averaging period.

(iii) Where a State operates a continuous analyzer that has been designated as a Federal Equivalent Method monitor as defined in 40 CFR 50.1(g) that complies with the monitoring requirements of 40 CFR part 58, Appendix C, and the State believes that collected data have been influenced by an event, in following the process outlined in paragraph (c)(2) of this section, the State shall create an initial event description and flag the associated event-influenced data that have been submitted to the AQS database for the affected monitor. Where a State demonstrates to the Administrator's satisfaction that such data satisfy the requirements in paragraph (c)(3)(iv)(B) of this section regarding the clear causal relationship criterion and otherwise satisfy the requirements of this section, the Administrator shall agree to exclude all data within the affected calendar day(s).

(8) Determinations with respect to the not reasonably controllable or preventable criterion.

(i) The not reasonably controllable or preventable criterion has two prongs that the State must demonstrate: prevention and control.

(ii) The Administrator shall determine that an event is not reasonably preventable if the State shows that reasonable measures to prevent the event were applied at the time of the event.

(iii) The Administrator shall determine that an event is not reasonably controllable if the State shows that reasonable measures to control the impact of the event on air quality were applied at the time of the event.

(iv) The Administrator shall assess the reasonableness of available controls for anthropogenic sources based on information available as of the date of the event.

(v) Except where a State, tribal or federal air agency is obligated to revise its state implementation plan, tribal implementation plan, or federal implementation plan, the Administrator shall consider enforceable control measures implemented in accordance with a state implementation plan, tribal implementation plan, or federal implementation plan, approved by the EPA within 5 years of the date of the event, that address the event-related pollutant and all sources necessary to fulfill the requirements of the Clean Air Act for the state implementation plan, tribal implementation plan, or federal implementation plan to be reasonable controls with respect to all anthropogenic sources that have or may have contributed to the monitored exceedance or violation.

(vi) Where a State, tribal or federal air agency is obligated to revise its state implementation plan, tribal implementation plan, or federal implementation plan, the deference to enforceable control measures identified in paragraph (b)(8)(v) of this section shall remain only until the due date of the required state implementation plan, tribal implementation plan, or federal implementation plan revisions. However, where an air agency is obligated to revise the enforceable control measures identified in paragraph (b)(8)(v) of this section in its implementation plan as a result of an action pursuant to Clean Air Act section 110(k)(5), the deference, if any, to those enforceable control measures shall be determined on a case-by-case basis.

(vii) The Administrator shall not require a State to provide case-specific justification to support the not reasonably controllable or preventable criterion for emissions-generating activity that occurs outside of the State's jurisdictional boundaries within which the concentration at issue was monitored. In the case of a tribe treated as a state under 40 CFR 49.2 with respect to exceptional events requirements, the tribe's jurisdictional boundaries for purposes of requiring or directly implementing emission controls apply. In the case of a federal land manager or other federal agency submitting a demonstration under the requirements of this section, the jurisdictional boundaries that apply are those of the State or the tribe depending on which has jurisdiction over the area where the event has occurred.

(viii) In addition to the provisions that apply to specific event types identified in paragraphs (b)(3)(ii) and (b)(5)(i) through (iii) of this section in addressing the requirements set forth in paragraph (c)(3)(iv)(D) of this section regarding the not reasonably controllable or preventable criterion, the State must include the following components:

(A) Identification of the natural and anthropogenic sources of emissions causing and contributing to the monitored exceedance or violation, including the contribution from local sources.

(B) Identification of the relevant state implementation plan, tribal implementation plan, or federal implementation plan or other enforceable control measures in place for the sources identified in paragraph (b)(8)(vii)(A) of this section and the implementation status of these controls.

(C) Evidence of effective implementation and enforcement of the measures identified in paragraph (b)(8)(vii)(B) of this section.

(D) The provisions in this paragraph shall not apply if the provisions in paragraph (b)(4), (b)(5)(vi), or (b)(6) of this section apply.

(9) Mitigation plans.

(i) Except as provided for in paragraph (b)(9)(ii) of this section, where a State is subject to the requirements of 40 CFR 51.930(b), the Administrator shall not place a concurrence flag in the appropriate field for the data record in the AQS database, as specified in paragraph (c)(2)(ii) of this section, if the data are of the type and pollutant that are the focus of the mitigation plan until the State fulfills its obligations under the requirements of 40 CFR 51.930(b). The Administrator may nonconcur or defer action on such a demonstration.

(ii) The prohibition on placing a concurrence flag in the appropriate field for the data record in the AQS database by the Administrator stated in paragraph (b)(9)(i) of this section does not apply to data that are included in an exceptional events demonstration that is:

(A) submitted in accordance with paragraph (c)(3) of this section that is also of the type and pollutant that is the focus of the mitigation plan, and

(B) submitted within the 2–year period allowed for mitigation plan development as specified in 40 CFR 51.930(b)(3).

(c) Schedules and procedures—

(1) Public notification.

(i) In accordance with the mitigation requirement at 40 CFR 51.930(a)(1), all States and, where applicable, their political subdivisions must notify the public promptly whenever an event occurs or is reasonably anticipated to occur which may result in the exceedance of an applicable air quality standard.

(ii) [Reserved]

(2) Initial notification of potential exceptional event.

(i) A State shall notify the Administrator of its intent to request exclusion of one or more measured exceedances of an applicable national ambient air quality standard as being due to an exceptional event by creating an initial event description and flagging the associated data that have been submitted to the AQS database and by engaging in the Initial Notification of Potential Exceptional Event process as follows:

(A) The State and the appropriate EPA Regional office shall engage in regular communications to identify those data that have been potentially influenced by an exceptional event, to determine whether the identified data may

affect a regulatory determination and to discuss whether the State should develop and submit an exceptional events demonstration according to the requirements in this section;

(B) For data that may affect an anticipated regulatory determination or where circumstances otherwise compel the Administrator to prioritize the resulting demonstration, the Administrator shall respond to a State's Initial Notification of Potential Exceptional Event with a due date for demonstration submittal that considers the nature of the event and the anticipated timing of the associated regulatory decision;

(C) The Administrator may waive the Initial Notification of Potential Exceptional Event process on a case-by-case basis.

(ii) The data shall not be excluded from determinations with respect to exceedances or violations of the national ambient air quality standards unless and until, following the State's submittal of its demonstration pursuant to paragraph (c)(3) of this section and the Administrator's review, the Administrator notifies the State of its concurrence by placing a concurrence flag in the appropriate field for the data record in the AQS database.

(iii) [Reserved]

(iv) [Reserved]

(v) [Reserved]

(vi) Table 2 to § 50.14 identifies the submission process for data that will or may influence the initial designation of areas for any new or revised national ambient air quality standard.

**Table 2 to § 50.14—Schedule for Initial Notification and Demonstration Submission for Data Influenced by Exceptional Events for Use in Initial Area Designations**

| Exceptional events/ Regulatory action | Condition | Exceptional events deadline schedule [d] |
|---|---|---|
| (A) Initial Notification deadline for data years 1, 2 and 3. [a] ...................................... | If state and tribal initial designation recommendations for a new/revised national ambient air quality standard are due August through January,.................... | then the Initial Notification deadline will be the July 1 prior to the recommendation deadline. |
| (B) Initial Notification deadline for data years 1, 2 and 3. [a] ...................................... | If state and tribal recommendations for a new/revised national ambient air quality standard are due February through July,... | then the Initial Notification deadline will be the January 1 prior to the recommendation deadline. |
| (C) Exceptional events demonstration submittal deadline for data years 1, 2 and 3 [a] .............................................................. | None............................................................. | no later than the later of November 29, 2016 or the date that state and tribal |

| | | recommendations are due to the Administrator. |
|---|---|---|
| (D) Initial Notification and exceptional events demonstration submittal deadline for data year 4 [b] and, where applicable, data year 5. [c] ............................................ | None.......................................................... | by the last day of the month that is 1 year and 7 months after promulgation of a new/ revised national ambient air quality standard, unless either paragraph (E) or paragraph (F) applies. |
| (E) Initial Notification and exceptional events demonstration submittal deadline for data year 4 [b] and, where applicable, data year 5. [c] ............................................ | If the Administrator follows a 3-year designation schedule................................. | the deadline is 2 years and 7 months after promulgation of a new/ revised national ambient air quality standard. |
| (F) Initial Notification and exceptional events demonstration submittal deadline for data year 4 [b] and, where applicable, data year 5. [c] ............................................ | If the Administrator notifies the state/ tribe that it intends to complete the initial area designations process according to a schedule between 2 and 3 years,............... | the deadline is 5 months prior to the date specified for final designations decisions in such Administrator notification. |

(3) Submission of demonstrations.

(i) Except as provided under paragraph (c)(2)(vi) of this section, a State that has flagged data as being due to an exceptional event and is requesting exclusion of the affected measurement data shall, after notice and opportunity for public comment, submit a demonstration to justify data exclusion to the Administrator according to the schedule established under paragraph (c)(2)(i)(B).

(ii) [Reserved]

(iii) [Reserved]

(iv) The demonstration to justify data exclusion must include:

(A) A narrative conceptual model that describes the event(s) causing the exceedance or violation and a discussion of how emissions from the event(s) led to the exceedance or violation at the affected monitor(s);

(B) A demonstration that the event affected air quality in such a way that there exists a clear causal relationship between the specific event and the monitored exceedance or violation;

(C) Analyses comparing the claimed event-influenced concentration(s) to concentrations at the same monitoring site at other times to support the requirement at paragraph (c)(3)(iv)(B) of this section. The Administrator shall not require a State to prove a specific percentile point in the distribution of data;

WESTLAW   © 2024 Thomson Reuters. No claim to original U.S. Government Works.

(D) A demonstration that the event was both not reasonably controllable and not reasonably preventable; and

(E) A demonstration that the event was a human activity that is unlikely to recur at a particular location or was a natural event.

(v) With the submission of the demonstration containing the elements in paragraph (c)(3)(iv) of this section, the State must:

(A) Document that the State followed the public comment process and that the comment period was open for a minimum of 30 days, which could be concurrent with the beginning of the Administrator's initial review period of the associated demonstration provided the State can meet all requirements in this paragraph;

(B) Submit the public comments it received along with its demonstration to the Administrator; and

(C) Address in the submission to the Administrator those comments disputing or contradicting factual evidence provided in the demonstration.

(vi) Where the State has submitted a demonstration according to the requirements of this section after September 30, 2016 and the Administrator has reviewed such demonstration and requested additional evidence to support one of the elements in paragraph (c)(3)(iv) of this section, the State shall have 12 months from the date of the Administrator's request to submit such evidence. At the conclusion of this time, if the State has not submitted the requested additional evidence, the Administrator will notify the State in writing that it considers the demonstration to be inactive and will not pursue additional review of the demonstration. After a 12–month period of inactivity by the State, if a State desires to pursue the inactive demonstration, it must reinitiate its request to exclude associated data by following the process beginning with paragraph (c)(2)(i) of this section.

**Credits**

[72 FR 13580, March 22, 2007; 72 FR 28612, May 22, 2007; 73 FR 58046, Oct. 6, 2008; 73 FR 67051, Nov. 12, 2008; 73 FR 70597, Nov. 21, 2008; 73 FR 76220, Dec. 16, 2008; 74 FR 23312, May 19, 2009; 75 FR 6531, Feb. 9, 2010; 75 FR 35592, June 22, 2010; 78 FR 3277, Jan. 15, 2013; 80 FR 65452, Oct. 26, 2015; 81 FR 68277, Oct. 3, 2016]

SOURCE: 36 FR 22384, Nov. 25, 1971; 50 FR 25544, June 19, 1985; 63 FR 7274, Feb. 12, 1998 unless otherwise noted., unless otherwise noted.

AUTHORITY: 42 U.S.C. 7401, et seq.

Current through Jan. 5, 2024, 89 FR 713. Some sections may be more current. See credits for details.

### Footnotes

a      The EPA believes that elements of these BSMP could also be practical and beneficial to apply to wildfires for areas likely to experience recurring wildfires.

b      The listing of BSMP in this table is not intended to be all-inclusive. Not all BSMP are appropriate for all burns. Goals for applicability should retain flexibility to allow for onsite variation and site-specific conditions that can be variable on the day of the burn. Burn managers can consider other appropriate BSMP as they become available due to technological advancement or programmatic refinement.

a      Where data years 1, 2, and 3 are those years expected to be considered in state and tribal recommendations.

b      Where data year 4 is the additional year of data that the Administrator may consider when making final area designations for a new/revised national ambient air quality standard under the standard designations schedule.

c      Where data year 5 is the additional year of data that the Administrator may consider when making final area designations for a new/revised national ambient air quality standard under an extended designations schedule.

d      The date by which air agencies must certify their ambient air quality monitoring data in AQS is annually on May 1 of the year following the year of data collection as specified in 40 CFR 58.15(a)(2). In some cases, however, air agencies may choose to certify a prior year's data in advance of May 1 of the following year, particularly if the Administrator has indicated intent to promulgate final designations in the first 8 months of the calendar year. Exceptional events demonstration deadlines for "early certified" data will follow the deadlines for "year 4" and "year 5" data.

---

**End of Document** <span style="float:right">© 2024 Thomson Reuters. No claim to original U.S. Government Works.</span>

Code of Federal Regulations
  Title 40. Protection of Environment
    Chapter I. Environmental Protection Agency (Refs & Annos)
      Subchapter C. Air Programs
        Part 51. Requirements for Preparation, Adoption, and Submittal of Implementation Plans (Refs & Annos)
          Subpart CC. Provisions for Implementation of the 2015 Ozone National Ambient Air Quality Standards (Refs & Annos)

40 C.F.R. § 51.1312

§ 51.1312 Requirements for reasonably available control technology (RACT) and reasonably available control measures (RACM).

Effective: February 4, 2019

Currentness

(a) RACT requirement for areas classified pursuant to § 51.1303.

(1) For each nonattainment area classified Moderate or higher, the state shall submit a SIP revision that meets the VOC and $NO_X$ RACT requirements in CAA sections 182(b)(2) and 182(f).

(2) SIP submission deadline.

(i) For a RACT SIP required pursuant to initial nonattainment area designations, the state shall submit the RACT SIP for each area no later than 24 months after the effective date of designation for a specific ozone NAAQS.

(ii) For a RACT SIP required pursuant to reclassification, the SIP revision deadline is either 24 months from the effective date of reclassification, or the deadline established by the Administrator in the reclassification action.

(iii) For a RACT SIP required pursuant to the issuance of a new Control Techniques Guideline (CTG) under CAA section 183, the SIP revision deadline is either 24 months from the date of CTG issuance, or the deadline established by the Administrator in the action issuing the CTG.

(3) RACT implementation deadline.

(i) For RACT required pursuant to initial nonattainment area designations, the state shall provide for implementation of such RACT as expeditiously as practicable, but no later than January 1 of the fifth year after the effective date of designation.

(ii) For RACT required pursuant to reclassification, the state shall provide for implementation of such RACT as expeditiously as practicable, but no later than the start of the attainment year ozone season associated with the area's new

attainment deadline, or January 1 of the third year after the associated SIP revision submittal deadline, whichever is earlier; or the deadline established by the Administrator in the final action issuing the area reclassification.

(iii) For RACT required pursuant to issuance of a new CTG under CAA section 183, the state shall provide for implementation of such RACT as expeditiously as practicable, but either no later than January 1 of the third year after the associated SIP submission deadline or the deadline established by the Administrator in the final action issuing the CTG.

(b) Determination of major stationary sources for applicability of RACT provisions. The amount of VOC and $NO_X$ emissions are to be considered separately for purposes of determining whether a source is a major stationary source as defined in CAA section 302.

(c) RACM requirements. For each nonattainment area required to submit an attainment demonstration under § 51.1308(a) and (b), the state shall submit with the attainment demonstration a SIP revision demonstrating that it has adopted all RACM necessary to demonstrate attainment as expeditiously as practicable and to meet any RFP requirements. The SIP revision shall include, as applicable, other control measures on sources of emissions of ozone precursors located outside the nonattainment area, or portion thereof, located within the state if doing so is necessary or appropriate to provide for attainment of the applicable ozone NAAQS in such area by the applicable attainment date.

**Credits**

[83 FR 63033, Dec. 6, 2018]

SOURCE: 36 FR 22398, Nov. 25, 1971; 52 FR 24712, July 1, 1987; 55 FR 14249, April 17, 1990; 56 FR 42219, Aug. 26, 1991; 57 FR 32334, July 21, 1992; 57 FR 52987, Nov. 5, 1992; 58 FR 38821, July 20, 1993; 60 FR 40100, Aug. 7, 1995; 62 FR 8328, Feb. 24, 1997; 62 FR 43801, Aug. 15, 1997; 62 FR 44903, Aug. 25, 1997; 63 FR 24433, May 4, 1998; 64 FR 35763, July 1, 1999; 65 FR 45532, July 24, 2000; 72 FR 28613, May 22, 2007; 83 FR 10382, March 9, 2018, unless otherwise noted.

AUTHORITY: 23 U.S.C. 101; 42 U.S.C. 7401–7671q.

Current through Jan. 5, 2024, 89 FR 713. Some sections may be more current. See credits for details.

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

Code of Federal Regulations
  Title 40. Protection of Environment
    Chapter I. Environmental Protection Agency (Refs & Annos)
      Subchapter C. Air Programs
        Part 51. Requirements for Preparation, Adoption, and Submittal of Implementation Plans (Refs & Annos)
          Subpart CC. Provisions for Implementation of the 2015 Ozone National Ambient Air Quality Standards (Refs & Annos)

40 C.F.R. § 51.1318

§ 51.1318 Suspension of SIP planning requirements in nonattainment areas that have air quality data that meet an ozone NAAQS.

Effective: February 4, 2019

Currentness

Upon a determination by the EPA that an area designated nonattainment for a specific ozone NAAQS has attained that NAAQS, the requirements for such area to submit attainment demonstrations and associated RACM, RFP plans, contingency measures for failure to attain or make reasonable progress, and other planning SIPs related to attainment of the ozone NAAQS for which the determination has been made, shall be suspended until such time as: The area is redesignated to attainment for that NAAQS, at which time the requirements no longer apply; or the EPA determines that the area has violated that NAAQS, at which time the area is again required to submit such plans.

**Credits**

[83 FR 63033, Dec. 6, 2018]

SOURCE: 36 FR 22398, Nov. 25, 1971; 52 FR 24712, July 1, 1987; 55 FR 14249, April 17, 1990; 56 FR 42219, Aug. 26, 1991; 57 FR 32334, July 21, 1992; 57 FR 52987, Nov. 5, 1992; 58 FR 38821, July 20, 1993; 60 FR 40100, Aug. 7, 1995; 62 FR 8328, Feb. 24, 1997; 62 FR 43801, Aug. 15, 1997; 62 FR 44903, Aug. 25, 1997; 63 FR 24433, May 4, 1998; 64 FR 35763, July 1, 1999; 65 FR 45532, July 24, 2000; 72 FR 28613, May 22, 2007; 83 FR 10382, March 9, 2018, unless otherwise noted.

AUTHORITY: 23 U.S.C. 101; 42 U.S.C. 7401–7671q.

Current through Jan. 5, 2024, 89 FR 713. Some sections may be more current. See credits for details.

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

# Standing Addendum

# TABLE OF CONTENTS

Declaration of Dolores Leonard............................................................. 1

Declaration of Robert Shobe............................................................... 22

Declaration of Martin Habalewsky..................................................... 26

Declaration of Andrew Sarpolis......................................................... 31

## DECLARATION OF DR. DOLORES LEONARD

I, Dolores Leonard, hereby declare as follows:

1.  I am over 18 years of age, of sound mind, and otherwise competent to make this Declaration. The statements below are based on my personal knowledge.

2.  I am a member of Sierra Club and have been a member since 2005.

3.  After joining Sierra Club, I volunteered for the Detroit office's Committee on Environmental Justice, where I conducted research, edited a quarterly newsletter, and helped review permits and draft comments, among other things. As a result of this and other work, I am familiar with health, environmental, and equity issues in Detroit and the nation.

4.  I live in Detroit in zip code 48217 in Wayne County, Michigan. I have lived at my current residence since 1957.

5.  My house is surrounded by industrial facilities that emit high amounts of pollution. Wayne County is home to oil refineries, steel mills, and other industrial facilities. I live one mile from the Marathon Detroit oil refinery.

6.  I closely follow air pollution permits in my area, as well as air pollution monitoring issues, so I am aware that many of the facilities in or near my neighborhood emit nitrogen oxide (NOx) and volatile organic compounds

1

(VOCs), both of which contribute to ozone pollution.  I am also aware that cars and trucks contribute to ozone pollution.

7.  Some of the facilities near my home that have permits allowing them to emit more than 100 tons of NOx and/or more than 100 tons VOCs per year include the AK Steel (now Cleveland Cliffs Steel) mill, Ford Motor Company's Rouge auto-manufacturing complex, the Marathon Petroleum refinery, and Dearborn Industrial Generation, a gas-fired power plant.

8.  Many of the industrial facilities in my neighborhood are located across the street from people's homes and are also close to public schools.

9.  There are other industrial sources of VOCs in my zipcode, like oil and gas storage and loading facilities, asphalt mixing plants, and auto coating shops. The attached excerpt from the Michigan Department of Environment, Great Lakes, and Energy (EGLE)'s lists dozens of pollution sources with active air permits in my zipcode and neighboring areas like 48120, 48209, and 48218.

10.  I also live close to major highways, including about a half-mile from the I-75, a major north-to-south interstate highway.

11.  I understand that high ozone levels can make breathing more difficult and cause asthma and other respiratory issues, as well as contributing to what is

2

**002**

commonly known as smog. As a senior citizen, I am particularly vulnerable to air pollution.

12.   I have asthma, for which I regularly use an inhaler and take medication when my symptoms worsen.

13.   I regularly check the news for ozone levels, and refrain from spending time outdoors when air quality is bad because I know that ozone pollution can worsen my respiratory problems and cause other harm to my health. When the air quality is poor, I rarely open the windows of my house. I have to use a central air system, which I do not like, to help with air circulation and to manage my respiratory problems.

14.   I have flower and vegetable gardens, but because of my concerns about the impact of air pollution on my health, I do not tend to them as much as I would like. When the air quality is poor, I am also less likely to spend time at outdoor events I might enjoy with my friends and family.

15.   I support Sierra Club's lawsuit to require EPA to take all legally required steps to ensure that ozone pollution does not exceed federal air quality standards in my area. I understand that success in this lawsuit would trigger additional requirements for state regulators to consider pollution reductions from Wayne

County and surrounding counties.  I would support this because such reductions

would result in cleaner, healthier, and clearer air for myself and my community.

I declare under penalty of perjury that the foregoing is true and

correct.

Executed on this 27 day of December, 2023.


_Dolores Leonard_

DOLORES LEONARD

4

Exhibit 1

## Active PTIs Approved since 1997 Sorted by County & City

### Active PTIs in WAYNE COUNTY

| Company | SRN | Address | City | ZIP Code | PTI No. | Approved | Notes |
|---|---|---|---|---|---|---|---|
| WALMART STORES EAST, LP dba WALMART SUPERCENTER #2872 | P1335 | 10562 BELLEVILLE ROAD | BELLEVILLE | 48111 | 8-23 | 1/20/2023 | |
| FUEL CELL SYSTEM MANUFACTURING, LLC | P0250 | 20001 BROWNSTOWN CENTER DRIVE | BROWNSTOWN | 48183 | 66-18A | 7/27/2020 | |
| J & A CREMATION, INC | P0731 | 23700 WEST ROAD | BROWNSTOWN CHARTER TOWNSHIP | 48183 | 134-16 | 9/2/2016 | |
| SOUTH HURON VALLEY UTIL AUTH | M4853 | 34001 W JEFFERSON AVENUE | BROWNSTOWN TOWNSHIP | 48173 | 395-00 | 5/8/2001 | |
| SOUTH HURON VALLEY UTIL AUTH | M4853 | 34001 W JEFFERSON AVENUE | BROWNSTOWN TOWNSHIP | 48173 | 148-03 | 9/9/2003 | |
| DURCON LABORATORY TOPS, INC | N0516 | 8464 RONDA DRIVE | CANTON | 48187 | 41-06A | 8/28/2008 | |
| METALTEC STEEL ABRASIVE COMPANY | N1022 | 41055 JOY ROAD | CANTON | 48187 | 258-07 | 10/31/2007 | |
| CSM CREMATION SERVICES, INC | N6208 | 8219 RONDA DRIVE | CANTON | 48187 | 15-97A | 8/28/1997 | |
| INTERNATIONAL DOOR, INC | N7109 | 8001 RONDA DRIVE | CANTON | 48187 | 44-02 | 5/14/2002 | |
| AMERESCO WOODLAND MEADOWS ROMULUS, LLC | P0317 | 4620 HANNAN ROAD | CANTON | 48188 | 61-16 | 8/29/2016 | |
| ADVANCE ENGINEERING COMPANY | P0687 | 7505 BARON DRIVE | CANTON | 48187 | 64-16 | 5/16/2016 | |
| BODYCOTE THERMAL PROCESSING, INC | P1106 | 8580 HAGGERTY ROAD | CANTON | 48187 | 6-20A | 10/20/2022 | |
| LINDE GAS, LLC | M4691 | 5001 DEWITT ROAD | CANTON TOWNSHIP | 48188 | 52-06 | 5/22/2006 | |
| GREAT LAKES WATER AUTHORITY | M4840 | 43127 JOY ROAD - JOY ROAD PUMP STATION | CANTON TOWNSHIP | 48187 | 255-99B | 12/1/2008 | |
| SAUK TRAIL HILLS DEVELOPMENT | N6009 | 5011 S LILLEY ROAD - ADRIAN LANDFILL | CANTON TOWNSHIP | 48188 | 122-11 | 11/9/2011 | Rolled into ROP |
| CANTON RENEWABLES, LLC | P0270 | 4345 S LILLEY ROAD | CANTON TOWNSHIP | 48188 | 98-11A | 2/16/2012 | Rolled into ROP |
| A K STEEL CORPORATION | A8640 | 3001 MILLER ROAD | DEARBORN | 48120 | 8-08 | 2/4/2008 | Rolled into ROP |
| A K STEEL CORPORATION | A8640 | 4001 MILLER ROAD - DEARBORN WORKS | DEARBORN | 48120 | 70-13 | 9/16/2013 | Rolled into ROP |
| A K STEEL CORPORATION | A8640 | 4001 MILLER ROAD | DEARBORN | 48120 | 182-05C | 5/12/2014 | |
| A K STEEL CORPORATION | A8640 | 4001 MILLER ROAD | DEARBORN | 48120 | 20-14 | 9/10/2014 | Rolled into ROP |
| CLEVELAND-CLIFFS STEEL CORPORATION | A8640 | 4001 MILLER ROAD | DEARBORN | 48120 | 84-11 | 8/15/2011 | |
| CLEVELAND-CLIFFS STEEL CORPORATION | A8640 | 4001 MILLER ROAD | DEARBORN | 48120 | 8-08A | 8/15/2011 | |

EGLE Air Quality Division

**Active PTIs Approved since 1997 Sorted by County & City**

Active PTIs in WAYNE COUNTY

| Company | SRN | Address | City | ZIP Code | PTI No. | Approved | Notes |
|---|---|---|---|---|---|---|---|
| CLEVELAND-CLIFFS STEEL CORPORATION | A8640 | 4001 MILLER ROAD - DEARBORN WORKS | DEARBORN | 48120 | 120-16 | 8/18/2016 | |
| DEARBORN GREAT LAKES, LLC | A8640 | 4001 MILLER ROAD | DEARBORN | 48120 | 114-16 | 12/15/2016 | |
| ROUGE STEEL COMPANY | A8640 | 3001 MILLER ROAD | DEARBORN | 48120 | 142-97 | 4/8/1997 | Rolled into ROP |
| ROUGE STEEL COMPANY | A8640 | 3001 MILLER ROAD | DEARBORN | 48120 | 343-97 | 10/31/1997 | Rolled into ROP |
| ROUGE STEEL COMPANY | A8640 | 3001 MILLER ROAD | DEARBORN | 48120 | 463-97 | 5/15/2000 | Rolled into ROP |
| ROUGE STEEL COMPANY | A8640 | 3001 MILLER ROAD | DEARBORN | 48120 | 193-00 | 9/5/2000 | Rolled into ROP |
| SEVERSTAL NORTH AMERICA, INC | A8640 | 3001 MILLER ROAD | DEARBORN | 48120 | 182-05B | 4/19/2007 | Rolled into ROP |
| FORD MOTOR COMPANY | A8648 | 3001 MILLER ROAD - DEARBORN ASSEMBLY | DEARBORN | 48121 | 200-97 | 5/9/1997 | Rolled into ROP |
| FORD MOTOR COMPANY | A8648 | 3001 MILLER ROAD - DEARBORN ASSEMBLY | DEARBORN | 48121 | 112-00 | 6/15/2000 | Rolled into ROP |
| FORD MOTOR COMPANY | A8648 | 3001 MILLER ROAD - DEARBORN ASSEMBLY | DEARBORN | 48121 | 109-00 | 7/5/2000 | Rolled into ROP |
| FORD MOTOR COMPANY | A8648 | 3001 MILLER ROAD - DEARBORN ASSEMBLY | DEARBORN | 48121 | 454-96C | 12/18/2001 | Rolled into ROP |
| FORD MOTOR COMPANY | A8648 | 3001 MILLER ROAD - DEARBORN ASSEMBLY | DEARBORN | 48121 | 144-04 | 11/1/2004 | Rolled into ROP |
| FORD MOTOR COMPANY | A8648 | 3001 MILLER ROAD - DEARBORN ASSEMBLY | DEARBORN | 48121 | 342-06A | 6/3/2008 | Rolled into ROP |
| FORD MOTOR COMPANY | A8648 | 3001 MILLER ROAD - DEARBORN ASSEMBLY | DEARBORN | 48121 | 188-12 | 2/12/2013 | Rolled into ROP |
| FORD MOTOR COMPANY | A8648 | 3001 MILLER ROAD - DEARBORN ASSEMBLY | DEARBORN | 48121 | 126-14 | 9/24/2014 | |
| FORD MOTOR COMPANY | A8648 | 3001 MILLER ROAD - ROUGE COMPLEX | DEARBORN | 48121 | 1-16 | 3/23/2016 | Rolled into ROP |
| FORD MOTOR COMPANY | A8648 | 3001 MILLER ROAD - DEARBORN DIVERSIFIED MANUFACTURING PLANT | DEARBORN | 48121 | 94-16 | 8/18/2016 | Rolled into ROP |
| FORD MOTOR COMPANY | A8648 | 3001 MILLER ROAD - ROUGE COMPLEX | DEARBORN | 48121 | 154-19 | 2/20/2020 | Rolled into ROP |
| FORD MOTOR COMPANY | A8648 | 3001 MILLER ROAD - ROUGE COMPLEX | DEARBORN | 48121 | 101-19A | 3/5/2020 | Rolled into ROP |
| WATERFRONT PETROLEUM TERMINAL COMPANY | B5434 | 1071 MILLER ROAD | DEARBORN | 48120 | 181-10A | 11/15/2012 | |

## Active PTIs Approved since 1997 Sorted by County & City

### Active PTIs in WAYNE COUNTY

| Company | SRN | Address | City | ZIP Code | PTI No. | Approved | Notes |
|---------|-----|---------|------|----------|---------|----------|-------|
| FORD MOTOR COMPANY | B6230 | 21500 OAKWOOD BLVD - RESEARCH & ENGINEERING | DEARBORN | 48124 | 392-94A | 3/27/1997 | Rolled into ROP |
| FORD MOTOR COMPANY | B6230 | 20000 ROTUNDA DRIVE - RESEARCH & DEVELOPMENT CENTER | DEARBORN | 48124 | 185-88 | 5/20/1998 | Rolled into ROP |
| FORD MOTOR COMPANY | B6230 | 1701 VILLAGE ROAD - RESEARCH & DEVELOPMENT CENTER | DEARBORN | 48124 | 122-04 | 7/19/2004 | Rolled into ROP |
| FORD MOTOR COMPANY | B6230 | 18901 OAKWOOD BLVD - RESEARCH & DEVELOPMENT CENTER | DEARBORN | 48124 | 174-09 | 8/25/2009 | Rolled into ROP |
| FORD MOTOR COMPANY | B6230 | 1701 VILLAGE ROAD - RESEARCH & DEVELOPMENT CENTER | DEARBORN | 48124 | 194-15A | 4/6/2017 | Rolled into ROP |
| FORD MOTOR COMPANY | B6230 | 1701 VILLAGE ROAD - RESEARCH & DEVELOPMENT CENTER | DEARBORN | 48124 | 174-09A | 4/24/2019 | Rolled into ROP |
| COMPREHENSIVE ENV SOLUTIONS | B9080 | 6011 WYOMING AVENUE | DEARBORN | 48126 | 305-04A | 7/15/2005 | |
| ENVIRO SOLIDS, LLC | B9080 | 6011 WYOMING AVENUE | DEARBORN | 48126 | 7-03 | 6/10/2003 | |
| BEAUMONT HOSPITAL | J4912 | 18101 OAKWOOD BLVD | DEARBORN | 48124 | 57-13A | 12/19/2017 | |
| UNIVERSITY OF MICHIGAN | K5375 | 4901 EVERGREEN ROAD | DEARBORN | 48128 | 22-04 | 7/19/2004 | |
| UNIVERSITY OF MICHIGAN | K5375 | 4901 EVERGREEN ROAD | DEARBORN | 48128 | 2-19 | 7/3/2019 | Revised |
| DTE ENERGY SERVICES | M4175 | 17600 MICHIGAN AVENUE | DEARBORN | 48121 | 183-00A | 12/15/2000 | Revised |
| FORD MOTOR COMPANY | M4175 | 1 AMERICAN ROAD | DEARBORN | 48126 | 292-98A | 5/15/2012 | |
| FORD MOTOR COMPANY | M4175 | 1 AMERICAN ROAD | DEARBORN | 48126 | 10-17 | 4/5/2017 | |
| BIG 3 PRECISION PRODUCTS, INC | M4260 | 10800 FORD ROAD | DEARBORN | 48126 | 187-14 | 11/18/2014 | General PTI |
| FORD MOTOR COMPANY | M4764 | 1200 ELM STREET | DEARBORN | 48121 | 195-96A | 8/18/1997 | Rolled into ROP |
| FORD MOTOR COMPANY | M4764 | 1200 ELM STREET | DEARBORN | 48121 | 195-96B | 4/7/2010 | Rolled into ROP |
| PRO V ENTERPRISES, LLC | M4798 | 4401 WYOMING AVENUE | DEARBORN | 48126 | 164-15 | 10/5/2015 | |
| GREAT LAKES WATER AUTHORITY | M4838 | 8300 W WARREN AVENUE - SPRINGWELLS PLANT | DEARBORN | 48126 | 256-99B | 12/1/2008 | |
| FORD MOTOR COMPANY | M4847 | 3001 MILLER ROAD | DEARBORN | 48126 | 259-00 | 1/30/2001 | |
| KENWAL PICKLING, LLC | M4847 | 8223 W WARREN AVENUE | DEARBORN | 48126 | 196-00C | 6/27/2007 | |
| DEARBORN INDUSTRIAL GENERATION | N6631 | 2400 MILLER ROAD | DEARBORN | 48121 | 217-03 | 9/25/2003 | Rolled into ROP |
| DEARBORN INDUSTRIAL GENERATION | N6631 | 2400 MILLER ROAD | DEARBORN | 48121 | 253-02A | 9/25/2003 | Rolled into ROP |

## Active PTIs Approved since 1997 Sorted by County & City

### Active PTIs in WAYNE COUNTY

| Company | SRN | Address | City | ZIP Code | PTI No. | Approved | Notes |
|---|---|---|---|---|---|---|---|
| DEARBORN INDUSTRIAL GENERATION | N6631 | 2400 MILLER ROAD | DEARBORN | 48121 | 8-17 | 4/5/2017 | |
| DEARBORN INDUSTRIAL GENERATION, LLC | N6631 | 2400 MILLER ROAD | DEARBORN | 48121 | 72-15 | 8/12/2015 | |
| DEARBORN INDUSTRIAL GENERATION, LLC | N6631 | 2400 MILLER ROAD | DEARBORN | 48121 | 163-17 | 1/31/2018 | |
| DEARBORN INDUSTRIAL GENERATION, LLC | N6631 | 2400 MILLER ROAD | DEARBORN | 48121 | 109-23 | 9/26/2023 | |
| DTE ENERGY SERVICES | N6663 | 1 AUTO CLUB DRIVE | DEARBORN | 48126 | 341-99 | 10/27/1999 | |
| WEBER SAND & GRAVEL, INC | N7288 | 8950 DIX STREET - PLANT 2 | DEARBORN | 48120 | 216-03 | 9/29/2003 | General PTI |
| MOTOROLA | N7340 | 15201 MERCANTILE DRIVE | DEARBORN | 48120 | 89-04 | 4/30/2004 | |
| GREAT LAKES WATER AUTHORITY | N7584 | 9543 DIX AVENUE | DEARBORN | 48210 | 69-06 | 6/1/2006 | |
| DTE ENERGY SERVICES | N7844 | 21500 OAKWOOD BLVD | DEARBORN | 48121 | 181-00A | 12/15/2000 | Revised |
| MICHIGAN BELL TELEPHONE COMPANY | N8024 | 23460 MICHIGAN AVENUE | DEARBORN | 48124 | 96-08 | 7/3/2008 | |
| MICHIGAN BELL TELEPHONE COMPANY | N8024 | 23460 MICHIGAN AVENUE | DEARBORN | 48124 | 18-09 | 1/26/2009 | General PTI |
| AT&T MICHIGAN | N8026 | 17651 MICHIGAN AVENUE | DEARBORN | 48126 | 145-11 | 10/10/2011 | |
| SPEEDWAY SUPERAMERICA, LLC | N8080 | 23785 W MICHIGAN AVENUE - SSA #8732 | DEARBORN | 48124 | 210-08 | 7/28/2008 | General PTI |
| SUNOCO, INC | P0207 | 2600 S TELEGRAPH ROAD | DEARBORN | 48124 | 22-11 | 2/17/2011 | General PTI |
| GROUND EFFECTS, INC | P0344 | 15200 COMMERCE DR NORTH | DEARBORN | 48120 | 59-12A | 11/22/2017 | |
| EDWARD C LEVY COMPANY | P0460 | 9400 EAGLE STREET - PLANT 2 PORTABLE CRUSHER | DEARBORN | 48209 | 7-13A | 8/20/2013 | |
| XEROX BUSINESS SERVICES | P0487 | 5225 AUTO CLUB DRIVE | DEARBORN | 48126 | 182-13 | 1/28/2014 | |
| BRANDENBURG INDUSTRIAL SERVICE COMPANY | P0873 | 17000 ROTUNDA DRIVE | DEARBORN | 48121 | 156-17 | 10/20/2017 | General PTI |
| DTE ELECTRIC COMPANY | P0879 | 1641 CAROL SHELBY WAY EAST | DEARBORN | 48121 | 144-17 | 4/13/2018 | |
| GROUND EFFECTS, INC | P1224 | 13750 ROTUNDA DRIVE | DEARBORN | 48120 | 105-21 | 12/7/2021 | |
| VERIZON BUSINESS | P1344 | 4401 STECKER STREET | DEARBORN | 48126 | 46-23 | 3/22/2023 | |
| WAYNE COUNTY DEPARTMENT OF PUBLIC WORKS | M4826 | 21100 FORD ROAD | DEARBORN HEIGHTS | 48127 | 303-99 | 6/9/2000 | |
| DETROIT WATER & SEWERAGE DEPT | | CORNER OF DUBOIS & ATWATER | DETROIT | 48207 | 254-00 | 1/16/2001 | |

## Active PTIs Approved since 1997 Sorted by County & City

Active PTIs in WAYNE COUNTY

| Company | SRN | Address | City | ZIP Code | PTI No. | Approved | Notes |
|---|---|---|---|---|---|---|---|
| QUAKER HOUGHTON | A7513 | 9100 FREELAND STREET | DETROIT | 48228 | 53-20 | 4/29/2020 | General PTI |
| DELRAY CONNECTING RAILROAD COMPANY | A7809 | 7109 W JEFFERSON AVENUE | DETROIT | 48209 | 304-99 | 11/30/2000 | Rolled into ROP |
| DYNAMIC RESOURCES COMPANY, LLC | A7809 | 1400 ZUG ISLAND ROAD | DETROIT | 48209 | 123-12A | 3/26/2013 | |
| M & W INDUSTRIES, INC | A8005 | 13595 HELEN STREET | DETROIT | 48212 | 102-05 | 4/21/2005 | General PTI |
| ARTED CHROME PLATING, INC | A8087 | 38 PIQUETTE STREET | DETROIT | 48202 | 74-02A | 3/31/2010 | |
| DETROIT DIESEL CORPORATION | A8638 | 13400 W OUTER DRIVE | DETROIT | 48239 | 102-00 | 4/16/2003 | Rolled into ROP |
| DETROIT DIESEL CORPORATION | A8638 | 13400 W OUTER DRIVE | DETROIT | 48239 | 125-05 | 5/18/2005 | Rolled into ROP |
| DETROIT DIESEL CORPORATION | A8638 | 13400 W OUTER DRIVE | DETROIT | 48239 | 208-05 | 8/18/2005 | Rolled into ROP |
| DETROIT DIESEL CORPORATION | A8638 | 13400 W OUTER DRIVE | DETROIT | 48239 | 165-06 | 6/9/2006 | Rolled into ROP |
| DCI AEROTECH, INC | A8831 | 7515 LYNDON AVENUE | DETROIT | 48238 | 183-02 | 5/29/2003 | |
| DCI AEROTECH, INC | A8831 | 7515 LYNDON AVENUE | DETROIT | 48238 | 40-20 | 7/9/2020 | |
| AMERITI MANUFACTURING, LLC | A8892 | 19300 FILLER AVENUE | DETROIT | 48234 | 549-97D | 9/14/2023 | |
| DETROIT REFINING LOGISTICS, LLC | A9831 | 1300 S FORT STREET | DETROIT | 48217 | 122-15 | 5/26/2016 | |
| MARATHON ASHLAND PETROLEUM COMPANY | A9831 | 12700 TORONTO STREET | DETROIT | 48217 | 180-97 | 4/18/1997 | Rolled into ROP |
| MARATHON ASHLAND PETROLEUM COMPANY | A9831 | 1300 S FORT STREET | DETROIT | 48217 | 120-99 | 8/3/1999 | Rolled into ROP |
| MARATHON ASHLAND PETROLEUM COMPANY | A9831 | 1300 S FORT STREET | DETROIT | 48217 | 61-99 | 10/5/1999 | Rolled into ROP |
| MARATHON ASHLAND PETROLEUM COMPANY | A9831 | 1300 S FORT STREET | DETROIT | 48217 | 90-98 | 2/22/2000 | Rolled into ROP |
| MARATHON ASHLAND PETROLEUM COMPANY | A9831 | 1300 S FORT STREET | DETROIT | 48217 | 195-00 | 8/17/2000 | Rolled into ROP |
| MARATHON ASHLAND PETROLEUM COMPANY | A9831 | 1300 S FORT STREET | DETROIT | 48217 | 108-02 | 9/3/2002 | Rolled into ROP |
| MARATHON ASHLAND PETROLEUM COMPANY | A9831 | 1300 S FORT STREET | DETROIT | 48217 | 232-02 | 12/10/2002 | Rolled into ROP |
| MARATHON ASHLAND PETROLEUM COMPANY | A9831 | 1300 S FORT STREET | DETROIT | 48217 | 244-00A | 9/30/2003 | Rolled into ROP |

## Active PTIs Approved since 1997 Sorted by County & City

### Active PTIs in WAYNE COUNTY

| Company | SRN | Address | City | ZIP Code | PTI No. | Approved | Notes |
|---|---|---|---|---|---|---|---|
| MARATHON OIL COMPANY | A9831 | 1300 S FORT STREET | DETROIT | 48217 | 5-98 | 6/2/1998 | Rolled into ROP |
| MARATHON PETROLEUM COMPANY LP | A9831 | 1300 S FORT STREET | DETROIT | 48217 | 96-11 | 1/11/2012 | Rolled into ROP |
| MARATHON PETROLEUM COMPANY LP | A9831 | 1300 S FORT STREET | DETROIT | 48217 | 81-12 | 9/7/2012 | |
| MARATHON PETROLEUM COMPANY LP | A9831 | 1300 S FORT STREET | DETROIT | 48217 | 142-11A | 9/13/2012 | Rolled into ROP |
| MARATHON PETROLEUM COMPANY LP | A9831 | 1300 S FORT STREET | DETROIT | 48217 | 148-11A | 9/13/2012 | Rolled into ROP |
| MARATHON PETROLEUM COMPANY LP | A9831 | 1300 S FORT STREET | DETROIT | 48217 | 63-04C | 11/9/2012 | Rolled into ROP |
| MARATHON PETROLEUM COMPANY LP | A9831 | 1300 S FORT STREET | DETROIT | 48217 | 18-12B | 7/24/2013 | Rolled into ROP |
| MARATHON PETROLEUM COMPANY LP | A9831 | 1300 S FORT STREET | DETROIT | 48217 | 54-13 | 8/29/2013 | Rolled into ROP |
| MARATHON PETROLEUM COMPANY LP | A9831 | 1300 S FORT STREET | DETROIT | 48217 | 157-13 | 1/30/2014 | |
| MARATHON PETROLEUM COMPANY LP | A9831 | 1300 S FORT STREET | DETROIT | 48217 | 63-08D | 5/12/2014 | Rolled into ROP |
| MARATHON PETROLEUM COMPANY LP | A9831 | 1300 S FORT STREET | DETROIT | 48217 | 52-15 | 4/13/2015 | |
| MARATHON PETROLEUM COMPANY LP | A9831 | 1300 S FORT STREET | DETROIT | 48217 | 118-15 | 5/26/2016 | |
| MARATHON PETROLEUM COMPANY LP | A9831 | 1300 S FORT STREET | DETROIT | 48217 | 63-08E | 6/10/2016 | Rolled into ROP |
| MARATHON PETROLEUM COMPANY LP | A9831 | 1300 S FORT STREET | DETROIT | 48217 | 57-20 | 6/12/2020 | |
| MARATHON PETROLEUM COMPANY LP | A9831 | 1001 S OAKWOOD BLVD | DETROIT | 48217 | 113-22 | 9/1/2022 | |
| MARATHON PETROLEUM COMPANY, LLC | A9831 | 1300 S FORT STREET | DETROIT | 48217 | 190-00A | 12/7/2001 | |
| MARATHON PETROLEUM COMPANY, LLC | A9831 | 1300 S FORT STREET | DETROIT | 48217 | 236-02 | 3/26/2003 | Rolled into ROP |
| MARATHON PETROLEUM COMPANY, LLC | A9831 | 1300 S FORT STREET | DETROIT | 48217 | 184-03 | 8/27/2003 | Rolled into ROP |
| MARATHON PETROLEUM COMPANY, LLC | A9831 | 1300 S FORT STREET | DETROIT | 48217 | 262-02 | 2/25/2004 | Rolled into ROP |
| MARATHON PETROLEUM COMPANY, LLC | A9831 | 1300 S FORT STREET | DETROIT | 48217 | 67-02A | 6/15/2004 | Rolled into ROP |
| MARATHON PETROLEUM COMPANY, LLC | A9831 | 1300 S FORT STREET | DETROIT | 48217 | 28-02A | 1/5/2006 | Rolled into ROP |
| MARATHON PETROLEUM COMPANY, LLC | A9831 | 1300 S FORT STREET | DETROIT | 48217 | 198-06 | 8/17/2006 | Rolled into ROP |
| MARATHON PETROLEUM COMPANY, LLC | A9831 | 1300 S FORT STREET | DETROIT | 48217 | 175-06 | 10/12/2006 | Rolled into ROP |
| MARATHON PETROLEUM COMPANY, LLC | A9831 | 1300 S FORT STREET | DETROIT | 48217 | 63-04A | 11/8/2007 | Rolled into ROP |
| MARATHON PETROLEUM COMPANY, LLC | A9831 | 1300 S FORT STREET | DETROIT | 48217 | 245-07B | 9/2/2008 | Rolled into ROP |
| MARATHON PETROLEUM COMPANY, LLC | A9831 | 1300 S FORT STREET | DETROIT | 48217 | 136-09 | 7/7/2009 | Rolled into ROP |
| MAGNI INDUSTRIES, INC | B1014 | 2771 HAMMOND STREET | DETROIT | 48209 | 181-06D | 3/6/2023 | |

## Active PTIs Approved since 1997 Sorted by County & City

Active PTIs in WAYNE COUNTY

| Company | SRN | Address | City | ZIP Code | PTI No. | Approved | Notes |
|---------|-----|---------|------|----------|---------|----------|-------|
| GREAT LAKES WATER AUTHORITY | B2103 | 9300 W JEFFERSON AVENUE | DETROIT | 48226 | 252-06 | 12/21/2006 | Rolled into ROP |
| AMERICAN AXLE & MANUFACTURING, INC | B2150 | 1840 HOLBROOK STREET | DETROIT | 48212 | 371-08 | 12/23/2008 | |
| ARCO ALLOYS CORPORATION | B2159 | 1891 TROMBLY STREET | DETROIT | 48211 | 49-12 | 6/13/2012 | |
| THYSSENKRUPP BUDD | B2162 | 12141 CHARLEVOIX STREET | DETROIT | 48215 | 325-05 | 11/22/2005 | General PTI |
| BUCKEYE TERMINALS, LLC | B2247 | 700 S DEACON STREET - DETROIT TERMINAL | DETROIT | 48217 | 364-99 | 4/11/2000 | |
| BUCKEYE TERMINALS, LLC | B2247 | 700 S DEACON STREET - DETROIT TERMINAL | DETROIT | 48217 | 149-15 | 9/25/2015 | |
| BUCKEYE TERMINALS, LLC | B2247 | 700 S DEACON STREET - DETROIT TERMINAL | DETROIT | 48217 | 200-16 | 4/27/2017 | |
| DETREX CORPORATION | B2273 | 12886 EATON AVENUE | DETROIT | 48227 | 354-01 | 3/11/2002 | |
| PVS TECHNOLOGIES | B2371 | 10825 HARPER AVENUE | DETROIT | 48213 | 152-16A | 8/1/2022 | |
| DETROIT EDISON COMPANY | B2798 | 6603 W JEFFERSON AVENUE | DETROIT | 48217 | 373-98 | 12/18/1998 | Rolled into ROP |
| DETROIT EDISON COMPANY | B2814 | 541 MADISON AVENUE - BEACON HEATING PLANT | DETROIT | 48226 | 63-05 | 7/26/2005 | Rolled into ROP |
| DETROIT EDISON COMPANY | B2814 | 541 MADISON AVENUE - BEACON HEATING PLANT | DETROIT | 48226 | 62-21 | 8/31/2021 | |
| DETROIT THERMAL, LLC | B2814 | 541 MADISON AVENUE - BEACON HEATING PLANT | DETROIT | 48226 | 63-05A | 8/1/2007 | Rolled into ROP |
| SUNOCO MARKETING & TERMINALS, LP | B2926 | 500 S DIX STREET | DETROIT | 48217 | 143-18A | 7/9/2019 | |
| CAPITAL RESIN CORPORATION MICHIGAN | B2927 | 17350 RYAN ROAD - BUILDING B | DETROIT | 48212 | 157-10D | 12/14/2022 | |
| DETROIT THERMAL, LLC | B3012 | 555 W BALTIMORE AVENUE | DETROIT | 48226 | 361-97 | 9/23/1997 | |
| FITZGERALD FINISHING COMPANY | B3037 | 17450 FILER AVENUE | DETROIT | 48212 | 403-99D | 10/22/2015 | |
| FITZGERALD FINISHING, LLC | B3037 | 17450 FILER AVENUE | DETROIT | 48212 | 63-21 | 8/31/2021 | General PTI |
| CADILLAC ASPHALT PRODUCTS | B3195 | 670 S DIX AVENUE | DETROIT | 48217 | 57-01C | 12/13/2022 | |
| CADILLAC ASPHALT, LLC | B3195 | 670 S DIX AVENUE | DETROIT | 48217 | 57-01B | 9/30/2008 | |
| METROPOLITAN ALLOYS CORPORATION | B3259 | 17385 RYAN ROAD | DETROIT | 48212 | 30-08C | 8/19/2021 | |
| GIBRALTAR NATIONAL CORP / QUIKRETE DETROIT | B3291 | 8951 SCHAEFER HIGHWAY | DETROIT | 48228 | 205-16 | 3/22/2017 | |
| EDWARD C LEVY COMPANY | B3533 | 8800 DIX AVENUE - PLANT 1 | DETROIT | 48209 | 104-16 | 9/23/2016 | |

# Active PTIs Approved since 1997 Sorted by County & City

Active PTIs in WAYNE COUNTY

| Company | SRN | Address | City | ZIP Code | PTI No. | Approved | Notes |
|---------|-----|---------|------|----------|---------|----------|-------|
| SAINT MARY'S CEMENT, INC | B3567 | 9333 DEARBORN STREET | DETROIT | 48209 | 115-11 | 9/2/2011 | General PTI |
| SAINT MARY'S CEMENT, INC | B3567 | 9333 DEARBORN STREET | DETROIT | 48209 | 262-99B | 1/25/2012 | |
| SAINT MARY'S CEMENT, INC | B3567 | 9333 DEARBORN STREET | DETROIT | 48209 | 76-18 | 8/31/2018 | |
| SAINT MARY'S CEMENT, INC | B3567 | 9333 DEARBORN STREET | DETROIT | 48209 | 41-22 | 4/12/2022 | General PTI |
| SAINT MARY'S CEMENT, INC (US) | B3567 | 9333 DEARBORN STREET | DETROIT | 48209 | 262-99A | 1/30/2004 | |
| SAINT MARY'S CEMENT, INC (US) | B3567 | 9333 DEARBORN STREET | DETROIT | 48209 | 14-04 | 4/16/2004 | |
| EDWARD C LEVY COMPANY | B4243 | 13800 MELLON STREET - PLANT 6 | DETROIT | 48217 | 298-03 | 5/11/2004 | Rolled into ROP |
| EDWARD C LEVY COMPANY | B4243 | 13800 MELLON STREET - PLANT 6 | DETROIT | 48217 | 248-06 | 9/19/2006 | Rolled into ROP |
| EDWARD C LEVY COMPANY | B4243 | 13800 MELLON STREET - PLANT 6 | DETROIT | 48217 | 5-19 | 3/12/2019 | |
| EDWARD C LEVY COMPANY | B4243 | 13800 MELLON STREET - PLANT 6 | DETROIT | 48217 | 45-20 | 5/29/2020 | |
| EDWARD C LEVY COMPANY | B4249 | 8941 W JEFFERSON AVENUE - JEFFERSON MARINE | DETROIT | 48209 | 135-23 | 11/30/2023 | |
| RECYCLING & TREATMENT TECHNOLOGIES OF DETROIT (RTT) | B4354 | 530 ROUGE STREET SOUTH | DETROIT | 48217 | 181-13 | 4/15/2014 | |
| MCCOIG MATERIALS, LLC | B4369 | 500 E 7 MILE ROAD | DETROIT | 48203 | 246-10 | 3/17/2011 | |
| GREAT LAKES PETROLEUM TERMINAL, LLC | B4752 | 12500 STOCKER ROAD | DETROIT | 48217 | 153-09B | 4/14/2014 | |
| IHC, LLC | B4795 | 19200 GLENDALE AVENUE | DETROIT | 48223 | 111-22 | 8/12/2022 | |
| PEERLESS METAL POWDERS & ABRASIVES | B4847 | 124 S MILITARY STREET | DETROIT | 48209 | 165-04 | 8/13/2004 | |
| PEERLESS METAL POWDERS & ABRASIVES | B4847 | 124 S MILITARY STREET | DETROIT | 48209 | 353-07 | 1/3/2008 | |
| PEERLESS METAL POWDERS & ABRASIVES | B4847 | 124 S MILITARY STREET | DETROIT | 48209 | 186-11 | 2/17/2012 | |
| AJAX METAL PROCESSING, INC | B5830 | 4651 BELLEVUE AVENUE | DETROIT | 48207 | 14-05 | 1/25/2005 | Rolled into ROP |
| AJAX METAL PROCESSING, INC | B5830 | 4651 BELLEVUE AVENUE | DETROIT | 48207 | 131-11 | 10/20/2011 | Rolled into ROP |
| AJAX METAL PROCESSING, INC | B5830 | 4651 BELLEVUE AVENUE | DETROIT | 48207 | 47-16 | 6/21/2016 | Rolled into ROP |
| AJAX METAL PROCESSING, INC | B5830 | 4651 BELLEVUE AVENUE | DETROIT | 48207 | 47-16A | 3/30/2017 | Rolled into ROP |
| DETROIT ELECTRO-COATINGS COMPANY | B6511 | 2703 23RD STREET | DETROIT | 48216 | 81-06 | 3/21/2006 | General PTI |
| SUPERIOR MATERIALS | B8763 | 8911 W JEFFERSON AVENUE | DETROIT | 48209 | 138-18 | 10/18/2018 | |

As of Friday, December 1, 2023

EGLE Air Quality Division

**012**

## Active PTIs Approved since 1997 Sorted by County & City

### Active PTIs in WAYNE COUNTY

| Company | SRN | Address | City | ZIP Code | PTI No. | Approved | Notes |
|---|---|---|---|---|---|---|---|
| SUPERIOR MATERIALS | H6483 | 20565 HOOVER ROAD | DETROIT | 48205 | 137-18 | 10/17/2018 | |
| HENRY FORD HOSPITAL | K1271 | 2799 W GRAND BLVD | DETROIT | 48202 | 307-99 | 1/4/2000 | Rolled into ROP |
| HENRY FORD HOSPITAL | K1271 | 2799 W GRAND BLVD | DETROIT | 48202 | 287-01 | 12/18/2001 | Rolled into ROP |
| HENRY FORD HOSPITAL | K1271 | 2799 W GRAND BLVD | DETROIT | 48202 | 220-02 | 9/17/2002 | Rolled into ROP |
| HENRY FORD HOSPITAL | K1271 | 2799 W GRAND BLVD | DETROIT | 48202 | 202-02 | 11/5/2002 | Rolled into ROP |
| HENRY FORD HOSPITAL | K1271 | 2799 W GRAND BLVD | DETROIT | 48202 | 186-06B | 8/26/2008 | Rolled into ROP |
| HENRY FORD HOSPITAL | K1271 | 2799 W GRAND BLVD | DETROIT | 48202 | 179-14 | 12/23/2014 | Rolled into ROP |
| HENRY FORD HOSPITAL | K1271 | 2799 W GRAND BLVD | DETROIT | 48202 | 224-15 | 2/26/2016 | Rolled into ROP |
| DMC SINAI GRACE HOSPITAL | K1276 | 6071 W OUTER DRIVE | DETROIT | 48235 | 176-16 | 2/10/2017 | |
| SINAI GRACE HOSPITAL | K1276 | 6071 W OUTER DRIVE | DETROIT | 48235 | 421-99 | 11/3/1999 | General PTI |
| GREAT LAKES WATER AUTHORITY | K5392 | 11000 E 8 MILE ROAD | DETROIT | 48205 | 111-06 | 5/24/2006 | |
| WAYNE STATE UNIVERSITY | M0239 | 421 W CANFIELD STREET | DETROIT | 48202 | 99-04 | 4/12/2004 | General PTI |
| WAYNE STATE UNIVERSITY | M0239 | 5454 CASS AVENUE - FACILITIES PLANNING & MANAGEMENT | DETROIT | 48202 | 80-06A | 11/19/2015 | |
| SAINT JOHN HOSPITAL & MEDICAL CENTER | M1812 | 22101 MOROSS ROAD | DETROIT | 48236 | 313-06 | 11/30/2006 | |
| CUMMINGS-MOORE GRAPHITE COMPANY | M2369 | 1646 N GREEN STREET | DETROIT | 48209 | 51-06 | 4/11/2006 | |
| CUMMINGS-MOORE GRAPHITE COMPANY | M2369 | 1646 N GREEN STREET | DETROIT | 48209 | 213-15 | 12/18/2015 | |
| CUMMINGS-MOORE GRAPHITE COMPANY | M2369 | 1646 N GREEN STREET | DETROIT | 48209 | 93-16 | 7/8/2016 | |
| VALICOR ENVIRONMENTAL SEVICES, LLC | M3727 | 9000 ROSELAWN AVENUE | DETROIT | 48204 | 124-04 | 3/10/2005 | Revised |
| RIM CUSTOM RACKS | M3847 | 6501 E MCNICHOLS ROAD | DETROIT | 48212 | 211-06B | 8/23/2019 | |
| CHRYSLER GROUP, LLC | M4085 | 11570 E WARREN AVENUE - MACK ENGINE PLANT | DETROIT | 48214 | 261-99B | 7/18/2013 | Rolled into ROP |
| FCA US, LLC | M4085 | 11570 WARREN AVENUE EAST - MACK AVENUE ENGINE PLANT | DETROIT | 48214 | 261-99C | 8/20/2015 | Rolled into ROP |
| FCA US, LLC | M4085 | 11570 WARREN AVENUE EAST - MACK AVENUE ENGINE PLANT | DETROIT | 48214 | 47-18 | 6/8/2018 | |
| DETROIT READY MIX CONCRETE, INC | M4112 | 9189 CENTRAL STREET | DETROIT | 48204 | 32-19 | 3/25/2019 | |
| SLIPNOT METAL SAFETY FLOORING | M4130 | 2545 BEAUFAIT STREET | DETROIT | 48207 | 334-98C | 3/3/2023 | |

EGLE Air Quality Division

**013**

## Active PTIs Approved since 1997 Sorted by County & City

**Active PTIs in WAYNE COUNTY**

| Company | SRN | Address | City | ZIP Code | PTI No. | Approved | Notes |
|---|---|---|---|---|---|---|---|
| GREATER DETROIT RESOURCE RECOVERY FACILITY | M4148 | 5700 RUSSELL STREET | DETROIT | 48211 | 468-83D | 8/13/2010 | |
| HENRY FORD HEALTH | M4159 | 1150 ELIJAH MCCOY DRIVE | DETROIT | 48202 | 21-23 | 2/1/2023 | |
| GENERAL MOTORS, LLC | M4168 | RENAISSANCE CENTER | DETROIT | 48265 | 2-11 | 3/9/2011 | |
| MEADOWCREST MEMORIAL & CREMATORIUM ASSOCIATION | M4185 | 5800 E DAVISON STREET | DETROIT | 48212 | 156-18 | 1/18/2019 | |
| GENERAL MOTORS CORPORATION | M4199 | 2500 E GENERAL MOTORS BLVD - HAMTRAMCK | DETROIT | 48211 | 8-03 | 2/12/2003 | Rolled into ROP |
| GENERAL MOTORS CORPORATION | M4199 | 2500 E GENERAL MOTORS BLVD - HAMTRAMCK | DETROIT | 48211 | 125-81C | 2/25/2003 | Rolled into ROP |
| GENERAL MOTORS CORPORATION | M4199 | 2500 E GENERAL MOTORS BLVD - HAMTRAMCK | DETROIT | 48211 | 156-04 | 7/28/2004 | Rolled into ROP |
| GENERAL MOTORS CORPORATION | M4199 | 2500 E GENERAL MOTORS BLVD - HAMTRAMCK | DETROIT | 48211 | 91-15 | 7/14/2015 | |
| GENERAL MOTORS, LLC | M4199 | 2500 E GENERAL MOTORS BLVD - DETROIT-HAMTRAMCK ASSEMBLY | DETROIT | 48211 | 209-19A | 4/15/2022 | |
| MAC CASTINGS, INC | M4323 | 13600 GIRARDIN STREET | DETROIT | 48212 | 50-09 | 4/8/2009 | |
| DRSN REAL ESTATE, LLC | M4445 | 7733 E JEFFERSON AVENUE | DETROIT | 48214 | 157-17 | 3/9/2018 | |
| U S ECOLOGY DETROIT (SOUTH) | M4545 | 1923 FREDERICK STREET | DETROIT | 48211 | 269-04H | 2/5/2018 | |
| GALLAGHER-KAISER CORPORATION | M4573 | 13400 MOUNT ELLIOTT AVENUE | DETROIT | 49212 | 57-23 | 4/26/2023 | |
| CASEY'S CONCRETE CARRIERS CORP | M4577 | 18001 MOUNT ELLIOTT STREET | DETROIT | 48234 | 71-19 | 5/14/2019 | |
| DANA CONTAINER, INC | M4626 | 11430 RUSSELL STREET | DETROIT | 48211 | 125-07 | 6/11/2007 | |
| DETROIT SALT CO | M4685 | 10335 FLORA STREET | DETROIT | 48217 | 318-98B | 6/17/2020 | |
| DETROIT RECEIVING HOSPITAL | M4704 | 4201 SAINT ANTOINE BLVD | DETROIT | 48201 | 397-99 | 10/14/1999 | General PTI |
| DETROIT RECEIVING HOSPITAL | M4704 | 4201 SAINT ANTOINE BLVD | DETROIT | 48201 | 117-11 | 7/26/2011 | |
| RAYCO PLATING, INC | M4718 | 10023 W FORT STREET | DETROIT | 48209 | 65-03 | 8/9/2004 | |
| JOHN D DINGELL VA MEDICAL CENTER | M4752 | 4646 JOHN R STREET | DETROIT | 48201 | 295-07 | 10/29/2007 | |
| TPI PETROLEUM, INC | M4756 | 10840 FENKELL STREET | DETROIT | 48185 | 214-02 | 10/30/2002 | |
| AT&T | M4785 | 445 STATE STREET | DETROIT | 48226 | 103-08 | 8/7/2008 | |
| AT&T | M4785 | 445 STATE STREET | DETROIT | 48226 | 153-10A | 10/29/2014 | |

EGLE Air Quality Division

**014**

## Active PTIs Approved since 1997 Sorted by County & City

Active PTIs in WAYNE COUNTY

| Company | SRN | Address | City | ZIP Code | PTI No. | Approved | Notes |
|---------|-----|---------|------|----------|---------|----------|-------|
| GENERAL SERVICES ADMINISTRATION | M4803 | 985 MICHIGAN AVENUE - FEDERAL BUILDING | DETROIT | 48226 | 216-98A | 7/15/2021 | |
| MOUNT ELLIOTT STEEL PRODUCTS | M4827 | 13200 MOUNT ELLIOTT STREET | DETROIT | 48207 | 306-99 | 7/6/2000 | |
| GREAT LAKES WATER AUTHORITY | M4842 | 12244 E JEFFERSON AVENUE - CONNERS PUMP STATION | DETROIT | 48215 | 260-99B | 12/1/2008 | |
| GREAT LAKES WATER AUTHORITY | M4843 | 12300 FREUD AVENUE - FREUD PUMP STATION | DETROIT | 48215 | 259-99B | 12/1/2008 | |
| GREAT LAKES WATER AUTHORITY | M4844 | 17145 MACK AVENUE - BLUEHILL PUMP | DETROIT | 48224 | 252-99B | 12/1/2008 | |
| GREAT LAKES WATER AUTHORITY | M4845 | 6425 HUBER AVENUE | DETROIT | 48211 | 121-02A | 12/1/2008 | |
| DETROIT THERMAL, LLC | M4851 | 100 RENAISSANCE CENTER | DETROIT | 48243 | 16-01 | 2/14/2001 | |
| H D INDUSTRIES, INC | N0246 | 19455 GLENDALE STREET | DETROIT | 48223 | 242-06C | 5/31/2013 | |
| PERFECTION INDUSTRIES, INC | N0305 | 18571 WEAVER STREET | DETROIT | 48228 | 213-01B | 6/4/2004 | |
| FLOYD'S U-CART REDI MIX CONCRETE | N0373 | 14284 MEYERS ROAD | DETROIT | 48227 | 87-19 | 6/10/2019 | |
| NECABA MANAGEMENT GROUP, INC | N0703 | 10755 GRATIOT AVENUE | DETROIT | 48213 | 54-09 | 3/25/2009 | |
| CLEAN EARTH ENVIRONMENTAL SOLUTIONS, INC | N0731 | 421 & 515 LYCASTE STREET | DETROIT | 48214 | 6-19 | 6/18/2019 | |
| DAIMLERCHRYSLER CORPORATION | N2155 | 2101 CONNER STREET - JEFFERSON ASSEMBLY | DETROIT | 48215 | 153-97A | 5/29/2001 | Rolled into ROP |
| DAIMLERCHRYSLER CORPORATION | N2155 | 2101 CONNER STREET - JEFFERSON ASSEMBLY | DETROIT | 48215 | 32-95C | 5/29/2001 | Rolled into ROP |
| DAIMLERCHRYSLER CORPORATION | N2155 | 2101 CONNER STREET - JEFFERSON ASSEMBLY | DETROIT | 48225 | 615-86A | 10/8/2002 | Rolled into ROP |
| DAIMLERCHRYSLER CORPORATION | N2155 | 2101 CONNER STREET - JEFFERSON ASSEMBLY | DETROIT | 48215 | 220-04 | 10/5/2004 | Rolled into ROP |
| DAIMLERCHRYSLER CORPORATION | N2155 | 2101 CONNER STREET - JEFFERSON ASSEMBLY | DETROIT | 48215 | 18-08 | 4/19/2010 | Rolled into ROP |
| FCA US, LLC (CHRYSLER) | N2155 | 4000 SAINT JEAN STREET - DETROIT ASSEMBLY COMPLEX - MACK | DETROIT | 48214 | 14-19A | 10/30/2020 | |
| 3M DETROIT ABRASIVES | N2999 | 11900 E 8 MILE ROAD | DETROIT | 48205 | 318-01G | 7/30/2021 | |
| LAWFORD FABRICATING COMPANY, INC | N5174 | 20445 GLENDALE AVENUE | DETROIT | 48223 | 392-97 | 9/18/1997 | |
| LAWFORD FABRICATING COMPANY, INC | N5174 | 20445 GLENDALE AVENUE | DETROIT | 48223 | 392-97A | 10/20/1999 | |

## Active PTIs Approved since 1997 Sorted by County & City

Active PTIs in WAYNE COUNTY

| Company | SRN | Address | City | ZIP Code | PTI No. | Approved | Notes |
|---|---|---|---|---|---|---|---|
| HISPANIC MANUFACTURING CORPORATION | N6262 | 2555 CLARK STREET | DETROIT | 48209 | 164-97 | 2/23/1998 | |
| STRONG STEEL PRODUCTS, LLC | N6293 | 6464 STRONG STREET | DETROIT | 48211 | 183-97 | 6/17/1997 | |
| DETROIT THERMAL, LLC | N6358 | 2401 4TH AVENUE | DETROIT | 48226 | 458-97 | 2/9/1998 | |
| OMNICHEM, LLC | N6373 | 13700 W BUENA VISTA STREET | DETROIT | 48227 | 380-97A | 4/2/2002 | |
| NORTHWEST AIRLINES, INC | N6544 | DETROIT METROPOLITAN WAYNE COUNTY AIRPORT | DETROIT | 48242 | 122-99 | 5/19/1999 | |
| COOPER HEAT TREATING, LLC | N6693 | 20251 SHERWOOD AVENUE | DETROIT | 48234 | 34-03B | 10/24/2022 | |
| MAXIMUM PLATING IND, INC | N6695 | 13840 KEAL STREET | DETROIT | 48227 | 222-01 | 11/19/2001 | |
| TRILOGY FINISHING, INC | N7159 | 4561 BEAUFAIT STREET | DETROIT | 48207 | 136-02 | 9/13/2002 | |
| AEVITAS SPECIALTY SERVICES CORPORATION | N7359 | 663 LYCASTE STREET | DETROIT | 48214 | 10-12 | 4/3/2012 | |
| AMERICAN AGGREGATES OF MICHIGAN, INC | N7375 | 9400 EAGLE STREET | DETROIT | 48209 | 7-13 | 1/18/2013 | |
| GREEN POLYMERIC MATERIALS, INC | N7416 | 6031 JOY ROAD | DETROIT | 48204 | 49-05A | 3/1/2010 | |
| SPRINT COMMUNICATIONS COMPANY LP | N7471 | 1320 3RD STREET | DETROIT | 48226 | 23-08 | 1/24/2008 | General PTI |
| GREAT LAKES WATER AUTHORITY | N7545 | 10100 E JEFFERSON AVENUE | DETROIT | 48214 | 108-06 | 8/4/2006 | |
| PTI PAINT SATELLITE, LLC | N7598 | 6501 E NEVADA STREET | DETROIT | 48234 | 300-08 | 9/10/2008 | General PTI |
| PTI SATELLITE PAINT, LLC | N7598 | 6501 E NEVADA STREET | DETROIT | 48234 | 176-06 | 6/15/2006 | General PTI |
| ENVIRONMENTAL WOOD SOLUTIONS | N7685 | 1550 HARPER AVENUE | DETROIT | 48211 | 110-22 | 8/11/2022 | |
| GREAT LAKES WATER AUTHORITY | N7704 | 12082 PLEASANT AVENUE | DETROIT | 48217 | 291-06 | 12/7/2006 | |
| PITA METALS, INC | N7742 | 411 S FORT STREET | DETROIT | 48217 | 373-06 | 3/13/2007 | Revised |
| GREAT LAKES WATER AUTHORITY | N7879 | 2 PLEASURE DRIVE - BELLE ISLE | DETROIT | 48207 | 332-07 | 10/11/2007 | General PTI |
| GREAT LAKES WATER AUTHORITY | N7879 | 735 RANDOLPH STREET | DETROIT | 48226 | 333-07 | 11/8/2007 | |
| MICHIGAN BELL TELEPHONE COMPANY | N8019 | 17151 LAHSER ROAD | DETROIT | 48219 | 91-08 | 10/14/2008 | |
| MICHIGAN BELL TELEPHONE COMPANY | N8021 | 105 E BETHUNE STREET | DETROIT | 48202 | 93-08 | 8/13/2008 | |
| MICHIGAN BELL TELEPHONE COMPANY | N8022 | 13635 GREINER STREET | DETROIT | 48205 | 94-08 | 8/13/2008 | |
| MICHIGAN BELL TELEPHONE COMPANY | N8023 | 6125 GRAND RIVER AVENUE | DETROIT | 48208 | 95-08 | 7/3/2008 | |
| MICHIGAN BELL TELEPHONE COMPANY | N8029 | 10515 NORTHLAWN STREET | DETROIT | 48204 | 102-08 | 7/16/2008 | |

## Active PTIs Approved since 1997 Sorted by County & City

### Active PTIs in WAYNE COUNTY

| Company | SRN | Address | City | ZIP Code | PTI No. | Approved | Notes |
|---------|-----|---------|------|----------|---------|----------|-------|
| ENVIROSOLUTIONS, INC | N8049 | 22645 W 8 MILE ROAD | DETROIT | 48219 | 151-08 | 6/12/2008 | General PTI |
| JOY CONSTRUCTION & LEASING, INC | N8078 | 19200 WOODWARD AVENUE | DETROIT | 48238 | 205-08 | 7/31/2008 | General PTI |
| DETROIT INSTITUTE OF ARTS | N8089 | 5200 WOODWARD AVENUE | DETROIT | 48202 | 214-08 | 8/19/2008 | |
| NEXT ENERGY | N8164 | 461 BURROUGHS STREET | DETROIT | 48202 | 308-08 | 3/9/2009 | |
| DETROIT WATER & SEWERAGE DEPT | N8174 | 11900 FREUD STREET | DETROIT | 48215 | 243-00 | 3/1/2001 | |
| GREAT LAKES WATER AUTHORITY | N8174 | 11900 FREUD STREET | DETROIT | 48214 | 346-08 | 10/30/2008 | General PTI |
| MRP PROPERTIES, LLC | N8237 | 10000 PLYMOUTH ROAD | DETROIT | 48204 | 43-09 | 3/3/2009 | General PTI |
| DETROIT INTERNATIONAL BRIDGE COMPANY | P0077 | 3001 W FORT STREET | DETROIT | 48232 | 54-10 | 3/4/2010 | General PTI |
| MM&S INVESTMENT II | P0092 | 16850 JAMES COUZENS HIGHWAY | DETROIT | 48235 | 75-10 | 4/8/2010 | General PTI |
| FPT LONYO, LLC | P0120 | 3100 LONYO AVENUE | DETROIT | 48209 | 119-10 | 6/8/2010 | General PTI |
| SET DUCT MANUFACTURING, INC | P0150 | 7800 INTERVALE STREET | DETROIT | 48238 | 232-10 | 2/1/2011 | |
| HEALTH ALLIANCE PLAN | P0224 | 2850 W GRAND BLVD | DETROIT | 48202 | 41-11 | 3/29/2011 | |
| WATERFRONT PETROLEUM TERMINAL COMPANY | P0305 | 5431 W JEFFERSON AVENUE | DETROIT | 48209 | 67-12 | 11/15/2012 | |
| WATERFRONT PETROLEUM TERMINAL COMPANY | P0305 | 5431 W JEFFERSON AVENUE | DETROIT | 48209 | 72-18 | 6/29/2018 | Revised |
| NEIGHBORHOOD SERVICE ORGANIZATION | P0329 | 882 OAKMAN BLVD | DETROIT | 48238 | 39-12 | 3/29/2012 | |
| ARROW CHEMICAL PRODUCTS, INC | P0356 | 2067 SAINT ANNE STREET | DETROIT | 48216 | 20-13 | 3/15/2013 | |
| AT&T | P0357 | 444 MICHIGAN AVENUE | DETROIT | 48226 | 85-12 | 9/6/2012 | |
| SAKTHI AUTOMOTIVE GROUP USA, INC | P0380 | 6401 W FORT STREET | DETROIT | 48209 | 92-16 | 10/31/2016 | |
| EES COKE BATTERY, LLC | P0408 | 1400 ZUG ISLAND ROAD | DETROIT | 48209 | 51-08C | 11/21/2014 | |
| EES COKE BATTERY, LLC | P0408 | 1400 ZUG ISLAND ROAD | DETROIT | 48209 | 108-23 | 9/26/2023 | |
| DETROIT AGGREGATES, LLC | P0431 | 115 ROSA PARKS BLVD | DETROIT | 48216 | 95-23 | 8/4/2023 | General PTI |
| DETROIT BULK SERVICES, INC | P0431 | 115 ROSA PARKS BLVD | DETROIT | 48216 | 3-19 | 2/1/2019 | |
| MICHIGAN PET MEMORIALS, LLC | P0438 | 12871 WESTWOOD STREET | DETROIT | 48223 | 59-13 | 5/17/2013 | |
| PET & ANIMAL CREMATION EXCHANGE | P0592 | 1947 W FORT STREET | DETROIT | 48216 | 34-15A | 5/12/2015 | |
| EDWARD C LEVY COMPANY | P0947 | 9690 BRENNAN STREET | DETROIT | 48209 | 136-18 | 9/14/2018 | |

*EGLE Air Quality Division*

**017**

## Active PTIs Approved since 1997 Sorted by County & City

### Active PTIs in WAYNE COUNTY

| Company | SRN | Address | City | ZIP Code | PTI No. | Approved | Notes |
|---------|-----|---------|------|----------|---------|----------|-------|
| 21ST CENTURY SALVAGE, INC | P1004 | 866 TERMINAL STREET | DETROIT | 48214 | 40-19 | 3/8/2019 | |
| MCCOIG MATERIALS, LLC | P1030 | 1441 SPRINGWELLS COURT - (also 1515 SPRINGWELLS COURT) | DETROIT | 48001 | 242-10B | 9/18/2019 | |
| DETROIT BULK SERVICES, INC | P1038 | 5851 W JEFFERSON AVENUE | DETROIT | 48209 | 105-19 | 7/12/2019 | |
| REVERE DOCK, LLC | P1038 | 5851 W JEFFERSON AVENUE | DETROIT | 48209 | 41-20 | 1/29/2020 | |
| MOUNT ELLIOT PROPERTY, LLC | P1101 | 6400 MOUNT ELLIOT STREEET | DETROIT | 48217 | 208-19 | 1/8/2020 | General PTI |
| DINO-MITE CRUSHING & RECYCLING, LLC | P1114 | 12625 GREENFIELD ROAD | DETROIT | 48227 | 48-18A | 10/11/2019 | |
| SAINT MARY'S CEMENT, INC | P1142 | 9333 DEARBORN STREET | DETROIT | 48209 | 104-20 | 9/10/2020 | General PTI |
| SAINT MARY'S CEMENT, INC | P1147 | 9333 DEARBORN STREET | DETROIT | 48001 | 120-20 | 10/14/2020 | General PTI |
| BRIDGING NORTH AMERICA | P1216 | 1001 SPRINGWELLS COURT | DETROIT | 48209 | 40-22 | 4/15/2022 | Revised |
| DTE ENERGY COMPANY | P1289 | 1 ENERGY PLAZA - DOWNTOWN HEADQUARTERS | DETROIT | 48226 | 101-22 | 7/27/2022 | |
| TRITECH TITANIUM PARTS, LLC | P1299 | 6401 E 7 MILE ROAD | DETROIT | 48234 | 20-23 | 1/31/2023 | |
| RYAN'S HUBBELL AUTO PARTS, INC | P1384 | 9143 HUBBELL STREET | DETROIT | 48228 | 93-23 | 8/2/2023 | |
| SUPERIOR MATERIALS HOLDING | P1395 | 7811 W JEFFERSON AVENUE | DETROIT | 48209 | 125-23 | 10/30/2023 | |
| 21ST CENTURY SALVAGE, INC | P1400 | 4461 W JEFFERSON AVENUE | DETROIT | 48209 | 100-23 | 8/17/2023 | General PTI |
| AKJ INDUSTRIES | A7809 | 1 QUALITY DRIVE | ECORSE | 48229 | 271-97 | 9/17/1997 | Rolled into ROP |
| DTE ENERGY SERVICES | A7809 | 1 QUALITY DRIVE | ECORSE | 48229 | 102-04 | 8/26/2004 | |
| FRITZ ENTERPRISES, INC | A7809 | 1 QUALITY DRIVE | ECORSE | 48229 | 108-15 | 7/9/2015 | |
| INTERNATIONAL MILL SERVICES | A7809 | 1 QUALITY DRIVE | ECORSE | 48229 | 271-01 | 10/5/2001 | Rolled into ROP |
| NATIONAL STEEL CORPORATION | A7809 | 1 QUALITY DRIVE | ECORSE | 48229 | 223-98 | 3/2/2000 | Rolled into ROP |
| NATIONAL STEEL CORPORATION | A7809 | 1 QUALITY DRIVE | ECORSE | 48229 | 59-01 | 1/30/2002 | Rolled into ROP |
| NATIONAL STEEL CORPORATION | A7809 | 1 QUALITY DRIVE | ECORSE | 48229 | 99-03 | 7/16/2003 | Rolled into ROP |
| NATIONAL STEEL CORPORATION | A7809 | 1 QUALITY DRIVE | ECORSE | 48229 | 103-03 | 6/15/2004 | Rolled into ROP |
| U S STEEL CORPORATION | A7809 | 1 QUALITY DRIVE - GREAT LAKES WORKS | ECORSE | 48229 | 147-03 | 1/7/2004 | |
| U S STEEL CORPORATION | A7809 | 1 QUALITY DRIVE - GREAT LAKES WORKS | ECORSE | 48229 | 219-06 | 8/16/2006 | Rolled into ROP |
| U S STEEL CORPORATION | A7809 | 1 QUALITY DRIVE - GREAT LAKES WORKS | ECORSE | 48229 | 271-06 | 9/12/2006 | General PTI |
| U S STEEL CORPORATION | A7809 | 1 QUALITY DRIVE - GREAT LAKES WORKS | ECORSE | 48229 | 96-12A | 12/9/2014 | |

EGLE Air Quality Division

## Active PTIs Approved since 1997 Sorted by County & City

### Active PTIs in WAYNE COUNTY

| Company | SRN | Address | City | ZIP Code | PTI No. | Approved | Notes |
|---|---|---|---|---|---|---|---|
| U S STEEL CORPORATION | A7809 | 1 QUALITY DRIVE - GREAT LAKES WORKS | ECORSE | 48229 | 98-15 | 12/3/2015 | |
| U S STEEL CORPORATION | A7809 | 1 QUALITY DRIVE - GREAT LAKES WORKS | ECORSE | 48229 | 219-06B | 12/3/2015 | |
| U S STEEL CORPORATION | A7809 | 1 QUALITY DRIVE - GREAT LAKES WORKS | ECORSE | 48229 | 19-16A | 7/1/2016 | |
| U S STEEL CORPORATION | A7809 | 1 QUALITY DRIVE - GREAT LAKES WORKS | ECORSE | 48229 | 13-17 | 4/24/2017 | |
| U S STEEL CORPORATION | A7809 | 1 QUALITY DRIVE - GREAT LAKES WORKS | ECORSE | 48229 | 7-22 | 1/25/2022 | General PTI |
| U S STEEL CORPORATION | A7809 | 1 QUALITY DRIVE - GREAT LAKES WORKS | ECORSE | 48229 | 110-23 | 9/26/2023 | |
| EDWARD C LEVY COMPANY | B4364 | 100 WESTFIELD STREET - PLANT 3 | ECORSE | 48229 | 482-97A | 10/26/1999 | Rolled into ROP |
| NATIONAL STEEL CORPORATION | B4364 | 100 WESTFIELD STREET | ECORSE | 48229 | 100-03 | 7/18/2003 | Rolled into ROP |
| MICHIGAN MEMORIAL PARK, INC | K7643 | 30895 W HURON RIVER DRIVE | FLAT ROCK | 48134 | 127-12 | 8/21/2012 | |
| FLAT ROCK METAL, INC | M4768 | 26601 W HURON RIVER DRIVE | FLAT ROCK | 48134 | 59-09 | 3/30/2009 | General PTI |
| FLAT ROCK METAL, INC | M4768 | 26601 W HURON RIVER DRIVE | FLAT ROCK | 48134 | 71-98A | 5/30/2023 | |
| AUTOALLIANCE INTERNATIONAL | N0929 | 1 INTERNATIONAL DRIVE | FLAT ROCK | 48134 | 181-04 | 8/4/2004 | Rolled into ROP |
| AUTOALLIANCE INTERNATIONAL | N0929 | 1 INTERNATIONAL DRIVE | FLAT ROCK | 48134 | 197-04 | 10/8/2004 | Rolled into ROP |
| AUTOALLIANCE INTERNATIONAL | N0929 | 1 INTERNATIONAL DRIVE | FLAT ROCK | 48134 | 89-07 | 6/16/2008 | Rolled into ROP |
| AUTOALLIANCE INTERNATIONAL | N0929 | 1 INTERNATIONAL DRIVE | FLAT ROCK | 48134 | 112-10 | 6/9/2010 | Rolled into ROP |
| AUTOALLIANCE INTERNATIONAL | N0929 | 1 INTERNATIONAL DRIVE | FLAT ROCK | 48134 | 138-10 | 11/23/2010 | Rolled into ROP |
| FORD MOTOR COMPANY | N0929 | 1 INTERNATIONAL DRIVE - FLAT ROCK ASSEMBLY | FLAT ROCK | 48134 | 122-17 | 3/22/2018 | Rolled into ROP |
| MRP PROPERTIES, LLC | N8235 | 25664 GIBRALTAR ROAD | FLAT ROCK | 48134 | 41-09 | 3/3/2009 | General PTI |
| INTERNATIONAL BULK SERVICE, INC | P1070 | 24002 VREELAND ROAD | FLAT ROCK | 48134 | 126-19A | 5/6/2020 | |
| EXTRUSION PAINTING, INC | B6147 | 32800 INDUSTRIAL BLVD | GARDEN CITY | 48135 | 471-99A | 4/26/2000 | |
| SAND VENTURES | N7314 | 32630 FORD ROAD - SUITE B | GARDEN CITY | 48135 | 290-03 | 12/10/2003 | General PTI |
| NASERDEAN REAL ESTATE, LLC | P1165 | 30259 FORD ROAD | GARDEN CITY | 48130 | 2-21 | 1/28/2021 | General PTI |
| HYCAL CORPORATION | P0766 | 27800 W JEFFERSON AVENUE | GIBRALTAR | 48173 | 91-09A | 1/17/2017 | |
| ANGLIN CIVIL | P1392 | 9601 GROH ROAD | GROSSE ILE | 48138 | 91-23 | 7/25/2023 | General PTI |
| HAMTRAMCK RECYCLING, LLC | P0453 | 3333 HAMTRAMCK DRIVE | HAMTRAMCK | 48211 | 100-13 | 8/7/2013 | |
| HAMTRAMCK RECYCLING, LLC | P0453 | 3333 HAMTRAMCK DRIVE | HAMTRAMCK | 48211 | 134-13 | 10/24/2013 | |
| ANGELO'S CRUSHED CONCRETE, INC | M3733 | 15150 OAKLAND AVENUE | HIGHLAND PARK | 48203 | 82-00 | 3/23/2000 | General PTI |

### DECLARATION OF ROBERT SHOBE

I, Robert Shobe, hereby declare as follows:

1.  I am over 18 years of age, of sound mind, and otherwise competent to make this Declaration. The statements below are based on my personal knowledge.

2.  I am a member of the Sierra Club.

3.  I live in Detroit on Beniteau Street in zip code 48214 in Wayne County, Michigan. I have lived in this home since 1998.

4.  My home is approximately 3.5 miles from the East 7 Mile air monitor located at 11600 East Seven Mile Road in Detroit, Michigan.

5.  As a child, I grew up in the same neighborhood where I currently reside. I lived with my mother in a house at 3881 Gladwin Avenue from age one to sixteen. I attended Mack Primary School, St. Clair Annex, Region 7 Middle School, and Denby High School as a child. I often played baseball and basketball at the Brewer Recreation Center. Gladwin Avenue and the homes on it, including my childhood home, no longer exist after being incorporated into what is now a parking lot for Chrysler Corporation, which has since become Stellantis.

6.  My current home is adjacent to two large automotive assembly plants owned and operated by Stellantis: the Mack Avenue Assembly Plant and the Jefferson North Assembly Plant (collectively, "Plants").

1

7.  I have been diagnosed with chronic obstructive pulmonary disease, for which I am prescribed an albuterol inhaler to help manage the condition. I was diagnosed with leukemia in December of 2015.

8.  I am aware that the automotive painting operations are a leading source of volatile organic compound (VOC) emissions at automotive manufacturing facilities and that these facilities are some of the largest sources of VOC pollution in Michigan, which contributes to ozone pollution. I am also aware that cars and trucks contribute to ozone pollution.

9.  Before the construction and operation of the Mack Avenue Assembly Plant, my property was roughly 1,000 feet from an automotive stamping plant, which emitted minimal amounts of VOCs. My home was separated from the stamping plant by a large earthen berm with trees and St. Jean Street.

10.  Today, my property is about 300 feet from the automotive paint operation that is a part of the Mack Avenue Assembly Plant and which is the main source of VOC emissions at the plant. The earthen berm, trees, and St. Jean Street were removed and turned into a parking lot for the Mack Avenue Assembly Plant.

11.  While I had air quality concerns before the plant was expanded, when the Mack Avenue Assembly Plant went into operation I became significantly more aware and concerned about how air quality affects my health. Since the Mack Avenue Assembly Plant began operation, I frequently notice the smell of paint from my home, like it was freshly sprayed from an aerosol can. It is often particularly strong early in the morning.

12.  Since the Mack Avenue Assembly Plant began operations, while at or near my home I often cough and develop increased tightness in my chest. I get frequent headaches and my

2

eyes often begin to burn. I am more easily fatigued and have developed frequent bouts of nausea. My symptoms often clear up within an hour of leaving my neighborhood.

13.   While emissions from the Plants are the most noticeable to me and impact my daily life, I understand that other facilities in Wayne county and across the Southeast Michigan region as well as mobile sources of pollution, such as cars and trucks, also impact the overall level of ozone pollution in and around my community and impact my health and well-being.

14.   I closely follow air quality in my community, and am more likely to stay indoors when there is an ozone action day out of concern for my health.

15.   Bad air quality in my area severely impacts my day-to-day life. I refrain from laying in my hammock and tending to my lawn, out of concern for air pollution's impact on my health. I also walk and jog less than I would if the air quality were better. I have stopped inviting people to my house because I do not feel comfortable asking them to come to a place with poor air quality. I almost never open the windows to my home, despite having no air conditioning. I rely on an air purifier to help clean the air in my house.

16.   I am aware that high levels of ozone can cause and exacerbate numerous respiratory conditions, including asthma, and can make breathing more difficult. My respiratory illness makes me especially vulnerable to high levels of ozone.

17.   I support Sierra Club's lawsuit to require EPA to take all legally required steps to ensure ozone pollution does not exceed safe levels in my area. I understand that success in this lawsuit would trigger additional requirements for state regulators to lower ozone pollution in my area. I would support this because such reductions would result in cleaner and healthier air for myself and my community.

3

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this $\underline{5}$ day of January, 2024.

ROBERT SHOBE

## DECLARATION OF MARTIN HABALEWSKY

I, Martin Habalewsky, hereby declare as follows:

1.  I am over 18 years of age, of sound mind, and otherwise competent to make this Declaration. The statements below are based on my personal knowledge.

2.  I am a member of Sierra Club and have been a member since 2003. I am a member because I enjoy the outings Sierra Club organizes and because Sierra Club works to protect things I care about, like clean air and water and a healthy environment.

3.  I am 70 years old and retired.

4.  My wife and I live in Port Huron in St. Clair County. I have lived in Port Huron for 12 years. Before that, I lived in or very near Detroit proper, where I grew up.

5.  I live about 8 miles from the air monitoring station in Port Huron, located at 2625 Dove Road.

6.  I enjoy spending time outdoors in my community and in, and around, Detroit, too. It's my way of keeping fit. I walk, bike, golf, and hike often, mostly in the community near my home, but also throughout the broader Detroit metropolitan area. For example, as part of participating in a weekly summer and fall fitness program called Walk Michigan, I walk every Tuesday during the program dates at various locations, like the St. Clair Riverfront in Port Huron. I ride my bike near my home, and sometimes also to the south, in Macomb County. I golf regularly, about twice a week, except in winter, including at the Rackham Golf Course, near Detroit.

7.  I very much enjoy hiking. I live about 3/4 of a mile from a large, forested City of Port Huron park with trails. It is my ideal place to hike. I also hike in county parks in the area. I enjoy looking at the trees and the scenery. I like to explore nature. My wife is a master

1

**024**

gardener and knows the plants and trees, and I like learning about them from her. Being in nature makes me feel at peace—it's a mystical kind of thing. The serenity of nature makes me relaxed.

8.  Because of my involvement with Sierra Club, I am aware of the harmful effects of ozone air pollution. I am aware that the United States Environmental Protection Agency (EPA) had designated all of St. Clair County, as well as Wayne County, which includes Detroit, Macomb County, and several other nearby counties, as failing to meet federal health standards for ozone, and that EPA has now removed that designation.

9.  There are a number of industrial sources of air pollution in St. Clair County, including coal- and gas-fired power plants, and several large industrial companies, such as Mueller Brass Company and ALD Thermal Treating Inc., both in Port Huron. In addition, electricity is generated from methane gas at the St. Clair County Landfill in nearby Kimball Township. This work is done by Blue Water Renewables, a division of DTE Energy, a major electric and gas utility.

10.  I am aware that both volatile organic compounds ("VOCs") and nitrogen oxides ("NOx") contribute to ozone. I understand that the Michigan Department of Environment, Great Lakes, and Energy ("EGLE") issued new rules to limit VOCs from certain existing sources of that pollution in Michigan's ozone nonattainment areas, but that since EPA removed the nonattainment designation from the Southeast Michigan area, EGLE has suspended its enforcement of those rules in my county and the other counties that had made up the nonattainment area. (See Exhibit 1.)  My understanding is that this means that sources of VOC pollution in these counties that otherwise would have had to comply with those rules and limit their emissions will no longer have to do that.

2

**025**

11. I am concerned about air quality in the Detroit area, including St. Clair County, because I spend a significant amount of time outdoors there. As a senior citizen, I am particularly vulnerable to air pollution. When the air quality is poor, I become concerned about the impacts it may have on my health during my outdoor activities. When I know it is a high-ozone day, that discourages me from exercising and otherwise enjoying the outdoors.

12. I am also concerned about the effects of air pollution on the natural world that I enjoy. I have seen many trees in my neighborhood have to come down and I am concerned that air pollution contributes to their harm.

13. I support Sierra Club's efforts to compel the EPA to take action that would help address the ozone air pollution problems in my community. I want to breathe as little pollution as possible. I believe that stronger action on ozone pollution would help lessen harms to my health when I recreate outdoors, and harms to the forests and natural world that is so important to me.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 4th day of January, 2024.

MARTIN HABALEWSKY

3

026

**Exhibit 1**



STATE OF MICHIGAN
# DEPARTMENT OF
## ENVIRONMENT, GREAT LAKES, AND ENERGY
LANSING

**EGLE**

GRETCHEN WHITMER
GOVERNOR

AARON B. KEATLEY
ACTING DIRECTOR

### Variance
### Suspension of Enforcement of Part 6 Reasonably Available Control Technology Rules
### For
### the Southeast Michigan 2015 Ozone Maintenance Area

1. **Variance Statement**

   In accordance with the provisions of Part 55, Air Pollution Control, of the Natural Resources and Environmental Protection Act, 1994 PA 451, as amended (NREPA), a variance is granted suspending specific requirements of various Part 6 rules only as described in subparagraphs I. and II. below.  This variance is granted for a period of one year from the effective date of this document.

   I.    For only Michigan Air Pollution Control Rules (MAPCR) R 336.1602(4); R 336.1606 – R 336.1608; R 336.1610a; R 336.1620a; R 336.1621a; R 336.1624a; and R 336.1633 – R 336.1644 the term "2015 ozone nonattainment area" as referenced in the rules and defined in R 336.1601(a), shall not include the following counties: Livingston, Macomb, Monroe, Oakland, St. Clair, Washtenaw, and Wayne.

   II.   For MAPCR R 336.1632 the exception within Rule 632(9)(a) does not apply to the following counties: Livingston, Macomb, Monroe, Oakland, St. Clair, Washtenaw, and Wayne Counties; instead, the exception in Rule 632(9)(b) and 632(9)(j) applies to those counties.

   The purpose of this variance is to suspend the Reasonably Available Control Technology (RACT) requirements of the newly promulgated MAPCR Part 6 rules for the counties in the southeast Michigan 2015 ozone maintenance area (SEMI NAA), also known as the Detroit maintenance area. On May 19, 2023, the United States Environmental Protection Agency (USEPA) redesignated the seven-county southeast Michigan area from nonattainment to attainment / maintenance based on Michigan's January 3, 2022, redesignation request, effectively nullifying the requirement for the RACT rules for the area.  Enforcing these RACT rules in an area that had attained the ozone National Ambient Air Quality Standard in a timely fashion would be an unreasonable hardship upon the impacted persons.

2. **Regulatory Background**

   Part 55 of the NREPA, along with rules promulgated pursuant to the NREPA, regulates emissions of air pollutants to the ambient air.

   Section 5535 (MCL 324.5535 *Suspension of enforcement; reasons; variance*) of the NREPA allows the department to suspend enforcement of the whole or part of any rule that would be an unreasonable hardship upon the person, provided it is granted by variance, and it does not violate the federal Clean Air Act (CAA).

   Section 5536 (MCL 324.5536 *Variance; considerations effecting*) specifies considerations the department shall give due recognition to in granting any variance, and conditions and

CONSTITUTION HALL • 525 WEST ALLEGAN STREET • P.O. BOX 30473 • LANSING, MICHIGAN 48909-7973
Michigan.gov/EGLE • 800-662-9278

**027**

Variance
Suspension of Enforcement of Part 6 Rules for
The Southeast Michigan 2015 Ozone Nonattainment Area
May 19, 2023
Page 2

requirements that shall apply. It also specifies when variances may *not* be granted, and those circumstances do not apply here.

Section 5538 (MCL 324.5538 *Variance; period granted; report; conditions*) specifies that any variance granted pursuant to Section 5535 shall be for a period of time specified by the department at the time of granting but not to exceed one year. However, any variance may be continued from year to year.

3. **Justification for the Department's Position**

The department submitted the redesignation request for the seven-county SEMI NAA on January 3, 2022. The USEPA redesignated the area to attainment with a maintenance classification on May 19, 2023, based on the submitted redesignation request. The department is suspending the requirements of the newly revised RACT requirements of the MAPCR Part 6 rules for the seven counties in southeast Michigan because the area has been redesignated such that the implementation of the RACT rules for the area are not required at this time. Requiring existing sources in an attainment area to comply with these more stringent requirements would create an unreasonable hardship.

This variance will not cause violations of the CAA. While all of the sources that qualify for this variance are also regulated under the CAA, this variance does not exempt these sources from complying with all other aspects of the NREPA, the CAA, and those rules promulgated thereunder.

### Final Approval

The Director of the Air Quality Division, having had opportunity to review the variance and having been delegated authority to grant variances by the Director of the Michigan Department of Environment, Great Lakes, and Energy pursuant to the provisions of Part 55 of the NREPA and otherwise being fully advised on the premises,

Hereby grants the variance, which shall be entered in the record of the department.

Annette Switzer, Director
Air Quality Division
Michigan Department of Environment, Great Lakes, and Energy

Effective Date: May 19, 2023

## DECLARATION OF ANDREW SARPOLIS

I, Andrew Sarpolis, hereby declare and state as follows:

1.    I am the Field Manager for Sierra Club's activities in Michigan. Sierra Club is a non-profit organization under the laws of the State of California. I am responsible for overseeing Sierra Club's on-the-ground efforts to meet objectives defined by its national campaigns and state Chapter. I live in Royal Oak, Michigan. The following information is within my personal knowledge.

2.    The Sierra Club's purposes are to explore, enjoy, and protect the wild places of the Earth; to practice and promote the responsible use of the Earth's ecosystems and resources; to educate and enlist humanity in the protection and restoration of the quality of the natural and human environment; and to use all lawful means to carry out these objectives. Sierra Club members are greatly concerned about air quality, and the Club has a long history of involvement in air quality-related advocacy on both the local and national levels.

3.    I began working at the Sierra Club on September 30, 2013, and have worked continuously at Sierra Club since July 21, 2014. In my current capacity, I am responsible for coordinating activities to advance Sierra Club objectives including managing field activities in Michigan to conduct community outreach, public education, and supporting litigation. In order to perform the responsibilities of these roles, I have interacted on a daily basis with the Sierra Club's members in Michigan, as well as other state and national staff. Because of my position and responsibilities, and through my regular interaction with members, I am familiar with the Sierra Club's purpose, organization, and activities, and with the environmental interests and concerns of Sierra Club members.  Both the Chapter and national campaigns I am involved in, including the Beyond Coal campaign, work to protect and improve air quality.

4.    Prior to my role as Field Manager, I was a Senior Organizing Representative for the Club's Beyond Coal Campaign. This often involved educating Sierra Club members as to air quality issues and providing opportunities for them to advocate for regulations that would result in cleaner air.

5.    Sierra Club has expended its resources addressing air pollution issues, including issues relating to ozone and the enforcement of the 2015 ozone National Ambient Air Quality Standard. For example, Sierra Club has sought to inform the public about the health impacts of ozone pollution. We regularly advocate for strong implementation of the National Ambient Air Quality Standards. We also use information that is produced through monitoring and reporting of air pollution to inform ourselves and our members about pollution.

6.    I am familiar with the nature and scope of Sierra Club's membership programs, its membership records, and the manner in which information on members can be retrieved. Sierra Club regularly maintains membership records that include the address of each member. These records are regularly updated to add new members, reflect address changes, and remove the names of persons who are no longer members. .

7.    Based on membership records as of October 2023, Sierra Club has nearly 700,000 members nationwide. Members reside in each of the 50 states of the United States, as well as the District of Columbia and Puerto Rico, and several U.S. territories. Nearly 20,000 Sierra Club members reside in Michigan. The following number of Sierra Club members reside in the following Michigan counties: Wayne (1,652); Washtenaw (1,693); St. Clair (191); Oakland (2,405), Monroe (169); Macomb (777), Livingston (431). The total number of members living in these seven counties is 7,308.

I declare, pursuant to 28 U.S.C. § 1746, under penalty of perjury that the foregoing is true and correct.

Executed on December 07, 2023.

_____
ANDREW SARPOLIS