**Nos. 23-3581, 23-3583**

---

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

---

SIERRA CLUB,

*Petitioner*,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY;
MICHAEL S. REGAN, Administrator, United States
Environmental Protection Agency,

*Respondents.*

---

On Petition for Review of the U.S. Environmental Protection Agency's
Final Rulemakings at 88 Fed. Reg. 32584 (May 19, 2023) and
88 Fed. Reg. 32594 (May 19, 2023)

---

**BRIEF OF AMICI CURIAE
MICHIGAN CLINICIANS FOR CLIMATE ACTION AND
MI AIR MI HEALTH IN SUPPORT OF PETITIONER**

---

John Minode'e Petoskey
Christopher R. Clark
EARTHJUSTICE
311 South Wacker Drive, Suite 1400
Chicago, IL 60606
(312) 500-2200
jpetoskey@earthjustice.org
cclark@earthjustice.org

*Counsel for Amici Curiae Michigan
Clinicians for Climate Action and
MI Air MI Health*

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

# Disclosure of Corporate Affiliations
# and Financial Interest

Sixth Circuit
Case Number: 23-3581, 23-358          Case Name: Sierra Club v. U.S. Env't Prot. Agency

Name of counsel: John Minode'e Petoskey

Pursuant to 6th Cir. R. 26.1, Michigan Clinicians for Climate Action
Name of Party

makes the following disclosure:

1. Is said party a subsidiary or affiliate of a publicly owned corporation? If Yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party:

> No

2. Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome? If yes, list the identity of such corporation and the nature of the financial interest:

> No

---

## CERTIFICATE OF SERVICE

I certify that on                    January 16, 2024                    the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/ John Minode'e Petoskey
311 South Wacker Drive, Suite 1400
Chicago, IL 60606

---

This statement is filed twice: when the appeal is initially opened and later, in the principal briefs, immediately preceding the table of contents. See 6th Cir. R. 26.1 on page 2 of this form.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

# Disclosure of Corporate Affiliations and Financial Interest

Sixth Circuit
Case Number: 23-3581, 23-358      Case Name: Sierra Club v. U.S. Env't Prot. Agency

Name of counsel: John Minode'e Petoskey

Pursuant to 6th Cir. R. 26.1, MI Air MI Health

*Name of Party*

makes the following disclosure:

1.     Is said party a subsidiary or affiliate of a publicly owned corporation?  If Yes, list below the identity of the parent corporation or affiliate and the relationship between it and the named party:

> No

2.     Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome?  If yes, list the identity of such corporation and the nature of the financial interest:

> No

---

CERTIFICATE OF SERVICE

I certify that on _____ January 16, 2024 _____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

s/ John Minode'e Petoskey
311 South Wacker Drive, Suite 1400
Chicago, IL 60606

---

This statement is filed twice:  when the appeal is initially opened and later, in the principal briefs, immediately preceding the table of contents.  See 6th Cir. R. 26.1 on page 2 of this form.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES............................................................ vi

INTRODUCTION .........................................................................1

INTERESTS OF AMICI...............................................................2

PROCEDURAL BACKGROUND..................................................4

SUMMARY OF ARGUMENT.......................................................8

ARGUMENT .................................................................................9

I.     Ground-Level Ozone Harms Public Health. ..............................9

II.    EPA's Redesignation Decision Was Arbitrary and Capricious Because It Did Not Account for Public Health and Environmental Justice. ..........13

    A.    EPA Has a Duty to Prioritize Public Health and Environmental Justice. ..........................................................................13

        1.    NAAQS Compliance Alone Is Insufficient to Approve a Redesignation Request Because the CAA Requires EPA to Consider the Totality of Circumstances.............................13

        2.    EPA Must Prioritize Public Health in Approving Exceptional Event Demonstrations.......................................16

        3.    Michigan's Maintenance Plan Must Comply with Title VI of the Civil Rights Act. .....................................................17

        4.    Executive Orders Require EPA to Ensure Its Redesignation Decision Does Not Adversely and Disproportionately Affect Environmental Justice Communities. .........................19

    B.    EPA Failed to Contend with the Public Health Circumstances and Environmental Injustices Present in Detroit. .........................20

        1.    Ozone Levels in Detroit Exceed the NAAQS. .....................21

        2.    EPA's Decision to Redesignate Detroit to Attainment and Allow EGLE to Revoke Strict Ozone Controls in Detroit Will Exacerbate Environmental Burdens. ............................22

III.    Public Health Will Not Be Sufficiently Protected if Detroit's Air
Quality Exceeds the Ozone NAAQS in the Near Future. ........................28

IV.    EPA Provides No Evidence to Support Its Conclusion that Ozone
Concentrations Will Imminently Decline in the Detroit Area.................30

CONCLUSION .....................................................................................................32

CERTIFICATE OF COMPLIANCE ......................................................................34

CERTIFICATE OF SERVICE ...............................................................................35

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alliance of Nurses for Healthy Environments v. Regan*,
No. 22-cv-1606 (D.D.C.) ..................................................................5

*Communities Against Runway Expansion, Inc. v. FAA*,
355 F.3d 678 (D.C. Cir. 2004) .........................................................19

*Gerber v. Norton*,
294 F.3d 173 (D.C. Cir. 2002) .........................................................26

*Kentucky Riverkeeper, Inc. v. Rowlette*,
714 F.3d 402 (6th Cir. 2013) ...........................................................24

*Michigan v. EPA*,
576 U.S. 743 (2015).........................................................................17

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983)...........................................................16, 24, 32

*New York v. EPA*,
921 F.3d 257 (D.C. Cir. 2019) .........................................................15

*Sierra Club v. EPA*,
793 F.3d 656 (6th Cir. 2015) .....................................................14, 28

*South Coast Air Quality Mgmt. Dist. v. EPA*,
472 F.3d 882 (D.C. Cir. 2006)....................................................14, 16, 24

*Susquehanna Int'l Grp. v. Sec. & Exch. Comm'n*,
866 F.3d 442 (D.C. Cir. 2017) ...................................................15, 27

*Wall v. EPA*,
265 F.3d 426 (6th Cir. 2001) ...........................................................28

*Whitman v. Am. Trucking Ass'ns*,
531 U.S. 457 (2001)........................................................................17

## Statutes & Regulations

40 C.F.R. § 7.35(b) .................................................................................18

40 C.F.R. § 50.1(j)-(k) .............................................................................16

5 U.S.C. § 706(2)(A) ...............................................................................19

42 U.S.C. § 2000d-1 ...............................................................................29

42 U.S.C. § 2000d, Civil Rights Act Title VI ...................................*passim*

42 U.S.C. § 7401(b)(1) .............................................................................13

42 U.S.C. § 7401 et seq., Clean Air Act .........................................*passim*

42 U.S.C. § 7407(d)(3)(E) ...............................................14, 15, 23, 27

42 U.S.C. § 7407(d)(3)(E)(i)-(v) ...........................................................14

42 U.S.C. § 7409 .......................................................................................9

42 U.S.C. § 7409(b) ..................................................................................4

42 U.S.C. § 7409(b)(1) .......................................................................13, 17

42 U.S.C. § 7410(a)(2)(D)(i)(I) ...............................................................31

42 U.S.C. § 7410(a)(2)(E) ..................................................................17, 29

42 U.S.C. § 7412(n)(1)(A)'s ....................................................................17

42 U.S.C. § 7511(b)(2)(A) .........................................................................4

42 U.S.C. § 7511a(a)(2)(A) ..................................................................4, 23

42 U.S.C. § 7511e .....................................................................................15

42 U.S.C. § 7554(b)(2) .............................................................................15

42 U.S.C. § 7607(d)(9)(A)-(D) .................................................................1

42 U.S.C. § 7619(b)(1)(A) .......................................................................16

42 U.S.C. § 7619(b)(3)(A)(i) ...................................................................17

Executive Order 12898, *Federal Actions to Address Environmental Justice in Minority Populations and Low-Income Populations* (Feb. 16, 1994) ................................................................................ 19

Executive Order 14008, *Tackling the Climate Crisis at Home and Abroad* (Jan. 27, 2021) ................................................................................ 20

Executive Order 14096, *Revitalizing Our Nation's Commitment to Environmental Justice for All* (Apr. 21, 2023) ............................ 19, 20

**Other Authorities**

80 Fed. Reg. 65292 (Oct. 26, 2015) .................................................. 4, 9

83 Fed. Reg. 25776 (June 4, 2018) ........................................................ 4

85 Fed. Reg. 87256 (Dec. 31, 2020) ...................................................... 9

87 Fed. Reg. 14210 (Mar. 14, 2022) ...................................................... 5

88 Fed. Reg. 32584 (May 19, 2023) ............................................ *passim*

88 Fed. Reg. 32594 (May 19, 2023) ............................................ *passim*

88 Fed. Reg. 36654 (June 5, 2023) ...................................................... 31

88 Fed. Reg. 67102 (Sept. 29, 2023) .................................................. 31

Am. Lung Ass'n, *Ozone* (last updated Oct. 25, 2023) ........................ 11

Cong Liu et al., *Interactive Effects of Ambient Fine Particulate Matter and Ozone on Daily Mortality in 372 Cities*, BMJ (2023) .................. 21

Daniel Mendoza et al., *Impact of Low-Level Fine Particulate Matter and Ozone Exposure on Absences in K-12 Students and Economic Consequences*, Env't Res. Letters (Nov. 2020) .................................. 12

EGLE, *Air Quality Division's Clean Air Action Day Program* (Sept. 13, 2023) ................................................................................ 21

EGLE, *Monitoring Data E-7 Mile Monitor* (June 24-25, 2022) ............ 6

viii

EGLE, *Request for Revision to Michigan's State Implementation Plan and Ozone Maintenance Plan for Southeast Michigan Ozone Nonattainment Area* (Jan. 2022) ...........................................................18

EGLE, *Variance: Suspension of Enforcement of Part 6 Reasonably Available Control Technology Rules for the Southeast Michigan 2015 Ozone Maintenance Area* (May 19, 2023) ......................................7, 16, 22

EGLE, *Wildfire Exceptional Event Demonstration for Ground-Level Ozone in Southeast Michigan - East 7 Mile Monitor* (Jan. 26, 2023).................................................................................5

EGLE, *Request for Redesignation to Attainment for the 2015 Ozone National Ambient Air Quality Standard* (Jan. 3, 2022) ........................................4

EPA, *Control Techniques Guidelines and Alternative Control Techniques Documents for Reducing Ozone-Causing Emissions* (last updated May 8, 2023) ...............................................................23

EPA, *EJScreen* (last visited Jan. 15, 2024)...........................................................25

EPA, *EPA's "Good Neighbor Plan" Response to Comply with Stay Orders Pending Judicial Review* (Sept. 21, 2023) ...............................................32

EPA, *Final Good Neighbor Plan Design Value Contributions*, Tab 4 (Feb. 28, 2022)..............................................................................32

EPA, *Health Effects of Ozone in the General Population* (last updated Apr. 20, 2023) ..............................................................10, 11, 12

EPA Office of General Counsel, *EPA Legal Tools to Advance Environmental Justice* (May 2022) ........................................................19

EPA, *Ozone and Your Health* (Feb. 2009) .............................................................10

EPA, *Ozone NAAQS Timelines* (last updated Oct. 26, 2023)...............................4

EPA, *The Ozone Problem* (last updated July 11, 2023) .........................................10

EPA, *What Is Ozone and Where Is It in the Atmosphere?* (last updated July 11, 2023)...............................................................10

Erika M. Manczak et al., *Census Tract Ambient Ozone Predicts Trajectories of Depressive Symptoms in Adolescents*, Dev. Psych., (Mar. 2022) .................................................................................... 11

Prudence Kunyangna & Beth Anderson, *Detroit: The Current Status of the Asthma Burden*, Mich. Dep't of Health & Hum. Servs. (2021) ............................................................................................. 25

Sophie Szopa et al., *Short-lived Climate Forcers* in *IPCC Sixth Assessment Report* (2021) ............................................................ 30, 31

U.S. Dep't of Just., *Title VI Legal Manual*, Section VII (last visited Jan. 15, 2024) .................................................... 18

White House Council of Econ. Advisors, *Chronic Absenteeism and Disrupted Learning Require an All-Hands-on-Deck Approach* (Sept. 13, 2023) .......................................................................... 12

WHO, *WHO Global Air Quality Guidelines* (2021) ............................................. 11

## INTRODUCTION

Michigan Clinicians for Climate Action ("MiCCA") and MI Air MI Health ("MAMH") (collectively "Health Amici") submit this amicus brief in support of Sierra Club. Sierra Club petitioned for a review of the United States Environmental Protection Agency's ("EPA") decision to redesignate the Detroit area as being in "attainment" of the eight-hour National Ambient Air Quality Standard ("NAAQS") for ozone under the Clean Air Act ("CAA"). Sierra Club also petitioned for a review of EPA's approval of the Michigan Department of Environment, Great Lakes, and Energy's ("EGLE") exceptional event demonstration. These petitions were consolidated by this Court. EPA's actions in this case were arbitrary, capricious, an abuse of discretion, and not in accordance with law. 42 U.S.C. § 7607(d)(9)(A)-(D).

This brief is filed pursuant to Rule 29(a)(3). No party's counsel authored this brief in whole or in part; no party's counsel or other person contributed money to fund the brief.

## INTERESTS OF AMICI

MiCCA is a coalition of Michigan health professionals who seek to prevent the adverse health effects of climate change. MiCCA was founded in 2020 and consists of over 400 members, including university professors, physicians, and respiratory health specialists. MiCCA's work focuses on educating healthcare workers, the general public, and policymakers on climate change issues that affect people's health. MiCCA's vision is to create a climate in which the health and wellbeing of all people are valued.

MAMH was founded in April 2012 by representatives from thirty Michigan health organizations to give health groups a stronger voice when advocating for policies that improve outdoor air quality, curb the harmful health impacts of climate change, and improve the health of children and families. MAMH is committed to ensuring healthy air for Michigan communities by assessing the health effects of air quality and advocating for policies that address these issues.

Health Amici believe their expertise will assist the Court. Through their education and advocacy efforts, the two groups have acquired and compiled information about the negative effects of ozone and other air pollutants. Furthermore, members of the two groups include nurses, physicians, and public health experts who have firsthand knowledge that can inform the Court's understanding of how EPA's decision will have major consequences for individuals

and communities. These professionals are concerned about the growing impacts of poor air quality on their patients and the communities they serve.

Health Amici have an interest in seeing EPA retain the nonattainment designation for Detroit because doing so will reduce ground-level ozone and improve public health by requiring additional and more stringent emissions control measures on the city's many sources of ozone pollution.

## PROCEDURAL BACKGROUND

This is a consolidated petition to review EPA's decisions to redesignate Detroit as being in "attainment" of the ozone NAAQS and approve EGLE's exceptional event demonstration. The ozone NAAQS is designed to ensure that the public health risks of ozone exposure are minimized. 42 U.S.C. § 7409(b). EPA set the ozone NAAQS at 0.070 parts per million ("ppm") in 2015. *NAAQS for Ozone*, 80 Fed. Reg. 65292 (Oct. 26, 2015). In 2018, EPA classified the Detroit area as a "marginal nonattainment area." *Additional Air Quality Designations for the 2015 Ozone National Ambient Air Quality Standards*, 83 Fed. Reg. 25776, 25813 (June 4, 2018). EPA's decision required EGLE to impose control measures on sources of ozone-creating emissions to bring the Detroit area into compliance by August 3, 2021, but EGLE missed this deadline. 42 U.S.C. § 7511a(a)(2)(A) (requirements for marginal nonattainment areas); *see also* EPA, *Ozone NAAQS Timelines*, https://www.epa.gov/ground-level-ozone-pollution/ozone-naaqs-timelines (last updated Oct. 26, 2023).

Subsequently, EPA was required to issue a "finding of failure to attain" for the Detroit area by February 3, 2022. 42 U.S.C. § 7511(b)(2)(A). But on January 3, 2022, EGLE requested that EPA reverse course and change the area's designation to "attainment" based on ozone data from 2019-2021. EGLE, *Request for Redesignation to Attainment for the 2015 Ozone National Ambient Air Quality*

*Standard* (Jan. 3, 2022), https://www.regulations.gov/document/EPA-R05-OAR-2022-0004-0002.

Meanwhile, EPA failed to make the finding of failure to attain for the Detroit area by the February 3, 2022 deadline, provoking a lawsuit from environmental and health groups. *See Alliance of Nurses for Healthy Environments v. Regan,* No. 22-cv-1606 (D.D.C.). As this suit proceeded, EPA proposed to approve EGLE's redesignation request on March 14, 2022. *Air Plan Approval; Michigan; Redesignation of the Detroit, MI Area to Attainment of the 2015 Ozone Standards*, 87 Fed. Reg. 14210 (Mar. 14, 2022).

The 2022 ozone season created very poor air quality conditions in the Detroit area. Environmental and health groups pointed out in comments that redesignation of the area to attainment, and abandonment of stronger control measures, was not appropriate given high concentrations of ground-level ozone. EGLE's answer to these concerns was to argue in an "exceptional event demonstration" that certain days with problematic ozone pollution in 2022 should not count in the calculation of the Detroit area's "design value."[1] EGLE, *Wildfire Exceptional Event Demonstration for Ground-Level Ozone in Southeast Michigan – East 7 Mile Monitor* (Jan. 26, 2023), https://www.michigan.gov/egle/-

---

[1] A "design value" is a calculation used to assess NAAQS attainment. It reflects a three-year average of eight-hour concentrations of ambient ozone, as measured by EGLE air quality monitoring sites.

5

/media/Project/Websites/egle/Documents/Reports/AQD/state-implementation-plan/2023-01-Exceptional-Event-Demonstration-for-Southeast-Michigan.pdf.

In its exceptional event demonstration, EGLE sought to exclude two days' worth of data from Detroit's E-7 Mile monitor. On these days, the monitors showed ozone levels exceeding the 0.070 ppm ozone standard. *See* EGLE, *Monitoring Data E-7 Mile Monitor*, http://www.deqmiair.org/monitoringdata.cfm?site=1692&date=6%2F24%2F2022 (June 24, 2022, reflecting ozone levels of up to 77 ppm); *id*., http://www.deqmiair.org/monitoringdata.cfm?site=1692&date=6%2F25%2F2022 (June 25, 2022, reflecting ozone levels of up to 82 ppm). EGLE argued that EPA should approve the exclusion of this "exceptional" data, and approve its 2022 redesignation request, because the high ozone levels on these days resulted from wildfires 1,430 miles away. Because of the Detroit area's thin compliance margin, if EGLE did not exclude this data from its calculation of the design value, then EPA could not approve EGLE's redesignation request. The exclusion of the "exceptional" data was essential to demonstrating attainment with the 0.070 ppm NAAQS for ground-level ozone at the time of approval.

Finally, on February 1, 2023, EPA issued a finding that Detroit did not attain the 2015 ozone NAAQS based on data gathered from 2018-2020. This obligated EGLE to apply stricter regulations to major sources of ozone-creating pollution in the Detroit area. But before EGLE could implement this policy, EPA approved

EGLE's January 2022 redesignation request to reclassify the Detroit area from "marginal nonattainment" to "attainment" of the ozone NAAQS. *Redesignation of the Detroit, MI Area to Attainment of the 2015 Ozone Standards*, 88 Fed. Reg. 32594 (May 19, 2023) (hereinafter "*Redesignation*"). EPA simultaneously issued a "clean data determination" allowing EGLE to exclude the "exceptional" ozone data from June 24 and 25, 2022, lowering the design value below the NAAQS threshold at the time of approval. *Clean Data Determination for the Detroit Area for the 2015 Ozone Standard*, 88 Fed. Reg. 32584 (May 19, 2023) (hereinafter "*CDD*"). EGLE then suspended nonattainment requirements that applied to major sources of ozone-creating emissions in the Detroit area. *See* EGLE, *Variance: Suspension of Enforcement of Part 6 Reasonably Available Control Technology Rules for the Southeast Michigan 2015 Ozone Maintenance Area* (May 19, 2023), https://www.michigan.gov/egle/-/media/Project/Websites/egle/Documents/Laws-Rules/AQD/air-pollution-control-rules/part06/apc-part06%20variance.pdf.

## SUMMARY OF ARGUMENT

Health Amici respectfully request that this Court reverse EPA's erroneous decision to redesignate Detroit as in attainment with the ozone NAAQS. EPA's decision violates the CAA because EPA's process for approving Michigan's redesignation request did not consider the public health and environmental justice circumstances in Detroit. EPA also provides no evidence for its incorrect conclusion that national ozone control programs will imminently reduce ozone pollution and associated harms in Detroit, offsetting any potential increases in ozone flowing from EPA's decision.

If EPA's decision stands, it will allow sources of ozone to evade proven emissions reduction measures required under the CAA's nonattainment provisions at a time when respiratory health in Detroit is in crisis.

**ARGUMENT**

EPA's approval of EGLE's request to redesignate the Detroit area as in attainment of the ozone NAAQS rests on a deficient analysis of public health and environmental justice. EPA's decision was arbitrary because the agency dismissed concerns about how this action will exacerbate health disparities in Detroit. Additionally, EPA asserted that national ozone control programs will deliver "health benefits" to Detroit residents sufficient to offset any increases in ozone resulting from this decision, but provides no evidence to support this conclusion. These errors are emblematic of EPA and EGLE's rush to redesignate the Detroit area to attainment and loosen restrictions on ozone-creating pollution sources without proper consideration of the impact on residents who must actually breathe the air.

## I.    GROUND-LEVEL OZONE HARMS PUBLIC HEALTH.

The CAA directs EPA to establish NAAQS to reduce the public health impacts of ground-level ozone pollution. 42 U.S.C. § 7409. The NAAQS for ozone requires Michigan to achieve ambient concentrations of 0.070 ppm in the atmosphere of each "attainment area" within the State. *National Ambient Air Quality Standards for Ozone*, 80 Fed. Reg. 65292 (Oct. 26, 2015); *see also Review of the Ozone National Ambient Air Quality Standards*, 85 Fed. Reg. 87256 (Dec.

9

31, 2020). When an area exceeds the ozone standards, the populations living there are at risk for numerous debilitating health conditions.

Ozone in the stratosphere protects us from radiation, but ground-level ozone is harmful. EPA, *What Is Ozone and Where Is It in the Atmosphere?*, https://www.epa.gov/ozone-pollution-and-your-patients-health/what-ozone (last updated July 11, 2023). Ozone is formed when oxides of nitrogen ("NOx") and volatile organic compounds ("VOCs") react in sunlight. These "precursors" are emitted by stationary sources, such as power plants, and mobile sources, such as trucks, and cause the formation of ground-level ozone. EPA, *The Ozone Problem*, https://www3.epa.gov/region1/airquality/oz_prob.html (last updated July 13, 2023).

Ground-level ozone enters the body through the respiratory system, triggering a cascade of cellular inflammation. This inflammation exacerbates chronic respiratory illnesses like asthma. *See* EPA, *Health Effects of Ozone in the General Population*, https://www.epa.gov/ozone-pollution-and-your-patients-health/health-effects-ozone-general-population (last updated Apr. 20, 2023); EPA, *Ozone and Your Health* (Feb. 2009), https://www.epa.gov/sites/default/files/2015-06/documents/ozone_and_your_health.pdf.

A substantial body of research demonstrates the link between ozone exposure and a multitude of other serious health conditions. Am. Lung Ass'n,

*Ozone*, https://www.lung.org/clean-air/outdoors/what-makes-air-unhealthy/ozone (last updated Oct. 25, 2023) ("Long-term ozone exposure is associated with increased respiratory illnesses, metabolic disorders, nervous system issues, reproductive issues … cancer and also increased cardiovascular mortality"). Research also shows that adolescents exposed to ground-level ozone are at a higher risk for depression. Erika M. Manczak et al., *Census Tract Ambient Ozone Predicts Trajectories of Depressive Symptoms in Adolescents*, Dev. Psych., Mar. 2022, at 485-486, https://www.apa.org/pubs/journals/releases/dev-dev0001310.pdf.

The World Health Organization ("WHO") recognizes the link between ozone exposure and serious health conditions. WHO recommends that states bring ground-level ozone concentrations down to 0.051 ppm, lower than the ozone NAAQS of 0.070 ppm. WHO, *WHO Global Air Quality Guidelines* 110 (2021), https://iris.who.int/bitstream/handle/10665/345329/9789240034228-eng.pdf. WHO also notes that even small increases in ozone concentrations can exacerbate respiratory health problems. *Id*. at 103-106 (discussing ozone and mortality). For example, incremental increases in ozone can increase the rate of asthma hospitalizations. *See* EPA, *Health Effects of Ozone in the General Population*, https://www.epa.gov/ozone-pollution-and-your-patients-health/health-effects-ozone-general-population (last updated Apr. 20, 2023).

11

Ground-level ozone also has social and financial impacts by contributing to absences from work and school. Daniel Mendoza et al., *Impact of Low-Level Fine Particulate Matter and Ozone Exposure on Absences in K-12 Students and Economic Consequences*, Env't Res. Letters, Nov. 2020, at 1. The *Mendoza et al.* study underscores ozone's intersecting health and economic impacts. That study used a dense, research-grade air sensor network in the Salt Lake City Area to model the association between ground-level ozone concentrations and school absences. *Id*. This area was chosen because of the availability of high-grade monitors located near schools. After controlling for other variables, the researchers showed that reductions in ozone and particulate matter could lead to "437 [fewer absences] per year for all elementary schools" and "50 per year for all high schools across the school district," saving $426,000 per year. *Id.* at 6. This figure accounted for lost per-pupil funding due to students' absences from school. *Id.* at 3.

Furthermore, increased absenteeism detrimentally affects students. The White House Council of Economic Advisors notes that school absences "can be a predictor of high school drop-out, which has been linked to poor labor market prospects, diminished health, and increased involvement in the criminal justice system." White House Council of Econ. Advisors, *Chronic Absenteeism and Disrupted Learning Require an All-Hands-on-Deck Approach* (Sept. 13, 2023), https://www.whitehouse.gov/cea/written-materials/2023/09/13/chronic-

absenteeism-and-disrupted-learning-require-an-all-hands-on-deck-approach. These

economic and social burdens compound the physical impacts of ozone on health.

## II.  EPA'S REDESIGNATION DECISION WAS ARBITRARY AND CAPRICIOUS BECAUSE IT DID NOT ACCOUNT FOR PUBLIC HEALTH AND ENVIRONMENTAL JUSTICE.

### A.  EPA Has a Duty to Prioritize Public Health and Environmental Justice.

EPA has statutory and administrative obligations to ensure that redesignation

decisions are consistent with the promotion of public health and air quality.

#### 1.  *NAAQS Compliance Alone Is Insufficient to Approve a Redesignation Request Because the CAA Requires EPA to Consider the Totality of Circumstances.*

The CAA requires EPA and the states to implement strong regulatory

regimes to reduce air pollution. Congress was explicit that the purpose of the CAA

is "to protect and enhance the quality of the Nation's air resources so as to promote

the public health and welfare and the productive capacity of its population." 42

U.S.C. § 7401(b)(1). The NAAQS program is at the heart of this policy. In

implementing NAAQS, EPA is required to ensure that air quality is at a level

"requisite to protect the public health" with "an adequate margin of safety." 42

U.S.C. § 7409(b)(1). Redesignating an area from nonattainment to attainment

eliminates mandates for states to adopt strict pollution standards for major sources

of ozone-creating emissions in the area at issue. Because of this, EPA must ensure

that a state's analysis of NAAQS compliance captures all health impacts and is

sufficient to permanently maintain air quality improvements. 42 U.S.C. §

7407(d)(3)(E); *South Coast Air Quality Mgmt. Dist. v. EPA*, 472 F.3d 882, 900

(D.C. Cir. 2006) ("*South Coast I*") ("Congress's intent [is] that air quality should

be improved until safe and never allowed to retreat thereafter.").

    To ensure that the CAA's strong mandate to permanently improve air quality

is faithfully carried out, Congress provided EPA with the discretion to deny

redesignation requests even if a state's design value reflects NAAQS compliance.

Specifically, the CAA mandates that EPA ensure a redesignation request meets a

set of five conditions for approval, including that the area is meeting NAAQS. 42

U.S.C. § 7407(d)(3)(E)(i)-(v). Even if a state's demonstration meets these criteria,

EPA is not required to approve a redesignation request. *See Sierra Club v. EPA*, 793

F.3d 656, 660 (6th Cir. 2015) ("When a State asks EPA to redesignate a

nonattainment area to attainment status (and thus remove [] additional

requirements from its [air quality regulations]), the agency ***may do so*** only if five

conditions are satisfied." (emphasis added)). A compliant design value alone may

not warrant the revocation of nonattainment requirements, considering other

evidence related to air quality and public health in the attainment area. Put

differently, unlike other statutory provisions that also result in relaxing air pollution

protections, Section 7407(d)(3)(E) criteria are *necessary* conditions for

redesignation, but they are not *sufficient* conditions, so EPA must exercise

14

judgment notwithstanding their satisfaction. *Compare* 42 U.S.C. § 7407(d)(3)(E) ("The Administrator ***may not*** promulgate a redesignation of a nonattainment area to attainment unless [five criteria are satisfied])" *with, e.g.*, 42 U.S.C. § 7511e (for ozone nonattainment areas that meet specified conditions in 1990, "the Administrator ***shall*** suspend the application of the requirements of this subpart to such area until December 31, 1991") *and* 42 U.S.C. § 7554(b)(2) (where a set of particular conditions are met, "[t]he Administrator ***shall*** increase the level of emissions of particulate matter allowed under the standard") (emphases added).

NAAQS redesignation decisions require EPA to exercise independent judgment as to whether the air quality in the Detroit area has improved, is safe, and will remain safe under EGLE's plan. *See New York v. EPA*, 921 F.3d 257, 262 (D.C. Cir. 2019) (a certain "requirement is a necessary but not sufficient condition for" EPA to act). EPA cannot place "unquestioning reliance" on EGLE's assurances that redesignation is valid and will not adversely impact public health in Detroit—EPA must examine this question for itself. *See Susquehanna Int'l Grp. v. Sec. & Exch. Comm'n*, 866 F.3d 442, 449 (D.C. Cir. 2017) (striking down SEC's approval of a dividend rate plan because the only evidence of the plan's compliance with statutory requirements was the regulated party's analysis). EPA's judgment regarding attainment in Detroit must not rely only on the minimum criteria; it must be rational and consistent with the mandate of the CAA to improve air quality and

not permit retreat thereafter. *See South Coast I*, 472 F.3d at 900; *see also Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

Redesignation requests have serious consequences because they can fundamentally alter the air quality regulatory scheme in a state. Notably, EGLE suspended enforcement of regulations applicable to major sources of VOCs in the Detroit area the same day that EPA issued its redesignation decision. *See Variance: Suspension of Enforcement of Part 6 Reasonably Available Control Technology Rules for the Southeast Michigan 2015 Ozone Maintenance Area*, EGLE, *supra*. Given the consequences, EPA has a duty to ensure that Michigan's redesignation request and maintenance plan will not harm public health and will maintain compliance with NAAQS.

> **2.    *EPA Must Prioritize Public Health in Approving Exceptional Event Demonstrations.***

Section 319 of the Clean Air Act authorizes states, in limited circumstances, to request that EPA exclude air quality data from the calculation of an attainment area's design value if an "exceptional event" influenced air quality on the day(s) the data was generated. 42 U.S.C. § 7619(b)(1)(A). States do this through an "exceptional event demonstration," which EPA must review and approve.

Exceptional events can include high-wind events, wildfires, and similar emissions-creating events. 40 C.F.R. § 50.1(j)-(k). To ensure that Section 319's exceptional event process is not abused at the expense of people's health, Congress

16

underscored EPA's public health obligations in the statutory text. *See* 42 U.S.C. §

7619(b)(3)(A)(i) (EPA's exceptional event rules follow "the principle that

protection of public health is the highest priority."). Furthermore, the CAA's

overarching purpose is to promote public health, and EPA can only consider other

issues when the statutory text allows. *Compare Whitman v. Am. Trucking Ass'ns,*

531 U.S. 457, 465, 468-69 (2001) (holding that because 42 U.S.C. § 7409(b)(1)

contained no "textual commitment of authority to the EPA to consider costs," the

agency could only consider public health, not cost effectiveness, in setting

NAAQS), *with Michigan v. EPA*, 576 U.S. 743, 747 (2015) (holding that under 42

U.S.C. § 7412(n)(1)(A)'s mandate that EPA establish hazardous air pollutant

standards for power plants that are "appropriate and necessary," the agency must

consider costs in addition to public health). Exceptional events must be *exceptional*

and not used to artificially establish NAAQS compliance to the detriment of public

health.

### 3. *Michigan's Maintenance Plan Must Comply with Title VI of the Civil Rights Act.*

EGLE is required to provide "necessary assurances" to EPA's satisfaction

that its "maintenance plan" complies with Title VI of the Civil Rights Act, 42

U.S.C. § 2000d. 42 U.S.C. § 7410(a)(2)(E); *Redesignation*, 88 Fed. Reg. at 32600

(acknowledging the applicability of Title VI to the review of EGLE's maintenance

plan). EGLE's maintenance plan lays out a variety of conditions that the State will

adopt to maintain attainment with NAAQS after EPA's approval of the redesignation request. EGLE, *Request for Revision to Michigan's State Implementation Plan and Ozone Maintenance Plan for Southeast Michigan Ozone Nonattainment Area* (Jan. 2022), https://www.michigan.gov/egle/-/media/Project/Websites/egle/Documents/Programs/AQD/State-Implementation-Plan/recent-aq-planning-actions-and-documents/ozone-se-mi-redesignation-public-comment-document.pdf. Title VI prohibits recipients of federal financial assistance, like EGLE, from denying benefits to or discriminating against any person on the grounds of race, color or national origin. 42 U.S.C. § 2000d. In this action, EPA acknowledged the applicability of Title VI to EGLE's maintenance plan. *Redesignation*, 88 Fed. Reg. at 32600.

Per EPA regulations, all applicants for and recipients of EPA assistance, such as EGLE, "shall not use criteria or methods of administering its program or activity"—such as implementing the ozone NAAQS—"which have the effect of subjecting individuals to discrimination because of their race, color, national origin, or sex." 40 C.F.R. 7.35(b). This prohibition against disparate effects applies to recipients of federal funds independently of intent and focuses on the impacts of the recipient's actions. *See* U.S. Dep't of Just., *Title VI Legal Manual*, Section VII at 2, https://www.justice.gov/crt/book/file/1364106/dl?inline. EPA is responsible for ensuring that EGLE's request to redesignate the Detroit area and maintain

compliance with NAAQS adheres to Title VI. *See* EPA Office of Gen. Counsel,

*EPA Legal Tools to Advance Environmental Justice*, at 2 (May 2022),

https://www.epa.gov/system/files/documents/2022-05/EJ%20Legal%20Tools

%20May%202022%20FINAL.pdf.

    **4.**    ***Executive Orders Require EPA to Ensure Its Redesignation Decision Does Not Adversely and Disproportionately Affect Environmental Justice Communities.***

Several executive orders direct EPA to promote environmental justice in its

administration of the Clean Air Act. Here, the agency expressly acknowledged the

applicability of Executive Order 12898, *Federal Actions to Address Environmental*

*Justice in Minority Populations and Low-Income Populations*, 59 Fed. Reg. 7629

(Feb. 16, 1994). *Redesignation*, 88 Fed. Reg. at 32596; *CDD*, 88 Fed. Reg. at

32593.[2] That order directs federal agencies to not only "identify[]" but also

"address[] the disproportionately high and adverse human health or environmental

effects of [their] programs, policies, and activities on minority populations and

low-income populations." Exec. Order 12898 at 1-103.

Additionally, Executive Order 14096, *Revitalizing Our Nation's*

*Commitment to Environmental Justice for All*, signed on April 21, 2023, requires

---

[2] EPA exercised its discretion to include an environmental justice analysis as part of reaching its redesignation decision. This analysis is reviewable under the Administrative Procedures Act. *Communities Against Runway Expansion, Inc. v. FAA*, 355 F.3d 678, 688-89 (D.C. Cir. 2004); *see also* 5 U.S.C. § 706(2)(A).

agencies to analyze the cumulative environmental impacts and the disproportionate health consequences of their decisions on environmental justice communities. *Id*. at § 3. It also requires agencies to undertake evaluations of their legal authority to achieve reductions in health disparities. *Id*. Moreover, Executive Order 14008, *Tackling the Climate Crisis at Home and Abroad*, directs federal agencies to promote environmental justice by "developing programs, policies, and activities to address the disproportionately high and adverse human health, environmental, climate-related and other cumulative impacts on disadvantaged communities, as well as the accompanying economic challenges of such impacts." *Id*. at § 219.

## B. EPA Failed to Contend with the Public Health Circumstances and Environmental Injustices Present in Detroit.

EPA's redesignation decision is arbitrary and capricious because it ignores Detroit's poor air quality and respiratory health crisis. The agency wrongly concluded that its redesignation decision will not worsen public health in Detroit because EGLE has artificially established the area as in attainment with the ozone NAAQS. *See Redesignation*, 88 Fed. Reg. 32594, 32599-600. EPA ignores the facts: Detroit residents—particularly those who live around the E-7 Mile monitor—breathe polluted air that violates the ozone NAAQS. EGLE's compliance demonstration ignores two days' worth of problematic air quality data from one of Detroit's most polluted zip codes to reach its conclusion that the air complies with NAAQS and is safe. Rather than restore Detroit's air quality to safe

20

levels, EPA's decision to approve EGLE's redesignation request entrenches the problem because it allows EGLE to retract needed regulations on major sources of ozone-creating emissions. Detroit's already poor air quality will worsen as a result of EPA's redesignation decision. EPA ignores this reality, and Detroit residents will have to live with the consequences.

1.    *Ozone Levels in Detroit Exceed the NAAQS.*

The real-life exposures to ozone experienced by the population of Detroit are frequently higher than 0.070 ppm over eight-hour periods, substantially exacerbating respiratory conditions and other health issues. Contrary to EPA's predictions, 2023 ozone levels were some of the highest on record—the Detroit area had thirteen "ozone action days" in 2023, more than twice the number of action days declared by EGLE in each of the past two years. *See* EGLE, *Air Quality Division's Clean Air Action Day Program* (Sept. 13, 2023), https://www.michigan.gov/egle/-/media/Project/Websites/egle/Documents/Reports/AQD/monitoring/2023-action-days-ozone-pm25.pdf ("AQD meteorologists issue Air Quality Action Days when pollution levels in a forecast area are expected to reach the Unhealthy [level] for Sensitive Groups"). High ozone during an action day compounds the impact of other pollutants already in the atmosphere, such as fine particulate matter. Cong Liu et al., *Interactive Effects of Ambient Fine Particulate Matter and Ozone on Daily Mortality in 372 Cities*, BMJ (2023), at 1,

https://www.bmj.com/content/bmj/383/bmj-2023-075203.full.pdf. The ozone data that EGLE and EPA excluded from the design value is not exceptional and is consistent with the rising ozone levels residents have been experiencing for years. *See Sierra Club Comments*, at 22-23 (Mar. 6, 2023), https://www.regulations.gov/comment/EPA-R05-OAR-2023-0058-0031; Brief of Petitioner, at 41-43. Excluding data collected by the E-7 Mile monitor may produce a design value below 0.070 ppm, but the high ozone actually experienced by people who live around the monitor was not any less dangerous on June 24 and 25, 2022, and throughout 2023.

### 2. *EPA's Decision to Redesignate Detroit to Attainment and Allow EGLE to Revoke Strict Ozone Controls in Detroit Will Exacerbate Environmental Burdens.*

EPA's decision to ignore the consequences of revoking stronger requirements and capitulate to EGLE's insufficient showing of NAAQS compliance is arbitrary, capricious, and harmful to Detroit residents. EPA's decision will exacerbate Detroit's disparate environmental burdens because it will halt the implementation of stricter pollution control measures. *See Variance: Suspension of Enforcement of Part 6 Reasonably Available Control Technology Rules for the Southeast Michigan 2015 Ozone Maintenance Area*, EGLE, *supra*.

Detroit's nonattainment designation required EGLE to regulate sources of NOx and VOC pollution to reduce ground-level ozone. Among other requirements, these sources had to implement "reasonably available control technology"

22

("RACT"). The RACT standard is one of the CAA's strongest and requires major

industrial sources of ozone precursors to construct filters, vapor condensers, and

other projects to mitigate emissions at their facilities. *See* EPA, *Control Techniques*

*Guidelines and Alternative Control Techniques Documents for Reducing Ozone-*

*Causing Emissions*, https://www.epa.gov/ground-level-ozone-pollution/control-

techniques-guidelines-and-alternative-control-techniques (last updated May 8,

2023). The more severe the nonattainment classification, the stricter the RACT

requirements. *See* 42 U.S.C. § 7511a(a)(2)(A) (requiring revisions to existing

RACT requirements, if any, applicable to marginal nonattainment areas); *id.* at

(b)(2)(A)-(C) (requiring states to impose RACT requirements on *all* major sources

of VOCs in moderate nonattainment areas).

EPA acted unlawfully by declining to address how eliminating RACT

measures for major pollution sources might exacerbate the disparate air pollution

burdens in Detroit's most polluted zip codes. Instead, EPA dismissed these

concerns by gesturing toward the Detroit area's contested NAAQS compliance and

approving EGLE's redesignation request, which excluded problematic ozone data

from a polluted and disadvantaged neighborhood on East 7 Mile Road.

*Redesignation*, 88 Fed. Reg. 32594, 32598. As discussed above, compliance with

the ozone NAAQS and satisfaction of the other four criteria in 42 U.S.C. §

7407(d)(3)(E) are necessary for approving a redesignation request, but they are not

sufficient. Even if EPA agrees with EGLE that the Detroit area complies with the ozone NAAQS—which it does not—EPA must still exercise its independent judgment and evaluate the totality of circumstances as to whether redesignation complies with the Act's mandate for permanent air quality improvement. *South Coast I*, 472 F.3d at 900. EPA's judgment must reflect the CAA's mandates and a rational connection between the facts found by the agency regarding the attainment area and the ultimate redesignation decision. *State Farm*, 463 U.S. at 43.

Here, the Detroit area is not in attainment with NAAQS for the reasons stated in Sierra Club's comments and brief. EPA also did not exercise independent rational judgment on whether this redesignation satisfies the requirements of the CAA and the environmental justice principles the agency articulated in the final redesignation action and exceptional event demonstration. *See Kentucky Riverkeeper, Inc. v. Rowlette*, 714 F.3d 402, 413 (6th Cir. 2013) (invalidating a Clean Water Act permit because the Corps did not analyze the impacts of its action, leaving the court "with nothing more than its say-so that it meets CWA and NEPA standards.") (citing *Sec. & Exch. Comm'n v. Chenery Corp.*, 332 U.S. 194, 196 (1947) (courts review agency actions on the "grounds invoked by the agency."); *Redesignation*, 88 Fed. Reg. at 32596; *CDD*, 88 Fed. Reg. at 32586 (acknowledging the applicability of environmental justice standards).

24

EPA's decision will have profound environmental justice consequences that its analysis completely overlooks. Its own environmental justice mapping and screening tool, EJScreen, shows that residents living within a three-mile radius of the excluded E-7 Mile monitor are 78% Black, 83% people of color, and 58% low-income. EPA, *EJScreen*, https://ejscreen.epa.gov/mapper (last visited Jan. 15, 2024) (open Reports tab and using "Drop a Pin," place a marker on 11600 East Seven Mile Road, Detroit, Michigan, and generate a Community Report using a three-mile buffer). This population also has high percentiles for exposure to numerous pollutants. Residents of this area are in the 87th percentile for highest ground-level ozone exposure in the United States. Increases in ambient concentrations of ground-level ozone also pose particular risks to residents because of the City's high rates of asthma. *See* Prudence Kunyangna & Beth Anderson, *Detroit: The Current Status of the Asthma Burden*, Mich. Dep't of Health & Hum. Servs. (2021), https://www.michigan.gov/-/media/Project/Websites/mdhhs/Folder50/Folder3/Detroit-AsthmaBurden-2021_Update.pdf ("The rate of hospitalizations for asthma was at least four times greater for Detroit residents than for Michigan residents as a whole, from 2016-2019.").

Although EPA stated in its final rulemaking that it recognizes that "communities in Detroit face environmental conditions that have adverse human health or environmental effects on people of color, and/or low-income

populations," it deflected these concerns by pointing to the Detroit area's artificial

compliance with the ozone NAAQS:

> [T]his action … is not likely to change existing disproportionate and adverse effects on people of color, low-income populations, and/or Indigenous peoples because it reflects air quality measurements for ground level ozone that have improved … to levels that now meet health-based air quality standards.

*CDD*, 88 Fed. Reg. at 32585.

The agency similarly dismisses Title VI concerns, asserting only that "there

is no information to support a conclusion that EGLE's implementation of [its

maintenance plan] would result in an unjustified disparate impact or is otherwise

prohibited by [T]itle VI of the Civil Rights Act" because "[t]his redesignation

action, at its core, recognizes that [the Detroit] area is meeting the NAAQS."

*Redesignation*, 88 Fed. Reg. at 32600. A conclusion regarding compliance with

NAAQS based on the exclusion of actual ozone data from a predominantly Black

neighborhood threatens to further the disparate impacts already experienced within

the community.

EPA's perfunctory conclusion that the Detroit area's disputed NAAQS

compliance means there are no environmental justice or civil rights concerns

associated with its redesignation decision ignores the dire state of ground-level

ozone pollution in Detroit and its impact on residents. *See Gerber v. Norton*, 294

F.3d 173, 185 (D.C. Cir. 2002) ("[S]tating that a factor was considered—or

found—is not a substitute for considering or finding it." (internal citation omitted)). EGLE may be able to generate a design value for the Detroit area that is under the NAAQS threshold if it ignores data from the E-7 Mile monitor, but that does not allow EPA to abdicate its duty to examine the facts in the record or make the air safe to breathe.

EGLE's redesignation request ignores the truly poor air quality of Detroit and the respiratory health crisis facing residents, but EPA pulled the ripcord on redesignation anyway. EPA's decision will allow EGLE to retract RACT requirements for major sources of pollution in Detroit, increasing ground-level ozone and sacrificing residents' health. But EPA completely failed to address, or even articulate, the consequences of this reduction in ozone controls for Detroit residents. Simply put, EPA's reasoning that the air is safe and will remain safe because EGLE's deeply flawed analysis says so, is circular, arbitrary and unlawful because it does not represent the exercise of reasoned, independent judgment required under the CAA's redesignation provisions. 42 U.S.C. § 7407(d)(3)(E); *see also Susquehanna Int'l Grp.*, 866 F.3d at 448 ("[T]he SEC defends its unquestioning reliance on [the regulated party's] claim that the dividend rate is reasonable by its unquestioning reliance on [the regulated party's] claim that the Plan's structure is reasonable. That is no defense at all.").

This Court has twice struck down EPA redesignation decisions based on the agency's arbitrary conclusions about the sufficiency of a state's RACT measures, and it should do so again here. *See Sierra Club*, 793 F.3d at 670 ("[A] State seeking redesignation 'shall provide for the implementation' of [] RACT, even if those measures are not strictly necessary to demonstrate attainment … If the State has not done so, EPA cannot 'fully approve' the area's [attainment]" (internal citation omitted)); *Wall v. EPA*, 265 F.3d 426, 442 (6th Cir. 2001) ("EPA abused its discretion when it determined that it could redesignate the Cincinnati metropolitan area as achieving attainment before Ohio had fully adopted all of the RACT rules."). Reversal is warranted because EPA failed to address the public health and environmental consequences of weakening ozone controls for Detroit residents who will breathe more polluted air as a result of this redesignation decision.

## III.    PUBLIC HEALTH WILL NOT BE SUFFICIENTLY PROTECTED IF DETROIT'S AIR QUALITY EXCEEDS THE OZONE NAAQS IN THE NEAR FUTURE.

The Detroit area could fall into nonattainment again, considering the high ozone levels registered at the E-7 Mile monitor since EPA issued this final action. *See supra* at 21. But because of EPA's decision to redesignate the area as in attainment, the response to future nonattainment will come from EGLE's maintenance plan, which will be inadequate to address the disparate impact of weakening ozone control measures on residents. The maintenance plan's

contingency measures provide a high level of discretion instead of mandates, which is inappropriate given public health in the Detroit area.

EGLE's maintenance plan does not require that it apply RACT to major sources of NOx and VOCs. In place of mandatory standards, the maintenance plan has vague commitments to improve "traffic flow and transit" and "trip reduction programs" that will not require the mandatory reduction of emissions from major sources. *Request for Redesignation to Attainment*, EGLE, *supra* at 35. In effect, Detroit residents have found themselves breathing air that exceeds the 0.070 ppm NAAQS ozone standard, and industries contributing to the problem need not implement the strong emissions controls associated with a nonattainment designation.

EGLE has not analyzed the impact of these weakened standards on low-income minority communities in Detroit who live on the fence line of industrial facilities. Therefore, EGLE has not provided, and EPA has not shown, that the maintenance plan's provisions necessarily assure that it will have no disparate impacts. *See* 42 U.S.C. § 7410(a)(2)(E) (each plan for achieving attainment must "provide (i) necessary assurances that the State … is not prohibited by any provision of Federal or State law from carrying out such implementation plan or portion thereof."); 42 U.S.C. § 2000d-1. EPA acknowledged the applicability of Title VI, but failed to undertake an analysis of the consequences of Michigan's

weak maintenance plan for Detroit residents. *Redesignation*, 88 Fed. Reg. at 32600.

## IV. EPA PROVIDES NO EVIDENCE TO SUPPORT ITS CONCLUSION THAT OZONE CONCENTRATIONS WILL IMMINENTLY DECLINE IN THE DETROIT AREA.

EPA's national ozone control programs will be ineffective at mitigating the disproportionate harm that will result from the redesignation decision. EGLE's retraction of RACT requirements will cause ozone concentrations to increase in the Detroit area, amplifying the effect of increasing ozone levels resulting from climate change. EPA's assumption that ozone levels will decrease in the near future is not based on any evidence. Furthermore, its assertion that the "Good Neighbor Plan" will deliver health benefits sufficient to offset increases in ozone as a result of loosening control measures is merely hopeful conjecture.

EPA's assumption that ozone levels will decrease in the near future ignores the growing impacts of climate change, which causes more high-temperature and high-sunshine days that are ideal for ozone formation. The United Nations International Panel on Climate Change warns of increasing ground-level ozone levels across the world as a result of a variety of climate stressors. *See* Sophie Szopa et al., *Short-lived Climate Forcers* in *IPCC Sixth Assessment Report*, 861-863 (2021), https://www.ipcc.ch/report/ar6/wg1/downloads/report/IPCC_ AR6_WGI_Chapter06.pdf. In cities like Detroit that have numerous sources of

30

ozone precursors, this effect will be more pronounced. *Id*. at 861. EPA's redesignation decision is based on flawed assumptions and stands to position Detroit to be less resilient to global increases in ozone levels due to climate change.

EPA also provides no evidence for its incorrect assertion that a separate rulemaking known as the "Good Neighbor Plan" guarantees pollution reductions that will deliver "health benefits" to Detroit sufficient to offset any future increases in ozone resulting from weakening standards. *Redesignation*, 88 at 32599; *see also* 42 U.S.C. § 7410(a)(2)(D)(i)(I). In June 2023, EPA issued a final rule governing the transport of emissions between twenty-three states, including Michigan and neighboring states. *Federal "Good Neighbor Plan" for the 2015 Ozone National Ambient Air Quality Standards*, 88 Fed. Reg. 36654 (June 5, 2023). Whatever future ozone reduction benefits the Good Neighbor Plan may have for Detroit, EPA does not articulate them in the record. But what is clear is that ozone has risen substantially over the last year and is likely to continue to rise. *See supra* at 21-23.

Furthermore, half of the states considered in EPA's Good Neighbor Plan analysis no longer have to implement it as a result of a federal stay. *Response to Additional Judicial Stays of SIP Disapproval Action for Certain States*, 88 Fed. Reg. 67102 (Sept. 29, 2023). EPA's final analysis of the Good Neighbor rules' impacts shows that Kentucky, Missouri, Oklahoma, Texas, and West Virginia each

contribute significantly to nonattainment in Michigan. EPA, *Final Good Neighbor Plan Design Value Contributions*, Tab 4 (Feb. 28, 2022), https://www.epa.gov/system/files/documents/2022-03/2016v2_dvs_state_contributions.xlsx. These states are no longer required to implement the Good Neighbor Plan. EPA, *EPA's "Good Neighbor Plan" Response to Comply with Stay Orders Pending Judicial Review* (Sept. 21, 2023), https://www.epa.gov/system/files/documents/2023-06/IFR%20Fact%20Sheet.pdf.

EPA asserts that Detroit residents need not worry about how the agency's weakening of control measures on ozone precursors may affect their health because ozone concentrations might go down in the future. *CDD*, 88 Fed. Reg. at 32585. Such a leap of logic does not demonstrate a rational connection between facts in this record and the choice made to redesignate Detroit. *State Farm*, 463 U.S. at 43. The impact of EPA's Good Neighbor Plan in Detroit is unknown. What is known, however, is that the air Detroiters breathe every day often exceeds the ozone NAAQS standard and that ozone levels are rising and will worsen as a result of climate change. EPA ignores this reality in its final redesignation decision.

## CONCLUSION

For the reasons set forth above, the Health Amici respectfully request that this Court reverse and remand EPA's decision.

Dated: January 16, 2024                    s/ John Minode'e Petoskey

                                           John Minode'e Petoskey
                                           Christopher R. Clark
                                           EARTHJUSTICE
                                           311 South Wacker Drive, Suite 1400
                                           Chicago, IL 60606
                                           (312) 500-2200
                                           jpetoskey@earthjustice.org
                                           cclark@earthjustice.org

                                           *Attorney for Amici Curiae Michigan
                                           Clinicians for Climate Action and
                                           MI Air MI Health*

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) and Fed. R. App. P. 29(a)(5) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 6,498 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface in Microsoft Office 365 using 14-point Times New Roman.

Dated: January 16, 2024                    s/ John Minode'e Petoskey

John Minode'e Petoskey
Christopher R. Clark
EARTHJUSTICE
311 South Wacker Drive, Suite 1400
Chicago, IL 60606
(312) 500-2200
jpetoskey@earthjustice.org
cclark@earthjustice.org

*Attorney for Amici Curiae Michigan Clinicians for Climate Action and MI Air MI Health*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on January 16, 2024, an electronic copy of this Brief of Amici Curiae Michigan Clinicians for Climate Action and MI Air MI Health in Support of Petitioner was filed with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit by using the CM/ECF system. The undersigned also certifies that participants who are registered CM/ECF users will be served via the CM/ECF system.

Dated: January 16, 2024                    s/ John Minode'e Petoskey

                                           John Minode'e Petoskey
                                           Christopher R. Clark
                                           EARTHJUSTICE
                                           311 South Wacker Drive, Suite 1400
                                           Chicago, IL 60606
                                           (312) 500-2200
                                           jpetoskey@earthjustice.org
                                           cclark@earthjustice.org

                                           *Attorney for Amici Curiae Michigan*
                                           *Clinicians for Climate Action and*
                                           *MI Air MI Health*

35