ORAL ARGUMENT NOT YET SCHEDULED

Case Nos. 23-3581, 23-3583 (consolidated)

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

SIERRA CLUB,

*Petitioner*,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, *et al.,*

*Respondents.*

---

On Petition for Review of Final Actions of the
United States Environmental Protection Agency

---

## BRIEF FOR RESPONDENTS UNITED STATES
## ENVIRONMENTAL PROTECTION AGENCY, *et al.*

TODD KIM
Assistant Attorney General

APRIL 23, 2024

Of Counsel:
EATON WEILER
U.S. EPA, Region 5
KAYTRUE TING
ELIZABETH PETTIT
U.S. EPA, Headquarters

HEATHER E. GANGE
Environmental Defense Section
Environment & Natural Resources Division
United States Department of Justice
P.O. Box 7611
Washington, D.C.  20044
(202) 514-4206

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...........................................................................................v

INTRODUCTION .......................................................................................................1

STATEMENT REQUESTING ORAL ARGUMENT .......................................................3

STATEMENT OF ISSUES .........................................................................................3

LEGAL BACKGROUND............................................................................................4

      I.      National Ambient Air Quality Standards ("NAAQS").................................4

            A.      Area Designations and Classifications ................................................5

            B.      State Implementation Plans...................................................................5

                  1.      Attainment Areas.......................................................................6

                  2.      Nonattainment Areas..................................................................7

      II.     Clean Data Determinations.................................................................8

      III.    Redesignations to Attainment...............................................................8

      IV.    Data Exclusion Due to Exceptional Events................................................10

            A.      Exceptional Event Process....................................................................10

            B.      Guidance for Exceptional Events to Attributable to Wildfire Emissions..................................................................................12

FACTUAL BACKGROUND ......................................................................................14

      I.      THE FOUR OZONE NAAQS PROMULGATED BETWEEN 1979 AND 2015 ........................................................................14

      II.     DETROIT AREA 2015 OZONE NAAQS ACTIONS ..........................15

i

A. Reclassification to Moderate Nonattainment by Operation of Law ........................................................................................16

B. Exceptional Event Caused by Canadian Wildfires .........................16

C. Clean Data Determination ...............................................................18

D. Redesignation to Attainment ............................................................18

II. THE RULES AT ISSUE .........................................................................19

STANDARD OF REVIEW ...........................................................................................21

SUMMARY OF ARGUMENT .....................................................................................24

ARGUMENT .................................................................................................................26

I. EPA'S CONCURRENCE WITH MICHIGAN'S EXCEPTIONAL EVENT DEMONSTRATION WAS REASONABLE, AND THE DEMONSTRATION AND CLEAN DATA DETERMINATION BOTH SHOULD BE UPHELD ........................................................................................26

A. EPA Adequately Explained Its Basis for Finding That Michigan Satisfied the Requirements of 40 C.F.R. 50.14 and the Wildfire Guidance ........................................27

1. Sierra Club Does Not Dispute that Michigan Satisfied the First Two and Last Two Event Requirements ........................................................................28

2. EPA Detailed the Record Bases for Its Finding that the Wildfire Submittal Satisfied the Third Event Requirement ..............................................29

a. EPA Reasonably Concurred with the Wildfire Submittal's Tier 3 Clear Causal Relationship Demonstration ......................................30

|  |  | i. | Tier 3 Demonstration Components ...................................................30 |

|  |  | ii. | EPA Reasonably Concluded That the Weight of the Evidence in the Tier 3 Demonstration Establishes the Necessary Clear Causal Connection ............................................31 |

B. Sierra Club's Contrary Arguments Lack Merit and Should Be Rejected ...........................................................................35

1. EPA Properly Weighed Evidence That Wildfire Smoke Reached the East 7-Mile Monitor .....................................................................................35

a. No Single Piece of Contrary Evidence Requires EPA to Refuse to Concur with an Event Submittal ..............................................35

b. EPA Properly Weighed the Results of the LADCO Analysis .....................................................37

c. EPA Properly Weighed Evidence of Brown Carbon in the Detroit Area during the Relevant Time Frame ..............................39

d. EPA Properly Weighed the Results of the Wildfire Submittal's Matching Day Analysis ..........................................................................41

e. EPA Reasonably Concurred with the Wildfire Submittal without a Photochemical Analysis ..............................................43

II. EPA REASONABLY REDESIGNATED THE DETROIT AREA TO ATTAINMENT OF THE 2015 NAAQS ......................................................................................................45

A. The First Redesignation Criterion Was Fulfilled..............................45

B. The Third Redesignation Criterion Was Fulfilled...........................46

C. EPA Reasonably Found That the Fifth
Redesignation Criterion Was Fulfilled ...........................................52

    1. EPA Applied the Best Contextual Reading of
the Fifth Criterion ..................................................................54

    2. EPA's Reading is Permissible and Entitled to
Deference.................................................................................56

D. Sierra Club's Objections to EPA's Reading of the
Fifth Redesignation Criterion Lack Merit ......................................59

    1. CAA Section 7505a Does Not Conflict with
EPA's Reading.........................................................................59

    2. Prior Decisions from This Circuit Do Not
Conflict with EPA's Reading..................................................60

    3. Sierra Club's Remaining Arguments Do Not
Overcome the Deference Due to EPA's
Long-Standing Reading of the Fifth
Resignation Criterion .............................................................61

CONCLUSION ..........................................................................................62

# TABLE OF AUTHORITIES

**CASES**

*Alaska Dep't of Env't Conservation v. EPA,*
540 U.S. 461 (2004)................................................................21, 22, 28

*Bahr v. Regan,*
6 F.4th 1059 (9th Cir. 2021) .......................................11, 33, 34, 36, 38, 39, 40

*Bank of New York v. Janowick,*
470 F.3d 264 (6th Cir. 2006)..................................................................23

*Battle Creek Health Sys. v. Leavitt,*
498 F.3d 401 (6th Cir. 2007)..................................................................23

*BP Exploration & Oil, Inc. v. EPA,*
66 F.3d 784 (6th Cir. 1995)...................................................................21

*Chao v. Occupational Safety and Health Review Comm'n,*
540 F.3d 519 (6th Cir. 2008)...............................................................23, 57

*Chemical Mfrs. Ass'n v. NRDC,*
470 U.S. 116 (1985)........................................................................22, 57

*Chevron U.S.A. Inc. v. NRDC,*
467 U.S. 837 (1984).................................................................22, 56, 57, 62

*Christensen v. Harris Cnty.,*
529 U.S. 576 (2000)....................................................................22, 23, 57

*Donovan v. FirstCredit, Inc.,*
983 F. 3d 246 (6th Cir. 2020) .................................................................55

*EPA v. EME Homer City Generation, L.P.,*
572 U.S. 489 (2014)...........................................................................22

*FCC v. Fox Television Stations, Inc.,*
556 U.S. 502 (2009)...............................................................21, 34, 39, 52

*FCC v. Prometheus Radio Project*,
   141 S.Ct. 1150 (2021) .................................................................................21

*FCC v. WNCN Listeners Guild*,
   450 U.S. 582 (1981) .....................................................................................21

*Guedes v. Bureau of Alcohol, Tobacco, Firearms and Explosives*,
   45 F.4th 306 (D.C. Cir. 2022) ....................................................................56

*Kuhn v. Washtenaw Cnty.*,
   709 F.3d 612 (6th Cir. 2013) ......................................................................45

*Ky. Res. Council, Inc. v. EPA*,
   467 F.3d 986 (6th Cir. 2006) .......................................................21, 33, 39

*Motor Vehicle Mfrs. Assn. of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983) ......................................................................................21

*NRDC v. EPA,*
   571 F.3d 1245 (D.C. Cir. 2009) ..................................................................8,

*NRDC v. EPA,*
   777 F.3d 456 (D.C. Cir. 2014) ...................................................................14

*Roth v. Guzman*,
   650 F.3d 603 (6th Cir. 2011) ......................................................................55

*Sierra Club v. EPA,*
   793 F.3d 656 (6th Cir. 2015) ................................................................ 60, 61

*Skidmore v. Swift & Co.,*
   323 U.S. 134 (1944) ..............................................................22, 23, 56, 57, 62

*St. Mary's Cement, Inc. v. EPA,*
   782 F.3d. 280 (6th Cir. 2015) ...........................................21, 33, 34, 39, 52

*United States v. Shimer,*
   367 U.S. 374 (1961) .....................................................................................22

*Wall v. EPA,*
   265 F.3d 426 (6th Cir. 2001) ...............................................................7, 60, 61

*Whitman v. Am. Trucking Ass'ns,*
  531 U.S. 457 (2001) .................................................................................4

*Wolverine Pipeline Co. v. DOT,*
  69 F.4th 365 (6th Cir. 2023) ........................................... 21, 22, 28, 34

**STATUTES**

5 U.S.C. § 553 ...........................................................................................6

5 U.S.C. § 706(2)(A) ...............................................................................21

42 U.S.C. § 7401 ......................................................................................4

42 U.S.C. § 7401(d) .................................................................................5

42 U.S.C. § 7407(d)(1) ....................................................................... 1, 5

42 U.S.C. § 7407(d)(1)(A)(i) .................................................................15

42 U.S.C. § 7407(d)(3) ............................................................................1

42 U.S.C. § 7407(d)(3)(D) ..........................................................9, 56, 57

42 U.S.C. § 7407(d)(3)(E) ............................................9, 24, 45, 54, 60

42 U.S.C. § 7407(d)(3)(E)(i) ..........................................3, 25, 45, 53, 55

42 U.S.C. § 7407(d)(3)(E)(ii) ............................................. 1, 45, 53, 55

42 U.S.C. § 7407(d)(3)(E)(iii) .............................3, 25, 45, 46, 53, 55

42 U.S.C. § 7407(d)(3)(E)(iv) ...............................................45, 53, 55

42 U.S.C. § 7407(d)(3)(E)(v) ...........................2, 3, 9, 25, 45, 53, 54, 55, 56

42 U.S.C. § 7408(a)(1)(A) ......................................................................4

42 U.S.C. § 7408(a)(1)(B) .......................................................................4

42 U.S.C. § 7408(a)(2) ............................................................................5

42 U.S.C. § 7409(b)(1)-(2) ................................................5

42 U.S.C. § 7410 ................................................9, 53, 60

42 U.S.C. § 7410(a) ................................................ 5, 6

42 U.S.C. § 7410(k)(1)(B) ................................................58

42 U.S.C. § 7410(k)(2) ................................................58

42 U.S.C. § 7410(*l*) ................................................6

42 U.S.C. § 7413 ................................................6

42 U.S.C. §§ 7470-79 ................................................6

42 U.S.C. § 7475(a)(3) ................................................6

42 U.S.C. § 7501-14a ................................................53

42 U.S.C. § 7501-15 ................................................7

42 U.S.C. § 7502(c)(1) ................................................7

42 U.S.C. § 7505a ................................................59

42 U.S.C. §§ 7511-11f ................................................4

42 U.S.C. § 7511(a) ................................................ 5, 7

42 U.S.C. § 7511(a)(1) Table 1 ................................................ 5, 59

42 U.S.C. § 7511(b)(2) ................................................7

42 U.S.C. § 7511(b)(2)(A) ................................................8

42 U.S.C. § 7511a ................................................7

42 U.S.C. § 7511a(a) ................................................ 7, 53

42 U.S.C. § 7511a(a)(2)(A) ................................................53

42 U.S.C. § 7511a(b)(2) ................................................7

viii

42 U.S.C. § 7511a(i) ............................................................................. 8, 59

42 U.S.C. § 7515 ...................................................................................6

42 U.S.C. § 7602(h) ...............................................................................5

42 U.S.C. § 7602(q) ...............................................................................6

42 U.S.C. § 7604(a) ...............................................................................6

42 U.S.C. § 7619(b) ............................................................... 1, 10, 11, 12

42 U.S.C. § 7619(b)(1)(A) ...................................................................10

442 U.S.C. § 7619(b)(2) .......................................................................34

2 U.S.C. § 7619(b)(3)(B)(ii) ..................................................................3

Pub. L. No. 95-95, 91 Stat. 685 (1977)..................................................4

## CODE OF FEDERAL REGULATIONS

40 C.F.R. Part 50, app. U ....................................................................15

40 C.F.R. Part 58 .................................................................................15

40 C.F.R. § 50.1....................................................................................20

40 C.F.R. § 50.14 .......................................................................10, 11, 20

40 C.F.R. § 50.14(a)(1)(i) .....................................................................12

40 C.F.R. § 50.14(b)(1)...........................................................................1

40 C.F.R. § 50.14(b)(4)..........................................................................11

40 C.F.R. § 50.14(c)(2)(i) ......................................................................30

40 C.F.R. § 50.14(c)(2)(i)(A)................................................................28

40 C.F.R. § 50.14(c)(3)..........................................................................28

40 C.F.R. § 50.14(c)(3)(i) ...............................................................................28

40 C.F.R. § 50.14(c)(3)(iv) ............................................................. 10, 11, 28, 29

40 C.F.R. § 50.14(c)(3)(iv)(B)........................................................................29

40 C.F.R. § 50.14(c)(3)(v) ..............................................................................11

40 C.F.R. § 50.14(c)(3)(v)(A) ........................................................................28

40 C.F.R. § 50.14(c)(3)(v)(B)-(C)...................................................................28

40 C.F.R. § 51.1318 .........................................................................3, 8, 20, 34

## FEDERAL REGISTER

44 Fed. Reg. 8202 (Feb. 8, 1979) ...................................................................14

60 Fed. Reg. 12459 (Mar. 7, 1995) ............................................................ 9, 57

62 Fed. Reg. 38856 (July 18, 1997) ................................................................14

68 Fed. Reg. 25418 (May 12, 2003) ...............................................................57

72 Fed. Reg. 13452 (Mar. 22, 2007) ..............................................................57

72 Fed. Reg. 25967 (May 8, 2007)..................................................................57

72 Fed. Reg. 27060 (May 14, 2007) ...............................................................57

72 Fed. Reg. 27247 (May 15, 2007) ...............................................................57

72 Fed. Reg. 27425 (May 16, 2007) ...............................................................57

72 Fed Reg. 27640 (May 16, 2007) ................................................................57

72 Fed. Reg. 27644 (May 16, 2007) ...............................................................57

72 Fed. Reg. 27648 (May 16, 2007) ...............................................................57

72 Fed. Reg. 27652 (May 16, 2007) ...............................................................57

73 Fed. Reg. 16436 (Mar. 27, 2008) ..................................................................14

78 Fed. Reg. 48087 (Aug. 7, 2013) ...................................................................57

78 Fed. Reg. 59258 (Sept. 26, 2013) ................................................................57

80 Fed. Reg. 65292 (Oct. 26, 2015) ..................................................................15

80 Fed. Reg. 81495 (Dec. 30, 2015) .................................................................12

81 Fed. Reg. 68216 (Oct. 3, 2016) .................................................. 11, 12, 34, 36

83 Fed. Reg. 25776 (June 4, 2018) ...................................................................15

85 Fed. Reg. 14608 (Mar. 13, 2020) .................................................................57

85 Fed. Reg. 35377 (June 10, 2020) ..................................................................57

87 Fed Reg. 14210 (Mar. 14, 2022) ......................................................18, 47, 49

87 Fed Reg. 21825 (Apr. 13, 2022) ..................................................................16

87 Fed Reg. 21842 (Apr. 13, 2022) ..................................................................15

88 Fed. Reg. 6633 (Feb. 1, 2023) ............................................................... 15, 16

88 Fed. Reg. 7382 (Feb. 3, 2023) ..........................................................12, 17, 18

88 Fed. Reg. 32584 (May 19, 2023) .... 8, 9, 10, 12, 16, 17, 18, 19, 20, 27, 28, 29, 31, 32, 33, 36, 38, 40, 41, 42, 43, 44, 45, 46, 47, 49, 50, 53 57, 60

## INTRODUCTION

In June 2018, the State of Michigan's greater Detroit area ("Detroit Area") was designated "Marginal nonattainment" for the National Ambient Air Quality Standard for ozone that was promulgated in 2015 ("2015 NAAQS"). From the following year through 2021, however, the Detroit Area's air quality was attaining the 2015 NAAQS. At the beginning of 2022, Michigan therefore submitted a substantively complete request to the U.S. Environmental Protection Agency ("EPA") to redesignate the Detroit Area from Marginal nonattainment to attainment of the 2015 NAAQS under 42 U.S.C. § 7407(d)(3). But for two days on June 24-25, 2022, while that request was pending, smoke from Canadian wildfires caused a single air monitor to measure ozone levels that would have caused the Detroit Area to exceed the NAAQS ("Event Data").

Michigan thereafter prepared an "exceptional event" submittal that would exclude the Event Data from Detroit Area attainment calculations ("Wildfire Submittal"), pursuant to EPA regulations governing such situations. That submittal was prepared in close coordination with EPA pursuant to the implementing regulations for the Clean Air Act's ("CAA" or "the Act") exceptional event provision, 42 U.S.C. § 7619(b), and pursuant to detailed guidance for wildfire-related exceptional event demonstrations that EPA issued in 2016 following public notice and comment ("Wildfire Guidance"). While the Wildfire Submittal was pending, the Detroit Area was reclassified to Moderate nonattainment as a matter of law because its air quality

1

was not determined to attain the 2015 NAAQS before the applicable Marginal area attainment deadline.

EPA ultimately concurred with the Wildfire Submittal and issued a "Clean Data Determination" finding that the Detroit Area's air quality attained the 2015 NAAQS in 2022. Based on the Clean Data Determination, EPA also approved Michigan's request to redesignate the Michigan Area to attainment of the 2015 NAAQS ("Redesignation Rule").

In these consolidated petitions, Petitioner Sierra Club challenges all three of those decisions. EPA's concurrence with the Wildfire Submittal, and the Clean Data Determination based upon that concurrence, should be upheld because EPA clearly explained the record bases for its determination that the weight of the evidence in the Wildfire Submittal established that the high levels of ozone measured on June 24-25, 2022, are attributable to Canadian wildfire smoke. The Redesignation Rule also should be upheld because Sierra Club's three contrary arguments lack merit. First, EPA properly determined that the Detroit Area had attained the 2015 NAAQS through the final action date based on the Clean Data Determination. Second, EPA clearly detailed the record bases for its determination that improvements in the Detroit Area's air quality are attributable to permanent and enforceable reductions in emissions from federal control measures and control measures in Michigan's state implementation plan ("SIP"). And third, EPA properly applied its decades-long construction of 42 U.S.C. § 7407(d)(3)(E)(v) that a State has met all requirements

applicable to a nonattainment area if their SIP imposes the requirements for that area's nonattainment classification that are applicable at the time the State completes its role in the redesignation process by providing a complete submittal to EPA.

## STATEMENT REQUESTING ORAL ARGUMENT

EPA concurs with Sierra Club's Statement Requesting Oral Argument.

## STATEMENT OF ISSUES

1. Whether EPA reasonably concurred with Michigan's exceptional event submittal, based on a finding that the State established a clear causal relationship between the measured exceedances of the 2015 NAAQS and wildfire smoke at the East 7-Mile monitor in Detroit, on June 24-25, 2022 as required under 42 U.S.C. § 7619(b)(3)(B)(ii).

2. Whether EPA reasonably determined pursuant to 40 C.F.R. § 51.1318 that the Detroit nonattainment area ("Detroit Area") attained the 2015 NAAQS ("Clean Data Determination").

3. Whether EPA reasonably found that the Detroit Area attained the 2015 NAAQS pursuant to 42 U.S.C. § 7407(d)(3)(E)(i).

4. Whether EPA reasonably found that improvements in the Detroit Area's air quality were due to permanent and enforceable reductions in emissions pursuant to 42 U.S.C. § 7407(d)(3)(E)(iii).

5. Whether EPA reasonably found that Michigan met all requirements applicable to the Detroit Area pursuant to 42 U.S.C. § 7407(d)(3)(E)(v).

3

<u>**LEGAL BACKGROUND**</u>

Congress enacted the Clean Air Act in 1963, and substantially amended it in 1967, 1970 and 1977, to establish a comprehensive national program to protect public health and welfare from the harmful effects of exposure to a series of ubiquitous air pollutants, including ozone (also known as smog).[1] *See generally* 42 U.S.C. § 7401; Pub. L. No. 95-95, 91 Stat. 685 (1977).  Congress amended the CAA again in 1990 ("1990 Amendments") to, among other things, promulgate new provisions regarding attainment of air quality standards for specific pollutants, including the ozone-specific nonattainment provisions in Subpart 2 of Part D of Title I and requirements for nonattainment areas seeking redesignation to attainment.  *See* 42 U.S.C. §§ 7511-11f; *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 477 (2001).

**I.     National Ambient Air Quality Standards ("NAAQS")**

The Act requires EPA to identify and list air pollutants that "may reasonably be anticipated to endanger public health or welfare" and whose "presence . . . in the ambient air results from numerous or diverse mobile or stationary sources."  42 U.S.C. § 7408(a)(1)(A),(B).  EPA then must issue "air quality criteria" reflecting the latest scientific knowledge regarding "all identifiable effects on public health or

---

[1]  Ground-level ozone is formed near the earth's surface in the presence of sunlight through reactions between volatile organic compounds ("VOCs") and oxides of nitrogen ("NOx") that are emitted by many different sources.  Those include manmade mobile and stationary sources (*e.g.,* cars, trucks, power plants) as well as natural sources (*e.g.,* wildfires, vegetation).

welfare" that may result from a given pollutant's presence in the ambient air. *Id.* § 7408(a)(2). CAA section 7409 then directs EPA to propose and promulgate primary NAAQS "the attainment and maintenance of which . . . allow[] an adequate margin of safety, are requisite to protect the public health," and secondary NAAQS (not implicated here) that protect public welfare. *Id.* §§ 7409(b)(1)-(2), 7602(h).

## A. Area Designations and Classifications

Once EPA establishes a new or revised NAAQS, the Agency, in cooperation with the States, designates areas of the country as "attainment" (*i.e.,* meeting that NAAQS), "nonattainment" (*i.e.,* not meeting that NAAQS), or "unclassifiable." *Id.* § 7407(d)(1). With respect to ozone NAAQS, each nonattainment area is given a classification at the time of designation ranging from Marginal to Extreme based upon its ambient air pollution levels. *Id.* § 7511(a). Many of the applicable planning and implementation requirements imposed by the CAA, including the deadlines by which each ozone NAAQS must be attained, vary significantly depending upon each area's classification. *See id.* § 7511(a)(1) Table 1.

## B. State Implementation Plans

States have primary responsibility for ensuring that air quality within their jurisdiction meets each NAAQS, and States containing nonattainment areas must develop a State Implementation Plan ("SIP") that specifies*, inter alia*, how they will attain each NAAQS by the applicable deadlines. *Id.* §§ 7401(d), 7410(a), 7501-14a. The contents of each plan and the requirements they must fulfill with respect to each

NAAQS depend upon the designations and classifications of the various areas within each State's boundaries.  *See, e.g., id.* § 7511a.

States must formally adopt SIPs or SIP revisions through state-level notice-and-comment rule makings, and then submit them to EPA for approval.  *Id.* § 7410(a).  Once EPA approves them through federal notice-and-comment rule making, SIPs become binding on the State and regulated entities within its boundaries, and they are enforceable as federal law under the CAA.  *Id.* §§ 7413, 7602(q) (definition of "applicable implementation plan"), 42 U.S.C. § 7604(a); 5 U.S.C. § 553.  SIPs can only be revised through an EPA notice-and-comment rule making consistent with the requirements of CAA sections 7410(*l*) and 7515, if applicable.  42 U.S.C. §§ 7410(*l*), 7515.

### 1.    Attainment Areas

SIPs for areas designated or redesignated to attainment of a NAAQS must provide, *inter alia*, for the Prevention of Significant Deterioration ("PSD") of air quality under CAA section 7471.  These provisions, which are generally set out in CAA Part C, 42 U.S.C. §§ 7470-79, include pre-construction permitting that ensures major sources or major modifications to existing sources "will not cause, or contribute to, air pollution in excess of any . . . [NAAQS] in any air quality control region, or . . . any other applicable emission standard or standard of performance under this chapter."  42 U.S.C. § 7475(a)(3).  The corresponding permitting program for nonattainment areas is known as New Source Review.  *See infra* at 10-11.

### 2. Nonattainment Areas

The SIP for an ozone nonattainment area must meet the requirements of 42 U.S.C. § 7410(a), which apply to all areas regardless of designation, and the requirements of Part D of the Act, "Plan Requirements for Nonattainment Areas." Part D is further divided into subparts covering the various pollutants. *Id.* at 7501-7515. CAA Subpart 2, entitled "Additional Provisions for Ozone Nonattainment Areas," includes 42 U.S.C. § 7511a which sets distinct requirements for each of the five classifications of ozone nonattainment areas. Pertinent to this case, SIPs for Moderate and higher nonattainment areas (but not Marginal nonattainment areas) must impose, among other things, reasonably available control technology ("RACT") requirements for major sources in the area and for any sources that emit volatile organic carbon compounds ("VOC") in the area that are covered by a control techniques guideline. 42 U.S.C. § 7502(c)(1); *see Wall v. EPA,* 265 F.3d 426, 429 (6th Cir. 2001); *compare* 42 U.S.C. § 7511a(b)(2) (Moderate requirement) *with* 42 U.S.C. § 7511a(a) (Marginal one-time corrections requirement).

Section 7511a(a) and EPA's implementing regulations establish an attainment deadline for each nonattainment area based on the area's classification. 42 U.S.C. § 7511(a). EPA subsequently must determine whether each area attained the ozone NAAQS by its attainment date, based on the air quality as of the attainment date. 42 U.S.C. § 7511(b)(2). If an area does not attain by its statutory deadline and EPA so finds, the area is reclassified by operation of law to the higher of either (1) the next

higher classification or (2) the classification applicable to the area based on its actual air quality. *Id.* § 7511(b)(2)(A). Upon reclassification, the area is subject to both the later attainment date and the additional SIP requirements for the new classification. *Id.* § 7511a(i).

## II.    Clean Data Determinations

When air quality in an area designated nonattainment for a specific ozone NAAQS has attained the standard, EPA may make what is known as a determination of attainment or a "Clean Data Determination" based on the most recent three calendar years of air quality data. 40 C.F.R. § 51.1318; *see also NRDC v. EPA,* 571 F.3d 1245, 1258-59 (D.C. Cir. 2009); 88 Fed. Reg. 32584, 32591 & n.8 (May 19, 2023). Clean Data Determinations, which require EPA notice-and-comment rule making, suspend some attainment-related planning requirements for as long as an area is attaining the NAAQS, but do not change an area's nonattainment designation or classification. 40 C.F.R. § 51.1318; *NRDC v. EPA,* 571 F.3d at 1258-61.

## III.    Redesignations to Attainment

Once a nonattainment area is attaining a NAAQS, the Governor of a State may submit a request for redesignation of any area (or portion of an area) within the State. Within 18 months of receiving a complete submittal, EPA either approves or denies it based upon whether the submittal meets five statutory Redesignation Criteria: (1) an EPA determination that the area has in fact attained the NAAQS; (2) EPA approval of the applicable SIP; (3) an EPA determination that attainment is due to permanent

8

and enforceable emission reductions; (4) an EPA-approved plan for the area to maintain its attainment; and (5) a State request establishing that all requirements applicable to the area under 42 U.S.C. § 7410 and CAA Part D were met. 42 U.S.C. § 7407(d)(3)(D), (E).

Because the State's role in the redesignation process concludes upon submission of a complete application for redesignation, in 1992 EPA issued a guidance memorandum referred to as the "Calcagni Memo" that, among other things, construed 42 U.S.C. § 7407(d)(3)(E)(v) to mean that the fifth redesignation criterion is satisfied if the State's complete submittal adequately addressed all requirements applicable to redesignation as of the date on which it was submitted. "Procedures for Processing Requests to Redesignate Areas to Attainment," J. Calcagni, EPA Director of Air Quality Management Division (Sept. 4, 1992), at 4-5 & n.3; *see* 60 Fed. Reg. 12459, 12465/2 – 12466/3 (Mar. 7, 1995) (redesignating Detroit-Ann Arbor area to attainment of the 1979 ozone NAAQS) (citing Calcagni Memorandum and collecting other guidance citations); *see* 88 Fed. Reg. at 32595/2, 32611/3 – 32612/2 (citing Calcagni Memorandum).[2] The Calcagni Memo, including the construction of Section 7407(d)(3)(E)(v), has been consistently applied to evaluate redesignation requests in

---

[2] Federal Register citations herein specify the column in which cited material may be found by including "/#" following the page numbers.

final rule makings that are subject to public notice and comment. *See infra* at 56-57 & n.13.

## IV. Data Exclusion Due to Exceptional Events

Whether an area is attaining the NAAQS or not is determined by the air quality data collected at monitors sited in the area. The CAA recognizes that air quality may be affected by "exceptional events" that are natural events that are not reasonably controllable or preventable (*e.g.*, wildfires, high wind dust events, stratospheric ozone intrusions) or that are caused by human activity that is unlikely to recur at a particular location. 42 U.S.C. § 7619(b)(1)(A). Monitoring data influenced by such an exceptional event may be excluded from calculations used to determine whether air quality exceeds or violates a NAAQS for the purpose of CAA regulatory actions[3] (*e.g.*, area redesignations, clean data determinations). *Id.* § 7619(b); 40 C.F.R. § 50.14(a)(1)(i), (b)(4); Wildfire Guidance, at 5; Technical Support Document ("TSD"), at 2.

### A. Exceptional Event Process

States seeking to exclude such data must follow the process established in 40 C.F.R. § 50.14 to: notify EPA that an exceptional event occurred; flag affected data in EPA's air quality system; prepare a submittal demonstrating that all five criteria in 40 C.F.R. § 50.14(c)(3)(iv) have been satisfied; seek public notice and accept comments

---

[3] Data used for such purposes is deemed to have "regulatory significance." 40 C.F.R. § 50.14(a)(1)(i); *see* 88 Fed. Reg. at 32588/3 – 32589/1.

for a minimum of 30 days; and provide the public comments and the State's responses with the submittal seeking EPA's concurrence to exclude the affected data from the design value calculations to determine whether a NAAQS was attained for purposes of a CAA regulation action ("Event Submittal").  42 U.S.C. § 7619(b); 40 C.F.R. § 50.14(a)(1)(i), (b)(4), (c)(3)(v); *see* 81 Fed. Reg. 68216 (Oct. 3, 2016).

Event Submittals must include:  (1) A narrative conceptual model that describes the event causing the exceedance and discusses how resulting emissions led to the exceedance at affected air monitors; (2) a demonstration that the event affected air quality such that there is a clear causal relationship between the specific event and the monitored exceedance; (3) analyses comparing the event-influenced concentrations to concentrations at the same monitoring site at other times; (4) a demonstration that the event was both not reasonably controllable and not reasonably preventable; and (5) a demonstration that the event was a natural event or that it was caused by human activity that is unlikely to recur at a particular location.  40 C.F.R. § 50.14(c)(3)(iv).

EPA determines whether to concur with the State's Event Submittal on a case-by-case basis, based on the weight of the evidence provided.  40 C.F.R. § 50.14(b)(1) ("[EPA] shall exclude data . . . where a State demonstrates to [EPA]'s satisfaction . . . "), § 50.14(b)(4) (same); Wildfire Guidance, at 3-4, 5 n.6; 81 Fed. Reg. 68216, 68227 & n.19, 68230/2-3 (Oct. 3, 2016) (promulgating current 40 C.F.R. § 50.14, including weight of the evidence approach); *Bahr v. Regan,* 6 F.4th 1059, 1075 & n.16 (9th Cir.

11

2021) (explaining weight of the evidence approach and upholding exclusion of data affected by California wildfires). Because EPA's concurrence with the exclusion of event-influenced data is a component of a request for EPA action under the CAA (*e.g.*, request for redesignation, determination of attainment), 40 C.F.R. § 50.14(a)(1)(i), EPA's determination whether to concur is reached as part of the public notice and comment rule making for that CAA action. *Id.* ("This section applies to the treatment of data . . . for purposes of the following types of regulatory determinations by [EPA] . . . "); *see, e.g.,* 88 Fed. Reg. 7382, 7383 (Feb. 3, 2023) (proposed action); 88 Fed. Reg. at 32584/1, 586/2 – 590/3 (final action).

### B.    Guidance for Exceptional Events Attributable to Wildfire Emissions

In December 2015, EPA published a notice of availability and sought public comment on non-binding guidance for States preparing exceptional event submittals for ozone NAAQS exceedances attributable to wildfires. 80 Fed. Reg. 81495 (Dec. 30, 2015). The Wildfire Guidance was updated to reflect intervening revisions to the implementing regulations for 42 U.S.C. § 7619(b), the CAA's exceptional event provision, and then finalized and issued in 2016. 81 Fed. Reg. at 68216; Wildfire Guidance at 2, 5.

Among other things, the non-binding Wildfire Guidance provides a three-tiered approach that States can use to address the "clear causal connection" requirement for wildfire ozone demonstrations, recognizing that some wildfire events

may be better understood and/or extreme and therefore, require relatively less evidence to establish that relationship. Wildfire Guidance, at 4. These tiers reflect the need for States to support the clear causal relationship demonstrations with: (1) a comparison of the ozone data they wish to exclude with historical concentrations at the same monitor; (2) a demonstration that the wildfire's emissions were transported to the affected monitor; and (3) a demonstration that emissions from the wildfire influenced the concentrations to be excluded. *Id.* at 9. The Wildfire Guidance also allows—but does not require—States to quantify the contribution of the wildfire's emissions to the exceedance or violation. *Id.* at 9, 26 ("an air agency *may* further support the clear causal relationship between the wildfire and the [ozone] exceedance . . .") (emphasis added); *accord* Pet. Br. 57 ("this type of analysis is not mandated by law or guidance . . .").

The tiering approach provides varying levels of analysis based on the severity, nature, and complexity of an ozone event. Wildfire Guidance, at 2, 3-4, 9, 12-13. Tier 1 analyses are used when wildfire events cause clear ozone impacts in areas or at times when ozone levels are typically low, and they require a simpler and less resource-intensive set of analyses than Tier 2 or Tier 3 analyses. *Id.* at 4. Tier 2 analyses are used when wildfire impacts on ozone levels are less clear and require more supportive documentation, but the wildfire's emissions and the distance between the wildfire and the affected monitor indicate a clear causal relationship. *Id.* at 16-17, 21-23. Tier 3 analyses are used when wildfires do not fall within the Tier 1 and Tier 2 scenarios, but

13

the aggregated information may show a clear causal relationship under a weight of evidence approach. *Id.* at 9, 25-26.

The Wildfire Guidance recommends several options for providing evidence to support a clear causal relationship demonstration for Tier 2 and Tier 3, recognizing that "other information may be equally (or more) convincing and carry more 'weight' under a weight of evidence assessment, but these data and/or tools may not be as widely available. . . . [I]t is not our intent to prevent air agencies from using any relevant, well-documented, appropriately-applied and technically sound evidence." *Id.* at 25. Options for Tier 3 include matching day analyses, statistical regression models or photochemical models. *Id.* at 26 ("an air agency *may* further support the clear causal relationship . . . with matching day analyses, statistical regression models, *or* photochemical models . . .") (emphasis added).

<u>**FACTUAL BACKGROUND**</u>

## I. THE FOUR OZONE NAAQS PROMULGATED BETWEEN 1979 AND 2015

In 1979, EPA promulgated the first ozone NAAQS based on a one-hour average concentration of 0.12 parts per million ("ppm"). 44 Fed. Reg. 8202 (Feb. 8, 1979). In 1997 and 2008, EPA promulgated new, generally more stringent NAAQS based on an eight-hour average concentration of 0.08 ppm and 0.075 ppm, respectively. 62 Fed. Reg. 38856, 38858 (July 18, 1997); 73 Fed. Reg. 16436 (Mar. 27, 2008); *NRDC v. EPA,* 777 F.3d at 462-63. In 2015, EPA promulgated the most

stringent eight-hour NAAQS to date of 0.070 ppm ("2015 NAAQS"). 80 Fed. Reg. 65292 (Oct. 26, 2015).

Compliance with the 2015 NAAQS is determined based on data derived from air monitors operated in accordance with 40 C.F.R. Part 58. This data is used to calculate a statistic known as the "Design Value" for each monitor, which is "the 3-year average of the annual fourth-highest daily maximum 8-hour [ozone] concentration." 40 C.F.R. Part 50, app. U. The Design Value for each monitor is then compared to the 0.070 ppm 2015 NAAQS to determine which areas should be designated as nonattainment areas because they were violating that Standard or contributing to nonattainment in nearby areas. *Id.*; *see also* 42 U.S.C. § 7407(d)(1)(A)(i).

## II.     DETROIT AREA 2015 OZONE NAAQS ACTIONS

In June 2018, the Detroit Area was designated Marginal nonattainment for the 2015 NAAQS based on data collected by the area's network of air monitors. 83 Fed. Reg. 25776 (June 4, 2018). Because of its Marginal classification, the Detroit Area's deadline to attain the 2015 NAAQS was August 3, 2021. 87 Fed. Reg. 21842 (Apr. 13, 2022). To timely attain, each air monitor in the Detroit Area's monitoring network needed to collect data that translated into a Design Value at or below 0.070 during the three-year period from 2018 through 2020. 88 Fed. Reg. 6633, 6634/1-2 (Feb. 1, 2023).

As discussed below, a number of related CAA actions were taken after the Detroit Area was designated as a Marginal nonattainment area that are pertinent to this case:

### A. Reclassification to Moderate Nonattainment by Operation of Law

Because the Detroit Area did not attain the 2015 NAAQS during the 2018 through 2020 ozone seasons, EPA proposed and then finalized a rule determining that the Area failed to attain that NAAQS by the applicable deadline. 87 Fed. Reg. 21825 (Apr. 13, 2022); 88 Fed. Reg. 6633 (Feb. 1, 2023). Consequently, the Detroit Area was reclassified to Moderate nonattainment by operation of law, and Michigan was required to adopt and submit SIP revisions addressing Moderate requirements for that area by March 1, 2023. *Id.* at 6634/2-3.

### B. Exceptional Event Caused by Canadian Wildfires

In June 2022, smoke and other ozone precursors from the McCafe, Melen and Evan Fires in Canada's Saskatchewan and Manitoba Provinces reached the United States. 88 Fed. Reg. at 32586/2; TSD, at 1. Those emissions were transported into the Detroit Area throughout the week of June 20, 2022, and they influenced ozone levels, causing the Design Value for the Area's East 7-Mile air monitor to exceed the 2015 NAAQS on June 24-25, 2022 ("Exceedances"). 88 Fed. Reg. at 32586/2-3; TSD at 1, 5-6 & Tables 2-3.

16

On November 17, 2022, Michigan notified EPA that an exceptional event may have caused ozone exceedances at the Detroit Area's East 7-Mile air monitor on June 24-25, 2022 ("Wildfire Event"). TSD, at 5. EPA confirmed that the Event Data causing the Exceedances had regulatory significance for the Detroit Area's attainment status for the 2015 NAAQS. Letter from John Mooney, EPA Region 5 Director, Air and Radiation Div., dated Dec. 21, 2022 ("Letter"), at 1; TSD, at 5. EPA also stated that a Tier 3 analysis would be needed and encouraged Michigan to prioritize the exceptional Event Submittal, including the State public notice and comment process. Letter, at 1.

Michigan, with EPA Region 5 engagement, developed an Event Submittal requesting that EPA exclude the Event Data from Design Value calculations to determine whether the Detroit Area attained the 2015 NAAQS during 2020-2022 ("Wildfire Submittal"). 88 Fed. Reg. at 32584/3, 32588/2-3. Michigan sought State-level public comment on the proposed Wildfire Submittal on December 19, 2022. *Id.* Michigan provided the final Wildfire Submittal to EPA on January 26, 2023, which included the public comments the State had received and the State's responses thereto. *Id.* EPA notified Michigan that it would concur with the Wildfire Submittal by letter dated January 30, 2023. *See* 88 Fed. Reg. at 32584/1; 88 Fed. Reg. at 7382/1.

### C. Clean Data Determination

On February 3, 2023, EPA published a proposed Clean Data Determination for the Detroit Area based on the removal of the June 24-25, 2022 Event Data from the East 7-Mile monitor from Design Value calculations. 88 Fed. Reg. 7382/1 (Feb. 3, 2023). In doing so, EPA also proposed to take final agency action concurring with the Wildfire Submittal and sought public comment on both EPA's concurrence and the proposed Clean Data Determination. 88 Fed. Reg. at 7383/2, 7384/1. Ultimately, EPA issued a final rule on May 19, 2023, responding to public comments and finalizing the Clean Data Determination based on, among other things, the exclusion of the June 24-25, 2022 data due to EPA's concurrence with the Wildfire Submittal. 88 Fed. Reg. 32584 (May 19, 2023).

### D. Redesignation to Attainment

Before the Canadian wildfires and the Detroit Area's reclassification, Michigan had submitted a complete application to redesignate the Detroit Area from Marginal nonattainment to attainment of the 2015 NAAQS based on 2019-2021 data ("Redesignation Submittal"). 87 Fed. Reg. 14210, 14210/2 (Mar. 14, 2022). EPA published a corresponding proposed rule in March 2022 to, among other things, approve the redesignation request. *Id. at* 14210-11. EPA issued a final rule on May 19, 2023 ("Redesignation Rule") that, among other things, approved the Redesignation Submittal based on 2019-2021 data and the Clean Data Determination

that established the Detroit Area continued to attain the 2015 NAAQS in 2022. 88 Fed. Reg. at 32594-95.

*   *   *

To summarize, pertinent to this case, the events following the Detroit Area's designation as a Marginal nonattainment area include:

| | |
|---|---|
| Jan. 3, 2022 | Michigan submits complete request to redesignate the Detroit Area to attainment <br> (based on 2019-2021 data) |
| March 14, 2022 | Proposed Redesignation to Attainment <br> (based on 2019-2021 data) |
| April 13, 2022 | Proposed Finding of Failure to Timely Attain as a Marginal Area and Reclassification to Moderate Nonattainment <br> (based on 2018-2020 data) |
| June 24-25, 2022 | Canadian wildfires affect ozone levels at the Detroit Area's East 7-Mile air monitor |
| Feb. 1, 2023 | Final Finding of Failure to Timely Attain and Reclassification to Moderate Nonattainment |
| Feb. 3, 2023 | Proposed Clean Data Determination <br> (based on 2020-2022 data) |
| May 19, 2023 | Final Clean Data Determination |
| May 19, 2023 | Final Redesignation to Attainment |

## II.    THE RULES AT ISSUE

In these consolidated cases, Sierra Club challenges the two final CAA rules issued on May 19, 2023: (1) the final Clean Data Determination which includes EPA's concurrence with the Wildfire Submittal, 88 Fed. Reg. at 32584; and (2) the final

19

Redesignation Rule redesignating the Detroit Area to attainment of the 2015 NAAQS, 88 Fed. Reg. 32594.  Importantly, Sierra Club does not challenge the exceptional event program established in 40 C.F.R. §§ 50.1, 50.14, 51.1318, or the Wildfire Guidance.

## STANDARD OF REVIEW

The standard of review in this case is provided by the Administrative Procedure Act, under which a final agency action may not be set aside unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A); *see Alaska Dep't of Env't Conservation v. EPA*, 540 U.S. 461, 496-97 (2004); *Wolverine Pipeline Co. v. DOT*, 69 F.4th 365, 372 (6th Cir. 2023). In applying this standard, the court's task is to determine whether the agency considered the relevant factors and articulated a rational connection between the facts found and the choice made. *Wolverine Pipeline Co.*, 69 F.4th at 372 ("The question is not what we would have done, nor whether we agree with the agency's action.") (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)); *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513 (2009)). When doing so, "[a] court simply ensures that the agency has acted within a zone of reasonableness . . .." *FCC v. Prometheus Radio Project*, 141 S.Ct. 1150, 1158 (2021) (citing *Fox Television,* 556 U.S. at 513–14, *Motor Vehicle Mfrs. Assn.,* 463 U.S. at 43, and *FCC v. WNCN Listeners Guild*, 450 U.S. 582, 596 (1981)).

Courts are "at [their] 'most deferential' when 'reviewing an agency's scientific determinations' about issues within its expertise.'" *St. Mary's Cement, Inc. v. EPA,* 782 F.3d 280, 286 (6th Cir. 2015) (quoting *Ky. Res. Council, Inc. v. EPA,* 467 F.3d 986, 991 (6th Cir. 2006)); *BP Exploration & Oil, Inc. v. EPA,* 66 F.3d 784, 792 (6th Cir. 1995). "So long as 'the agency's path may reasonably be discerned,' [the courts] uphold a

decision of even 'less than ideal clarity.'" *Wolverine Pipeline Co. v. DOT*, 69 F.4th 365, 372 (quoting *Alaska Dep't of Env't Conservation v. EPA*, 540 U.S. at 497).

Questions of statutory interpretation are governed by the two-step framework set forth in *Chevron U.S.A. Inc. v. NRDC*, 467 U.S. 837, 842-43 (1984).[4] Under the first step, the reviewing court must determine "whether Congress has directly spoken to the precise question at issue." 467 U.S. at 842. If so, that is the end of the inquiry, and the Court must apply the plain terms of the statute. 467 U.S. at 842-43. If the statute is silent or ambiguous on a particular issue, however, the agency charged with administering the statute also "is charged with filling the 'gap left open' by the ambiguity" and "the administering agency's construction is to be accorded 'controlling weight unless . . . arbitrary, capricious, or manifestly contrary to the statute.'" *EPA v. EME Homer City Generation, L.P.*, 572 U.S. 489, 513 (2014) (quoting *Chevron,* 467 U.S. at 843-44, 866, and *United States v. Shimer,* 367 U.S. 374, 382 (1961)); *Chemical Mfrs. Ass'n v. NRDC*, 470 U.S. 116, 125 (1985). Agency actions that do not warrant *Chevron* deference, such as interpretive guidance that has not been subject to notice and comment rule making, are typically entitled to what is known as *Skidmore* deference to the extent that the interpretation has the power to persuade. *Christensen v. Harris Cnty.*, 529 U.S. 576, 587 (2000) (quoting *Skidmore v. Swift & Co.,* 323 U.S. 134, 140 (1944));

---

[4] On May 1, 2023, the Supreme Court granted cert in *Loper Bright Enters., et al. v. Raimondo*, No. 22-451 to address whether *Chevron* should be clarified or overruled.

*Chao v. Occupational Safety and Health Review Comm'n*, 540 F.3d 519, 523 & n.3 (6th Cir. 2008) (citing *Skidmore,* 323 U.S. at 140 and *Battle Creek Health Sys. v. Leavitt,* 498 F.3d 401, 408-09 (6th Cir. 2007)); *Bank of New York v. Janowick*, 470 F.3d 264, 269 (6th Cir. 2006) (quoting *Christensen v. Harris*, 529 U.S. at 587).

## SUMMARY OF ARGUMENT

1.     EPA reasonably concurred with the Wildfire Submittal, thereby excluding data collected at the Detroit Area's East 7-Mile air monitor on June 24-25, 2022, from calculations to determine whether the Detroit Area attained the 2015 NAAQS in 2022.  More specifically, EPA fulsomely explained in the preambles to the proposed and final Clean Data Determination, the underlying Technical Support Document, and responses to public comments, the record bases for its determination that the weight of the evidence in the Wildfire Submittal established that the ozone levels measured at that monitor on June 24-25, 2022, were attributable to smoke from Canadian wildfires.  Sierra Club's contrary arguments lack merit because they are based primarily on misunderstandings of the weight of the evidence approach that EPA uses to evaluate exceptional event submittals and on disagreements with EPA's scientific findings and conclusions.

EPA's decision to concur with the Wildfire Submittal therefore was neither arbitrary nor capricious, and it should be upheld.  The Clean Data Determination also should be upheld, because Sierra Club challenges it solely on the ground that it relies upon EPA's concurrence with the Wildfire Submittal.

2.     EPA reasonably redesignated the Detroit Area to attainment of the 2015 NAAQS based on determinations that (among other things) the first, third and fifth Redesignation Criteria in 42 U.S.C. § 7407(d)(3)(E) were satisfied.  More specifically, EPA reasonably determined that the first Redesignation Criterion in Section

24

7407(d)(3)(E)(i) was satisfied by Detroit Area monitoring data that attained the NAAQS from 2019 through 2021 and by the Clean Data Determination.  Sierra Club disputes this determination based solely on the validity of the Clean Data Determination.

EPA clearly detailed the record bases for its determination that the third Redesignation Criterion in Section 7407(d)(3)(E)(iii) was satisfied by analyses and data in Michigan's submittal—and by analyses that EPA itself performed—establishing that the improvement in the Detroit Area's air quality resulted from the implementation of federal emission controls and controls in Michigan's SIP.  Sierra Club's contrary arguments lack merit because they are based primarily on speculation about possible impacts from the COVID pandemic and on disagreements with EPA's scientific findings and conclusions.

Finally, EPA properly determined that the fifth Redesignation Criterion in Section 7407(d)(3)(E)(v) was satisfied because Michigan's SIP imposed on the Detroit Area all requirements applicable to Marginal nonattainment areas.  More specifically, EPA reasonably applied its decades-long reading of Section 7407(d)(3)(E)(v) that a State satisfies this Criterion if its SIP imposes the requirements applicable to the area at the time the State fulfills its role in the redesignation process by providing EPA with a substantively complete redesignation submittal.  Sierra Club's contrary arguments are based on a reading that conflicts with the structure and statutory time frames for the redesignation process, and on decisions that do not address the

situation presented in this case, where an area's classification changes a significant time after a State provides a complete Redesignation Submittal. EPA thus appropriately determined that this Criterion was fulfilled, because the Detroit Area was in Marginal nonattainment at the time Michigan provided a complete redesignation submittal, and Michigan's SIP imposed Marginal nonattainment requirements on the Detroit Area. For all of these reasons, the Redesignation is well grounded in applicable law and amply supported by the record evidence. It therefore is neither arbitrary nor capricious, and should be upheld.

## ARGUMENT

**I. EPA'S CONCURRENCE WITH MICHIGAN'S EXCEPTIONAL EVENT DEMONSTRATION WAS REASONABLE, AND THE DEMONSTRATION AND CLEAN DATA DETERMINATION BOTH SHOULD BE UPHELD.**

EPA reasonably concurred with the State of Michigan's exceptional event demonstration (*i.e.,* the Wildfire Submittal). As EPA determined, the Wildfire Submittal satisfied the applicable requirements set forth at 40 C.F.R. § 50.14. EPA thus properly excluded data influenced by wildfires that was collected from the East 7-Mile air monitor on June 24 and 25, 2022, when approving the Detroit Area's Clean Data Determination for 2022.

EPA clearly explained its record bases for concurring with Michigan's demonstration in the Wildfire Submittal. As EPA explained, Michigan followed the procedure established in Section 50.14 and provided a valid Tier 3 analysis to establish

26

that the June 24-25, 2022, Exceedances of the 2015 NAAQS were attributable to Canadian wildfires. *See* 88 Fed. Reg. at 32584; TSD, at 5.

Sierra Club's contrary arguments lack merit. Some of its arguments are based on a misunderstanding of the weight of the evidence approach used to evaluate Event Submittals, and on misreadings of the Wildfire Guidance and the Clean Data Determination that comprises the decision document in which EPA concurred with the Wildfire Submittal. *See* 88 Fed. Reg. at 32584/1 ("EPA is taking final agency action on [the Wildfire Submittal]"). Others lack merit because they boil down to disagreements with scientific conclusions that fall squarely within EPA's expertise. In short, EPA reasonably concurred with Michigan's Wildfire Submittal, thereby authorizing the exclusion of the Event Data when determining whether the Detroit Area attained the 2015 NAAQS. Accordingly, both EPA's concurrence with the Event Submittal and the Clean Data Determination should be upheld, because Sierra Club only challenges the Clean Data Determination to the extent it relies upon the exclusion of the Event Data.

## A. EPA Adequately Explained Its Basis for Finding That Michigan Satisfied the Requirements of 40 C.F.R. 50.14 and the Wildfire Guidance.

States seeking EPA's approval to exclude monitoring data due to an exceptional event like a wildfire must follow the process established in, and provide the information required by, 40 C.F.R. § 50.14, the primary CAA implementing regulation for the exceptional event program. *See supra* at 10-12. More specifically,

Michigan was required to meet five requirements ("Event Requirements"): (1) timely notify EPA and the public that an event occurred and flag affected data (*id.* § 50.14(c)(1), (2)(i)); (2) regularly communicate with EPA to identify such data with regulatory significance and determine whether an Event Submittal should be prepared (*id.* § 50.14(c)(2)(i)(A)); (3) prepare an Event Submittal demonstrating that all five of the criteria in Section 50.14(c)(3)(iv) were satisfied (*id.* § 50.14(c)(3)); (4) provide public notice and accept comments for a minimum of 30 days (*id.* § 50.14(c)(3)(i), (v)(A)); and (5) provide the public comments and Michigan's responses to EPA as part of the final Event Submittal (*id.* § 50.14(c)(3)(v)(B)-(C)).

Because EPA clearly explained how Michigan followed that regulatory process and provided the required information, with relevant explanation contained within the Clean Data Determination and EPA's Technical Support Document, EPA's concurrence with the Wildfire Submittal should be upheld. *Wolverine Pipeline Co. v. DOT*, 69 F.4th at 372 (quoting *Alaska Dep't of Env't Conservation*, 540 U.S. at 497).

### 1. Sierra Club Does Not Dispute that Michigan Satisfied the First Two and Last Two Event Requirements.

EPA clearly explained why—and Sierra Club does not dispute that—Michigan satisfied the first two Event Requirements by timely notifying EPA and the public that the Canadian wildfires constituted an exceptional event, flagging related data, and communicating regularly with EPA to identify affected data and prepare the Event Submittal itself. 88 Fed. Reg. at 32584/3 ("substantial engagement with EPA staff

28

who provided guidance on analytical methods and data"), 32586/3 (Event Submittal "prepared with early engagement and feedback from EPA as it was being developed"), 32588/2-3, 32590/2-3; TSD at 5, 9-10; Letter, at 1.  EPA also clearly explained—and Sierra Club does not dispute—that Michigan satisfied the last two Event Requirements by seeking public comment on the proposed Event Submittal, preparing responses to them, and submitting the comments and responses to EPA as part of the final Event Submittal.  88 Fed. Reg. at 32584/3, 32588/1-2; TSD at 9-10.

### 2. EPA Detailed the Record Bases for Its Finding that the Wildfire Submittal Satisfied the Third Event Requirement.

To satisfy the third Event Requirement, Michigan's Wildfire Submittal had to satisfy all five of the criteria in 40 C.F.R. § 50.14(c)(3)(iv) ("Demonstration Criteria") to demonstrate a clear causal relationship between emissions from the Canadian wildfires and the Exceedances of the 2015 NAAQS at the East 7-Mile air monitor on June 24-25, 2022.  40 C.F.R. § 50.14(b)(4), (c)(3)(iv)(B).  Because Sierra Club only challenges compliance with the third Demonstration Criterion—the requirement that Michigan establish to EPA's satisfaction a clear causal relationship between Canadian wildfire emissions and Exceedances at the East 7-Mile air monitor on June 24-25, 2022—EPA does not address the other four Demonstration Criteria in this brief.  40 C.F.R. § 50.14(b)(1), (b)(4), (c)(3)(iv)(B).

a. **EPA Reasonably Concurred with the Wildfire Submittal's Tier 3 Clear Causal Relationship Demonstration.**

As part of the required initial notification process under 40 C.F.R. § 50.14(c)(2)(i), Michigan and EPA Region 5 engaged in early dialogue to identify which types of analyses might be most useful in supporting a clear causal relationship between the Canadian wildfire emissions and the ozone Exceedances at the East 7-Mile monitor. EPA instructed Michigan that if it were to prepare an Event Submittal, it must establish the necessary clear causal relationship through a Tier 3 demonstration "as described in the Wildfire Guidance." 12/21/2022 Letter, at 1; *see supra,* at 17. Under the Wildfire Guidance, EPA evaluates such demonstrations using a weight of the evidence approach in which EPA qualitatively weighs the evidence presented in an Event Submittal based on its relevance, degree of certainty, persuasiveness, and other considerations appropriate to the situation. Wildfire Guidance, at 3, 5 n.6; *see* 40 C.F.R. § 50.14(b)(4) (clear causal relationship must be demonstrated "to the Administrator's satisfaction").

i. **Tier 3 Demonstration Components**

The Wildfire Guidance recommends that Tier 3 demonstrations include the analyses used for Tier 2 demonstrations. Wildfire Guidance, at 25; TSD at 4. Those Tier 2 analyses include: (1) analyzing fire emissions and distance of fire(s) to affected monitoring site location(s) (Wildfire Guidance, at 16-21, 24-25 Table 2); (2) comparison of the event-related ozone concentration with non-event related high

ozone concentrations (*id.* at 21-22, 24-25 Table 2); (3) at least one piece of evidence that the fire emissions affected the monitor(s) (*e.g.,* satellite evidence of smoke, ozone precursors at the monitor, etc.) (*id.* at 22-23, 24-25 Table 2); and (4) at least one piece of evidence that emissions were transported to the monitor (*e.g.,* trajectory analyses, satellite imagery). *Id.* at 23-24 & Table 2; TSD at 3-4. In addition, Tier 3 demonstrations may—but are not required to—include additional analyses that add to the weight of the evidence, such as matching day analyses, statistical regression models, or photochemical models. *Id.* at 25-26; 88 Fed. Reg. at 32590/2; TSD at 3-4.

**ii.** **EPA Reasonably Concluded That the Weight of the Evidence in the Tier 3 Demonstration Establishes the Necessary Clear Causal Connection.**

In the Clean Data Determination and the underlying Technical Support Document, EPA detailed its record bases for finding that the Tier 3 demonstration contained all of the necessary information and analyses, and that the weight of the evidence established a clear causal relationship between the Canadian wildfires and the 2015 NAAQS Exceedances.[5] 88 Fed. Reg. at 32589/2 - 90/3; TSD at 7-8 & Table 5 (discussing Wildfire Submittal at 28-59).

More specifically, EPA found that the information at pages 28-31 of Michigan's Wildfire Submittal established that the Canadian wildfires were distant from the

---

[5] Sierra Club only challenges the Tier 3 demonstration. This brief therefore does not address other components of Michigan's Wildfire Submittal.

Detroit Area's East 7-Mile monitor, thus triggering the expectation for a Tier 3 analysis. TSD at 7, 8 Table 5, row 1, 10; 88 Fed. Reg. at 32586/2 – 32588/1. EPA also found that the Wildfire Submittal established that the Exceedances on June 24-25, 2022, were one of the four highest ozone concentrations in that year, including an unusual 31 parts-per-billion increase above normal ozone levels beginning the day before the excluded data was collected on June 24-25, 2022. TSD at 7, 8 Table 5, row 1; 88 Fed. Reg. at 32586/2-3, 32587/3 – 88/1. EPA further found that pages 28-31 of the Wildfire Submittal provide a fulsome comparison of historic high ozone concentrations and the excluded data. TSD at 7-8 & Table 5, row 2; 88 Fed. Reg. at 32589/3 – 32590/1.

EPA next found that meteorological data, the National Oceanic and Atmospheric Administration ("NOAA") Hazard Mapping System Fire and Smoke Product, the AirNow Air Quality Index Map for Ozone, and Hybrid Single-Particle Lagrangian Integrated Trajectory ("HYSPLIT") trajectory analyses at pages 32-38 of Michigan's Wildfire Submittal all demonstrate that emissions from the Canadian wildfires were transported to the East 7-Mile monitor during the relevant period and trapped there by stagnant air conditions. TSD at 7-8 & Table 5, row 3; 88 Fed. Reg. at 32586/2 - 87/1, 87/3 – 88/1. The hourly average Black Carbon and Brown Carbon analysis on page 41 of the Wildfire Submittal further established that those emissions actually affected the East 7-Mile monitor. TSD at 7-8 & Table 5, row 4; 88 Fed. Reg. at 32586/3, 32587/3 - 32588/1, 32589/2-3. Finally, EPA found that the

matching day analysis and other evidence at pages 41-59 of the Wildfire Submittal

established that "there would not have been an exceedance without the presence of

wildfire smoke." [6] TSD at 7; *id.* at 5, 8 & Table 5, row 5; 88 Fed. Reg. at 32586/3 -

87. Ultimately, EPA concluded that the weight of the evidence provided by the Tier 3

analyses "sufficiently demonstrate[d] a clear causal relationship between the emissions

generated by the McCafe, Melen, and Evan wildfires and the Exceedances measured

at the East 7-Mile monitoring station." TSD at 7-8; *see* 88 Fed. Reg. at 32586/2 –

32588/1.

In addition to being carefully explained and supported by the administrative

record, EPA's findings and conclusions are entitled to substantial deference because

they are based on complex scientific analyses which fall squarely within EPA's special

expertise. *St. Mary's Cement*, 782 F.3d at 286 ("we are at our 'most deferential' when

'reviewing an agency's scientific determinations' about issues within its expertise")

(quoting *Ky. Res. Council, Inc. v. EPA,* 467 F.3d 986, 991 (6th Cir. 2006)); *see Bahr v.*

*Regan,* 6 F.4th 1059, 1075, 1078-79 (9th Cir. 2021) (review of wildfire exceptional

event concurrence "is a quintessential instance where we are bound to defer to the

technical expertise of the agency."). As this Circuit explained in a different CAA case,

"arbitrary and capricious review does not ask who is right. It asks whether the EPA

---

[6] EPA also provided detailed responses to public comments questioning the
sufficiency of those analyses and the scientific conclusions that EPA drew from them.
88 Fed. Reg. at 32589/1 – 90/2.

followed a defensible process in assessing who is right." *St. Mary's Cement,* 782 F.3d at 286; *Wolverine Pipeline Co.*, 69 F.4th at 372. Moreover, the arbitrary and capricious standard forbids federal courts from "substitut[ing their] judgment for that of the agency" and requires the agency only to have "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action." *St. Mary's Cement*, 782 F.3d at 285 (quoting *FCC v. Fox Television Stations, Inc.,* 556 U.S. 502, 513 (2009)); *Wolverine Pipeline Co.,* 69 F.4th at 372 ("The question is not what we would have done, nor whether we agree with the agency's action. . . . So long as 'the agency's path may reasonably be discerned,' we will uphold a decision of even 'less than ideal clarity.'") (internal citations omitted); *see Bahr v. Regan,* 6 F.4th at 1075, 1076-77, 1078, 1080.

For all of these reasons, EPA's determination that the weight of the evidence in the Tier 3 demonstration established a clear causal relationship between Canadian wildfire smoke and the Exceedances at the East 7-Mile monitor was neither arbitrary nor capricious. Because Sierra Club only challenges EPA's concurrence with the Wildfire Submittal based on alleged defects in that Tier 3 demonstration,[7] nothing more is required to uphold EPA's concurrence—and the resulting exclusion of the

---

[7] Sierra Club does not challenge the Wildfire Guidance or the exceptional event program established pursuant to 42 U.S.C. § 7619(b)(2) in 40 C.F.R. §§ 50.1, 50.14, 51.1318 in this case. Indeed, a challenge to the exceptional event program would be barred as untimely as well as improperly venued pursuant to 42 U.S.C. § 7607(b)(1). *See also* 81 Fed. Reg. at 68218/3.

Event Data from calculations to determine that the Detroit Area's air quality attained the 2015 NAAQS from 2020 through 2022.

**B. Sierra Club's Contrary Arguments Lack Merit and Should Be Rejected.**

**1. EPA Properly Weighed Evidence That Wildfire Smoke Reached the East 7-Mile Monitor.**

**a. No Single Piece of Contrary Evidence Requires EPA to Refuse to Concur with an Event Submittal.**

Sierra Club's argument at Pet. Br. 43-47 challenging whether Canadian wildfire smoke actually reached the East 7-Mile monitor lacks merit, primarily because it is based on a misunderstanding of the weight of the evidence approach EPA uses when evaluating Event Submittals. Sierra Club essentially argues that EPA could not concur with the Tier 3 demonstration because an analysis by the Lake Michigan Air Directors Consortium ("LADCO") did not show elevated levels of fine particulate matter ("PM$_{2.5}$") and carbon monoxide. While EPA needs to—and did—consider that evidence, by itself that one piece of evidence may not—and in this case did not—compel EPA to reach a different conclusion.

The applicable implementing regulation at 40 C.F.R. § 50.14 requires States to demonstrate "to the Administrator's satisfaction" that a wildfire event is the cause of a NAAQS exceedance or violation that they would like to exclude. 40 C.F.R. § 50.14(b)(4) ("The Administrator *shall* exclude data . . . where a State demonstrates *to the Administrator's satisfaction* that emissions from wildfires caused a specific air

35

pollution concentration in excess of one or more [NAAQS] . . .") (emphasis added). To make that determination, EPA determines whether the majority of the *overall* weight of the evidence supports a particular finding.  81 Fed. Reg. at 68227 & n.19, 68230/2-3 (promulgating current 40 C.F.R. § 50.14, including weight of the evidence approach); Wildfire Guidance at 3-4, 7; *see Bahr v. Regan,* 6 F.4th at 1075 & n.16.  As the Wildfire Guidance explains:

> [E]ven if the monitored data and/or technical analyses may not unequivocally support the clear causal relationship, agencies should submit available information regarding the event and the monitored exceedances or violations.  It may still be possible to explain, with a weight of evidence approach, why the majority of the data or analyses are consistent with the event causing elevated [ozone] concentrations.

Wildfire Guidance, at 7; *see* 81 Fed. Reg. at 68230/3.

Under that approach, each piece of information or analysis—favorable or unfavorable—is considered, but by itself is not conclusive.  Wildfire Guidance at 3-4, 7-8; *see* 81 Fed. Reg. at 68230/3; 88 Fed. Reg. at 32590/2; *Bahr v. Regan,* 6 F.4th at 1076-77, 1078-79.  Moreover, the Wildfire Guidance provides multiple examples of analyses or information that States could choose to use (or not) in Tier 3 demonstrations to add to the weight of their evidence, and the Wildfire Guidance expressly states that "[States] can also prepare analyses or present documentation not listed or explained in this guidance provided the information . . . supports the weight of evidence showing."  Wildfire Guidance at 2; *id.* at 7-8, 9 & Table 1, 25-27; TSD at 4.

Sierra Club's argument that EPA could not concur with the Tier 3 demonstration because a LADCO analysis did not show elevated carbon monoxide and $PM_{2.5}$ co-located with the wildfire plume also lacks merit for several substantive reasons. Pet. Br. at 44-47. First, contrary to Sierra Club's assertions at Pet. Br. 46-47, the Wildfire Guidance expressly authorizes States to show that smoke was transported to the monitor location through plume imagery combined with just the presence of organic and elemental carbon. Wildfire Guidance, at 14-15. More specifically, it provides that Tier 3 demonstrations should provide "either a trajectory analysis *or* a combination of satellite and surface measurements" as "additional evidence to support the weight of evidence . . . that the emissions from the wildfire were transported to the monitor location." Wildfire Guidance at 14 (emphasis added). States therefore can provide a trajectory analysis performed using the HYSPLIT or other models, *or* they can use other means to show that a smoke plume's arrival at a given location (as shown by satellite imagery) "coincided with elevation of wildfire plume components (such as $PM_{2.5}$, [carbon monoxide] *or organic and elemental carbon*) . . ." Wildfire Guidance at 14-15 (emphasis added).

The Wildfire Submittal contained—and EPA explained how it weighed the results of— HYSPLIT trajectories showing smoke from the Canadian fires reaching the Detroit Area by June 23 and affecting the surface around the East 7-Mile monitor

during June 24-25. 88 Fed. Reg. at 32586/3; *see also Bahr v. Regan,* 6 F.4th at 1076 n.18 (discussing HYSPLIT trajectories in wildfire-based exceptional event demonstrations). The Wildfire Guidance describes HYSPLIT trajectories as a sufficient means of establishing that wildfire emissions reached a particular air monitor. Wildfire Guidance, at 14. Michigan also included—and EPA also weighed—other plume mapping from NOAA and the National Weather Service combined with elevated levels of brown carbon (*i.e.*, organic carbon) and $PM_{10}$. 88 Fed. Reg. at 32586/3, 32587/3 – 32588/1, 32589/2-3; *see e.g., Bahr v. Regan,* 6 F.4th at 1077-78 (PM and elemental and organic carbon analyses).

Second, and also contrary to Sierra Club's assertions at Pet. Br. 46-47, EPA did not simply ignore the results of the LADCO analysis. Instead, EPA acknowledged and considered those results, and then explained that the overall weight of the evidence in the Wildfire Submittal nonetheless favored concurrence because the presence of brown carbon, a class of organic carbon compounds, was consistent with the presence of wildfire emissions despite the absence of elevated carbon monoxide or $PM_{2.5}$. 88 Fed. Reg. at 32589/3; *accord* Wildfire Guidance at 14 ("$PM_{2.5}$, [carbon monoxide], *or organic and elemental carbon*") (emphasis added). EPA therefore articulated a clear connection between all of the record evidence it weighed and its concurrence that Canadian wildfire smoke was transported to the East 7-Mile monitor and remained there during the relevant time frame. *See also Bahr v. Regan,* 6 F.4th at 1078-79.

### c. EPA Properly Weighed Evidence of Brown Carbon in the Detroit Area during the Relevant Time Frame.

Sierra Club's arguments at Pet. Br. 48-52 objecting to EPA's consideration of evidence regarding the presence of brown carbon should be rejected, because those arguments ask the Court to step into EPA's scientific shoes and reach contrary conclusions from the scientific data and analyses in the administrative record. It is well established that the federal courts cannot substitute their judgment for that of an agency whose action they are reviewing, and this Circuit is "at [its] 'most deferential' when 'reviewing an agency's scientific determinations' about issues within its expertise." *St. Mary's Cement*, 782 F.3d at 286 (quoting *Ky. Res. Council, Inc. v. EPA,* 467 F.3d 986, 991 (6th Cir. 2006) and *FCC v. Fox Television Stations, Inc.,* 556 U.S. 502, 513 (2009)); *Bahr v. Regan,* 6 F.4th at 1075.

After stating that the administrative record does not contain detailed brown carbon data and includes only "an imprecise graph" (Pet. Br. 49), Sierra Club nonetheless asks the Court to contradict EPA's scientific conclusions about the presence and levels of brown carbon based on the Court's *de novo* analysis of that graph. Pet. Br. 49-52. Sierra Club also asks the Court to contradict EPA's scientific conclusion that brown carbon levels in the Detroit Area were abnormally elevated during the relevant time frame based on the graph and generalized statements about the data in the record, and *sua sponte* impose a requirement that brown carbon data be

"placed in its historical context" that appears nowhere in the Wildfire Guidance. Pet. Br. 50-52.

First, it is well established that this Court does not sit as a rival scientist in cases such as this, and the Court therefore does not reach (much less base its opinion on) its own scientific conclusions from record documents and the parties' briefs. Indeed, in a recent decision upholding EPA's concurrence with an exceptional event demonstration based on California wildfires, the U.S. Circuit Court of Appeals for the Ninth Circuit expressly rejected arguments based on competing scientific interpretations of record materials. *Bahr v. Regan*, 6 F.4th at 1076-77, 1078-79.

Regardless, EPA explained in detail why its findings were not contradicted by the fact that brown carbon levels peaked in the Detroit Area on June 23, a day before the Event Data was collected. *Contra* Pet. Br. 48-49. More specifically, EPA explained that air containing wildfire emissions was transported in the upper atmosphere above ground levels by northerly winds behind a cold front that swept through the Detroit Area on June 23, which is atypical air quality for such a frontal passage. 88 Fed. Reg. at 32586/2-3. The air behind the cold front containing the emissions—including brown carbon, which is a by-product of incomplete combustion and therefore an indicator of wildfire smoke—later subsided (*e.g.,* sank to the ground) and remained there on June 24-25, 2022, because meteorological conditions were stagnant. 88 Fed. Reg. at 32586/2-3. That brown carbon data also is consistent with the HYSPLIT trajectory analyses of the path by which smoke from the Canadian

wildfires was transported, and with meteorological maps from the National Weather Service and NOAA HMS smoke map that show the smoke reaching the Detroit Area and causing Exceedances of the 2015 NAAQS. 88 Fed. Reg. at 32586/2-3, 32587/3 – 32588/1.

#### d. EPA Properly Weighed the Results of the Wildfire Submittal's Matching Day Analysis.

Sierra Club's arguments at Pet. Br. 52-56 that EPA should not have considered Michigan's matching day analysis also lack merit. Meteorology (*e.g.*, temperature, wind, sunlight) has a significant effect on ozone formation, and ozone levels in a given area should be similar on days with similar meteorology. Wildfire Guidance at 27; 88 Fed. Reg. at 32587/1. The logic of a matching day analysis is straightforward: since meteorologically similar days are likely to have similar ozone concentrations, significant differences in ozone concentrations among days with similar meteorology may indicate influences from non-typical sources, such as wildfire. Wildfire Guidance at 27. Matching day analyses therefore seek to identify potential wildfire impacts by comparing ozone levels on two different sets of days: days allegedly affected by smoke when the State collected data that it seeks to exclude; and days with similar meteorology that were *not* affected by wildfire smoke. 88 Fed. Reg. at 32587/1; Wildfire Guidance at 27. If the ozone levels are different on the days allegedly affected by wildfire smoke, that provides evidence to "support a clear causal

41

relationship between the fire and the monitored concentration[s]." Wildfire Guidance at 27.

Sierra Club argues that the Wildfire Submittal's matching day analysis is defective because Michigan did not properly explain its exclusion of days that the State believed to be affected by wildfire smoke, and that EPA therefore should not have concurred. This argument fails for two reasons.

First, the entire *point* of a matching day analysis is to determine whether ozone levels differ between days that allegedly are affected by wildfire smoke and days that are not. Michigan therefore properly discarded such days from the analysis, because comparing ozone levels on days that all are allegedly affected by wildfire smoke would not provide the information the analysis is designed to obtain.

Second, contrary to Sierra Club's allegations at Pet. Br. 54-55, EPA specifically reviewed Michigan's three-step method for identifying meteorologically similar days and excluding those that likely were affected by smoke based on, among other things, daily meteorological parameters, smoke maps and HYSPLIT trajectories.[8] 88 Fed.

---

[8] More specifically, Michigan first analyzed daily meteorological parameters such as temperature, relative humidity, wind speed, and wind direction aloft and at the surface. Second, Michigan determined threshold values for the meteorological parameters using the meteorological conditions measured on June 24-25, 2022, and if a day fell within the established thresholds the day was kept in the analysis. Third, for those remaining days, Michigan evaluated the similarity of conditions aloft, smoke maps, and HYSPLIT trajectories, to assess whether they may have been affected by smoke. Wildfire Submittal, at 53.

Reg. at 32587, 32590/1; Wildfire Submittal at 53. EPA need only explain how it considered Michigan's explanation for the exclusion of such days; EPA is not required to reconstruct the analyses underlying that explanation or perform duplicative HYSPLIT and smoke map analyses to reproduce the data underlying the Wildfire Submittal. *See also* 88 Fed. Reg. at 32590/1 ("Supporting documentation used in a matching day analysis to demonstrate a day has potential smoke influence is not subject to the same level of rigor and evaluation as described in the exceptional event rule for exceptional events.").

Sierra Club's objection that those maps and trajectories did not come from other Event Submittals also is inapposite. Pet. Br. at 54. Such submittals are rare and likely would not exist for most days affected by wildfire emissions, because States can only make such submittals for days on which affected data would have regulatory significance. 88 Fed. Reg. at 32590/1.

### e. EPA Reasonably Concurred with the Wildfire Submittal without a Photochemical Analysis.

Sierra Club's argument that EPA should not have concurred with the Wildfire Submittal without explaining why no photochemical analysis was necessary also lacks merit for two reasons. Pet. Br. 56-58. First, as Sierra Club acknowledges, the Wildfire Guidance does not require States to provide a photochemical analysis or to explain why they are not doing so. Instead, it provides that States *may* include a matching day analysis, statistical regression analyses, *or* a photochemical analysis, to provide

43

additional evidence supporting a clear causal relationship between wildfire smoke and the ozone exceedances they wish to exclude. Wildfire Guidance at 26. The Wildfire Guidance also expressly states that "EPA does not expect an air agency to prepare all identified analyses" and that "the submitting air agency and the EPA Regional office should discuss the appropriate level of evidence during the initial notification process." Wildfire Guidance at 26. There simply is no basis for Sierra Club to claim that a photochemical analysis or an explanation for its absence is required before EPA can concur with wildfire event submittals.

Second, like Sierra Club's LADCO argument, *supra* at 35-38, this argument is based on a misunderstanding of the weight of the evidence approach that EPA uses to determine whether to concur with an Event Submittal. *See* 88 Fed. Reg. at 32590/2. EPA weighs the totality of the evidence provided to determine whether wildfire emissions caused the ozone exceedances that a State desires to exclude, and no single analysis or piece of evidence is dispositive in this analysis. Wildfire Guidance at 3-4; 40 C.F.R. § 50.14(b)(4); *see supra* at 11-12, 13-14, 31, 35-36, 44. EPA weighed the totality of the evidence in Michigan's Wildfire Submittal—which included a matching day analysis, but not a photochemical or statistical regression analysis— and explained why it determined that it "sufficiently demonstrate[d] a clear causal relationship between the emissions generated by the McCafe, Melen, and Evan wildfires and the exceedances measured at the East 7-Mile monitoring station." TSD at 8; 88 Fed. Reg. at 32587/1 – 88/1, 32590/2-3.

* * *

For all of the foregoing reasons, EPA's concurrence with the Wildfire Submittal was reasonable and should be upheld. The Clean Data Determination should be upheld as well, because it is challenged solely on the ground that it relies upon that concurrence.

## II. EPA REASONABLY REDESIGNATED THE DETROIT AREA TO ATTAINMENT OF THE 2015 NAAQS.

In May 2023, EPA issued the Redesignation Rule, which redesignated the Detroit Area to attainment of the 2015 NAAQS pursuant to 42 U.S.C. § 7407(d)(3)(E). 88 Fed. Reg. at 32594. Sierra Club challenges the Redesignation Rule on the grounds that the first, third and fifth criteria in Section 7407(d)(3)(E) ("Redesignation Criteria") were not fulfilled.[9] 42 U.S.C. § 7407(d)(3)(E)(i), (iii), (v). Because EPA reasonably found that all three of those Criteria were fulfilled, the Redesignation Rule should be upheld.

### A. The First Redesignation Criterion Was Fulfilled.

The first Redesignation Criterion requires EPA to determine that "the area has attained the national ambient air quality standard." 42 U.S.C. § 7407(d)(3)(E)(i). EPA

---

[9] Sierra Club does not challenge EPA's Redesignation Rule under the second and fourth criteria in Section 7407(d)(3)(E)(ii) or (E)(iv), and any related arguments therefore are waived. *See Kuhn v. Washtenaw Cnty.,* 709 F.3d 612, 624-25 (6th Cir. 2013). Consequently, EPA's determinations that those second and fourth criteria were fulfilled are not before the Court, and this brief does not address them.

fulfilled that criterion by reasonably determining that the Detroit Area attained the 2015 NAAQS from 2019 through 2022.

Michigan based its Redesignation Submittal on monitoring data collected between 2019 and 2021, and Sierra Club does not dispute that the Detroit Area attained the 2015 NAAQS during that time. *See* 88 Fed. Reg. at 32601/3 - 02/1. EPA further determined that the Detroit Area attained the 2015 NAAQS through 2022 in the Clean Data Designation. *Id.* EPA therefore fulfilled the first Redesignation Criterion.[10]

### B.    The Third Redesignation Criterion Was Fulfilled.

The third Redesignation Criterion requires EPA to determine that the improvement in the Detroit Area's air quality is due to reductions in emissions resulting from implementation of permanent and enforceable control measures, such as SIP control measures, federal control measures (*e.g.*, auto emission controls), and other permanent and enforceable reductions. 42 U.S.C. § 7407(d)(3)(E)(iii). Sierra Club challenges this determination at Pet. Br. 82-91 based on erroneous allegations that EPA "fails to account for the very real possibility" and "disregard[s] the good possibility" that COVID-related emission reductions helped the Detroit Area attain

---

[10] If the Court does not uphold EPA's concurrence with the Wildfire Submittal and vacates it, that vacatur would undermine the critical determination that the Detroit Area was in attainment of the NAAQS prior to EPA's finalization of the Redesignation Rule. In that event, EPA agrees with Sierra Club that the Court need not evaluate the remainder of the arguments as to the validity of the Redesignation Rule and should vacate both rules. Pet. Br. at 59.

the 2015 NAAQS from 2019-2021, and on disagreements with the scientific conclusions that EPA reached from pertinent record data and analyses that the Agency carefully considered and explained in great detail. *See* Pet. Br. 87, 89; 87 Fed. Reg. at 14214/3 – 17/1 & Table 2 (proposed rule); 88 Fed. Reg. at 32603/1 – 32605/2 (final rule).

EPA carefully considered this issue throughout the entire redesignation process. Michigan did not make its Redesignation Submittal until January 2022, by which time EPA had all of Michigan's monitoring data for the time frame that Sierra Club is concerned about. 87 Fed. Reg. at 14210/2; TSD at 9 (Michigan monitoring data received in nearly real time). Before issuing the proposed rule, EPA also performed exhaustive analyses of the potential sources and amounts of the Detroit Area's emission reductions. 87 Fed. Reg. 14214/3 – 14217/3. Contrary to Sierra Club's assertions, EPA *did* identify specific emission reductions during that period that are attributable to various categories of permanent and enforceable federal and state control measures, including:

- 17,000 tons of NOx per year beginning in 2021 due to federal interstate transport requirements (*id.* at 14214/3 – 215/1);

- 2,716 tons/year of NOx emission reductions starting in May 2021 due to the closure of the DTE Energy River Rouge power plant (*id.* at 14216/1);

- VOC reductions due to the mandatory sale of low Reid Vapor Pressure gasoline in the Detroit Area during the summer months (*id.* at 14216/1-2);

- a portion of the 76% and 28% reductions in NOx and VOC emissions nationally from light vehicle and light trucks (*id.* at 14216/1-2);

- a portion of the 80% and 70% reductions in NOx and particulate matter ("PM") from fleet automobiles and 60% reductions required by NOx and PM standards for heavy duty vehicles (*id.* at 14215/2-3);

- a portion of the 2,570,000 and 115,000 tons of NOx and VOC emission reductions nationally, respectively, due to federal heavy duty diesel rules (*id.* at 14215/3);

- a portion of the 90% reduction in NOx emissions from nonroad diesel engines nationally due to a federal rule (*id.* at 14215/3 – 16/1);

- a portion of the 72% and 80% VOC and NOx emission reductions nationally from nonroad engines, respectively, due to a federal rule (*id.* at 14216/1); and

- a portion of the 80% NOx emission reductions nationally from marine engines due to federal standards (*id.*).

EPA also compared emissions from the Detroit Area in 2014, one of the years used to designate the area as nonattainment, against emissions from the Area in 2019, one of the years in which the area attained the 2015 NAAQS. In tons per ozone

season day,[11] VOC emissions fell from 335 tons/day in 2014 to 230.67 tons/day in 2019—a reduction of 104.33 tons/day. 87 Fed. Reg. at 14217. And $NO_X$ emissions fell even more significantly, from 456.51 tons/day in 2014 to 253.30 tons/day in 2019—a reduction of 203.21 tons/day. *Id.* EPA reasonably concluded these emissions decreases contributed to the gradual reductions in ozone concentrations in the Detroit Area, 88 Fed. Reg. at 32597, and notably, the 2019 emissions do not reflect any potential impact from the COVID pandemic.

In addition, when formulating the proposed rule, EPA closely examined the on-road emission inventory and the vehicle travel information (*e.g.*, vehicle miles traveled, vehicle age and vehicle population) that Michigan used to calculate emission reductions for the Redesignation Submittal (87 Fed. Reg. at 14216/2 – 17/1), and then—although it was not required to—EPA performed its own independent emission reduction analysis as well. 87 Fed. Reg. at 14216/3.

Moreover, EPA closely examined several additional analyses that Michigan performed to confirm that reductions were attributable to permanent and enforceable emission reductions. *Id.* at 14217. Two of these analyses were performed to ensure that reductions were not due to unusually favorable meteorology: a meteorological analysis based on data from 2000-2021 that showed decreasing ozone levels at the same time summer temperatures (an indicator of conditions favorable for ozone

---

[11] The Michigan ozone season runs for 246 days each year, from March through October. 88 Fed. Reg. at 32589.

formation) increased; and a CART/regression tree analysis that identified the meteorological conditions associated with high ozone concentrations in Detroit that confirmed a consistent trend of decreasing ozone levels on days with these conditions from 2005-2019. *Id.*

Finally, EPA examined two economic analyses that Michigan performed to assess whether NAAQS attainment during the COVID pandemic was attributable to pandemic-related economic changes (as Sierra Club argues) or to permanent and enforceable emission reductions. *Id.* at 14217/2-3. Both of these analyses, separately and in combination, showed that various economic conditions associated with the pandemic were correlated with each other, but that they were not correlated with the Detroit Area's ozone levels. *Id.*

EPA continued to closely examine these various issues in response to public comments on the proposed rule, and in the preamble to the Redesignation Rule itself. In response to comments, EPA obtained an updated CART/regression analysis that included data collected through 2020 and that examined even more weather variables. 88 Fed. Reg. at 32602 – 03/1. As before, the updated analysis found that ozone levels fell regardless of weather conditions. *Id.* EPA also carefully examined a dewpoint study provided by Sierra Club, but ultimately determined based on that study, the updated CART/regression analysis and other scientific evidence that decreases in the Detroit Area's ozone levels are attributable to decreases in ozone precursors instead of meteorology. *Id.* The decreases in ozone precursors, in turn, are attributable to the

permanent and enforceable emission controls that EPA examined so closely in the proposed rule.

EPA also performed additional analyses of its own using data from 2018 through 2022 to evaluate the effect of the pandemic on power plant emissions. This analysis showed reductions in power generation in April 2020, but generation levels were rebounding by the next month, May 2020. *Id.* at 32603/2-3. With the exception of April 2020, power generation also followed the same annual patterns from 2018 through 2022. *Id.*

In response to comments asserting that vehicle use "plummeted" during the pandemic, EPA also re-examined traffic (vehicle miles travelled or "VMT") through 2020. *Id.* at 32604/1. This analysis established that VMT dropped during a stay-at-home order from March through May 2020, but by June 2020 had returned to pre-pandemic levels. *Id.* Because most ozone exceedances in the Midwest occur between late May and late July, traffic levels were not reduced during the 2020 and 2021 ozone seasons on which Sierra Club bases its arguments. *Id.* EPA also explained in detail how, unlike in many other parts of the country, manufacturing did not stop in the Detroit Area; it shifted to different pandemic-related processes. *Id.* at 32604/2.

EPA ultimately concluded that "the Federally enforceable emission reduction measures were the main driving factor in the area coming into attainment." *Id.* at 32604/3. In response to various public comments, EPA also explained how the federal rules and programs detailed in the proposed rule (*supra,* at 47-50) already had

greatly reduced emissions of ozone precursors and would continue to do so for many years to come. *Id.* at 32604/3 – 05/3.

There can be no doubt that EPA clearly and fulsomely explained the record bases—including its consideration of contrary information and studies provided by Sierra Club and other public commenters—for its scientific determination that the Detroit Area's attainment of the 2015 NAAQS is the result of emission reductions attributable to permanent and enforceable control measures. And Sierra Club's contrary arguments all boil down to disagreements with the technical and scientific views and conclusions that EPA explained in the proposed and final Redesignation Rule. Pet. Br. 84-91. As this Circuit observed in *St. Mary's Cement*, however, the Court is at its most deferential in situations like this, and "arbitrary and capricious review does not ask who is right. It asks whether the EPA followed a defensible process in assessing who is right." 782 F.3d at 286. And EPA is required "only to have 'examine[d] the relevant data and articulate[d] a satisfactory explanation for its action.'" *St. Mary's Cement*, 782 F.3d at 285 (quoting *FCC v. Fox Television Stations, Inc.,* 556 U.S. 502, 513 (2009)). Because EPA clearly did so, the Agency fulfilled the third Redesignation Criterion.

### C. EPA Reasonably Found That the Fifth Redesignation Criterion Was Fulfilled.

The fifth Redesignation Criterion is fulfilled if the State that contains the area to be redesignated "has met all requirements applicable to the area under section 7410

[] and part D" of this subchapter. 42 U.S.C. § 7407(d)(3)(E)(v). Unlike the other four

Redesignation Criteria, which direct EPA to make certain determinations and

approvals, 42 U.S.C. § 7407(d)(3)(E)(i)-(iv), the fifth Redesignation Criterion imposes

an obligation on the State requesting redesignation. The State's role in the

redesignation process is fulfilled, and the 18-month clock for EPA to act begins

running, once the State provides a complete Redesignation Submittal to EPA. Thus,

under EPA's reasonable longstanding interpretation, EPA has construed the fifth

redesignation criterion to be satisfied if the State's complete submittal adequately

addressed all requirements applicable to redesignation as of the date on which it was

submitted. *See* Calcagni Memo. at 4-5; *see supra* at 9-10.

Appropriately applying this longstanding statutory interpretation, EPA

correctly found that the fifth Redesignation Criterion was fulfilled here, because

Michigan had met all requirements applicable to the Detroit Area under 42 U.S.C. §

7410 and §§ 7501-7514a (Part D) when it provided the complete Redesignation

Submittal to EPA on January 3, 2022. At that time, the Detroit Area was a Marginal

nonattainment area for the 2015 NAAQS, and Marginal ozone nonattainment areas

are not subject to reasonably available control technology ("RACT") requirements.[12]

42 U.S.C. § 7511a(a). Consequently, when the State provided its complete

---

[12] Michigan had previously satisfied the one-time RACT corrections requirement
imposed by 42 U.S.C. § 7511a(a)(2)(A). 88 Fed. Reg. at 32611/2.

Redesignation Submittal to EPA, it had no obligation to revise its SIP to impose RACT requirements for the 2015 NAAQS in the Detroit Area.

      1.        **EPA Applied the Best Contextual Reading of the Fifth Criterion.**

EPA's longstanding interpretation—viewing the fifth Redesignation Criterion as satisfied where the State's complete submittal adequately addresses all requirements applicable as of the date of submittal—is the best contextual reading of that Criterion. As Sierra Club acknowledges at Pet. Br. 63, the phrase "*has met* all requirements applicable to the area" in the fifth Redesignation Criterion is written in the present perfect tense. 42 U.S.C. § 7407(d)(3)(E)(v) (emphasis added); Pet. Br. 63-64. The present perfect tense has two uses, both of which are different from the present tense: it can either denote events that occurred in the past that have significance in the present day, or it can denote events that began in the past and continue to the present day. *Present Perfect,* COLLINS COBUILD ENGLISH DICTIONARY (2024); *Present Perfect,* CAMBRIDGE DICTIONARY (2024). While words are to be given the meaning that proper grammar and usage would assign them, the statutory language at issue does not provide any indication that Sierra Club's preferred interpretation—*i.e.*, the present perfect tense's second meaning—is the plainer or more proper grammatical usage.

Instead, in the context of 42 U.S.C. § 7407(d)(3)(E) and the redesignation process itself, the first meaning applied by EPA is the appropriate usage. Consistent with the rest of the redesignation process established by 42 U.S.C. § 7407(d)(3), the

plain language of subsection (d)(3)(E) instructs the State containing the nonattainment area to meet the requirements applicable to that area (*e.g.*, Marginal) at the time the State completes its role in the redesignation process (*i.e.,* provides its complete redesignation request to EPA). That action necessarily occurs before EPA can make the determinations required by the other four Redesignation Criteria (*i.e.*, in the past), but it retains significance until EPA take a final action redesignating the area. *Donovan v. FirstCredit, Inc.*, 983 F. 3d 246, 256 (6th Cir. 2020) ("The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole.") (quoting *Roth v. Guzman*, 650 F.3d 603, 614 (6th Cir. 2011)).

Sierra Club argues that because EPA reads, for example, the first Redesignation Criterion as requiring continued attainment to the present, it is unreasonable to apply a different interpretation to the fifth criterion's use of the present perfect tense. According to Sierra Club, there are "no differences" in context. Pet. Br. at 64. To the contrary, the first four Redesignation Criteria each are directed at EPA's role of reviewing the submittal that the State already provided. *Compare* 42 U.S.C. § 7407(d)(3)(E)(i)-(iv) (instructing the EPA Administrator to make certain determinations), *with* 42 U.S.C. § 7407(d)(3)(E)(v). But since the State completes its role in the redesignation process when it provides a complete submittal, the natural reading of what the State must include in its Submittal is to have met the requirements applicable to an area at the time it makes its Submittal. By Sierra Club's reading, the

55

scope of requirements that must be met by the State's Submittal are defined by the timing of EPA's eventual action. But the State cannot know, at the time of submittal, when EPA will act on its request during the 18-month window provided by 42 U.S.C. § 7407(d)(3)(D).

For all of these reasons, in context, EPA's longstanding interpretation of the phrase "has met all requirements applicable to the area" in the fifth Redesignation Criterion is the best one. Thus, EPA's interpretation may be affirmed even without consideration of the deference due to the Agency under *Chevron*. *See Guedes v. Bureau of Alcohol, Tobacco, Firearms and Explosives*, 45 F.4th 306, 313 (D.C. Cir. 2022) (when "traditional tools" of interpretation demonstrate that the agency's interpretation is "the best one," the court need not rely on deference to the Agency).

### 2. EPA's Reading is Permissible and Entitled to Deference.

At a minimum, EPA's reading of 42 U.S.C. § 7407(d)(3)(E)(v) is reasonable and should be upheld applying appropriate deference under *Chevron* or *Skidmore*. EPA first explained its reading more than 30 years ago, nearly contemporaneously with Congress' revisions to the redesignation requirements in the 1990 Clean Air Act Amendments. *See* Calcagni Memo. at 4-5. And since the 1990 Amendments, the States have implemented their obligations in reliance upon this interpretation, with the Agency consistently applying this interpretation in redesignations effectuated through

formal, public notice and comment rule makings like the one at issue in this case.[13]  88

Fed. Reg. at 32611/3 - 12/2.

Applying *Chevron*, the Court "need not find" that EPA's interpretation "is the

only permissible construction that EPA might have adopted," but only that "EPA's

understanding of this very complex statute is a sufficiently rational one to preclude a

court from substituting its judgment for that of EPA." *Chem. Mfrs. Ass'n v. Natural

Res. Def. Council, Inc.,* 470 U.S. 116, 125 (1985) (internal quotation marks omitted).[14]

Under either *Chevron* or *Skidmore*, EPA's construction of the fifth Redesignation

Criterion is persuasive and should be upheld.  CAA Section 107(d)(3)(D) requires

EPA to approve or deny a complete redesignation submittal within 18 months after

receipt.  42 U.S.C. § 7407(d)(3)(D).  CAA Section 110(k)(1)(B) and (k)(2) imposes the

---

[13] *See, e.g.*, 60 Fed. Reg. 12459, 12465-66 (Mar. 7, 1995) (final redesignation of Detroit-Ann Arbor); 68 Fed. Reg. 25418, 25424-27 (May 12, 2003) (final redesignation of St. Louis); 72 Fed. Reg. 13452, 13455-56 (Mar. 22, 2007) (supplemental proposal regarding pending redesignations of 18 areas in Michigan, Ohio, and West Virginia, finalized at 72 Fed. Reg. 27425 (May 16, 2007) (Michigan areas); 72 Fed Reg. 27640 (May 16, 2007), 72 Fed. Reg. 27644 (May 16, 2007), 72 Fed. Reg. 27648 (May 16, 2007), 72 Fed. Reg. 27652 (May 16, 2007) (Ohio areas); 72 Fed. Reg. 25967 (May 8, 2007) (Parkersburg-Marietta, WV); 72 Fed. Reg. 27060 (May 14, 2007) (Steubenville-Weirton, WV); 72 Fed. Reg. 27247 (May 15, 2007) (Wheeling, WV); 78 Fed. Reg. 48087, 48092 (Aug. 7, 2013) (proposed redesignation of Canton-Massillon, finalized at 78 Fed. Reg. 59258 (Sept. 26, 2013));  85 Fed. Reg. 14608, 14612 (Mar. 13, 2020) (proposed redesignation of Newport State Park Area in Door County, finalized at 85 Fed. Reg. 35377 (June 10, 2020)).

[14]  If the Court evaluates EPA's construction under the *Skidmore* doctrine, the Court accords that construction deference to the extent it has the power to persuade.  *Chao*, 540 F.3d at 527 (citing *Christensen*, 529 U.S. at 587 (2000)).

same time frame on EPA with respect to SIP submissions: up to 6 months to determine whether a SIP submission is complete, and 12 months thereafter to take final action. 42 U.S.C. § 7410(k)(1)(B), (k)(2).

Before EPA receives a SIP submission, however, the State must develop it through a state-level notice and comment rule making which is subject to challenge in the State courts. Even without such a challenge, the State process can easily take more than a year. Assuming the State immediately provides its proposed SIP to EPA, that submittal must be evaluated for completeness and then substantively reviewed and acted upon through a federal notice and comment rule making. Congress recognized that EPA would need up to six months for a completeness review, and then another year to conduct the rule making process. Assuming that the State's submittal is in fact complete, the combined State and federal time frame totals nearly three years.

Under EPA's reasonable construction, limiting the applicable requirements to those already due when the redesignation request is submitted avoids any potential conflict between these various time frames. Areas like Detroit, which came into attainment of a NAAQS after an attainment deadline (and therefore are reclassified by operation of law based on older air quality data while a Redesignation Submittal is pending), can still be redesignated to attainment within the 18-month statutory time frame for redesignation decisions.

In contrast, under Sierra Club's construction, upon reclassification such areas would have to develop and obtain EPA's approval of a new SIP for their pending Redesignation Submittal. And contrary to Sierra Club's arguments at Pet. Br. 78-79, it simply is not possible to do so within the CAA's 18-month redesignation time frame.[15] Therefore, either States would be deprived of the opportunity to obtain meritorious redesignations, or EPA would be deprived of the 18-month period that the CAA grants it to act on redesignation requests.

### D. Sierra Club's Objections to EPA's Reading of the Fifth Redesignation Criterion Lack Merit.

#### 1. CAA Section 7505a Does Not Conflict with EPA's Reading.

Contrary to Sierra Club's argument at Pet. Br. 65-66, the CAA Section 7505a maintenance plan provision supports EPA's reading. 42 U.S.C. § 7505a. The subsection that Sierra Club emphasizes, Section 7505a(c), shows that where Congress intended for States to make additional submittals during the redesignation process, it expressly instructed them to do so. Congress did not do so in 42 U.S.C. §

---

[15] Sierra Club greatly overestimates how much time States have to amend their SIPs following reclassification. Pet. Br. at 78-79. The CAA imposes a series of attainment deadlines for each ozone NAAQS that are calculated based on two things: an area's classification under that NAAQS and the date on which the area originally was designated as nonattainment. 42 U.S.C. § 7511(a)(1) Table 1. When an area is reclassified as a matter of law under Section 7511(b)(2), as the Detroit Area was, the area's new attainment deadline is calculated based on its new classification and the date on which it *originally* was designated. *Id.* § 7511a(i). For example, upon reclassification to Moderate nonattainment, the Detroit Area's attainment deadline became 2024 (*i.e.,* six years after 2018 when it originally was designated nonattainment)—not 2029 as Sierra Club claims in its brief.

7407(d)(3)(E), § 7410 or elsewhere in Part D.  EPA also has never disputed that

Moderate nonattainment requirements applied to the Detroit Area as soon as it was

reclassified.  Indeed, the Reclassification Rule expressly stated that those requirements

applied unless and until the Detroit Area was redesignated to attainment, and it set a

deadline for Michigan to make corresponding SIP submittals.  88 Fed. Reg. at 6634/2-

3; *see also* 88 Fed. Reg. at 32598/1; Calcagni Memo. at 4 n.3.  For the same reason, the

legislative history that Sierra Club discusses at Pet. Br. 66 n.13 does not conflict with

EPA's reading.

### 2. Prior Decisions from This Circuit Do Not Conflict with EPA's Reading.

This Circuit's decisions in *Wall v. EPA* and *Sierra Club v. EPA* also do not

conflict with EPA's reading, because they did not reach or opine on the specific

timing issue presented in this case.  In this case, the Detroit Area was reclassified by

operation of law while its Redesignation Submittal was pending.  In contrast, in the

*Wall v. EPA* case, Kentucky and Ohio were not so reclassified; the deficiency

identified by the Court was that they had not amended their SIPs to include

requirements that were *already due* before they sought redesignation.  265 F.3d at 433.

Similarly, in *Sierra Club v. EPA*, the three States that administer pollution controls for

the Cincinnati-Hamilton metropolitan area had not amended their SIPs to include

RACT requirements that were already due before they sought redesignation.  793 F.3d

at 659.  The statement in the *Wall* and *Sierra Club* decisions that "RACT provisions

'must be contained in SIPs submitted *with respect to redesignation requests*'" therefore is reasonably construed to be limited to the factual situation actually before the court in those cases: namely, States were subject to RACT requirements that were already due when the States were making their redesignation requests. *See Sierra Club,* 793 F.3d at 668-69 (emphasis added) (quoting *Wall*).

### 3. Sierra Club's Remaining Arguments Do Not Overcome the Deference Due to EPA's Long-Standing Reading of the Fifth Resignation Criterion.

Sierra Club's arguments at Pet. Br. 74-76 and 78-80 that EPA is frustrating the goals of the CAA by functionally extending Michigan's attainment deadline also lack merit. By definition, *any* area that seeks redesignation to attainment already has attained the pertinent NAAQS. The Detroit Area had been attaining the 2015 NAAQS when it made its Redesignation Submittal. It still was attaining that NAAQS when it was reclassified to Moderate nonattainment by operation of law, as that reclassification was based on earlier monitoring data.

Sierra Club's arguments at Pet. Br. 81-82 that EPA's reading will incentivize States to "game the system" lack merit as well. Only a *complete* redesignation submittal satisfies the fifth Redesignation Criterion, and applications like those that Sierra Club hypothesizes—with missing SIP components or fewer than three uninterrupted years of attainment—are not complete. While States conceivably could send such submittals to EPA, they would not be deemed complete until after the defects were remedied.

For all of these reasons, whether the Court evaluates the timing issue raised in this case for the fifth Redesignation Criterion under *Chevron* or *Skidmore*, EPA's reading is the most persuasive and its finding that that Criterion was satisfied should be upheld.

## <u>CONCLUSION</u>

For the foregoing reasons, EPA respectfully requests that the Court deny the consolidated petitions for review.

Respectfully Submitted,

TODD KIM
Assistant Attorney General

    /s/ Heather E. Gange
HEATHER E. GANGE
United States Department of Justice
Environment & Natural Resources
  Division
Environmental Defense Section
P.O. Box 7611
Washington, DC 20044-7611
(202) 514-4206

**CERTIFICATE OF COMPLIANCE WITH WORD LIMIT**

I certify that pursuant to Rule 32(a)(7)(C)(i) of the Federal Rules of Appellate Procedure and Sixth Circuit Rule 32, the foregoing brief is proportionately spaced, has a typeface of 14 points, and contains 14,557 words, exclusive of those parts of the brief exempted by Rule 32(a)(7)(B)(iii) and Sixth Circuit Rule 32.  I have relied on Microsoft Word's calculation feature.

Date: April 24, 2024                        /s/ Heather E. Gange
                                             Heather E. Gange

63

## CERTIFICATE OF SERVICE

I hereby certify that on this 24th day of April 2024, I served the foregoing Final

Brief for Respondents on registered counsel through the Court's electronic filing

system (ECF):

Ms. Nicholas Leonard: nicholas.leonard@glelc.org

Mr. Sanjay Narayan: sanjay.narayan@sierraclub.org

Mr. John Petoskey: jpetoskey@earthjustice.org

Ms. Elena Saxonhouse: elena.saxonhouse@sierraclub.org

Mr. Nicholas J. Schroeck: schroenj@udmercy.edu

Date: April 23, 2024        /s/ Heather E. Gange
       Heather E. Gange