Nos. 23-3581, 23-3583

_____

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

SIERRA CLUB,

*Petitioner,*

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY and
MICHAEL REGAN, Administrator, U.S. Environmental Protection Agency,

*Respondents.*

Petition for Review of the U.S. Environmental Protection Agency's
Final Rulemakings at 88 Fed. Reg. 32,584 (May 19, 2023) and
88 Fed. Reg. 32,594 (May 19, 2023)

## PETITIONER'S REPLY BRIEF

Elena Saxonhouse
Sanjay Narayan
SIERRA CLUB
2101 Webster Street, Suite 1300
Oakland, CA 94612
(415) 977-5765
elena.saxonhouse@sierraclub.org
sanjay.narayan@sierraclub.org

Nicholas Leonard
GREAT LAKES ENVIRONMENTAL
LAW CENTER
4444 Second Avenue
Detroit, MI 48201
(313) 782-3372
nicholas.leonard@glelc.org

*Counsel for Sierra Club*

Dated: June 3, 2024

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................. iii

GLOSSARY OF TERMS ..................................................................................................... vi

INTRODUCTION ...................................................................................................................1

ARGUMENT ...........................................................................................................................3

I.   EPA's Exceptional Event Approval Does Not Satisfy the Arbitrary and Capricious Standard Because Its Explanations Are Not Supported by the Administrative Record .........................................................................................................3

   A.   The Arbitrary and Capricious Standard Requires EPA to Provide Logical Explanations For Its Decisions, Supported by Relevant Evidence from the Administrative Record ...............................................................................4

   B.   EPA Has Not Explained How It Determined Smoke Impacted Air Quality in the Detroit Area Absent High Levels of Pollutants Commonly Associated with Wildfire Smoke, Such as Particulate Matter, Carbon Monoxide, and Brown Carbon ....................................................................7

      1.   EPA Must Provide More Than A Conclusory Explanation As to How Smoke Could be Present in the Detroit Area Despite the Absence of Abnormally Elevated Levels of Fine Particulate Matter and Carbon Monoxide ............................................................................8

      2.   EPA's Conclusion That There Were Abnormally Elevated Brown Carbon Pollution Levels During the Exceptional Event is Illogical and Contradicted by Record Evidence ...........................................10

   C.   EPA Has Failed to Point to Any Record Evidence to Support Its Decision to Exclude "Several Days" from Michigan's Matching Day Analysis....15

   D.   EPA Was Required to Examine Local Pollution Sources and Their Contribution to High Ozone Levels Pursuant to the Clear Causal Connection Standard ...............................................................................18

II.  EPA's Finding That Detroit's Attainment Was Due to Permanent and Enforceable Reductions Is Irrational Because EPA Did Not Demonstrate That Detroit Would Have Attained Absent Emissions Reductions Attributable to the Pandemic .......................................................................................23

A. EPA Was Required to Analyze Whether Permanent Emissions Reductions Were Enough to Account for Detroit's Attaining Ozone Levels ..................................................................................23

B. EPA Cannot Rationally Conclude that Permanent and Enforceable Emissions Reductions Fully Explain Monitored Attainment in 2019-21 ......26

  1. EPA's "Analysis" of the Effect of the Pandemic Has Key Gaps in Logic and Supporting Evidence ........................................................26

  2. EPA's Quantification of Federally Enforceable Pollution Reductions Does Not Suffice to Demonstrate Those Reductions Can Achieve Attainment on Their Own ..................................................................30

III. EPA Erred in Redesignating the Detroit Area Without Requiring Michigan to Issue RACT Rules First ..........................................................................31

A. The RACT Requirement is Part of Congress's Plan to Remove States' and EPA's Discretion in Favor of Mandatory Controls, and Has Value Even After Redesignation to Attainment ............................................32

B. The Statutory Text Does Not Support EPA's or Amici's Reading of the Prerequisites for Redesignation..........................................................36

  1. Standard of Review ...................................................................36

  2. The Text of the Fifth Redesignation Criterion is Clear That the State Must Be Meeting Present-Day Area Requirements at the Time EPA Approves a Redesignation...............................................................37

    a. "Has Met"....................................................................37

    b. "Applicable"................................................................40

  3. Related Statutory Text Directly Contradicts EPA's Interpretation ........42

C. EPA's Concern about "Meritorious" Redesignation Applications Being Delayed is Overblown and Fails to Overcome Statutory Text ................44

CONCLUSION ...............................................................................................47

CERTIFICATE OF COMPLIANCE ................................................................48

CERTIFICATE OF SERVICE .........................................................................49

# TABLE OF AUTHORITIES

**Cases**

*Al-Koorwi v. Barr*, 837 F. App'x 323 (6th Cir. 2020)..............................................21

*Bahr v. Regan*, 6 F.4th 1059 (9th Cir. 2021) ...........................................................6

*Bangura v. Hansen*, 434 F.3d 487 (6th Cir. 2006) ................................. 5, 10, 15, 18

*Calvert v. Firstar Fin., Inc.*, 409 F.3d 286 (6th Cir. 2005) ....................................22

*Chevron v. Nat. Res. Def. Council (NRDC)*, 467 U.S. 837 (1984).........................36

*Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402 (1971) ..................5

*Commonwealth of Ky. v. EPA,* No. 96-4274, 1998 WL 661138 (6th Cir. Sept. 2, 1998) .........................................................................................................................38

*Conn. Light & Power Co. v. Nuclear Regul. Comm'n*, 673 F.2d 525 (D.C. Cir. 1982) .........................................................................................................................16

*Cozzie v. Metro. Life Ins. Co.*, 140 F.3d 1104 (7th Cir. 1998) .................................6

*Davila-Bardales v. Immigr. & Naturalization Serv.*, 27 F.3d 1 (1st Cir. 1994)......21

*Dep't of Com. v. New York*, 139 U.S. 2551 (2019) .................................................14

*Dixie Pine Products Co. v. Md. Casualty Co.*, 133 F.2d 583 (5th Cir. 1943).........19

*Donovan v. FirstCredit, Inc.*, 983 F. 3d 246 (6th Cir. 2020)..................................36

*Elliot v. Metro. Life Ins. Co.*, 473 F.3d 613 (6th Cir. 2006) .....................................7

*Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527 (1995) ...............................................................................................................................19

*Ky. Riverkeeper, Inc. v. Rowlette*, 714 F.3d 402 (6th Cir. 2013) ...........................10

*Landgraf v. USI Film Products*, 511 U.S 244 (1994)..............................................40

*McDonald v. W.S. Life Ins. Co.*, 347 F.3d 161 (6th Cir. 2003) ................................5

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983).9, 10, 15, 23

*NRDC v. EPA*, 777 F.3d 456, 460 (D.C. Cir. 2014) ...............................................33

*Ne. Ohio Reg. Sewer Dist. v. EPA*, 411 F.3d 726 (6th Cir. 2005) ............................5

*Paroline v. United States*, 572 U.S. 434 (2014) ..................................................19

*Roth v. Guzman*, 650 F.3d 603 (6th Cir. 2011) ...................................................37

*S. Coast Air Quality Mgmt. Dist. ("SCAQMD") v. EPA*, 472 F.3d 882 (D.C. Cir. 2006). ........................................................................................... 32, 33, 34

*Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666 (9th Cir. 2011) .......10

*Sierra Club v. EPA*, 375 F.3d 537 (7th Cir. 2004) .......................................... 41, 42

*Sierra Club v. EPA*, 60 F.4th 1008 (6th Cir. 2023) ...............................................34

*Sierra Club v. EPA*, 774 F.3d 383 (7th Cir. 2014) .................................... 23, 25, 38

*Sierra Club v. EPA*, 793 F.3d 656 (6th Cir. 2016) .................................... 33, 41

*Skidmore v. Swift & Co.*, 323 U.S. 134 (1944) ....................................................36

*Sw. Elec. Power Co. v. EPA*, 920 F.3d 999 (5th Cir. 2019) ..................................26

*Wall v. EPA*, 265 F.3d 426 (6th Cir. 2001) ............................................. 35, 40, 41

*Williams v. Int'l Paper Co.*, 227 F.3d 706 (6th Cir. 2000) ......................................5

*Wolverine Pipe Line Co. v. Dep't of Transp.*, 69 F.4th 365 (6th Cir. 2023). ............5

**Statutes**

42 U.S.C. § 7407(d)(3) .............................................................................................3

42 U.S.C. § 7407(d)(3)(D) ......................................................................................39

42 U.S.C. § 7407(d)(3)(E) ............................................................................ 1, 39, 40

42 U.S.C. § 7407(d)(3)(E)(ii) ..................................................................................42

42 U.S.C. § 7407(d)(3)(E)(iii) .................................................................................24

42 U.S.C. § 7407(d)(3)(E)(iv) ..................................................................................43

42 U.S.C. § 7407(d)(3)(E)(v) ................................... 2, 3, 31, 36, 37, 39, 40, 41, 43

42 U.S.C. § 7410(a)(1) ...........................................................................................35

42 U.S.C. § 7410(a)(2)(E)(i) ...................................................................................39

42 U.S.C. § 7505a(c) .................................................................................. 42, 43, 44

42 U.S.C. § 7505a(d) ...................................................................... 3, 35, 36

42 U.S.C. § 7511(a) ...............................................................................45

42 U.S.C. § 7511a(b)(1)(A)(i) ...............................................................32

42 U.S.C. § 7511a(b)(2) ....................................................................3, 32

42 U.S.C. § 7511a(f) ...............................................................................3

42 U.S.C. § 7619 ...................................................................................19

42 U.S.C. § 7619(b)(3)(A)(i) ...................................................................3

42 U.S.C. § 7619(b)(3)(B)(ii) ..................................... 4, 18, 19, 22, 23

42 U.S.C. § 7619(b)(3)(B)(iv) ................................... 4, 18, 19, 22, 23

**Regulations**

40 C.F.R. § 50.14(a)(1)(i)(A) ...................................................................1

40 C.F.R. § 51.1318 ................................................................................1

66 Fed. Reg. 33,505 (June 22, 2001) ...................................................46

66 Fed. Reg. 53,665 (Oct. 23, 2001) ....................................................46

72 Fed. Reg. 13,560 ................................................................................3

75 Fed. Reg. 45,210 (Aug. 2, 2010)......................................................27

81 Fed. Reg. 26,697 (May 4, 2016) ......................................................46

88 Fed. Reg. 32,584 (May 19, 2023) .................................. 1, 7, 12, 17, 18

88 Fed. Reg. 32,594 (May 19, 2023) .................................. 1, 25, 27, 29

88 Fed. Reg. 6,633 (Feb. 1, 2023) ........................................................45

# GLOSSARY OF TERMS

| | |
|---|---|
| EGLE | Michigan Department of Environment, Great Lakes, and Energy |
| EPA | United States Environmental Protection Agency |
| NAAQS | National Ambient Air Quality Standard |
| NOx | Nitrogen Oxides |
| $PM_{2.5}$ | Fine Particulate Matter |
| RACM | Reasonably Available Control Measures |
| RACT | Reasonably Available Control Technology |
| SIP | State Implementation Plan |
| VOCs | Volatile Organic Compounds |

# INTRODUCTION

Respondents and their supporting amici misread the standard of review, the record, the Clean Air Act ("Act"), and this Court's precedent to allow the United States Environmental Protection Agency ("EPA") far more flexibility than is lawful in excusing both high air pollution readings and a state's mandatory obligations under the Act. None of the three decisions challenged in this case, which collectively allow the state to avoid adopting improved pollution controls for the Detroit area, should stand.[1]

EPA responds to Sierra Club's claim that the agency erred in finding that Detroit's air quality had improved enough by 2022 to warrant the Clean Data Determination and Redesignation – which required tossing out two days of high ozone readings purportedly influenced by wildfire smoke – largely by characterizing the issues as technical, and demanding deference. *See* Respondents' Brief ("Resp. Br.") at 26-43. EPA repeats this approach in defending its determination that the air quality improvement was due to "permanent and

---

[1] EPA issued two rulemakings challenged in this direct appeal, one making a Clean Data Determination for the Detroit ozone nonattainment area ("Detroit Area") pursuant to 40 C.F.R. § 51.1318 ("Clean Data Determination"), and excluding certain air monitoring data in doing so pursuant to 40 C.F.R. § 50.14(a)(1)(i)(A) ("Exceptional Event Approval"). *See* 88 Fed. Reg. 32,584 (May 19, 2023). The other challenged rulemaking redesignated the Detroit Area to "attainment" pursuant to 42 U.S.C. § 7407(d)(3)(E) ("Redesignation"). *See* 88 Fed. Reg. 32,594 (May 19, 2023).

enforceable" emissions reductions, even though the COVID-19 pandemic temporarily suppressed emissions during the same time period. *Id.* at 46-52. The Administrative Procedures Act ("APA") requires, however, that EPA provide a rational basis for its decisions, including a logical explanation based on the administrative record. Even where the subject matter is technical or scientific, EPA must demonstrate that it has engaged in reasoned decision-making. Here, EPA has failed to do so, relying on multiple conclusions that are not supported by evidence in the record and dismissing contradictory evidence with mere conclusory statements. Each of the challenged decisions should be vacated and remanded on the basis of the record-related claims alone.

EPA's Redesignation must be vacated for another, independent, reason: EPA unlawfully approved the Redesignation absent the state first adopting more stringent emissions limits based on Reasonably Available Control Technology ("RACT"). Section 7407(d)(3)(E)(v) requires that EPA determine the state "has met all requirements applicable" to the nonattainment area. Though EPA concedes the RACT requirement applied to the Detroit Area as soon as it became a Moderate nonattainment area, and prior to EPA's decision on the Redesignation, EPA claims that a state's obligations to meet nonattainment area requirements are frozen in time at the point the state submits its redesignation request. But EPA and amici fail to provide support for this statutory interpretation from the actual text of the

provisions at issue, 42 U.S.C. §§ 7407(d)(3)(E)(v) (which uses the present perfect tense, rather than referring to a state's obligations at a prior point in time) and 7511a(b)(2) and (f) (which mandate RACT for Moderate areas without exception). Further, they disregard other language in §§ 7407(d)(3) and 7505a(d) demonstrating that the relevant point in time to assess whether the state met its area requirements is the date of EPA's decision to approve or deny the redesignation. EPA leans on its 18-month deadline to approve or deny the request and its policy concern that nonattainment areas meeting air quality standards will be unable to get redesignated before a new "bump-up" in nonattainment status is upon them. Even if these concerns could supersede the text of the provisions above, they are in any event ill-founded. EPA and states have multiple options to timely satisfy the Act's deadlines.

## ARGUMENT

**I. EPA's Exceptional Event Approval Does Not Satisfy the Arbitrary and Capricious Standard Because Its Explanations Are Not Supported by the Administrative Record**

In the preamble to its rules governing the exclusion of air quality data influenced by exceptional events, EPA noted the Act required that the rules make the protection of public health the highest priority. 72 Fed. Reg. 13,560, 13,569, 13,574 (Mar. 22, 2007); 42 U.S.C. § 7619(b)(3)(A)(i). To bring this principle to life, the Act requires EPA to meet a strict standard by finding there is a "clear

3

causal relationship" between the exceptional event and the exceedance of the air quality standard and that the exceedance is "directly due" to the exceptional event. 42 U.S.C. §§ 7619(b)(3)(B)(ii), (iv). The reason for this strict standard is simple: an exceptional event determination strips the Act's protections for nonattainment areas from communities with pollution that exceeds a health-based air quality standard. Rather than comply with the strict contours of the Act, EPA has urged this Court to defer to its conclusions, invoking the "weight of evidence" approach identified in EPA guidance. The "weight of evidence" approach is not set forth in any statute or regulation, and does not relieve EPA of its obligations to establish a "clear causal relationship" between the wildfire smoke and the ozone exceedances during the proposed exceptional event. Nor does it relieve EPA from satisfying arbitrary and capricious review, which requires EPA to not just acknowledge contrary evidence, but to logically explain how it weighed the evidence in the administrative record and came to its conclusions. It has failed to do so.

A. **The Arbitrary and Capricious Standard Requires EPA to Provide Logical Explanations For Its Decisions, Supported by Relevant Evidence from the Administrative Record**

Throughout its brief, EPA urges this Court to uphold its determinations because they are based on "complex scientific analyses." Resp. Br. at 33. However, Sierra Club is not asking the Court to review highly technical information and substitute its judgment for that of EPA; it is simply asking for this Court to ensure

that EPA's explanations for its conclusion are logical and that they are based on evidence in the administrative record.

The arbitrary and capricious standard under the APA is not a "rubber stamp" that excuses EPA from a thorough judicial review. *McDonald v. W.S. Life Ins. Co.*, 347 F.3d 161, 169, 172 (6th Cir. 2003) (quoting *Williams v. Int'l Paper Co.*, 227 F.3d 706, 712 (6th Cir. 2000)); *see also Wolverine Pipe Line Co. v. Dep't of Transp.*, 69 F.4th 365 (6th Cir. 2023). While EPA may be granted some degree of deference, the Court must still undergo a "searching and careful" examination of the agency's decision, along with the administrative record, to ensure that the agency has examined the relevant evidence and provided a satisfactory explanation for its decision based on that evidence. *Ne. Ohio Reg. Sewer Dist. v. EPA*, 411 F.3d 726, 732 (6th Cir. 2005) (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971)); *see Bangura v. Hansen*, 434 F.3d 487, 502 (6th Cir. 2006).

Here, EPA failed to provide logical explanations, based on evidence in the administrative record, for four conclusion that are crucial for its Exceptional Event Approval:

- EPA failed to explain how smoke could be present in the Detroit Area despite counter-evidence – the lack of elevated levels of fine particulate

matter and carbon monoxide – strongly supporting a conclusion that smoke was *not* present in the Detroit Area;

- EPA asserted that brown carbon pollution, which is a component of wildfire smoke, was abnormally elevated during the exceptional event despite no support for that assertion in the administrative record;

- EPA approved Michigan's decision to omit several days from its matching day analysis despite there being no evidence in the administrative record even identifying what days those were, let alone supporting the state's choice, and;

- EPA failed to explain why Michigan need not examine the impact of local sources of pollution, despite such analyses being commonly included in exceptional event demonstrations for areas with significant, local sources of air pollution and despite EPA acknowledging that such sources could be responsible for high ozone concentrations at the East 7 Mile monitor.

Unlike the petitioners' claims in *Bahr v. Regan*, 6 F.4th 1059 (9th Cir. 2021), none of these issues invokes the substance of EPA's technical expertise. As such, none of the issues raised regarding the Exceptional Event Approval are the type that call on the Court to afford deference to EPA. Instead, they fall squarely within the "teeth" of judicial review. *Cozzie v. Metro. Life Ins. Co.*, 140 F.3d 1104, 1107-08 (7th Cir. 1998).

EPA has made clear that it relied on its analysis of surface-level brown carbon pollution data and a matching day analysis, both of which are mentioned by EPA guidance as factors to consider, to determine that a clear causal relationship exists between wildfire smoke and the monitored ozone exceedances. 88 Fed. Reg. at 32,587. Since EPA relied on both of these pieces of evidence in its Exceptional Event Approval, a finding by this Court that EPA's consideration of either of these required analyses was arbitrary and capricious will warrant vacatur and remand of its decision for EPA to deny the exceptional event request if it cannot explain how the evidence supports its finding of a clear causal relationship. *See* ARC-62 (Exceptional Events Guidance) at 3, 26 [App. __, __]; *Elliot v. Metro. Life Ins. Co.*, 473 F.3d 613 (6th Cir. 2006) (finding that remand is a proper remedy when a determination is arbitrary and capricious).

**B. EPA Has Not Explained How It Determined Smoke Impacted Air Quality in the Detroit Area Absent High Levels of Pollutants Commonly Associated with Wildfire Smoke, Such as Particulate Matter, Carbon Monoxide, and Brown Carbon**

As mentioned by EPA guidance, abnormally elevated concentrations of pollutants that are components of wildfire smoke, such as fine particulate matter ($PM_{2.5}$), carbon monoxide (CO), and brown carbon, are relevant factors in an exceptional event analysis. ARC-62 at 14, 22 [App. __, __]. If the arrival of wildfire smoke coincides with elevated levels of these pollutants, it can be evidence that illustrates the smoke was present at ground-level and impacted ozone

7

concentrations. *Id.* at 14-15 [App. __]. EPA concedes that $PM_{2.5}$ and CO levels were not elevated on June 24 and 25, but still has not explained why, and has failed to draw rational conclusions from the brown carbon data in the record.

1. **EPA Must Provide More Than A Conclusory Explanation as to How Smoke Could be Present in the Detroit Area Despite the Absence of Abnormally Elevated Levels of Fine Particulate Matter and Carbon Monoxide**

EPA's guidance regarding the preparation of exceptional event demonstrations notes that fires typically generate emissions of a number of pollutants, including CO and $PM_{2.5}$. ARC-62 at 22 [App. __]. At the direction of this guidance, Michigan utilized a screening analysis developed by the Lake Michigan Air Directors Consortium ("LADCO"), which endeavors to show whether there were abnormally high levels of $PM_{2.5}$ and CO that accompanied high levels of ozone pollution. ARC-02 (Michigan 2022 Exceptional Event Demonstration) at 51-52 [App. __]. If so, this may be evidence that wildfire smoke was present in a given area. However, in this case the LADCO analysis showed there *were not* abnormally high levels of $PM_{2.5}$ and CO during the exceptional event, which is evidence that wildfire smoke *was not* present in the Detroit Area on June 24 and 25, 2022. *Id.* In the past, EPA has refused to concur with exceptional event submittals accompanied by a LADCO analysis that was *more* supportive of the presence of wildfire smoke than that provided in Michigan's submittal. *E.g.*, ARC-31 (Great Lakes Environmental Law Center and Sierra Club Comments on

8

Proposed Clean Data Determination) at 26-27 [App. __] (noting that EPA issued a non-concurrence letter for an Ohio exceptional event demonstration despite the submittal including a LADCO analysis that found two of the three pollutants – ozone and $PM_{2.5}$ – were abnormally elevated).

EPA does not dispute that the lack of elevated levels of $PM_{2.5}$ and CO is evidence that runs counter to their conclusion that wildfire smoke impacted the East 7 Mile monitor during the days in question. Resp. Br. at 38. Instead, EPA responds that it "acknowledged and considered" that counter-evidence, but chose to rely on brown carbon data to support its determination that wildfire smoke was present in the Detroit Area and impacted the East 7 Mile monitor. *Id.*[2]

Under the arbitrary and capricious standard, EPA must do more than "acknowledge and consider" this evidence. It must also articulate a rational connection between the facts found and the choice made here, i.e., how wildfire smoke could be present in the Detroit Area without elevated levels of key pollutants whose absence, under EPA guidance, generally contradicts the presence of such smoke. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). In other words, how could EPA conclude that smoke is present when there are elevated levels of one indicator pollutant but not elevated levels of

---

[2] EPA's conclusions based on the brown carbon are not supported by the administrative record, in any event, as discussed in section I.B.2.

other indicator pollutants? EPA does not claim to have answered this question; it says only that it "acknowledged and considered" this evidence. Resp. Br. at 37-38. That bare conclusory statement, without any explanation as to why EPA chose to disregard this important evidence, is straightforward arbitrary and capricious. *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 42; *Bangura*, 434 F.3d at 502; *see also Ky. Riverkeeper, Inc. v. Rowlette*, 714 F.3d 402, 411 (6th Cir. 2013) (noting that conclusory final-decision statement that disregards relevant evidence fails to satisfy arbitrary and capricious review); *Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666, n.35 (9th Cir. 2011) (failure to address counter-evidence with an articulable explanation "raises questions" about the decision-making process and may indicate "a failure to consider relevant evidence.").

### 2. EPA's Conclusion That There Were Abnormally Elevated Brown Carbon Pollution Levels During the Exceptional Event is Illogical and Contradicted by Record Evidence

Despite the absence of elevated levels of $PM_{2.5}$ and CO, EPA has asserted that the "presence of brown carbon" – which is both emitted by local pollution sources and a byproduct of wildfire smoke – during June 24 and 25 was evidence that smoke was present in the Detroit Area and had a clear causal effect on ozone concentrations. Even if accurate, EPA's conclusion would still be unreasonable because of its failure to account for the absence of elevated concentrations of other pollutants it commonly associated with wildfire smoke. But in any event, the

record squarely contradicts EPA's claims regarding the present of abnormally elevated concentrations of brown carbon in the Detroit Area.

Since brown carbon is a component of wildfire smoke, abnormally elevated levels of brown carbon pollution will coincide in both time and place with the presence of smoke. ARC-62 at 14-15 [App. ___]. To assess the presence of brown carbon pollution during the exceptional event period, EPA relied upon a single graph which illustrates the short-term, 1-hour concentrations of brown carbon pollution measured by an air quality monitor in Dearborn, Michigan:



**FIGURE 33. Time-series of hourly average Black Carbon and Brown Carbon at the Dearborn monitoring site.**

Figure 1. Concentrations of Brown Carbon Measured in Dearborn June 21-28, 2022 (ARC-02 at 41 [App. ___]).

For the brown carbon data provided in Figure 1 above to logically support EPA's conclusion that wildfire smoke clearly caused the ozone exceedances on June 24 and 25, it must show that there were abnormally elevated levels of brown carbon pollution for the duration of both exceptional event days. In an attempt to explain how the brown carbon data provided in Figure 1 supports the conclusion that wildfire smoke was present throughout June 24 and 25, EPA posits that wildfire smoke came into the region but remained in the upper atmosphere above ground levels on June 23 before dropping to ground level on June 24 and 25. Resp. Br. at 40. Based on this explanation, one would expect brown carbon pollution measured by ground level monitors to be low on June 23. In fact, the opposite occurred and brown carbon pollution was at its highest on June 23 – the day *before* the exceptional event and when EPA asserted wildfire smoke was not present at ground level. ARC-02 at 41 [App. __].

Nor is there any evidence to support the latter portion of EPA's claim: that brown carbon fell to the ground and remained there on June 24 and 25. Resp. Br. at 40; 88 Fed. Reg. at 32,586. To support this claim, EPA asserts that elevated concentrations of brown carbon pollution were present throughout June 24 and 25. 88 Fed. Reg. at 32,586. But as Figure 1 illustrates, brown carbon pollution levels were generally very low on both days – indicating wildfire smoke *was not* present during the claimed exceptional event. ARC-02 at 41 [App. __]. Thus, the record

12

directly contradicts EPA's stated rationale: EPA claims that brown carbon was in elevated atmospheric levels on June 23 – the day before the exceptional event - but the record indicates it was at ground level. And EPA claims that this brown carbon fell from the atmospheric level to the ground level and remained there for the duration of the exceptional event on June 24 and 25, but the record indicates brown carbon pollution was generally low during this time period.

Nor can EPA bolster its unfounded conclusion that wildfire smoke was present based on record evidence other than the brown carbon data. In its amicus brief, the Midwest Ozone Group asserts that satellite imagery nonetheless supports EPA's conclusion that wildfire smoke was present in the Detroit area throughout the exceptional event period. Midwest Ozone Grp. Br. at 17. EPA guidance instructs that a combination of satellite imagery and surface-level air monitoring data for smoke indicator pollutants, such as brown carbon data, can be evidence that wildfire smoke was present. ARC-62 at 14-15 [App. __]; *see also* Resp. Br. at 37. But again, a non-technical review of the administrative record demonstrates this is plainly false. The satellite imagery provided in Michigan's exceptional event demonstration shows no smoke in the entire Southeast Michigan region at approximately 5:01pm Eastern Time on June 24:



Figure 2. Satellite Imagery for June 24, 2022 (ARC-02 at 45 [App. ___]).

EPA's failure to provide logical support for its conclusion that there was wildfire smoke in the Detroit area despite a lack of evidentiary support from the LADCO analysis, brown carbon data, and the satellite imagery for June 24 renders its conclusion arbitrary and capricious. *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2575 (2019) (when the explanation for agency action "is incongruent with what the record reveals," it is arbitrary and capricious).

Even if EPA had properly concluded that based on evidence in the administrative record that there were elevated levels of brown carbon pollution in the Detroit Area during the claimed exceptional event, it still must show brown carbon levels were *abnormal* to indicate that the pollution was due to an unusual source, such as wildfire smoke, and not local pollution sources. To assess whether brown carbon levels were abnormal, basic logic requires EPA to examine how

14

such pollution during the proposed exceptional event deviated from the historical norm. EPA has not done so. Instead, it claims such an analysis is not required by its guidance. Resp. Br. at 39-40. In fact, the guidance *does* identify as a relevant factor examining whether pollutants "have increases or differences in typical behavior that indicate the wildfire's emissions influenced the monitor." ARC-62 at 22 [App. __]. Since EPA has not provided evidence of the area's "typical" brown carbon pollution levels, as required by EPA guidance (and basic logic), its conclusion that wildfire smoke was in the area based on abnormal brown carbon levels during the exceptional event period is arbitrary and capricious. *See Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 42; *Bangura*, 434 F.3d at 502.

### C. EPA Has Failed to Point to Any Record Evidence to Support Its Decision to Exclude "Several Days" from Michigan's Matching Day Analysis

To support its exceptional event demonstration, Michigan provided a matching day analysis that compares ozone levels on previous days with similar meteorological conditions to those that existed during the exceptional event period. Petitioner's Brief ("Pet. Br.") at 31; ARC-02 at 53-59 [App. __]. If ozone levels are higher during the exceptional event period compared to other days with similar meteorological conditions, that is considered indirect evidence that something atypical, like wildfire smoke, could be impacting the ozone levels. Michigan omitted "several days" from its matching day dataset due to "potential smoke

influence" based on smoke maps and trajectory analyses that predict the travel pathways of smoke plumes. ARC-02 at 53 [App. __]. Nowhere in the record before either the state or EPA does Michigan specify which days were excluded. Sierra Club argued that since Michigan did not include evidence to support the omission of several unspecified days from its matching day analysis, EPA could not reasonably rely on Michigan's analysis to support its conclusions. Pet. Br. at 52-55.

EPA does not dispute that the evidence to support the exclusion of several days from the matching day analysis is not in the administrative record. Nonetheless, it argues that it is proper for Michigan to exclude days impacted by wildfire smoke from the analysis and that EPA reviewed Michigan's methodology for assessing smoke impacts and determined it was acceptable. Resp. Br. at 42-43.

The issue is not, however, whether it is acceptable to exclude certain days from a matching day analysis due to smoke impacts or whether EPA failed to review Michigan's methodology. Instead, the issue is that under the arbitrary and capricious standard EPA is required to base its decisions on information in the administrative record. This basic requirement exists to ensure that agencies make reasoned decisions, but also enables public participation in agency decision-making and effective judicial review. *See Conn. Light & Power Co. v. Nuclear Regul. Comm'n*, 673 F.2d 525, 530 (D.C. Cir. 1982) (noting that it is important for

16

an agency to "identify and make available technical studies that is has employed" to allow a "genuine interchange"). Petitioner has noted repeatedly to both Michigan and EPA that it is impossible for anyone to conclude that the matching day analysis supports the exceptional event demonstration without knowing which days were excluded from that analysis and without reviewing the evidence Michigan relied on to determine it was proper to omit those days, which in turn could drastically alter the ultimate results of the analysis. ARC-02, App. C (Comments on Michigan's Draft Exceptional Event Demonstration) at 9 [App. __]; ARC-31 at 28 [App. __]. EPA noted that the "[s]upporting documentation used in a matching day analysis to demonstrate a day has potential smoke influence is not subject to the same level of rigor and evaluation as described in the exceptional event rule." 88 Fed. Reg. at 32,590. EPA gives no reason other than its say-so for a lower level of rigor.

In any case, certainly the arbitrary and capricious standard requires EPA to apply *some* level of rigor when evaluating the supporting documentation for a matching day analysis. At a minimum, EPA was required to review the evidence Michigan relied upon to exclude certain days from the matching day analysis. However, EPA could not have done this because Michigan never presented such information. Without this information, EPA could not have engaged in reasoned decision-making regarding the matching day analysis, making its Exceptional

Event Approval arbitrary and capricious. *Bangura*, 434 F.3d at 502 (noting that when an agency fails to examine relevant evidence then its decision is arbitrary and capricious).

### D. EPA Was Required to Examine Local Pollution Sources and Their Contribution to High Ozone Levels Pursuant to the "Clear Causal Relationship" Standard

In the Exceptional Event Approval, EPA acknowledged that local pollution sources could have "potentially contributed to the higher ozone concentrations." 88 Fed. Reg. at 32,590. Nonetheless, EPA stated that it did not have to assess the contribution of local pollution sources to ozone levels during the exceptional event because this type of analysis is not always required per its guidance. Resp. Br. at 43-44. But the question is not whether EPA is *always* required to assess local pollution sources for its exceptional event determinations; it is whether it was required to do so *in this case* and more specifically whether its explanation as to why it refused to do so satisfies the arbitrary and capricious standard.

The Clean Air Act requires EPA to find "a clear causal relationship" between the measured exceedance of the ozone air quality standard and the exceptional event "to demonstrate that the exceptional event caused a specific air pollution concentration at a particular air quality monitor location." 42 U.S.C. § 7619(b)(3)(B)(ii). It also requires that the exceedance of the ozone standard be "directly due" to the exceptional event. *Id.* § 7619(b)(3)(B)(iv). When Congress

18

speaks to the existence of a causal relationship in a statute – as Congress has done with the "clear causal relationship" and "directly due" language – the Supreme Court has found it encompasses proximate causation between the event and the result, or in this case the wildfire smoke and the exceedance of the ozone standard. *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 536 (1995) (reading the statutory phrase "caused by" as incorporating a proximate causation requirement); *Dixie Pine Products Co. v. Md. Casualty Co.*, 133 F.2d 583, 585 (5th Cir. 1943) ("It is well settled that the words 'direct cause' ordinarily are synonymous in legal intendment with 'proximate cause[.]'"); *Paroline v. United States*, 572 U.S. 434, 444 (2014) ("The idea of proximate cause . . . generally refers to the basic requirement that . . . there must be some direct relation between" the event and the resulting outcome) (internal citations and quotation marks omitted). The use of the qualifiers "clear" and "direct' in the Act's causation standard as well as Congress' expressed statutory principle that "protection of public health is the highest priority" are key indications that the plain language of 42 U.S.C. § 7619 calls on EPA to find that wildfire emissions were the proximate cause of the ozone exceedances.

Under any interpretation of the causation standard in 42 U.S.C. § 7619(b)(3)(B)(ii) and (iv), when EPA has acknowledged that local conditions may have contributed to the ozone exceedances claimed to have been caused by an

exceptional event, EPA must examine the causal significance of that contribution to the ozone exceedances. As EPA has noted, the analyses needed to demonstrate a clear causal relationship between a wildfire and the exceedance of an air quality standard varies by numerous factors, including the "complexity of the airshed." ARC-62 at 3 [App. __]. The sheer number and diversity of local air pollution sources that contribute to ozone pollution establish the Detroit airshed's complexity. Wayne County, where the East 7 Mile monitor is located, is in the 75th percentile nationally for ozone pollution, meaning that ozone pollution is higher in Wayne County than 75 percent of the United States. ARC-56 (EJScreen Report – Wayne County) [App. __]. In the Detroit Area, there are several hundred local stationary sources of nitrogen oxides ("NOx") and volatile organic compounds ("VOCs"), both of which are precursors to the formation of ozone. ARR-02 (Redesignation Request), Attach. B [App. __]. Mobile source emissions from both on-road and nonroad vehicles are also a significant source of these ozone-causing pollutants. ARR-02 at 7 [App. __]. This empirical evidence is also supported by resident declarations, which have noted that their neighborhood is generally "surrounded by industrial facilities." Decl. of Dolores Leonard ¶¶ 5, 9.

When EPA has examined exceptional event demonstrations from other similarly situated urban areas with a multitude of local pollution sources, those demonstrations have generally included *some* analysis of local sources. For

example, Ohio examined NOx emissions from local power plants as part of an exceptional event demonstration for the Cincinnati area to illustrate that wildfire smoke rather than emissions from power plant emissions were the cause of high ozone levels. ARC-31 at 29 [App. __]. Even with this analysis, EPA determined Ohio had not adequately supported its exceptional event demonstration. *Id.* at 27 [App. __]. Ohio is not an isolated example. EPA has routinely required states to submit an analysis of local pollution sources to determine their contribution to exceedances of the ozone air quality standard. *Id.* at 29-30 [App. __] (noting that exceptional event demonstrations submitted by Ohio, Maryland, New Jersey, Connecticut, and Pennsylvania all involved some degree of analysis of local pollution sources and their potential contribution to ozone pollution).

While analyses of local pollution sources may not be necessary in some circumstances, it is clear that they are frequently a key component of exceptional event demonstrations, particularly in places that have a significant number of local air pollution sources like the Detroit Area. When an agency fails to explain inconsistencies in the types of supporting evidence required for exceptional event demonstrations "without any semblance of a plausible explanation" it raises concerns regarding arbitrary agency action. *Al-Koorwi v. Barr*, 837 F. App'x 323, 332 (6th Cir. 2020) (quoting *Davila-Bardales v. Immigr. & Naturalization Serv.*, 27 F.3d 1, 5 (1st Cir. 1994)). The failure to consider local sources when it is

21

specifically contemplated by EPA guidance may raise questions "about the thoroughness and accuracy of the . . . determination" at issue. *Calvert v. Firstar Fin., Inc.*, 409 F.3d 286, 295 (6th Cir. 2005). A conclusory statement that this analysis is not required by guidance is insufficient for satisfying the arbitrary and capricious standard of review. EPA must explain why it was not required *in this case.* Regardless of how this Court interprets the causation requirements in 42 U.S.C. § 7619(b)(3)(B)(ii) and (iv), they require EPA to assess whether other sources of air pollution may have caused the exceedance, particularly when EPA has acknowledged that it is a possibility here and guidance acknowledges it is a relevant factor.

In the end, two critical factors EPA relied upon to establish a clear causal connection between the wildfire smoke and the ozone exceedances at the East 7 Mile monitor on June 24 and 25 – brown carbon data and a matching day analysis – are not supported by, or are contradicted by, evidence in the administrative record. The satellite data mentioned by the amicus also contradicts EPA's conclusion. ARC-02 at 45 [App. __]. EPA also failed to rationally consider the lack of elevated levels of $PM_{2.5}$ and CO, which is contradicting evidence supporting a conclusion that wildfire smoke was not present during the exceptional event. It has also failed to articulate a rational explanation as to why it did not require an analysis of local pollution sources' potential contribution to the ozone

exceedances, despite acknowledging those local sources could have contributed to the higher ozone concentrations. The Act establishes that EPA may only disregard air quality data if there is a "clear causal relationship" between wildfire smoke and ozone exceedances and the exceedance is "directly due" to the exceptional event. 42 U.S.C. § 7619(b)(3)(B)(ii), (iv). With the many gaps and contradictions described above, EPA cannot meet this standard. Although EPA has interpreted the standard to require a multi-factor, weight-of-evidence analysis, that interpretation does not give EPA a carte-blanche. Where, as here, EPA has failed to rationally articulate its conclusions, the Court must vacate EPA's decision. *Motor Vehicles Mfrs. Ass'n*, 463 U.S. at 43.

## II. EPA's Finding That Detroit's Attainment Was Due to Permanent and Enforceable Reductions Is Irrational Because EPA Did Not Demonstrate That Detroit Would Have Attained Absent Emissions Reductions Attributable to the Pandemic

The third criterion for redesignation requires a finding "not just that ozone in an area dropped below a certain level," but also that "the requisite ozone drops are 'reasonably attributable' to permanent and enforceable reductions." *Sierra Club v. EPA*, 774 F.3d 383, 385 (7th Cir. 2014). Both the analytical approach and the factual support EPA relied upon to make this finding for the Detroit Area suffer from key omissions.

### A. EPA Was Required to Analyze Whether Permanent Emissions Reductions Were Enough to Account for Detroit's Attaining Ozone Levels

EPA's finding that Detroit's air quality met the National Ambient Air Quality Standard ("NAAQS") for ozone during the period 2019-2021 "due to permanent and enforceable reductions in emissions" is arbitrary because EPA does not show that attainment would have been achieved by permanent reductions alone, absent the effect of the temporary reductions attributable to pandemic-related impacts. 42 U.S.C. § 7407(d)(3)(E)(iii); *see* Pet. Br. at 82-91. Rigorous enforcement of this redesignation criterion helps ensure that EPA does not redesignate an area only to find that air quality worsens again when conditions change. EPA urges the Court to accept its finding that the criterion was met because the "scientific conclusions that EPA reached from pertinent record data and analyses" deserve deference. Resp. Br. at 47, 52. But the Court need not dispute any of EPA's "scientific conclusions" to reject EPA's analysis, which rests on a fundamental error in logic.

The error is this: EPA fails to account for the razor-thin margin of attainment, such that *any* pandemic-related emissions reductions would be part of the "requisite ozone drops" relied upon for the Redesignation. Two of the area's ozone monitors had design values of exactly 70 ppb, meaning that any additional day with an 8-hour average ozone reading of more than 70 ppb would have pushed the monitor into nonattainment. *See* Pet. Br. at 13. In other words, every reduction in emissions during that period was necessary to secure attainment. EPA appears to

concede that some of those reductions were temporary, concluding that federally enforceable reductions were the "*main* driving factor in the area coming into attainment" in 2019-2021. Resp. Br. at 51 (quoting 88 Fed. Reg. at 32,604) (emphasis added). Yet EPA made no effort to address the necessary consequence of that admission: that the area's attainment cannot, absent further analysis, be attributed solely to the "permanent and enforceable" emissions measures in place at that time.

EPA did not even attempt to analyze whether the pandemic was the tipping point for attainment. This might not be necessary if there were a large margin of compliance with the standard such that the permanent reductions on their own would have been sufficient to attain. But where the area barely achieved the NAAQS, it is crucial to understand whether unusual circumstances like the pandemic were the deciding factor. As the EPA guidance recognizes, and basic logic dictates, if temporary reductions were necessary to achieve attainment, then attainment cannot "reasonably" be attributed to permanent reductions. ARR-17 (Calcagni Memo) at 4 [App. __] (the state should "clearly show that the air quality improvements are the result of implemented controls."). Even if this Court agrees with the Seventh Circuit that EPA need not "prove causation [of attainment] to an absolute certainty," *Sierra Club*, 774 F.3d at 396, if EPA does not even attempt to determine that the reductions achieved by enforceable measures were themselves

enough to attain, EPA cannot reasonably attribute attainment to permanent emission reductions. Pet. Br. at 82-84.

Before deferring to EPA's expertise, the Court must determine that EPA's basic logic is sound. "That is a legal – not a technical or scientific – conclusion that the APA requires [courts] to make." *Sw. Elec. Power Co. v. EPA*, 920 F.3d 999, 1022 (5th Cir. 2019). Because EPA fails to acknowledge that, given the specific factual context in Detroit, *any* impact from the pandemic is legally significant, its analysis omits a crucial logical foundation.

**B. EPA Cannot Rationally Conclude that Permanent and Enforceable Emissions Reductions Fully Explain Monitored Attainment in 2019-2021**

EPA fails to refute evidence that the pandemic had an impact in reducing ozone concentrations such that attainment is reasonably attributable to pandemic-related reductions rather than permanent reductions alone. Again, the issue is not a disagreement over EPA's technical analysis. Rather, because EPA fails to explore the key question – whether pandemic-related emissions reductions combined with permanent reductions to tip the area into attainment – EPA relies primarily on evidence that is irrelevant because it would be consistent with attainment being attributable to temporary reductions. In other places, EPA's assertions are directly contradicted by the record.

**1. EPA's "Analysis" of the Effect of the Pandemic Has Key Gaps in Logic and Supporting Evidence**

26

As discussed in Sierra Club's opening brief, evidence submitted by commenters on the proposed Redesignation demonstrated that ozone precursor emissions from Midwest coal-fired power plants, as well as overall vehicular traffic, were both lower than usual from March 2020 through at least May 2021. Pet. Br. at 84-85. Coal-fired power plants are one of the largest contributors of NOx generally, and this pollution creates ozone as it is transported downwind. *See, e.g.*, 75 Fed. Reg. 45,210, 45,224 (Aug. 2, 2010) (power plants "were found to be a major source of the . . . NOx emissions which contributed to . . . ozone problems downwind). EPA's own analysis of ozone trends notes that lower concentrations in ozone "in 2020 may have been partially due to reductions in precursor emissions caused by stay-at-home orders during the COVID-19 pandemic, with increases in 2021 as normal economic activity resumed." ARR-43 (Trends in Ozone Adjusted for Weather Conditions) at 2 [App. __].

Neither Michigan's nor EPA's analysis refutes the evidence that temporary conditions significantly reduced ozone precursor emissions during the 2020 and even 2021 ozone seasons. Resp. Br. at 51. EPA relies in part on Michigan's analysis that "ozone levels fell regardless of weather conditions" through 2020. *Id.* at 50. The analysis EPA references was in response to commenters' concerns about temporary meteorological – not economic –conditions, however. 88 Fed. Reg. at 32,602. Moreover, that analysis suggests only that precursor emissions have been

27

falling along with ozone concentrations. Even if true, that does not mean those precursor emissions had fallen *enough, without the pandemic's temporary influence*, to achieve attainment.

Further, while EPA points to "rebounding" power generation in May 2020 to suggest that the reduced power generation at the onset of the pandemic would not explain the area's attainment, the agency's own data clearly states that power generation had *not* rebounded in May 2020. *See* Pet. Br. at 87 (gray line for 2020 is significantly lower than other years' lines for month "5", i.e., May). EPA also concedes that the rebound in vehicle use did not occur until June 2020, and further that "most ozone exceedances in the Midwest occur between late May and late July." Resp. Br. at 51. EPA thus fails to refute Sierra Club's point that ozone exceedances regularly occur in May and would have been likely in May 2020 were it not for the pandemic's influence on emissions levels, resulting in nonattainment. *See* Pet. Br. at 88.

EPA also fails to refute the record evidence that emissions stayed unusually low until 2021, meaning the entire 2020 ozone season would have risked exceedances of the NAAQS were it not for the pandemic. *See* Pet. Br. at 84-85, 88 (pointing to evidence of both coal-fired power plant and vehicular emissions staying lower throughout 2020 and into the 2021 ozone season). EPA responds that "manufacturing . . . shifted to different pandemic-related processes." Resp. Br. at

28

51 (citing 88 Fed. Reg. at 32,604). But there is no evidence in the record that those processes emit any NOx or VOCs at all, let alone at substantial enough levels to offset the reduction in pollution from fossil fuel-fired power plants (i.e., one of the largest sources of ozone precursors that exists). Thus, EPA cannot rationally rely on this point to find that the pandemic's effects were not essential to the area achieving attainment. Nor does EPA respond to other arguments in Sierra Club's opening brief demonstrating the irrationality of EPA's conclusions. Pet. Br. at 82-91.

Ultimately, the agency appears to concede that it does not know whether the pandemic influenced attainment, concluding only that enforceable control measures were the "main driving factor" leading to attainment. Resp. Br. at 51. Given that the reductions occurring between 2019 and 2021 were the bare minimum necessary to reach attainment, identifying the "main" factor is not enough to show that permanent and enforceable measures in fact produced attainment. EPA's statement concedes there were other factors, too. *See* ARR-43 at 2 [App. __]. EPA acted irrationally in finding that attainment was reasonably attributable to permanent reductions without an accompanying determination that attainment would have been achieved even without the pandemic's emissions-

suppressing effects. That emissions rebounded further in 2022 only confirms EPA's flaw.[3]

### 2. EPA's Quantification of Federally Enforceable Pollution Reductions Does Not Suffice to Demonstrate Those Reductions Can Achieve Attainment on Their Own

EPA points to its "exhaustive" discussion of federally enforceable reductions as if this is enough to rule out temporary economic conditions as a necessary factor in achieving attainment. Resp. Br. at 47-48. But this estimate of the volume of emissions reductions resulting from federal rules tells us nothing about whether those reductions were enough to bring the area into attainment *without* the reductions provided by the pandemic. EPA's litany of numbers provides a veneer of objectivity, but it is pure speculation that these numbers (in pounds or tons of VOC or NOx pollution) translate into sufficient reductions in ozone concentrations in the ambient air such that levels would be low enough to achieve attainment on their own.[4] Given that the area only barely achieved attainment, EPA must refute concrete evidence that additional, temporary influences (which cannot be counted on for the future) were also necessary to bring the area into attainment. EPA has not done so. Simply citing estimated tonnage reductions attributable to various

---

[3] *See* ARC-45 (Detroit Design Value Report) [App. ___].

[4] Emissions reductions are pollution reductions at the emitting source in pounds or tons of NOx or VOCs. Improvement in air quality or in ozone concentrations refers to the parts of ozone per billion units of air measured at the area's ambient air quality monitors.

federal rules does not provide EPA with a rational basis to conclude that these reductions sufficed to bring the area into attainment. Therefore, EPA cannot satisfy the third criterion for redesignation.

### III. EPA Erred in Redesignating the Detroit Area Without Requiring Michigan to Issue RACT Rules First

In responding to Sierra Club's arguments that the Redesignation was unlawful absent state rules implementing RACT, EPA and amici fundamentally misread the role of RACT within the 1990 Amendments to the Act, settled caselaw in this Circuit, and the text of the fifth redesignation criterion, 42 U.S.C. § 7407(d)(3)(E)(v). Contrary to EPA's and amici's claims, imposing RACT even where the state has made progress towards attaining the ozone standard[5] would not be "unreasonable" or an "undue burden" for Michigan or its industrial polluters. *See, e.g.*, Se. Mich. Council of Gov'ts ("SEMCOG") and Mich. Mfrs. Ass'n (hereinafter "SEMCOG") Br. at 21. Rather it would effectuate Congress's clear intent following years of consideration as to how best to protect the public from unhealthy levels of ozone.

A brief review of the function of the statutory provisions at issue will help frame the textual analysis that follows in Section II.B below.

---

[5] This section sets aside for purposes of argument the dispute addressed in prior sections as to whether the Detroit Area has indeed achieved attainment. EPA concedes that if the Court resolves the Exceptional Event issue in Sierra Club's favor, it need not move on to the RACT issue. Resp. Br. at 46 n.10.

**A. The RACT Requirement is Part of Congress's Plan to Remove States' and EPA's Discretion in Favor of Mandatory Controls, and Has Value Even After Redesignation to Attainment**

As described in Sierra Club's opening brief, the Moderate nonattainment area requirements, including RACT rules, were included in Congress's 1990 Amendments to the Clean Air Act.[6] Those amendments put forth a new protocol of automatic bump-ups and "a harsher set of mandatory controls" enacted "to deal with the specific problem of ozone." *S. Coast Air Quality Mgmt. Dist. ("SCAQMD") v. EPA*, 472 F.3d 882, 887 (D.C. Cir. 2006). Congress was "[n]o longer willing to rely upon EPA's exercise of discretion," where that approach had been ineffective in timely achieving and maintaining the NAAQS, "exposing as many as 95 million people to unhealthy levels of ozone." *Id.*

Unique to the ozone provisions, Congress required RACT rules for Moderate areas independently of, *and in addition to*, requirements to achieve attainment. *Compare* 42 U.S.C. § 7511a(b)(1)(A)(i) (requiring reductions in ozone precursor emissions "as necessary to attain the [NAAQS]") *with id.* § 7511a(b)(2) (requiring RACT). The harsher protocols associated with bump-ups were thus "prescribed *whether or not* that area was closer to attainment when it missed the deadline than when it was originally classified." *SCAQMD*, 472 F.3d at 888

---

[6] EPA concedes that the Moderate Area requirements came due prior to its action on Redesignation based on the Detroit Area's failure to meet its initial attainment deadline. Resp. Br. at 60.

(emphasis added). *See also Sierra Club v. EPA*, 793 F.3d 656, 669-70 (6th Cir. 2016) ("[A] State seeking redesignation 'shall provide for the implementation' of RACM/RACT, even if those measures are not strictly necessary to demonstrate attainment . . . .").[7]

Put simply, Congress recognized that ozone is a difficult problem and that relapses are likely even in areas where air quality is improving. Congress recognized that the evident patterns of delay and relapse were the result of states' and EPA's dependence on wishful thinking – as opposed to strong pollution controls – to achieve and maintain healthy air, and sought to remedy that problem. *See, e.g.*, *SCAQMD*, 472 F.3d at 888. It therefore put in place a statutory scheme that eliminates states' and EPA's discretion to decide whether RACT is "necessary" or "reasonable" once the Moderate area designation is in force. *See Nat. Res. Def. Council (NRDC) v. EPA*, 777 F.3d 456, 460 (D.C. Cir. 2014) ("After nearly a decade of debate," Congress amended the Act to "abandon[] the

---

[7] SEMCOG attempts to distinguish *Sierra Club* on grounds that the Court was reviewing EPA's interpretation of "applicable implementation plan" under the second redesignation criterion, rather than "applicable" requirements under the fifth criterion. SEMCOG Br. at 24-25. However, the Court's holding did not turn on anything unique to the second criterion. Rather, it reflects the Court's broader consideration of whether EPA can appropriately excuse RACT if an area achieves attainment prior to EPA's action on a redesignation request. (The Court determined that EPA cannot.) *See Sierra Club*, 793 F.3d at 669.

discretion-filled approach of two decades prior. . . .") (citing *SCAQMD*, 472 F.3d at 886 (alteration in original)).

The situation in Detroit is exactly what Congress prepared for by removing EPA's discretion to decide whether RACT rules to limit pollution further are necessary. After years of delay in addressing the area's smog problem, the state rushed to conclude on shaky data that Detroit had achieved attainment. Pet. Br. at 19-23. Upon redesignation, the state immediately suspended enforcement of the RACT rules that had been in place to limit VOC pollution in the area. *Id*. at 17. A year later, the state is again "fac[ing] challenges in maintaining the [NAAQS]."[8] Had the state adopted and enforced a full suite of RACT rules, ozone design values may have stayed below the NAAQS.

RACT rules also play a role beyond helping an area achieve attainment in the first instance: If adopted into a State Implementation Plan ("SIP") before redesignation, RACT measures become "contingency measures" in the state's

---

[8] Mich. Dep't of the Env't, Great Lakes, and Energy ("EGLE"), *Key Findings and Policy Implications from the MOOSE Study*, at 2 (Apr. 22, 2024) ("The 2023 ozone season reflects the likelihood that contingency controls will eventually be required."), https://www.michigan.gov/egle/-/media/Project/Websites/egle/Documents/Groups/AAC/Presentations/presentation-2024-04-23-AAC-MOOSE-Update.pdf?rev=95f5141ee2074d449bc09953ca9b47ce&hash=4FF3F2804737EDED19C9FFD0C4D134E6. *See Sierra Club v. EPA*, 60 F.4th 1008, 1014 (6th Cir. 2023) ("[The Court] may take judicial notice of public and government documents.").

maintenance plan that will be triggered if ozone levels rise, even if the state

abandons RACT measures upon redesignation.[9] Contingency measures "assure

that the State will promptly correct any violation of the standard which occurs after

the redesignation of the area as an attainment area." 42 U.S.C. § 7505a(d); *see*

*Wall v. EPA*, 265 F.3d 426, 442 (6th Cir. 2001). Contingency measures are crucial

to the fate of a redesignated area's air quality because they are the *only* required

remedy if ozone concentrations exceed the NAAQS following redesignation. *See*

42 U.S.C. § 7505a(d) ("The failure of any area redesignated [to] attainment to

maintain the [NAAQS] . . . shall not result in a requirement that the state revise its

State Implementation Plan."). The Act requires that contingency measure include

"a requirement the State will implement" all relevant measures that "were

contained in the [SIP] … before redesignation." *Wall*, 265 F.3d at 442 (quoting 42

U.S.C. § 7505a(d)). As recognized in *Wall*, excusing a state from enacting RACT

rules "before redesignation" thus weakens the set of pollution controls that the

public can count on occurring if the air turns out to not be as clean as EPA

expected. *Id.* at 442; Pet. Br. at 24-25. Because EPA cut corners in its

---

[9] Per 42 U.S.C. § 7410(a)(l), the state could only do so if it could demonstrate to EPA that removing those control measures would not interfere with attainment of the NAAQS. Although SEMCOG suggests that the RACT rules would automatically disappear based on Sierra Club's statement that "RACT *only* applies while the area is in nonattainment," SEMCOG Br. at 22, this statement was intended to refer to the state's obligation to adopt RACT rules in the first instance, not the applicability of the rules once adopted.

redesignation process for Detroit, RACT rules remain optional for the state even if air quality levels trigger Michigan's contingency measures. *See* ARR-02 at 29 [App. __].

In this way, EPA's claim of discretion to excuse Michigan from enacting RACT rules prior to redesignation undermines not only the mandatory nature of the RACT provision itself but also the function of the maintenance plan to "promptly correct any violation of the standard" following redesignation. 42 U.S.C. § 7505a(d). Likewise, requiring RACT prior to redesignation does not "defy logic . . . when the Detroit area is already attaining" the NAAQS. SEMCOG Br. at 22. Rather, it is consistent with (and mandated by) the statutory scheme, and would help ensure that attainment continues long-term.

**B. The Statutory Text Does Not Support EPA's or Amici's Reading of the Prerequisites for Redesignation**

**1. Standard of Review**

Because the meaning of 42 U.S.C. § 7407(d)(3)(E)(v) is made plain by its language and statutory context, the Court need not defer to EPA's interpretation under *Chevron v. NRDC*, 467 U.S. 837 (1984) or *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944). As EPA concedes, "[t]he plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Donovan v. FirstCredit, Inc.*, 983 F. 3d 246, 256 (6th Cir. 2020) (quoting *Roth v.*

*Guzman*, 650 F.3d 603, 614 (6th Cir. 2011)). Both text and context foreclose the

agency's interpretation. *See* Pet. Br. at 60-82.

**2. The Text of the Fifth Redesignation Criterion is Clear That the State Must Be Meeting Present-Day Area Requirements at the Time EPA Approves a Redesignation**

**a. "Has Met"**

EPA concedes that Sierra Club's reading of "*has met* all requirements

applicable to the area" is consistent with a plain language definition of the present

perfect tense – "denot[ing] events that began in the past and continue to the present

day." Resp. Br. at 54 (quoting 42 U.S.C. § 7407(d)(3)(E)(v) (emphasis added)).

Under this reading, Michigan was required to have met Moderate area

requirements because those were the applicable requirements at the time of EPA's

action.

EPA submits that there is another reading of the present perfect tense,

however – "denot[ing] events that occurred in the past that have significance in the

present day" – and that this is the "appropriate usage." Resp. Br. at 54. But EPA

does not explain how a state's compliance with the Marginal area requirements in

the past would still have "significance" or "continuing relevance" in a present day

governed by more stringent, Moderate area, standards. Indeed, this Circuit has

explicitly rejected the idea that the use of "has met" could denote "noncontinuing

compliance." *Commonwealth of Ky. v. EPA,* No. 96-4274, 1998 WL 661138, at *3

(6th Cir. Sept. 2, 1998). EPA's reading would denote just that: that the state met, at a prior time (the date of submittal), requirements that used to be applicable but which have no continuing relevance to the present day because the new area requirements have superseded them. Thus, EPA's reading is inconsistent even with the agency's own preferred formulation of the present perfect tense.

As noted in Sierra Club's opening brief, EPA's reading of subpart (v) also would be inconsistent with its neighboring subparts, which all refer to present-day obligations. Pet. Br. at 64-65. EPA claims that this inconsistent reading is nonetheless the best because (v) is the only subpart that involves the state's role in the approval process, and that role ends at the moment the state submits its redesignation request and maintenance plan. Resp. Br. at 52-53. EPA's assertion that a state's obligations with respect to a plan submittal end on the date of submittal is simply incorrect. In practice, the submittal is not frozen in time. EPA can, and does, require more from a state prior to approving a redesignation submittal where circumstances change. *See, e.g.*, *Sierra Club*, 774 F.3d at 387-88 (noting that Illinois had provided EPA with supplemental ozone data in 2011 after initially submitting its redesignation request for Chicago in 2009; and that EPA opted not to finalize redesignation for Sheboygan County, Wisconsin based on new data since the date of submittal). And EPA cannot ignore changed circumstances. For example, EPA could hardly approve a redesignation request accompanied by a

38

maintenance plan that was sufficient when submitted, but where the legislature subsequently revoked the state agency's authority or funding for the plan before EPA acted on it. *See* 42 U.S.C. § 7410(a)(2)(E)(i) (state must have sufficient legal authority and resources to carry out the plan).

Regardless, EPA does not provide any textual support for its selection of the date of a state's submittal as the relevant cut-off date for the "events that occurred in the past" that still purportedly have significance. Resp. Br. at 54. There is nothing in the text of § 7407(d)(3)(E) to suggest the moment the state submits the redesignation request is the significant point in time for EPA's determination that the state has met all applicable requirements. In fact, reading § 7407(d)(3)(E) together with § 7407(d)(3)(D) implies the contrary. Section 7407(d)(3)(D) describes a process where the state submits a request for redesignation and EPA then approves or denies the request within 18 months. Section 7407(d)(3)(E) then describes the criteria EPA must use to make its decision. The natural reading of this chronology is that the requirements set forth in § 7407(d)(3)(E) apply at the endpoint in the process described in the immediately preceding provision, § 7407(d)(3)(D)) – i.e., the date of EPA's approval or denial. Nothing in the text supports EPA's suggestion that the Court should read the requirement in § 7407(d)(3)(E)(v) – and only (v) – to jump back to the point in time referenced in the beginning of § 7407(d)(3)(D), instead of the chronological endpoint of that

39

section (EPA's decision). That EPA decision is the action governed by §

7407(d)(3)(E); the moment of that decision should therefore be the significant one

for determining compliance with the redesignation criteria. *See Landgraf v. USI*

*Film Products*, 511 U.S 244, 291 (1994) (Scalia, J., concurring in judgment)

("[T]he presumed temporal application of a statute" is when "the relevant activity

that the rule regulates" occurs).

In sum, EPA has fabricated a meaning for the term "has met" in §

7407(d)(3)(E)(v) that may be consistent with a 1992 guidance memo and EPA past

practice, but has no footing in the statutory text or context.

### b. "Applicable"

Although EPA states repeatedly that "applicable" means "requirements

applicable to redesignation as of the date on which [the request] was submitted,"

*e.g.*, Resp. Br. at 53, again, EPA provides no support from either the statutory text

or from caselaw for this notion, abandoning the arguments it had included in the

Redesignation regarding the meaning of "applicable." SEMCOG takes up those

arguments, but likewise fails to provide textual support and relies solely on an

egregious misreading of the relevant caselaw.

SEMCOG relies heavily on *Wall*, claiming that the Court recognized "that

the statute does not tell EPA how to discern what requirements are applicable,

leaving the agency some discretion to make that determination." SEMCOG Br. at

13 (citing *Wall*, 265 F.3d at 438). But, as explained in the Court's subsequent opinion in *Sierra Club*, that is not what *Wall* held with respect to the RACT provisions EPA sought to excuse in both cases and seeks to excuse again here. 793 F.3d at 669-70. In *Sierra Club*, the Court explicitly rejected EPA's argument that the agency's interpretation of what requirements are "applicable" required deference where EPA's interpretation was contradicted by the RACT provisions' mandatory nature. *Id*. In *Wall*, too, the Court looked to the "shall" language of the RACT provision itself in determining it could *not* defer to EPA's attempt to exclude RACT as an "applicable" requirement. *Wall*, 265 F.3d at 440-41. The Court should abide by its own precedent and do the same here. *See* Pet. Br. at 70. Nor does *Wall*'s acceptance of EPA's exclusion of transportation conformity requirements from "applicable" requirements control here, as thoroughly explained in Sierra Club's opening brief. *Id.* at 71-72. Indeed, the *Wall* Court mentioned the Calcagni Memo's interpretation of "applicable" based on the state's submittal date, which SEMCOG seeks to defend, only in reference to *petitioners*' arguments, which the Court rejected. *Wall*, 265 F.3d at 439.

SEMCOG's reliance on *Sierra Club v. EPA*, 375 F.3d 537 (7th Cir. 2004) is also misplaced. First, the Seventh Circuit did not address the precise question here, which is whether EPA can find that a state "has met requirements applicable to the area" under § 7407(d)(3)(E)(v) when the state has not met the requirements that

41

EPA admits were in force at the time of EPA's finding. While the Seventh Circuit did hold that the word "applicable" in a different provision, § 7407(d)(3)(E)(ii), was ambiguous and approved EPA's discretionary interpretation that the state need not do more than is "necessary" to attain the NAAQS to satisfy that criteria, the Court need not expand that holding to allow EPA to include as "applicable" only those requirements in place at the time of the redesignation request where the text, context, and history of the statute all contradict that reading. The Seventh Circuit applied an overly permissive version of *Chevron* deference that failed to employ any of the tools of statutory construction to determine whether "applicable" was plain or ambiguous, and failed to consider statutory context. *Sierra Club*, 375 F.3d at 541; *see* Pet. Br. at 72-74. Following this approach would put this Court at odds with its own precedent and current Supreme Court doctrine. *Id.*

### 3. Related Statutory Text Directly Contradicts EPA's Interpretation

The text of 42 U.S.C. § 7505a(c) provides statutory context that directly rebuts EPA's view that nonattainment requirements that come due while the state's redesignation request is pending do not create "applicable" requirements for the state. Titled "Nonattainment requirements applicable pending plan approval," this provision speaks directly to a state's obligations following submittal of a maintenance plan and redesignation request. *Id.*; *see* Pet. Br. at 65-66. "Until [the maintenance plan] is approved and an area is redesignated as attainment," it states,

nonattainment area requirements "continue in force and effect." 42 U.S.C. § 7505a(c). In other words, the state's obligations are *not* lifted at the moment it submits a redesignation request and accompanying maintenance plan, as EPA claims.

EPA responds that the provision merely shows that "where Congress intended for States to make additional submittals during the redesignation process, it expressly instructed them to do so." Resp. Br. at 59. It is unclear what "express instruct[ion]" EPA is referring to. EPA's suggestion that Congress gave the "pending [maintenance] plan" referenced in § 7505a(c) a different effect than the pending redesignation request is also baffling because the maintenance plan is inseparable from the redesignation request. *See* ARR-02 at 25-30 [App. __] (same document as maintenance plan), and 42 U.S.C. § 7407(d)(3)(E)(iv) (requiring maintenance plan as fourth criterion for redesignation). Congress's intent with respect to the effect of a pending maintenance plan thus cannot be distinguished from its intent as to the effect of a pending redesignation request. The maintenance plan is simply a subset of the broader redesignation request.

EPA's response gets more baffling still when it states that it "has never disputed that Moderate nonattainment requirements applied to the Detroit area as soon as it was reclassified," even as it insists that those requirements are not "applicable" for purposes of § 7407(d)(3)(E)(v). Resp. Br. at 60. In other words,

43

EPA concedes that RACT requirements "applied" prior to maintenance plan approval. *Id.* Under 42 U.S.C. § 7505a(c), those requirements still should have had "force and effect" at the time of approval. Yet, EPA would have the Court hold that those requirements were at the same time *not* "applicable" at the time of plan approval, when EPA acted on the redesignation request. This incoherent reading cannot satisfy even minimal standards for deference.

### C. EPA's Concern about "Meritorious" Redesignation Applications Being Delayed is Overblown and Fails to Overcome Statutory Text

EPA's argument that under Sierra Club's reading states will be "deprived of the opportunity to obtain meritorious redesignations" lacks both legal and practical support.[10] Resp. Br. at 59. First, the notion that a redesignation request remains "meritorious" where the state does not comply with area requirements in force at the time of EPA's approval begs the very question before the Court: whether a state's redesignation is meritorious if the state has not met RACT requirements applicable to the state at the time of EPA's decision. While EPA may wish to make its own determination as to whether a redesignation request is "meritorious," this is exactly the kind of agency discretion the 1990 amendments meant to eliminate.

---

[10] EPA also raises concerns about meeting its 18-month deadline to approve or deny the redesignation request. Sierra Club thoroughly responded to this concern in its opening brief. Pet. Br. at 76-78.

The substance of EPA's policy concern – that states may be bumped up yet again before redesignation if required to adhere strictly to the fifth criterion – is overblown in any event. For example, an area reclassified from Marginal to Moderate has three additional years to achieve attainment before being bumped up to Serious.[11] EPA's assumption that states would not begin completing the RACT requirement until the Moderate bump-up occurs, and thus would need several years from that date to comply, is too pessimistic. The Court need not look further than Michigan's actions here for a counterexample: knowing that the Detroit Area had missed its attainment deadline and would automatically get bumped up, Michigan prepared to meet Moderate area requirements prior to the bump-up date. The state completed most of the necessary RACT rules for VOCs by April 2023, just one month following the Moderate bump-up, leaving more than enough time for EPA to approve the rules as part of the state SIP before the next bump-up had it postponed redesignation.[12] If other states hoping for redesignation are aware that approval will depend on compliance with any area requirements that come due prior to EPA's final action, they can and will plan their rulemaking ahead of time.

---

[11] *See* 42 U.S.C. § 7511(a); 88 Fed. Reg. 6,633, 6,635 (Feb. 1, 2023).
[12] *See* Pet. Br. at 7. Although Michigan did not complete the NOx RACT rules by this time, nor obtain EPA approval to adopt the rules into its SIP, it would not be impossible to complete the entire process well before the area would be at risk of a bump-up to Serious nonattainment.

Nothing in the statute requires states to forego planning until they are formally bumped up.

Sierra Club also explained in its opening brief practical ways EPA could address the situation that EPA claims is untenable, even if the state failed to begin its rulemaking process before the bump-up. *See, e.g.,* Pet. Br. at 78 (option for parallel processing, i.e., that EPA can propose approval of a redesignation even while the state is still working to complete its rules); *id.* at 79 (Clean Data Determination suspends most nonattainment obligations if monitored attainment is achieved while state is still working towards formal redesignation). EPA pointed to the possibility of parallel processing when it gave states just under seven months to submit new Moderate area attainment plans under its new reclassification rules for the 2008 ozone standard. 81 Fed. Reg. 26,697, 26,705 (May 4, 2016) ("recogniz[ing] the challenges posed by these very short deadlines"). States have also used parallel processing to obtain redesignation in a short timeframe even where they have not yet completed the required state processes at the time of submission *See, e.g.,* 66 Fed. Reg. 33,505, 33,505 (June 22, 2001) (proposing approval of Kentucky and Indiana redesignation requests for a shared ozone nonattainment area); 66 Fed. Reg. 53,665 (Oct. 23, 2001) (finalizing approval four months later). EPA did not address the utility of the parallel processing procedure

illustrated by these examples, a silence that speaks volumes. *See* Resp. Br. at 57-59.

In sum, the Act's schedule for bump-ups does not provide context that should persuade the Court to favor EPA's interpretation over the textual evidence and controlling precedent discussed above and in Sierra Club's opening brief. It bears noting that while both EPA and amici express concerns that the plain-language reading of the statute creates "hardships for states," SEMCOG Br. at 21, not a single state has weighed in in this litigation, not even Michigan itself.

## CONCLUSION

For the reasons stated above, the Court should vacate both of the rulemakings challenged by Sierra Club's petitions, encompassing EPA's redesignation of the Detroit Area to attainment, its Clean Data Determination for the area, and its Exceptional Events Approval.

Respectfully submitted,

*/s/Elena Saxonhouse*
Elena Saxonhouse
Sanjay Narayan
SIERRA CLUB
2101 Webster Street, Suite 1300
Oakland, CA 94612
(415) 977-5765
elena.saxonhouse@sierraclub.org
sanjay.narayan@sierraclub.org

*/s/Nicholas Leonard*
Nicholas Leonard
GREAT LAKES ENVIRONMENTAL
LAW CENTER
4444 Second Avenue
Detroit, MI 48201
(313) 782-3372
nicholas.leonard@glelc.org

*Counsel for Sierra Club*

**CERTIFICATE OF COMPLIANCE**

Pursuant to Fed. R. App. P. 32 and 6 Cir. R. 32, I hereby certify that the foregoing Petitioner's Reply Brief is 10,992 words, excluding exempted portions, according to the count of Microsoft Word, and thereby complies with the Order of the Clerk dated Nov. 6, 2023 [Doc.10] approving the parties' joint motion seeking, *inter alia*, an expansion of relevant word limits.

I further certify that the response complies with Fed. R. App. P. 32(a)(5) and (6) because it has been prepared in 14-point Times New Roman font.

Dated: June 3, 2024

*/s/Elena Saxonhouse*
Elena Saxonhouse

**CERTIFICATE OF SERVICE**

I hereby certify that on June 3, 2024, I caused the foregoing Petitioner's Reply Brief to be electronically filed with the Clerk of the Court by using the Court's CM/ECF system. All registered counsel will be served by the Court's CM/ECF system.

/s/Elena Saxonhouse<br>Elena Saxonhouse

# Addendum

# TABLE OF CONTENTS

**Unpublished Cases** ........................................................................ **1**

 *Al-Koorwi v. Barr*, 837 F. App'x 323
(6th Cir. 2020)..................................................................................... 1

*Commonwealth of Ky. v. EPA*, No. 96-4274, 1998 WL 661138
(6th Cir. Sept. 2, 1998) .................................................................... 10

[7] classifying witnesses as percipient instead of expert was not prejudicial; and

[8] classification of witnesses as percipient was not arbitrary and capricious.

Petition denied.

**Procedural Posture(s):** Review of Administrative Decision.

West Headnotes (8)

KeyCite Yellow Flag - Negative Treatment

Declined to Extend by   Solaka v. Wilkinson,   6th Cir.,   January 27, 2021

837 Fed.Appx. 323
This case was not selected for
publication in West's Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1 generally governing citation of judicial decisions issued on or after Jan. 1, 2007. See also U.S.Ct. of App. 6th Cir. Rule 32.1.
United States Court of Appeals, Sixth Circuit.

Ishan AL-KOORWI, Petitioner,

v.

William P. BARR, Attorney General, Respondent.

Case No. 19-3075
|
FILED November 17, 2020

**Synopsis**
**Background:** Lawful permanent resident, who was native and citizen of Iraq and first came to United States as refugee, petitioned for review of decision of Board of Immigration Appeals (BIA), denying his application for deferral of removal under Convention Against Torture (CAT), after he was convicted of attempting to commit crime involving moral turpitude.

**Holdings:** The Court of Appeals, Nalbandian, Circuit Judge, held that:

[1] BIA's decision was reviewable;

[2] BIA applied correct legal standard in evaluating CAT claim;

[3] substantial evidence supported BIA's conclusion it was not more likely than not that petitioner would be tortured upon removal;

[4] petitioner's aggregation argument was not exhausted;

[5] substantial evidence supported BIA's citation to caselaw;

[6] reports already part of record did not require admission into evidence;

**[1]     Aliens, Immigration, and Citizenship**   Jurisdiction and venue

INA provision, stating that "no court shall have jurisdiction to review any final order of removal against an alien who is removable by reason of having committed" covered criminal offense, did not divest Court of Appeals of jurisdiction to review Board of Immigration Appeals' (BIA) order denying lawful permanent resident's application for deferral of removal under Convention Against Torture (CAT), after he was convicted of attempting to commit crime involving moral turpitude, since jurisdiction-stripping statute did not apply to challenges to denials of CAT relief. Immigration and Nationality Act §§ 212, 242, 8 U.S.C.A. §§ 1182(a)(2)(A)(i)(I), 1252(a)(2)(C).

1 Case that cites this headnote

**[2]     Aliens, Immigration, and Citizenship**   Standard for relief

Board of Immigration Appeals (BIA) applied correct legal standard in evaluating legal permanent resident's claim for protection under Convention Against Torture (CAT), since BIA determined he had not shown that it was more likely than not that he would be tortured if removed to Iraq, where he was citizen. 8 C.F.R. § 1208.16(c)(2).

1 Case that cites this headnote

**[3]**    **Aliens, Immigration, and Citizenship**   Weight and Sufficiency

Board of Immigration Appeals' (BIA) conclusion, in denying lawful permanent resident's application for deferral of removal under Convention Against Torture (CAT), that it was not more likely than not that he would be tortured upon removal to Iraq, was supported by substantial evidence including that Iraqi government and extremist militia group would not target him as suspected member of Islamic State of Iraq and Syria (ISIS) as he had lived in United States for several years, Iraqi government had committed to investigating and punishing militia members, Iraqis who appeared "Westernized" were no longer singled out for poor treatment, he recently visited Iraq without any trouble, still spoke fluent Arabic, had family connections to Iraq, and his brother worked for Iraqi government. 8 C.F.R. §§ 1208.16(c)(2), 1208.18(a)(1).

1 Case that cites this headnote

**[4]**    **Aliens, Immigration, and Citizenship**   Presentation and preservation of questions at administrative level

Lawful permanent resident failed to exhaust his argument made to Court of Appeals that Board of Immigration Appeals (BIA) incorrectly applied standard of review for his application for deferral of removal under Convention Against Torture (CAT) by individually evaluating each factor he alleged in support of his CAT claim rather than aggregating all factors, where he failed to present claim to BIA, even though immigration judge (IJ) also considered each factor seriatim rather than in aggregate when making factual finding in first instance. Immigration and Nationality Act § 242, 8 U.S.C.A. § 1252(d)(1); 8 C.F.R. §§ 1003.3(b), 1208.16(c)(2).

1 Case that cites this headnote

**[5]**    **Aliens, Immigration, and Citizenship**   Findings or statement of reasons

Board of Immigration Appeals' (BIA) citation to caselaw, in denying legal permanent resident's application for deferral of removal under Convention Against Torture (CAT) after he was convicted of attempting to commit crime involving moral turpitude, was supported by substantial evidence, since BIA cited caselaw in support of legal proposition that petitioner for CAT protection was required to establish each link in hypothetical chain of events leading to torture as more likely than not to occur, and BIA found that immigration judge (IJ) did not clearly err in holding that legal permanent resident failed to do so. 8 C.F.R. § 1208.16(c)(2).

2 Cases that cite this headnote

**[6]**    **Aliens, Immigration, and Citizenship**   Admissibility

Board of Immigration Appeals (BIA) appropriately considered Department of State Country Report on Iraq for two years and was not required admit those reports and International Religious Freedom Report into evidence, in denying legal permanent resident's application for deferral of removal under Convention Against Torture (CAT) after he was convicted of attempting to commit crime involving moral turpitude, since BIA did not consider Country Report for one year cumulative of evidence already in record, immigration judge (IJ) took judicial notice of reports, and reports were already part of administrative record. 8 C.F.R. § 1208.16(c)(2).

**[7]**    **Aliens, Immigration, and Citizenship**   Witnesses

Lawful permanent resident was not prejudiced by immigration judge (IJ) and Board of Immigration Appeals (BIA) classifying his witnesses as percipient, rather than as experts, in denying his application for deferral of removal under Convention Against Torture (CAT) after

he was convicted of attempting to commit crime involving moral turpitude, since he cited only caselaw discussing prejudice to party when evidence was excluded, but he failed to apply that caselaw to his case in which his witnesses' testimony was not excluded, he made no argument and cited no case for proposition that BIA applied wrong standard in evaluating whether witnesses qualified as experts, and he articulated no reason why denying his witnesses expert status constituted due process violation.

U.S. Const. Amend. 5; 8 C.F.R. § 1208.16(c)(2).

2 Cases that cite this headnote

[8] **Aliens, Immigration, and Citizenship** 🔑 Witnesses

Board of Immigration Appeals (BIA) and immigration judge (IJ) did not act arbitrarily and capriciously in treating lawful permanent resident's witnesses as percipient, rather than as experts, in denying his application for deferral of removal under Convention Against Torture (CAT), since he never articulated how witnesses' declarations, if given expert weight, would have affected final outcome, and instead, he charged BIA with error without any reasoning or application of law to fact, witnesses' testimony was not excluded entirely in that they were considered as fact witnesses, and different outcomes in different cases were expected result of discretionary weighing required to make individualized determinations. 8 C.F.R. § 1208.16(c)(2).

3 Cases that cite this headnote

**\*325** ON PETITION FOR REVIEW FROM THE UNITED STATES BOARD OF IMMIGRATION APPEALS

**Attorneys and Law Firms**

Shanta Driver, Driver, Schon & Associates, Detroit, MI, for Petitioner

Jonathan A. Robbins, Joanna L. Watson, U.S. Department of Justice, Office of Immigration Litigation, Washington, DC, for Respondent

Before: KETHLEDGE, BUSH, and NALBANDIAN, Circuit Judges.

**OPINION**

NALBANDIAN, Circuit Judge.

Ishan Al-Koorwi petitions this court for review of a Board of Immigration Appeals decision denying his application for deferral of removal. Because substantial evidence supports the agency's findings, we **DENY** his petition for review.

I.

Al-Koorwi is a native and citizen of Iraq who first came to the United States in January 2011 as a refugee. In April 2013, Al-Koorwi became a lawful permanent resident of the United States. On February 17, 2016, Al-Koorwi pleaded no-contest to a charge of Attempted Unlawful Imprisonment, in violation of Michigan Compiled Law § 750.349b. The Department of Homeland Security then served Al-Koorwi with a Notice to Appear in immigration court, charging him as subject to removal under 8 U.S.C. § 1182(a)(2)(A)(i)(I), as an alien convicted of attempting to commit a crime involving moral turpitude.

Represented by counsel, Al-Koorwi appeared at the initial master calendar hearing in his removal proceedings on December 22, 2016. Because of his conviction, the Immigration Judge ("IJ") found Al-Koorwi removable. Al-Koorwi then applied for asylum, withholding of removal under 8 U.S.C. § 1231(b)(3), and protection under the Convention Against Torture ("CAT"), arguing that he would be persecuted and tortured if deported to Iraq because of his association with the United States and his status as a Sunni Muslim. Following three individual hearings on his application, the IJ found that Al-Koorwi's conviction for a particularly serious crime barred him from statutory relief. So he denied Al-Koorwi's request for deferral of removal under CAT.

Al-Koorwi moved to reopen his application based on changed conditions in Iraq, alleging that he would face torture as a Sunni Muslim, criminal, and perceived supporter of the United States. The IJ granted Al-Koorwi's motion to reopen, solely to determine whether he was eligible for deferral of removal under the CAT, considering the alleged changed conditions. During the reopened proceedings, the government submitted into evidence the 2016 United States Department of State Country Report for Iraq and the 2016 International Religious Freedom Report for Iraq. The IJ also took judicial notice of the 2017 **\*326** versions of these reports. Al-Koorwi submitted into evidence affidavits from Daniel W. Smith, Mark Lattimer, and Rebecca Heller. But the IJ found that neither Smith nor Heller qualified as an expert witness and admitted their declarations instead as percipient witnesses. The government contradicted the testimony of these witnesses with expert witnesses—Michael Rubin, Douglas Ollivant, and Denise Natali—and a report issued by the government of the United Kingdom. Ultimately, the IJ found the government's evidence more persuasive and, based on the totality of the evidence, held that Al-Koorwi failed to satisfy his burden of establishing that "it is more likely than not that he will be tortured by or with the acquiescence of the Iraqi government if he is returned to Iraq." [AR 234.] Thus, the IJ denied Al-Koorwi's claim and ordered Al-Koorwi removed to Iraq.

Al-Koorwi appealed the IJ's denial of his reopened motion for protection under the CAT to the United States Board of Immigration Appeals ("BIA"). He argued that the IJ erred in ruling that Al-Koorwi had not shown a clear probability of torture if he returns to Iraq. And he argued that the IJ prejudiced him by denying Heller and Smith expert status but granting that status to the government's witnesses. Al–Koorwi also submitted new evidence related to allegedly changed conditions in Iraq.

The BIA affirmed the IJ's classification of experts both because Al-Koorwi failed to object to classification of the government's witnesses as experts and because the merits supported the classification decisions. In reviewing whether Al-Koorwi had satisfied his burden of proof to qualify for protection under the CAT, the BIA made clear that it was reviewing the IJ's factual determinations for clear error. After discussing the relevant factual findings of the IJ, the BIA held that the IJ "properly found that the respondent's fear of torture upon return to Iraqi [sic] is speculative" and that "[e]vidence of the general possibility of torture does not meet the respondent's burden of establishing that it is more likely

than not that *he* will be targeted for such treatment." [AR 4.] Finally, the BIA treated Al-Koorwi's presentation of new evidence as a motion for remand and denied it because he failed to show how the new evidence materially differed from the record evidence. Finding none of Al-Koorwi's arguments persuasive, the BIA dismissed the appeal and adopted the IJ's decision.

On December 31, 2018, Al-Koorwi filed this petition for review. But we held the case in abeyance pending the Supreme Court's resolution of *Nasrallah v. Barr*, 140 S. Ct. 1683 (2020). The question before the Court was "whether, in a case involving a noncitizen who committed a crime specified in § 1252(a)(2)(C), the court of appeals should review the noncitizen's factual challenges to the CAT order (i) not at all or (ii) deferentially." *Id.* at 1688. The Court held "that the court of appeals should review factual challenges to the CAT order deferentially." *Id.*

Following *Nasrallah*, we ordered supplemental briefing on two issues. First, do we have jurisdiction to review Al-Koorwi's claims given the holding in *Nasrallah*? And second, if we have jurisdiction, does substantial evidence support the BIA's findings in this case? Satisfied that we have jurisdiction after *Nasrallah*, we determine that substantial evidence supported the BIA's findings. We thus deny Al-Koorwi's petition for review.

## II.

Al-Koorwi's petition before this court effectively **\*327** raises five claims.[1] First, Al-Koorwi argues that the BIA applied the incorrect legal standard for CAT claims "when it required that Mr. Al-Koorwi show a higher burden of proof than a 'more likely than not' probability of torture if removed to Iraq." [Pet'r's Br. at 2.] Second, the BIA misapplied the correct legal standard for CAT claims by relying "on a case with clearly distinguishable facts." [*Id.*] Third, the BIA committed legal error by "ignoring or disregarding" State Department country reports, in violation of BIA precedent. [*Id.*] Fourth, the BIA prejudiced Al-Koorwi by treating two of his witnesses as percipient, rather than expert, witnesses. And last, the BIA acted arbitrarily and capriciously in reaching a different decision in Al-Koorwi's case than in "other cases with nearly identical facts." [*Id.* at 3.]

[1]  Before reaching the merits of Al-Koorwi's claims, we must determine whether we have jurisdiction to review them. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 93–102, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998). 8 U.S.C. § 1252(a)(2)(C) provides that "no court shall have jurisdiction to review any final order of removal against an alien who is removable by reason of having committed a criminal offense covered in section ... 1227[.]" Until recently, this provision barred us from reviewing a petitioner's factual challenges to a CAT order. *Kilic v. Barr*, 965 F.3d 469, 473 (6th Cir. 2020). But *Nasrallah* held that § 1252(a)(2)(C) "does not cover challenges to denials of Convention Against Torture relief." *Id.*; *see Nasrallah*, 140 S. Ct. at 1692 ("Congress's decision to bar judicial review of factual challenges to final orders of removal does not bar judicial review of factual challenges to CAT orders."). Thus, we have jurisdiction to hear Al-Koorwi's claims under the CAT.

Still, our standard of review here is "highly deferential." *Nasrallah*, 140 S. Ct. at 1692. We use the substantial evidence standard and treat the agency's findings of fact as "conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." *Id.* This means we reverse the agency's fact findings only if the evidence *compels* that result. *I.N.S. v. Elias-Zacarias*, 502 U.S. 478, 481 n.1, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992). And "we must uphold the Board's decision if it is 'supported by reasonable, substantial, and probative evidence on the record considered as a whole.' " *Abay v. Ashcroft*, 368 F.3d 634, 637 (6th Cir. 2004) (quoting *Mikhailevitch v. I.N.S.*, 146 F.3d 384, 388 (6th Cir. 1998)).

When, as here, the BIA reviews an "immigration judge's decision and issues a separate opinion, rather than summarily affirming the immigration judge's decision, **\*328** we review the BIA's decision as the final agency determination." *Khalili v. Holder*, 557 F.3d 429, 435 (6th Cir. 2009). But to the extent that the BIA "adopted the immigration judge's reasoning," we also review the IJ's decision. *Id.*

A.

[2]  Al-Koorwi first asserts that the BIA applied the incorrect legal standard in evaluating his CAT claim because it required that he "show a higher burden of proof than a 'more likely than not' probability of torture if removed to Iraq." [2] [Pet'r's Br. at 2, 9–12.] But Al-Koorwi does not argue that the BIA applied anything other than the "more likely than not" standard. In fact, Al-Koorwi's brief concedes that the standard applied by the BIA—whether an applicant has shown that "it is more likely than not that he or she would be tortured if removed to the proposed country of removal"—is indeed the appropriate standard 8 C.F.R. § 1208.16(c)(2) requires. [AR 4; Pet'r's Br. at 9.]

Instead, Al-Koorwi asserts that "[t]he BIA erred in *concluding* that Mr. Al-Koorwi failed to establish that it was more likely than not that he would be tortured upon removal to Iraq[.]" [Pet'r's Br. at 9 (emphasis added).] In other words, Al-Koorwi doesn't like the outcome reached by the BIA. And to this end, Al-Koorwi simply restates facts that he believes establish a likelihood of torture upon his return to Iraq and asserts that given these facts, the BIA should have found he satisfied his burden.

[3]  But substantial evidence supports the BIA's conclusion that it's not more likely than not that Al-Koorwi will be tortured upon removal to Iraq. "To be eligible for CAT relief, a petitioner must 'establish that it is more likely than not that he or she would be tortured if removed to the proposed country of removal.' " *Faso v. Barr*, 823 F. App'x 321, 324 (6th Cir. 2020) (quoting 8 C.F.R. § 1208.16(c)(2)). Torture under the CAT means an "act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person." 8 C.F.R. § 1208.18(a)(1). The torture must be "for such purposes as obtaining from him or her or a third person information or a confession, punishing him or her for an act he or she or a third person has committed or is suspected of having committed, or intimidating or coercing him or her or a third person, or for any reason based on discrimination of any kind." *Id.* And it must be "inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity." *Id.*

As the BIA noted, evidence shows the Popular Mobilization Forces—an extremist militia group Al-Koorwi points to in order to show his fear of torture—and the Iraqi government target suspected members of ISIS. So these groups probably wouldn't target Al-Koorwi because they wouldn't suspect him of membership in ISIS. That's because Al-Koorwi lived in

the United States for several years. To the extent that Al-Koorwi fears the PMF, we also note that record evidence shows the Iraqi government has committed to investigating and punishing members of the PMF who've committed human rights abuses.

**\*329** Al-Koorwi also fears that when he returns, he'll be singled out because he appears "Westernized." But expert declarations note that Iraqis who appear "Westernized" are no longer singled out for poor treatment. As more Iraqis return to the country following an exodus after the United States initially entered the country, "Westernized" Iraqis have become more normal, and growing wealth in Iraq, coupled with increased consumption of Western goods, makes symbols of Western culture less conspicuous. Besides, Al-Koorwi recently visited Iraq without any trouble, and he still speaks Arabic fluently. And anti-American or -Western attitudes are no longer widespread in Iraq. So, according to expert declarations in the record, the risk of persecution for one who is perceived as aligning with American or Western interests isn't high.

Even more, the Iraqi government is focused on countering terrorism and achieving post-ISIS stabilization—not detaining returning Iraqis. So the suggestion that the Iraqi government is interested in detaining even criminals returning to Iraq is, in the words of one expert, "farfetched." Further, evidence in the administrative record also shows that Iraqi deportees don't face an appreciable risk of torture just because they return to Iraq. As professionalism in the Iraqi government grows, the likelihood that returnees will face trouble when they arrive in the country has shrunk. If a returnee can show family connections to Iraq, detention is unlikely, and if detention did happen, it would, according to experts in the record, likely be "benign and temporary." Not only can Al-Koorwi show family connections to Iraq, but his brother works for the Iraqi government.

In any event, regardless of whether we believe some or all of this in the first instance (and we have no reason to doubt it), substantial evidence supports the BIA's conclusion that it isn't more likely than not that Al-Koorwi will experience torture upon his removal to Iraq.

**[4]** Al-Koorwi also argues that the BIA incorrectly applied the "more likely than not" standard because it individually evaluated each factor he alleged in support of his CAT claim rather than aggregating all the factors. Al-Koorwi, however, failed to present this claim to the BIA, even though the IJ also

considered each factor seriatim rather than in the aggregate when it made the factual finding in the first instance. A party must exhaust his administrative remedies by properly presenting his claims to the BIA before we can review them. *8 U.S.C. § 1252(d)(1)*; *Ramani v. Ashcroft, 378 F.3d 554, 557–58 (6th Cir. 2004)*. And unlike in some contexts where administrative exhaustion is a court-created doctrine, here, exhaustion is a statutory requirement that deprives the federal courts of jurisdiction. *Hasan v. Ashcroft, 397 F.3d 417, 420 (6th Cir. 2005)*; *Ramani, 378 F.3d at 559*.

Additionally, the statute's exhaustion requirement, as we've construed it, mandates precision; it is stricter "than merely requiring an alien to exhaust all *avenues* of appeal; [it] further require[s] the alien to preserve *each claim* by presenting it to the BIA." *Ramani, 378 F.3d at 559* (emphasis added); *see Hasan, 397 F.3d at 420*. In other words, *§ 1252(d)(1)* imposes an administrative issue-exhaustion requirement. [3] In *Ramani*, a petitioner to this **\*330** court argued that the IJ improperly relied on evidence not admitted during the original proceeding, leading to an order of deportation. *378 F.3d at 558*. Because the petitioner failed to raise this argument in his appeal to the BIA, we held that *§ 1252(d)(1)*'s strict exhaustion requirement removed our jurisdiction over the claim: "Because the *arguments* currently presented by Ramani were not presented to the BIA, they are not subject to review by this court." *Id*. at 560 (emphasis added).

Al-Koorwi raises his aggregation argument for the first time in his petition to this court. In his brief before the BIA, Al-Koorwi chose to focus on the IJ's qualification of Heller and Smith as percipient witnesses, similar BIA decisions remanding the case because of improper qualification of expert witnesses, and human rights violations allegedly committed by the Iraqi government. Al-Koorwi's failure to present the aggregation argument to the BIA—or to contest the legal standard the IJ applied to his CAT claim at all—constitutes a failure to exhaust administrative remedies and forecloses our jurisdiction to review the claim. *See Ramani, 378 F.3d at 559* ("Had Ramani presented his current arguments to the BIA, this matter could have been properly dealt with by immigration judges whose experience in these matters is useful. In addition, the record on these issues could have been more fully developed[.]").

Because substantial evidence supports the agency's findings that Al-Koorwi is not likely to be tortured upon his removal to Iraq, we deny his petition for review. And Al-Koorwi did not exhaust his aggregation claim during the administrative process, so we lack jurisdiction to hear this claim on the merits.

### B.

 **[5]**  Al-Koorwi next argues that the BIA erred in relying on a decision, *Matter of J-F-F-*, 23 I. & N. Dec. 912, 921 (A.G. 2006), with "clearly distinguishable" facts. The claim that Al-Koorwi makes here is not that the BIA failed to apply the proper standard of review required by BIA precedent. Rather, Al-Koorwi argues that "the BIA misapplied *Matter of J-F-F-* to Mr. Al-Koorwi's case because the *facts* are so clearly distinguishable." [Pet'r's Br. at 15 (emphasis added).]

This fails for a few reasons. First, it can hardly be said that the BIA "relied" on *Matter of J-F-F-*. Instead, it appears the BIA cited the case in support of a legal proposition. In particular, the BIA cited it to state that a petitioner must establish each link in a hypothetical chain of events leading to torture as more likely than not to occur—and the IJ didn't clearly err in holding that Al-Koorwi failed to do so. Al-Koorwi objects to this, arguing that this isn't "a general rule applicable to all CAT claims." Instead, Al-Koorwi says, it applies only to cases where the petitioner presents "scant evidence for a CAT claim based on a sequence of events that must magically come together." And he contends that he presents multiple, independent reasons **\*331** that show that it's more likely than not that he'll be tortured.

But Al-Koorwi's claims are in fact interdependent. Consider *Shakkuri v. Barr*, 780 F. App'x 286 (6th Cir. 2019). There, the petitioner alleged that "if removed to Iraq, he would likely be tortured by both the Iraqi government and the PMF because he is a Chaldean Christian, has resided in the United States for virtually his entire life, has prior criminal convictions in the United States, and is a plaintiff in a highly publicized class action lawsuit regarding the deportation of Iraqi nationals." *Id.* at 292. That all sounds familiar. But we held in *Shakkuri* that "at least with regard to his fear of torture by the Iraqi government, Petitioner alleged his independent probabilities of torture *in an interdependent form*." *Id.* at

293 (emphasis added). So he had to show that each event was more likely than not: "that he would be detained at the airport, would be transported to a detention facility, and then would be tortured for one of the many proffered reasons." *Id.* For the same reason, Al-Koorwi also must show that each event in his chain of events is more likely than not to occur and lead to torture. He fails to do so, and substantial evidence supports the BIA's use of *Matter of J-F-F-*.

### C.

 **[6]**  Third, Al-Koorwi alleges that the BIA erred in considering the 2017 U.S. Department of State Country Report on Iraq "cumulative" of evidence already in the record. [Pet'r's Br. at 25.] He also faults the BIA for failing to treat the 2016 Country Report "with the weight required by [BIA and Sixth Circuit precedent]," [*Id.* at 26,] and for failing to admit the 2017 International Religious Freedom Report into evidence.

The BIA did not consider the 2017 Country Report "cumulative" of evidence already in the record. The BIA's reference to evidence being "cumulative" was directed to Al-Koorwi's attempt to present "additional evidence on appeal, including the 2018 International Religious Freedom Report for Iraq, travel advisory warnings, unpublished decisions from th[e] Board and an Immigration Judge in unrelated cases, and news articles from 2018 describing country conditions in Iraq." The IJ took judicial notice of the 2016 and 2017 Country Reports on Iraq and considered both in rendering its decision. It also took judicial notice of the 2017 International Religious Freedom Report, as noted in Al-Koorwi's own briefing. [Pet'r's Br. at 11 n.1; AR 55.] There was no need for the BIA to admit any of the reports into evidence because they were already part of the record. So Al-Koorwi's third claim is meritless.

### D.

 **[7]**  Fourth, Al-Koorwi argues that he was prejudiced by the IJ's classification of Heller and Smith as percipient, rather than expert, witnesses. Al-Koorwi cites several cases discussing the standard of admissibility of evidence in an immigration proceeding but fails to apply them to his case. Furthermore, the cases Al-Koorwi cites discuss prejudice to a party when evidence is *excluded*. *See, e.g., Diop v.*

*Holder*, 586 F.3d 587, 591–592 (8th Cir. 2009) (discussing the framework for analyzing whether *exclusion* of a witnesses constitutes a due process violation); [Pet'r's Br. at 29 ("To prevail in a due process challenge to the *exclusion of evidence*...") (emphasis added).] But the IJ did not exclude the testimony of Heller and Smith. Rather, he admitted the testimony but treated both as percipient, rather than expert, witnesses.

**\*332** Without applying the cases he cites to the facts of his own case, it is hard to decipher the grounds on which Al-Koorwi argues the BIA erred in denying his witnesses expert status. In any event, Al-Koorwi makes no argument, or cites no case for the proposition, that the BIA applied the wrong standard in evaluating whether Heller and Smith qualified as experts. He also articulates no reason why denying his witnesses expert status constituted a due process violation. Finding no cognizable legal argument, we reject Al-Koorwi's fourth argument.

E.

**[8]** Lastly, Al-Koorwi argues that it was arbitrary and capricious for the BIA to reach a different result in his case than in other cases with nearly identical facts. This final claim recycles his argument that the agency should've treated Heller and Smith as experts. Indeed, the thrust of Al-Koorwi's claim is that the BIA erred in treating Heller and Smith as percipient witnesses rather than expert witnesses when in previous cases it treated the two as experts. But the cases Al-Koorwi cites are unpublished BIA decisions, and federal regulations mandate that unpublished BIA decisions are not binding in other BIA cases. 8 C.F.R. § 1003.1(g); *see Ishac v. Barr*, 775 F. App'x 782, 788 (6th Cir. 2019) (noting that prior unpublished opinions are "not formally binding on the agency").

To be sure, "[i]n certain circumstances, the BIA's failure to explain inconsistent outcomes may raise 'an inference of arbitrary decisionmaking.' " *Nissan v. Barr*, 788 F. App'x 365, 367 (6th Cir. 2019) (per curiam) (quoting *Ishac*, 775 F. App'x at 788); *see also Davila-Bardales v. INS*, 27 F.3d 1, 5 (1st Cir. 1994) ("[E]ven if [unpublished BIA decisions]

are not 'precedent' in the technical sense, the prospect of a government agency treating virtually identical legal issues differently in different cases, without any semblance of a plausible explanation, raises precisely the kinds of concerns about arbitrary agency action that the consistency doctrine addresses."). But "[a]n Immigration Judge has broad discretion in conducting his or her hearings." *Francis v. Barr*, 781 F. App'x 495, 500 (6th Cir. 2019) (quotation omitted). So "some degree of inconsistency 'is unavoidable—after all, administrators are not automatons.' " *Nissan*, 788 F. App'x at 367 (quoting *Henry v. INS*, 74 F.3d 1, 5–6 (1st Cir. 1996)). Besides, "the Immigration Judge's decision not to certify Smith or Heller as expert witnesses did not exclude the evidence entirely; rather, the statements were considered by the Immigration Judge as fact witnesses." *Francis*, 781 F. App'x at 500. And Al-Koorwi never "even articulate[s] how Heller's and Smith's declarations—if given expert weight—would affect the result." *Faso*, 823 F. App'x at 324. He just charges the BIA with error without any reasoning or application of law to fact. So this claim fails. *See id.*

Cases that seem similar now "may not have looked that way to the IJs or BIA members who decided them." *Nissan*, 788 F. App'x at 367. Indeed, "[t]he BIA will sometimes reach opposite conclusions in cases that have many factual similarities, but this does not reflect a failure of the agency to follow its own precedent. Rather, the different outcomes are an expected result of the discretionary weighing required to make individualized determinations." *Ettienne v. Holder*, 659 F.3d 513, 518 (6th Cir. 2011). It wasn't arbitrary and capricious for the BIA and IJ to treat Smith and Heller as percipient witnesses.

III.

For the foregoing reasons we **DENY** Al-Koorwi's petition for review.

**All Citations**

837 Fed.Appx. 323

## Footnotes

1    Al-Koorwi's brief lists six issues presented. But issues four and six raise the same question—whether denial of expert witness status to Heller and Smith was improper. Issue four asks whether Al-Koorwi was "prejudiced by the BIA's decision to accept the IJ's ruling to treat two of his expert witnesses as percipient witnesses." [Pet'r's Br. at 2–3.] Issue six asks whether "the BIA committed a legal error in failing to qualify [the same witnesses] as experts." [*Id.* at 3.] Al-Koorwi also asserts that he "is raising a due process claim because his previous counsel's ineffective assistance of counsel prevented him from meaningfully pursuing his claims for relief." [*Id.* at 1.] This sentence in the jurisdictional statement, however, is the only time ineffective assistance of counsel is mentioned, so he forfeited this claim. *United States v. Stewart*, 628 F.3d 246, 256 (6th Cir. 2010) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to ... put flesh on its bones.") (internal quotation marks and citation omitted).

2    We note that Al-Koorwi's supplemental brief wasn't responsive to our request for supplemental briefing. Indeed, the phrase "substantial evidence" appears nowhere in it. For this reason alone, Al-Koorwi's factual challenges should fail—he never argues that substantial evidence doesn't support the agency's findings. *See, e.g.*, *Robinson v. Jones*, 142 F.3d 905, 906 (6th Cir. 1998). But regardless, his claims also fail under the substantial evidence standard.

3    This court recently confirmed that issue exhaustion is required when a general statute requiring " 'administrative remedies' to be 'exhausted' " is combined with agency rules requiring specific issues to be identified in a notice of an administrative appeal. *Island Creek Coal Co. v. Bryan*, 937 F.3d 738, 746–47 (6th Cir. 2019) (citing *Woodford v. Ngo*, 548 U.S. 81, 90–91 (2006)). 8 U.S.C. § 1252(d)(1) explicitly states that "[a] court may review a final order of removal only if the alien has exhausted all administrative remedies available to the alien as of right[.]" Federal regulations require that all notices of appeal filed with the BIA include a statement of the basis of appeal, which "must specifically identify the findings of fact, the conclusions of law, or both, that are being challenged." 8 C.F.R. § 1003.3(b). This regulation clarifies that § 1252(d)(1) requires issue exhaustion. *Cf.* *Island Creek Coal Co.*, 937 F.3d at 749 (holding that 20 C.F.R. § 802.211(a)'s requirement that petitions for review identify "specific issues to be considered" on appeal imposes an issue exhaustion requirement).

---

**End of Document**                                   © 2024 Thomson Reuters. No claim to original U.S. Government Works.

165 F.3d 26
Unpublished Disposition
NOTICE: THIS IS AN UNPUBLISHED OPINION.
(The Court's decision is referenced in a "Table of Decisions Without Reported Opinions" appearing in the Federal Reporter. Use FI CTA6 Rule 28 and FI CTA6 IOP 206 for rules regarding the citation of unpublished opinions.)
United States Court of Appeals, Sixth Circuit.

COMMONWEALTH OF KENTUCKY,
Natural Resources and Environmental Protection Cabinet, Petitioner,
STATE of Ohio, Intervenor,
v.
UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, Respondent.

No. 96-4274.
|
Sept. 2, 1998.

On Appeal from the United States Environmental Protection Agency.

Before SUHRHEINRICH, DAUGHTREY, and GILMAN, Circuit Judges.

**Opinion**

SUHRHEINRICH, Circuit Judge.

 **\*1** Petitioner Commonwealth of Kentucky appeals a final ruling of the Environmental Protection Agency ("EPA") denying Petitioner's request to (1) redesignate the Kentucky portion of the "Cincinnati-Northern Kentucky Moderate Ozone Nonattainment Area" (the "Area") to "attainment" status for the air quality standard for ozone and (2) approve Kentucky's associated attainment maintenance plan. [1]

Petitioner argues that the EPA's final ruling was arbitrary and capricious because even though the Area met the air quality standard for ozone for the period specified in the redesignation request, the EPA denied Petitioner's request for redesignation based on a single violation which occurred outside the period specified in the redesignation request. We AFFIRM the ruling of the EPA.

I.

The Clean Air Act (the "CAA") established a comprehensive program to improve the nation's air quality through state and federal regulation. 42 U.S.C. §§ 7401-7671q (West 1995). Under the CAA, the EPA Administrator must identify dangerous air pollutants and determine National Ambient Air Quality Standards ("NAAQS") for the permissible concentration of specified pollutants in the ambient air. *See id.* §§ 7408-7409. For each pollutant, a state must devise a state implementation plan ("SIP") to attain and maintain the NAAQS. *See id.* §§ 7407(a), 7410(a).

Ozone nonattainment areas are classified "marginal," "moderate," "serious," "severe," or "extreme." *See id.* § 7511a. The CAA specifies a deadline for each area to attain the ozone NAAQS. *See id.* § 7511(a)(1). If an area does not attain the NAAQS for ozone by the deadline, it is reclassified "by operation of law" and "bumped up" to the next more stringent classification. *See id.* § 7511(b)(2)(A).

The EPA has set the NAAQS for ozone at 0.12 parts per million. [2] *See id.* § 50.9 (1997). To determine attainment, the EPA records the average hourly concentration of ozone at monitoring sites within each area. The EPA records any "exceedances" of the NAAQS for ozone. An area is designated attainment when there are three or fewer exceedances in a three-year period. When there are more than three exceedances, the area is designated nonattainment.

On November 11, 1994, Kentucky requested that the EPA (1) redesignate the Area from "moderate" nonattainment to attainment, and (2) approve Kentucky's ten-year attainment maintenance plan for the Area. Later, Kentucky sought to omit from its original maintenance plan certain air quality control measures. The EPA informed Kentucky that a revised maintenance plan would be approved if Kentucky demonstrated that the measures it proposed to omit were not necessary to maintain the ozone NAAQS. On July 10, 1995, Kentucky submitted a revised request for final approval.

On July 14, 1995, the ozone level at a monitoring site in Lebanon, Ohio, violated the NAAQS for the fourth time in three years. After reviewing Kentucky's redesignation request, air quality data, and all public comments, the EPA issued a final ruling denying redesignation. 61 Fed.Reg. at 50,718 (1996).

## II.

**\*2** Petitioner argues that the EPA's final rule was arbitrary and capricious because the Area met the air quality standard for ozone for the period specified in the redesignation request, i.e., 1992-1994. The EPA denied Kentucky's request based on a single violation in July 1995. Petitioner raises four issues on appeal: (1) whether the EPA's interpretation of the Clean Air Act requires an area to be in attainment pending a redesignation request is reasonable and entitled to deference; (2) whether the EPA's policy of considering violations outside the period specified in a redesignation request is a *de facto* revision of the three year regulatory standard and results in a "moving standard" in violation of the Administrative Procedures Act; (3) whether Petitioner should be permitted to address the 1995 violation by implementing contingency provisions in its proposed maintenance plan; and (4) whether the EPA has arbitrarily subjected the Area to a possible "serious" nonattainment classification.

### A.

Courts review redesignation decisions of the EPA with deference and affirm them unless they are "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law." 5 U.S.C.A. § 706(2)(A) (West 1996). *See Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971); *Wayne State Univ. v. Cleland,* 590 F.2d 627, 632 (6th Cir.1978). Courts review an agency's interpretation of a statute it administers in two steps. *See Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc .,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). If Congress has directly addressed the precise issue, a court must effectuate the "unambiguously expressed intent of Congress." *Id.* at 842-43. If Congress has been either silent or ambiguous on the precise issue, then a reviewing court must defer to the agency's statutory interpretation if it is reasonable. *See id.* The agency's interpretation need not be the only permissible construction or the one that the reviewing court would have held. *See id.* at 843 n. 11. However, a court must set aside administrative rules for which there is no rational

basis. *PPG Indus., Inc. v. Costle,* 630 F.2d 462, 465 (6th Cir.1980).

### B.

Petitioner claims that the CAA does not require an air quality control area to be in attainment pending a redesignation request. The CAA requires a nonattainment area to satisfy five criteria to qualify for redesignation:

> (i) the Administrator determines that the area has attained the national ambient air quality standard;

> (ii) the Administrator has fully approved the applicable implementation plan for the area under section 7410(k) of this title;

> (iii) the Administrator determines that the improvement in air quality is due to permanent and enforceable reductions in emissions resulting from implementation of the applicable implementation plan and applicable Federal air pollutant control regulations and other permanent and enforceable reductions;

> **\*3** (iv) the Administrator has fully approved a maintenance plan for the area as meeting the requirements of section 7505a of this title; and

> (v) the State containing such area has met all requirements applicable to the area under section 7410 of this title and part D of this subchapter.

42 U.S.C. § 7407(d)(3)(E) (West 1995). Petitioner challenges the EPA's determination that Kentucky failed to meet criteria one and four.

Petitioner contends that the requirements of the phrase "has attained" in the first criterion are satisfied once an area meets the NAAQS and that the "has attained" status is not affected by a single subsequent violation of the NAAQS. The EPA responds that the phrase "has attained" means more than merely reaching attainment at a single point in time. In the EPA's view, it also means that the Area has remained in attainment until the EPA issues a final ruling on a request for redesignation.

The Third Circuit endorsed the view of the EPA in dicta. *Southwestern Pa. Growth Alliance v. Browner,* 121 F.3d

106, 113 (3d Cir.1997). In *Browner,* the court explained that "use of the term 'has attained' instead of 'attained' may be interpreted as suggesting that the attainment must continue until the date of redesignation." *Id; see* ⚑*Barrett v. United States,* 423 U.S. 212, 216-17, 96 S.Ct. 498, 46 L.Ed.2d 450 (1976).

Petitioner argues that Congress could have been more clear if it had used the simple present tense ("attains") or the progressive present tense ("is attaining") to explicitly require continuing compliance. However, as the EPA responds, Congress also could have been more clear if it had used the simple past tense ("attained") to require a noncontinuing compliance. Congress declined both of these options and simply used the present perfect tense ("has attained"). According to standard usage, the present perfect tense denotes past action with an abiding effect or continuing relevance. Kenneth Graham Wilson, *The Columbia Guide to Standard American English* 342 (1993); Celia Milward, *Handbook for Writers* 17, 463 (1980). Thus, the phrase "has attained," as the Third Circuit concluded, requires "that the attainment must continue until the date of redesignation." ⚑*Southwestern Pa. Growth Alliance,* 121 F.3d at 113.

The statutory phrase "fully approved a maintenance plan" in criterion four further supports the view that an area must comply with the NAAQS pending a final EPA ruling on a request for redesignation. A redesignation request must be accompanied by a "maintenance plan" which must include any proposed revision to the existing SIP. The maintenance plan must "provide for the maintenance of the [NAAQS] for at least 10 years after the redesignation." *Id.* § 7505a(a). As the EPA argues, by using the word "maintenance" and specifying a ten year period, Congress intended that an area must be "in attainment" when the EPA issues a ruling on a redesignation request. The Area's violation of the NAAQS within the ten-year maintenance period would indicate, as a practical matter, that the "maintenance" plan was ineffective.

**\*4** Moreover, until the EPA approves a maintenance plan and grants a redesignation request, the nonattainment requirements "shall continue in force and effect" for that area. *See id.* § 7505a(c). The nonattainment requirements most reasonably refer to the unrevised SIP or existing maintenance plan. *See* ⚑*id.* § 7502(c). Accordingly, we find that the CAA requires an area to be in attainment pending a redesignation request.

Finally, under *Chevron,* where an agency administers a statute and the statute is either silent or ambiguous on an issue, a reviewing court must defer to the agency's statutory interpretation, if it is reasonable. ⚑*Chevron,* 467 U.S. at 842-43. Considering (1) the use of the present perfect tense in the phrase, "has attained," denoting past action with abiding effect, (2) the use of the term "maintenance," and (3) the explicit continuation of the nonattainment requirements until redesignation of the area, the EPA's position requiring continuing compliance is not an unreasonable interpretation of the CAA. Accordingly, we must defer to the EPA's interpretation of the statute.

C.

Petitioner also argues that the EPA's policy of considering violations outside the period specified in a redesignation request is a *de facto* revision of the three year regulatory standard and results in a "moving standard" in violation of the Administrative Procedures Act. The EPA uses a three year period over which to average violations of the ozone standard for compliance with the NAAQS. *See* 40 C.F.R. § 50.9 app. H (1997). Petitioner contends that the EPA is required to consider only the air quality data from the three years identified in the state's redesignation request. The regulation, 40 C.F.R. § 50.9, provides only the methodology for determining attainment (averaging violations over a three year period) and does not specify which three year period the EPA must examine. Thus, the EPA is free to examine the most recent three year period for which air quality control data exists or the period identified in a state redesignation request. As the EPA interprets the CAA, the CAA requires the EPA to determine attainment based on all data available at the time the EPA issues its ruling. This has not resulted in a "moving" standard. The EPA uniformly considers the most recent three years of air quality control data when it considers a redesignation request.

D.

Petitioner also contends that it should be allowed to address the July 1995 violation by the remedial contingency provisions included in the maintenance plan that it submitted with its redesignation request. In the 1990 amendments to the CAA, Congress permitted states to address violations of the NAAQS after redesignation to attainment status by

contingency plans which are required for redesignation and must include all pre-request SIP measures. *See* 42 U.S.C. § 7505a(d). Petitioner argues that use of the contingency provisions would be appropriate because the July 1995 violation occurred after the EPA had published its proposed final ruling that the Area was in attainment.

**\*5** Under the plain language of the CAA, however, redesignation is a bright line rule. Until the EPA approves a request for redesignation, the existing requirements for nonattainment areas "continue in force and effect." *Id.* § 7505a(c). Further, the 1990 amendments were designed explicitly to "promptly correct any violation of the standard which occurs after the redesignation of the area as an attainment area." *Id.* § 7505a(d). Thus, the EPA's decision not to allow Petitioner to address the 1995 violation with its proposed contingency plan was proper.

E.

Finally, Petitioner claims that the Area has been arbitrarily subjected to a possible "serious" nonattainment classification. Petitioner argues that the EPA was arbitrary in not redesignating the Area to attainment status and that, if the Area again does not attain the ozone standard, it will automatically be bumped up from its "moderate" classification to a "serious" classification with the accompanying adverse regulatory and economic repercussions. We disagree. The threat of reclassification and its economic consequences simply are not relevant to the Area's attainment status.

III.

We find the EPA ruling on Petitioner's request for redesignation consistent with the EPA's authority under the CAA. Therefore, we AFFIRM its ruling.

**All Citations**

165 F.3d 26 (Table), 1998 WL 661138

## Footnotes

1   The State of Ohio intervenes in this action because the city of Cincinnati is part of the Area. Like Kentucky, Ohio has petitioned for redesignation. The EPA has not issued a final ruling on the Ohio petition. The Chambers of Commerce of Northern Kentucky and Greater Cincinnati filed a joint amicus brief of behalf of Kentucky.

2   The ozone standard was reduced to .08 parts per million on July 18, 1997.

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.